_____D.C.

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No. 00-6002-CIV-(UNGARO-BENAGES/Brown)

DENISE BROOKINS,

        Plaintiff

v.

MARTY SHOES, INC.,

        Defendant.

_____/

**DEFENDANT'S MOTION AND MEMORANDUM OF LAW
FOR SUMMARY JUDGMENT**

      Defendant Marty Shoes, Inc. ("Marty Shoes"), through undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Southern District of Florida Local Rules 7.1 and 7.5, moves for summary final judgment in its favor on the claims in the Amended Complaint (DE 8) filed by Plaintiff Denise Brookins ("Plaintiff").

**I.    INTRODUCTION.**

      There is a world of difference -- as well as a clear legal distinction -- between personal animosity among employees, and unlawful conduct by an employer. In this case, there is undisputed evidence of the former. There is no evidence of the latter.

      It is undisputed that Plaintiff argued *__more than once a day__* with the manager of the Marty Shoes store where she worked and it is undisputed that Plaintiff lost her temper with the manager "numerous" times. Not surprisingly, after months of such conflict, Plaintiff was eventually fired.

      But she was *__not__* unlawfully fired. No reasonable jury could find otherwise.

**II.    BACKGROUND.**

**A.    Marty Shoes.**

      Marty Shoes was founded in 1974 by Martin Samowitz, who is now over eighty years old and remains active in the management of the company. The first Marty's Shoes Outlet store was in Little Ferry, New Jersey. The current President of Marty Shoes is John Adams, who began

with Marty Shoes as a stockboy and became the manager of the first Marty's Shoes store.[1] Presently, Marty Shoes operates 89 retail stores throughout New Jersey and in New York, Connecticut and Florida, including a Marty's Shoes store in the Sawgrass Mills Mall, in Sunrise, Florida, where Plaintiff was employed from December of 1995 until June of 1996.

Marty Shoes is not an employer that makes decisions based on any prohibited reason, including race. Marty Shoes maintains this plain-spoken ethic in its policies (Composite Exhibit 1) as well as in practice.[2]

### B.    Plaintiff's employment history.

Marty Shoes hired Plaintiff in December of 1995 to work as a salesperson in the Sawgrass Mills Mall store. (Plaintiff's Depo., 27/22-25; 28/24-29/2). In early 1996, Roma Rybitwa was promoted to Store Manager. (Plaintiff's Depo., 30/15-19; Dzioba Declaration, ¶ 3 (Exhibit 2)). In March of 1996, Plaintiff began to have attendance problems, which Plaintiff says were a result of a conflict between her work schedule and her class schedule at Broward Community College (BCC), where she was a student. (Plaintiff's Depo., 58/25-59/10).[3]

Plaintiff says she had been scheduled to work at times when she was also scheduled to be in class. (Plaintiff's Depo., 59/2-24). Plaintiff was attending class about twelve hours a week and working more than twelve hours a week. (Plaintiff's Depo., 60/21-62/7). Plaintiff complained to Ms. Rybitwa that she had been scheduled to work at times that conflicted with her class schedule, and Ms. Rybitwa changed Plaintiff's work schedule to accommodate her. (Plaintiff's Depo., 59/21-60/4).

Shortly thereafter, there was another conflict between Plaintiff's class schedule and her work schedule. (Plaintiff's Depo., 61/8-10; 62/1-11). Plaintiff complained to Ms. Rybitwa, who asked to see Plaintiff's class schedule and again changed Plaintiff's work schedule around her class schedule in order to accommodate her. (Plaintiff's Depo., 61/13-22). After Ms. Rybitwa

---

[1] The correct corporate name of the Defendant is *Marty* Shoes, Inc., but the stores it operates are referred to as "*Marty's* Shoes" stores. (emphasis added).

[2] One of the company's three Regional Managers is originally from India and one is originally from Poland. (Dzioba Declaration, ¶ 2)(Exhibit 2). One of the company's six District Managers is black, two are originally from Korea, as is Mr. Adams, the company president (Dzioba Declaration, ¶ 2)(Exhibit 2).

[3] There were no conflicts between Plaintiff and Ms. Rybitwa until Plaintiff began having attendance problems. (Plaintiff's Depo., 58/15-59/1)

saw a copy of Plaintiff's class schedule, there was never another conflict between it and Plaintiff's work schedule. (Plaintiff's Depo., 62/12-16). But Plaintiff says she began to notice, at this same time period, that the hours she was scheduled to work were declining as new salespeople were hired. (Plaintiff's Depo., 71/17-24).

Soon thereafter, Plaintiff began to have regular conflicts and arguments with Ms. Rybitwa. In the three or so remaining months before Plaintiff was fired in late June of 1996, it is Plaintiff's testimony that she had ***more than one argument a day*** with Ms. Rybitwa. (Plaintiff's Depo., 182/4-6). Plaintiff had conflicts with Ms. Rybitwa – the Store Manager and thus Plaintiff's immediate supervisor and the highest ranking manager on site – over numerous issues, including job methods, Plaintiff's use of the store phone to make a personal call, Plaintiff's work attire, the way Plaintiff answered the store phone, Plaintiff's leaving the store to cash her paycheck, and on an occasion when Ms. Rybitwa believed four customers had stolen a pair of shoes from the store. (Plaintiff's Depo., 182/15-25). According to Plaintiff, no other employee had such arguments or conflicts with Ms. Rybitwa. (Plaintiff's Depo., 245/19-246/6).[4]

It is also undisputed that Plaintiff lost her temper with Ms. Rybitwa "numerous" times. (Plaintiff's Depo., 183/1-5). In Plaintiff's opinion, Ms. Rybitwa lost her temper with Plaintiff as well. (Plaintiff's Depo., 183/6-8). By her own estimate, Plaintiff had "[a] thousand" arguments with Ms. Rybitwa during the months they worked together.[5] As the arguments and conflicts between Plaintiff and Ms. Rybitwa continued into April, May and June, Plaintiff's work hours steadily decreased.[6]

---

[4] Plaintiff's deposition testimony concisely shows how Plaintiff speculatively transforms these arguments with Ms. Rybitwa into race discrimination. (Plaintiff's Depo., 182/13-25)(Q: And that's what the arguments were about? A: No, they were arguments about she had complaints with my wardrobe. She had complaints about my school schedule. She had complaints about the way I wore my hair. She had complaints about the way I answered the phone. She had complaints about my skin color. Q: How do you know she had complaints about your skin color? Did Roma [Rybitwa] ever say anything to you about your skin color? A: No.).

[5] (*See* Plaintiff's Depo., 181/25-182/6)(Q: How many [arguments] would you say during the time that Roma was the manager, how many arguments would you have had with her? A: A thousand. Q: A thousand? A: Yes. Q: So would you have more than one argument a day with Roma? A: Correct.).

[6] Plaintiff's pay records reflect her work hours as follows: an average of 22 hours per pay period for January 1996 and February 1996 (based on her year-to-date income on March 2, 1996, eight pay periods into 1996); **16.75** hours for the pay period ending March 2, 1996; **16.00** hours for the period ending March 9, 1996; **16.25** hours for the pay period ending March 16, 1996; **14.75** hours for the pay period ending March 23, 1996; **9.50** hours for the pay period ending March 30, 1996; **4.75** hours for the pay period ending April 6, 1996; **12.25** hours for the period ending

On May 27, 1996, Plaintiff sent a letter to the "District Managers of Marty's Shoes" complaining of "racist treatment." (Exhibit 4). Plaintiff complained that Ms. Rybitwa "honestly doesn't like me," complains of being "accused" by Ms. Rybitwa "of walking off [her] job, being seen in the Mall while working, drinking on the job, [and] being rude to Marty [Samowitz, the founder of Marty Shoes]." (Exhibit 4). Plaintiff also complains of derogatory remarks – which she called "innuendos." (Exhibit 4). Finally, Plaintiff's letter complains that Ms. Rybitwa has "deliberately cut [her] hours" for not "standing on her side when she accused 4 African-Americans of stealing shoes." (Exhibit 4).[7]

Throughout the last few months of Plaintiff's employment, Ms. Rybitwa repeatedly expressed concerns about her working relationship with Plaintiff to then-District Manager Stanley Dzioba. (Dzioba Declaration, ¶ 6)(Exhibit 2). Ms. Rybitwa described repeated conflicts and arguments with Plaintiff as well as Plaintiff's refusal to adhere to work rules, Plaintiff's use of workplace profanity, and her own personal fear of Plaintiff. (Dzioba Declaration, ¶ 6)(Exhibit 2). Toward the end of Plaintiff's employment, Ms. Rybitwa told Mr. Dzioba that she had deliberately scheduled Plaintiff to work hours other than those when Ms. Rybitwa was on duty, so she could avoid working with Plaintiff. (Dzioba Declaration, ¶ 7)(Exhibit 2). Mr. Dzioba advised Ms. Rybitwa to fire Plaintiff, but Ms. Rybitwa resisted – fearing that Plaintiff would react aggressively and harm her. (Dzioba Declaration, ¶ 8)(Exhibit 2). Ms. Rybitwa ultimately

---

April 13, 1996; **6.00** hours for the pay period ending April 20, 1996; **9.00** hours for the pay period ending April 27, 1996; **3.00** hours for the pay period ending May 4, 1996; **3.00** hours for the pay period ending May 11, 1996; **3.00** hours for the pay period ending May 18, 1996; **5.00** hours for the pay period ending May 25, 1996; **1.00** hour for the pay period ending June 1, 1996; **1.00** hour for the pay period ending June 8, 1996; **2.00** hours for the pay period ending June 15, 1996; **3.00** hours for the pay period ending June 22, 1996; and **5.00** hours for the pay period ending June 29, 1996. (Composite Exhibit 3). Curiously, the only weeks for which Plaintiff could **_not_** produce time records between March 2, 1996 and June 29, 1996 were those ending April 13, 1996 and April 27, 1996, the time periods which directly conflict with Plaintiff's assertion that her work hours were "steadily" reduced. (Amended Complaint, ¶ 7 d).

[7]  Plaintiff believes that Ms. Rybitwa was prejudiced against black people because, on one occasion, she asked Plaintiff to watch four customers who Ms. Rybitwa said looked suspicious and were shopping in the store dressed – in _**Plaintiff's**_ own opinion – like gang members. (Plaintiff's Depo., 79/15-17; 178/14-179/3). One of the men was seen wearing Timberland shoes, and according to Plaintiff, Ms. Rybitwa believed that he had switched his shoes with a pair of the Timberland shoes carried by the Sawgrass Mills store. (Plaintiff's Depo., 78/1-20). After the men, who were black, left the store, Ms. Rybitwa called mall security. (Plaintiff's Depo., 78/1-20). Security and the Sunrise police walked the men back to the store to compare the Timberland shoes with those sold in the Sawgrass Mills store, and it was determined that the shoes were not the type of Timberlands sold in the store. (Plaintiff's Depo., 78/1-16).

arranged for the termination of Plaintiff's employment while Ms. Rybitwa was away on vacation. (Dzioba Declaration, ¶ 9)(Exhibit 2).

The week she was fired, Plaintiff visited the Sawgrass Mills Mall store and spoke with Ms. Rybitwa. Ms. Rybitwa told Plaintiff that she was going on vacation and that Plaintiff should speak to Stanley Dzioba about her work schedule for the following week. (Plaintiff's Depo., 47/18-48/5). Then next day, Plaintiff visited the Sawgrass Mills Mall store where a note had been left for her indicating she should contact Mr. Dzioba. (Plaintiff's Depo., 48/19-49/16)(Exhibit 5). Plaintiff called Mr. Dzioba, who Plaintiff says informed her that her employment was terminated. (Plaintiff's Depo., 46/16-19).

Plaintiff's problems at Marty's Shoes are representative of her experience elsewhere. Conflict followed Plaintiff into her employment with Marty Shoes and into her employment after Marty Shoes. Plaintiff was fired from her job with ADT Automotive/Lauderdale-Miami Auto Auction ("ADT") in June of this year after being accused of harassing a coworker and saying inappropriate things to him.[8] Prior to being fired from ADT, Plaintiff had been repeatedly disciplined for insubordination and confrontation with a supervisor. (Composite Exhibit 7).

Plaintiff was also fired from a job she held with Sally's Beauty Supply after being accused of poor performance and a cash shortage.[9] Plaintiff lied in her sworn deposition when she was questioned about why she was fired by Sally's Beauty Supply.[10]

---

[8] (Plaintiff's Depo., 9/1-13/9)(*see also* Composite Exhibit 6). Plaintiff says that the accusations are false and were brought by a coworker after she had an argument with him. (Plaintiff's Depo., 10/24-11/2; 12/25-13/3).

[9] (*See* Plaintiff's Depo., 199/4-6)(*see also* Exhibit 8). Prior to being fired from Sally's Beauty Supply, Plaintiff had been repeatedly disciplined for failing to report to work and cash handling problems. (Composite Exhibit 9). Plaintiff says that the charges against her were "trumped up" by a supervisor who was under investigation. (Plaintiff's Depo., 203/13-15).

[10] Plaintiff's first deposition: Q: Why did you stop working for Sally's Beauty Supply? A: I didn't get full-time hours. (Plaintiff's Depo., 16/17-19). Plaintiff's second deposition: Q: Why did your employment end at Sally's Beauty Supply? A: New management came in. Q: Did you resign from Sally's Beauty Supply? A: No. Q: Were you fired? A: Yes. Q: Why were you fired? A: New management. Q: Is that the only reason why you were fired? A: Yes. (Plaintiff's Depo., 189/19-25; 190/1-6). Then, Plaintiff was asked the specific questions which follow: *Q: Were you fired by Sally's Beauty Supply for improper cash handling procedures? A: No. Q: Were you fired by Sally's Beauty Supply for poor performance? A: No.* (Plaintiff's Depo., 197/5-10)(emphasis added). Plaintiff was then shown a document subpoenaed from Sally's Beauty Supply (Exhibit 8) which Plaintiff admitted bore her signature, showing that Plaintiff was fired for a cash shortage and poor performance: *Q: You were terminated from Sally's Beauty Supply for cash shortage or poor performance, were you not? A: Yes.* (Plaintiff's Depo., 199/4-6)(emphasis added).

Earlier in the year she came to work for Marty Shoes, Plaintiff was barred from attending a course at Broward Community College for "willful disobedience or defiance toward college personnel," "disorderly [ ] conduct," and profanity, arising from an incident in which Plaintiff called her instructor a "bitch." (Exhibit 10).[11] Plaintiff is presently employed as a security guard by Westrec Marinas.[12]

### C.    Plaintiff's claims against Marty Shoes.

#### 1.    Procedural history.

After she was fired, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC). (Exhibit 13). Plaintiff alleged in her EEOC Charge that Marty Shoes discriminated against her because of her race and retaliated against her for complaining about being subjected to derogatory remarks by discharging her from her sales position. (Exhibit 13).

After investigating, the EEOC determined that "Plaintiff was terminated for violating company rules with respect to time, attendance and failing to perform to [ ] the expectations" of Marty Shoes. (Exhibit 14). The EEOC noted that "there is no direct evidence of race discrimination and none which would show that [Marty Shoes'] defense is a pretext." (Exhibit 14).

On July 15, 1997, Plaintiff filed a Complaint in Broward Circuit Court, founded on the same theories as her current action, against "Marty's Shoes, Inc.," but never served the Complaint. Six months later, on January 16, 1998, Plaintiff filed an Amended Complaint in that action against "Marty's Shoes of New Jersey, Inc.," but dismissed that action while a Motion to Quash Service and to Dismiss for Lack of Personal Jurisdiction was pending.

Almost *two years later*, on December 17, 1999, Plaintiff filed a new action in Broward Circuit Court, containing one count alleging race discrimination under 42 U.S.C. § 1981 against

---

[11] In her deposition, Plaintiff testified that she could not recall this incident or any of the details relating to it. (Plaintiff's Depo., 211/13-213/8).

[12] Plaintiff lied to Westrec Marinas in her job application paperwork, on a Fidelity Bond Application. (Plaintiff's Depo., 207/21-209/13). Although she had been fired by both Marty Shoes and Sally's Beauty Supply, Plaintiff told Westrec she had not been discharged from any employment. (Plaintiff's Depo., 207/21-208/6)(Exhibit 11). She also lied to Westrec about her reasons for leaving employment with Marty Shoes and Sally's Beauty Supply. (Plaintiff's Depo., 207/21-208/6)(Exhibit 12).

Marty Shoes of New Jersey, Inc. Marty Shoes of New Jersey, Inc., removed the action to this Court (DE 1) and moved for dismissal because it was not subject to personal jurisdiction in the courts of Florida. (DE 4). Plaintiff then filed an Amended Complaint (DE 8) against Marty Shoes, which is now ripe for summary judgment.

### 2.   Plaintiff's Amended Complaint.

Plaintiff's Amended Complaint contains a single count for race discrimination under 42 U.S.C. § 1981. (DE 8). Plaintiff, who is African-American, alleges that she has been "subjected to different terms, conditions and privileges of employment by reason of her race, color and retaliation which caused her termination." (Amended Complaint, ¶¶ 6, 7).

Plaintiff says that she was subjected to "biased counseling" and "derogatory remarks." (Amended Complaint, ¶ 7 c, e). Secondly, Plaintiff says her hours of employment were "steadily reduced" for "no apparent reason." (Amended Complaint, ¶ 7 d). Finally, Plaintiff claims that she was "terminated for conduct that similarly situated Caucasian employees were not even disciplined for" and "terminated for pre-textual reasons." (Amended Complaint, ¶ 7 a, b). Plaintiff has previously provided different reasons to subsequent employers about why she was terminated.[13] Indeed, Plaintiff testified that she cannot estimate how many lies she has told to her employers, including Marty Shoes.[14]

But when the record of this case – including Plaintiff's *own deposition testimony* – is examined, it becomes clear that Plaintiff has no race discrimination or retaliation claim to make. There is no evidence that Plaintiff was discriminated against because of her race or retaliated against for complaining about it.

## III.   LEGAL ARGUMENT AND MEMORANDUM OF LAW.

### A.   Legal standard for summary judgment.

As this Court has noted, "[t]he procedure for disposition of a summary judgment motion is well-established." *Gonzalez v. Monty*, 89 F. Supp. 2d 1347, 1350 (S.D. Fla. 2000). Summary

---

[13] Plaintiff told her current employer – Westrec -- her reason for leaving was that the "store closed [the] shoe department." (Exhibit 11). She told another employer– Sally's Beauty Supply – that her reason for leaving Marty Shoes was "no steady hours." (Exhibit 12). Plaintiff rationalizes this reason as truthful because, by being told she was terminated, she was "taken off the schedule meaning [she has] no steady hours." (Plaintiff's Depo., 194/18-196/25).

[14] (Plaintiff's Depo., 209/14-19; 210/9-11; 210/22-211/5).

judgment is authorized only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56).

The party moving for summary judgment has the burden of meeting this exacting standard. *Id.* (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). When assessing whether the movant has met this burden, the courts should view the evidence and factual inferences therefrom in the light most favorable to the party opposing the motion, and all reasonable doubts are resolved in favor of the nonmovant. *Gonzalez*, 89 F. Supp. 2d at 1350 (*citing Adickes*, 398 U.S. 144, 90 S.Ct. 1598).

The party opposing the motion may not simply rest upon mere allegations or denial of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the nonmoving party must make a sufficient showing to establish the existence of an essential element to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

This case meets the summary judgment standard. When we review the factual record here -- including Plaintiff's own deposition testimony – it becomes clear that Plaintiff has no viable claims for race discrimination or retaliation.

**B.    The legal significance of undisputed personal animosity between Plaintiff and Ms. Rybitwa, the Store Manager.**

Our employment laws do not make it illegal for Ms. Rybitwa to dislike Plaintiff, lose her temper with Plaintiff, or have arguments with Plaintiff -- any more than they make it illegal for Plaintiff to dislike Ms. Rybitwa, lose her temper with Ms. Rybitwa (as Plaintiff testified she did "numerous" times), or argue with Ms. Rybitwa (as Plaintiff testified she did "thousands" of times). But those laws also do not prevent Ms. Rybitwa from favoring other employees over Plaintiff or from disciplining or firing Plaintiff because of mutual dislike and Plaintiff cannot premise her claims on personal animosity between herself and Ms. Rybitwa.

Plaintiff freely admits she did not get along well with Ms. Rybitwa.[15]  In about three months between April and June of 1996, when Plaintiff was fired, it is Plaintiff's testimony that *she had more than one argument a day with Ms. Rybitwa.*  (Plaintiff's Depo., 182/4-6).  It is also undisputed that ***Plaintiff lost her temper with Ms. Rybitwa "numerous" times***.  (Plaintiff's Depo., 183/1-5).  In Plaintiff's opinion, Ms. Rybitwa lost her temper with Plaintiff as well. (Plaintiff's Depo., 183/6-8).  By her own estimate, ***Plaintiff had "[a] thousand" arguments with Ms. Rybitwa during the three or so months they worked together after their initial conflict began.***[16]

But such ***personal animosity, without more, "does not support a finding of discrimination***," even if the animosity exists between an employee and a supervisor. *Valle v. Johnson Controls World Services, Inc.*, 957 F. Supp. 1404, 1422 (S.D. Miss. 1996)(age discrimination case)(emphasis added).   As our Circuit recently noted, "[p]ersonal animosity is not the equivalent of [ ] discrimination" and a plaintiff "cannot turn a personal feud into a [ ] discrimination case." *Succar v. Dade County School Bd.*, ___ F.3d ___, 2000 WL 1520592, *1 (11th Cir. Oct. 13, 2000)(sex discrimination case)(at Exhibit 15).[17]   Personal animosity between Plaintiff and Ms. Rybitwa is not the same thing as discrimination or retaliation by Ms. Rybitwa or Marty Shoes.

There is a another important corollary, which applies equally to this case:  the ***undisputed personal animosity*** between Plaintiff and Ms. Rybitwa is a legitimate, nondiscriminatory reason for any "adverse employment action" Plaintiff claims to have suffered in this case.   As our Circuit noted in *McCollum v. Bolger*, evidence that "the plaintiff did not get along with her supervisor" and "had a bad relationship with her supervisor" can "make[ ] clear [ ] that the reason for [ ] disparate treatment" is not discrimination. 794 F.2d 602, 609-610 (11th Cir. 1986)), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 883, 93 L.Ed.2d 836 (1987)(sex discrimination case).[18]

---

[15](Plaintiff's Depo., 167/7-11)(Q:  Would it be accurate to say that you and Roma did not get along well?  A: Perfect. Q:  Perfectly accurate?  A: Yes.).

[16] (Plaintiff's Depo., 181/25-182/6).

[17] This Court has spoken similarly.  *Dudley v. Metro-Dade County*, 989 F. Supp. 1192, 1204 (S.D. Fla. 1997)(Title VII case)(supervisor's hostility toward employee, though it might create an unpleasant working atmosphere, does not rise to level of adverse employment action).

Thus, *denial of an employment benefit to an employee does not violate the law "when that decision is motivated by personal animosity."* *Neratko v. Frank*, 31 F. Supp. 2d 270, 285 (W.D.N.Y. 1998)(granting summary judgment in part on Title VII claim)(emphasis added).

The same is true for Plaintiff's claim for retaliation under Section 1981. The personality conflict between Plaintiff and Ms. Rybitwa constitutes a legitimate, non-retaliatory reason for any adverse action Plaintiff claims to have suffered. *Cf. Pace v. Paris Maintenance Company*, 107 F. Supp. 2d 251, 264 (S.D.N.Y. 2000)(granting summary judgment and noting that constant personality conflict between plaintiff and supervisor is legitimate, nonretaliatory reason for adverse action)(ADA case).

## MARTY SHOES IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR RACE DISCRIMINATION

Plaintiff's Section 1981 race discrimination claim requires proof of intentional discrimination. *Vincent v. Wells Fargo Guard Services, Inc.*, 3 F. Supp. 2d 1405, 1413 (S.D. Fla. 1998). The test for intentional discrimination under Section 1981 is the same as the formulation used in Title VII discriminatory treatment cases. *Id.* Here, Plaintiff can offer nothing in this case which could be remotely characterized as "direct evidence" of race discrimination. Thus, her race discrimination claim is evaluated under the now-familiar burden shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973).[19]

Plaintiff advances four theories in her Amended Complaint as to how she was discriminated and retaliated against. *First*, Plaintiff says she was subjected to "derogatory remarks." *Second*, Plaintiff says she was subjected to "biased counseling." *Third*, Plaintiff says her work hours were "steadily reduced." *Fourth*, Plaintiff was discharged from employment by Marty Shoes. But Plaintiff cannot survive summary judgment on any of these theories.

### 1.    Plaintiff cannot survive summary judgment based on the claim that she was subjected to "derogatory remarks."

---

[19] The initial burden under *McDonnell Douglas* rests with Plaintiff to demonstrate a *prima facie* case. Plaintiff must show: (1) she belongs to a racial minority; (2) she was subjected to adverse job action; (3) similarly situated employees outside her classification were treated more favorably; and (4) she was qualified to do the job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). If Plaintiff establishes a *prima facie* case, Marty Shoes must come forward and demonstrate legitimate, nondiscriminatory reasons for its conduct. *Id.* After Marty Shoes makes this showing, Plaintiff must raise a factual question as to whether those reasons are pretextual. *Id.*

Plaintiff says she was subjected to "derogatory remarks." (Amended Complaint, ¶ 7 e). But Plaintiff cannot base her case on such assertions. _**First**_, Plaintiff cannot establish that the alleged "derogatory remarks" constitute an adverse employment action within the meaning of Section 1981. _**Second**_, even if we assume Plaintiff could do so, Plaintiff cannot attribute those remarks to anything other her terrible relationship with Ms. Rybitwa.

Plaintiff's *prima facie* case fails because she cannot establish that the alleged "derogatory remarks" rise to the level of an "adverse employment action" under Section 1981. An "adverse employment action" is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)(citation omitted).

An employment action is not adverse "merely because the employee dislikes it or disagrees with it." *Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998)(*citations omitted*). Nor does every unkind act amount to an "adverse employment action." *Wu v. Thomas*, 966 F.2d 271, 273 n. 3 (11th Cir. 1993)(per curiam).[20] "Conduct that falls short of an ultimate employment decision must meet _**some threshold level of substantiality**_" to be considered an adverse employment action. *Gupta*, 212 F.3d at 587 (citations and internal punctuation omitted)(emphasis added). Where this threshold level of substantiality is not met, Plaintiff fails to demonstrate the "adverse employment action" prong of her *prima facie* case, and summary judgment is appropriate.[21]

Plaintiff says Ms. Rybitwa called her a "street person" in about April of 1996 during an argument with her. (Plaintiff's Depo., 112/15-18). Plaintiff and Ms. Rybitwa "exchanged words back and forth" after Ms. Rybitwa rearranged a rack of shoes Plaintiff had been working on.

---

[20] The employment laws "do not insulate [employees] from either the normal day-to-day dissatisfactions and annoyances commonly arising in the workplace or from the sometimes unpleasantness of a surly, strict or even personally insufferable and demanding supervisor." *Dachman v. Shalala*, 46 F. Supp. 2d 419, 438 (D. Md. 1999)(citation and internal quotation omitted), *appeal dismissed*, 191 F.3d 447 (4th Cir. 1999).

[21] *See, e.g., Blalock v. Dale County Bd. Of Educ.*, 84 F. Supp. 2d 1291, 1311 (M.D. Ala. 1999)(granting summary judgment where plaintiff fails to demonstrate "threshold level of substantiality" is met).

(Plaintiff's Depo., 113/4-12). It was in this argument that Plaintiff says Ms. Rybitwa called her a "street person" and "street walker." (Plaintiff's Depo., 113/4-21).

Plaintiff says that the term "street person" is derogatory based on her race, although she does not know exactly what it means. (Plaintiff's Depo., 111/12-25).[22] Plaintiff thinks the term "street walker" means "[s]omeone who is homeless, dirty, doesn't want to work, a low life, a bum." (Plaintiff's Depo., 113/22-114/1). The only explanation Plaintiff could provide to support why she believes that the terms "street person" or "street walker" are somehow connected to her race is because she was the only black employee at the Sawgrass Mills store and the only one Ms. Rybitwa called a "street person" or "street walker." (Plaintiff's Depo., 114/4-11). But Plaintiff is also the only person who could not get along with Ms. Rybitwa. (Plaintiff's Depo., 245/19-246/6).

Plaintiff also says that Ms. Rybitwa used the words "thug," "vagabond" and "you people" in reference to Plaintiff, in other arguments between them. (Plaintiff's Depo., 114/12-115/24). Plaintiff did not *ask* Ms. Rybitwa if, by the phrase "you people" she meant black people, and Ms. Rybitwa did not *say* that she meant black people by that phrase. (Plaintiff's Depo., 115/25-116/6).[23]

But even if we assume that Plaintiff has established a *prima facie* case based on the alleged "derogatory remarks," Plaintiff cannot show that those remarks are anything other than a result of her poor relationship with Ms. Rybitwa. No racially discriminatory animus can be

---

[22] Plaintiff says she believes that the term "street person" is racially derogatory because – and this is *Plaintiff's opinion only* – "black people primarily, the majority, walk the streets, sleep on the streets." (Plaintiff's Depo., 112/3-11). Plaintiff's opinion is obviously incorrect.

[23] Plaintiff believes the phrase "you people" is racially discriminatory, but her reasoning on this point is a speculative as it is on the other aspects of her case. (Plaintiff's Depo., 116/10-25: Q: What makes you feel like ["]you people["] means black people? A: Because that's the phrase that mostly white counterparts or people from other races refer to black people, you people, that's the – you people are commonly know as you people in that. Q: Okay. What experiences have you had that you're basing that on? A: Repeat the question. Q: You said its commonly known that when white people refer to blacks they say you people, and I'm asking you what experience are you basing that on? A: The experience that I base that on is my education from reading history, how white people and black people interact with people as humans. They refer to them as you people in a hostile environment."). *But no one else has ever used the phrase "you people" to refer to Plaintiff.* (Plaintiff's Depo., 116/7-9).

inferred from the remarks Plaintiff attributes to Ms. Rybitwa.[24]  And Plaintiff's deposition testimony shows that the alleged remarks were made during two of the "thousand" arguments she was had with Ms. Rybitwa.  (Plaintiff's Depo., 113/4-21; 114/12-115/24).  If an employee could sue for discrimination every time her manager called her a name in an argument, our courts could never close.

### 2.    Plaintiff cannot survive summary judgment based on the theory that she was subjected to "biased counseling."

Plaintiff claims she was treated differently than a number of other Marty Shoes' employees by being subjected to "biased counseling."  (Amended Complaint, ¶ 7 c).  To establish a *prima facie* case of discriminatory discipline (i.e., "biased counseling"), plaintiff must show that:  1) she did not violate a work rule, or 2) if she did violate the work rule, she was subjected to more severe disciplinary measures than those enforced against other employees engaged in similar misconduct.  *Thompson v. Nassau County Dept. of Transp.*, 1999 WL 1565200, *4 (M.D. Fla. Oct. 8, 1999)(citing *Jones v. Gerwens*, 874. F.2d 1534, 1540 (11th Cir. 1989)).

But Plaintiff's deposition testimony shows that her claims of "biased counseling" are entirely too inconsistent, insubstantial or speculative to provide any basis for a discrimination claim.

(a).    **Use of the store telephone.**  Plaintiff claims that other employees were allowed to use and answer the store telephone, but she was not.  One day, Plaintiff used the store telephone for a personal call to her sister, resulting in what Plaintiff characterized as a "problem" between herself and Ms. Rybitwa.  (Plaintiff's Depo., 147/23; 148/2-7).  Ms. Rybitwa unplugged the phone, stating that Plaintiff was tying it up to a potential business call.  (Plaintiff's Depo., 148/2-19).

After this incident, Ms. Rybitwa announced that only two other employees were allowed to use the telephone.  (Plaintiff's Depo., 148/20-24).[25]  After this announcement, Plaintiff says

---

[24] *See, e.g., Griffin v. Ambika Corp.,* 103 F. Supp. 2d 297, (S.D.N.Y. 2000)(managers' use of the phrases "street person" and "you people" could not be deemed inherently racially offensive without greater specificity as to the context of their usage)(hostile environment claim).

[25] Other employees, who were not black, were included among the group of people not allowed to use the phone.

she "never touched" the phone again, but other employees broke the rule about using the phone. (Plaintiff's Depo., 149/5-21).[26]  But Plaintiff cannot base a disparate treatment claim on the fact that other employees broke a work rule she did not break, and were not disciplined for it.

**(b).    Clocking out on breaks.**  Plaintiff also says she was subjected to "biased counseling" because she was "forced to" take the proper amount of time allotted for breaks by being told by Ms. Rybitwa that she would be clocked out if she were gone longer than her allotted break.  (Plaintiff's Depo., 150/18-151/6).  But Plaintiff says she never took a break longer than her allotted time, and she couldn't recall if employees who did take longer than their allotted break were clocked out by Ms. Rybitwa.  (Plaintiff's Depo., 151/16-152/13).  Clearly, Plaintiff can make no claim that she was treated differently based on these facts.

**(c).    Criticisms for being late.**  Plaintiff claims she was treated unfairly because another employee "had the option of coming to work late whenever she wanted to" and Plaintiff did not.  (Plaintiff's Depo., 167/12-16).  Plaintiff testified she was late "roughly three" times, but was never docked any pay.  (Plaintiff's Depo., 167/20-168/13).[27]  Each time, Ms. Rybitwa simply told Plaintiff not to let it happen again.  (Plaintiff's Depo., 168/4-7).  Plaintiff does not know if Ms. Rybitwa said the same thing to the other employee Plaintiff compares herself to, who Plaintiff testified was late frequently.  (Plaintiff's Depo., 168/22-25).  No claim for disparate treatment can arise from such facts.

**(d).    Register discounts and assisting customers.**  Plaintiff says she was treated differently than employees who were allowed to give larger discounts than she was and who were allowed to assist customers at the store cash register.  (Plaintiff's Depo., 161/19-20; 164/17-25).  But Plaintiff admitted there were other employees – none of whom were black – who were not allowed to give discounts.  (Plaintiff's Depo., 164/8-16).  And Plaintiff does not know whether Ms. Rybitwa told employees in addition to herself that they were not allowed to

---

[26] Plaintiff says she was *not allowed* to answer the phone (Plaintiff's Depo., 147/5-6) but at the same time claims, inconsistently, that she argued with Ms. Rybitwa because Ms. Rybitwa "had complaints *about the way I answered the phone.*"  (Plaintiff's Depo., 182/19-20)(emphasis added).

[27] Plaintiff testified in her first deposition that she was "never late" (Plaintiff's Depo., 38/9-14) then testified in her second deposition that she was late "a few" times, "roughly three."  (Plaintiff's Depo., 167/20-21; 168/11-13).

assist customers at the store cash register. (Plaintiff's Depo., 165/21-25). Again, Plaintiff's speculative assertion of disparate treatment cannot be based on these facts.

>      (e).    **Notifying manager at restroom breaks.**  Plaintiff claims that she was treated differently because Ms. Rybitwa told Plaintiff to let her know when she was taking a restroom break. (Plaintiff's Depo., 138/7-14). Plaintiff compares herself in this respect to Kim Chin, who Plaintiff says "was able to go to the restroom without notifying the manager." (Plaintiff's Depo., 138/7-14). But Plaintiff, of course, did not see every conversation between Ms. Chin and Ms. Rybitwa. (Plaintiff's Depo., 138/19-22). Neither Ms. Chin nor Ms. Rybitwa ever told Plaintiff Ms. Chin could go to the restroom without notifying Ms. Rybitwa. (Plaintiff's Depo., 139/17-140/1). Further, Plaintiff says that Ms. Chin and Ms. Rybitwa "laughed together . . . went to lunch together . . . [and] had a pleasant relationship." (Plaintiff's Depo., 139/13-16).[28] Even if what Plaintiff says is true, differential treatment based on favoritism by Ms. Rybitwa toward a friend or animosity toward Plaintiff is not race discrimination.[29]

>      (f).    **Other alleged disparate treatment.**  Plaintiff testified that she was required to show the shoes she was wearing to the manager upon reporting to work. (Plaintiff's Depo., 140/2-11). However, Ms. Rybitwa never disputed that Plaintiff was wearing her own shoes to work. (Plaintiff's Depo., 140/12-14). Plaintiff was never required to give the shoes she was wearing back to the store. (Plaintiff's Depo., 140/15-17). Plaintiff was never disciplined for stealing shoes. (Plaintiff's Depo., 140/23-25).

Clearly, Plaintiff's assertions cannot support the claim that she was subjected to any "adverse action" which meets the "threshold level of substantiality" required in this Circuit, or which is attributable to anything other than the good relationship Ms. Rybitwa evidently had with every employee except Plaintiff, and the bad relationship between them.

---

[28] Plaintiff also testified that Ms. Rybitwa favored other employees based on shared nationality or personal friendships or relationships. For example, Plaintiff says she was treated differently than Orlando Gonzalez, and believes that Ms. Rybitwa favored Mr. Gonzalez because his girlfriend was Polish (as is Ms. Rybitwa), and because Ms. Rybitwa and Mr. Gonzalez "lived in the same [apartment] complex." (Plaintiff's Depo., 166/14-167/6).

[29] *See Rivera v. National Westminster Bank*, 801 F. Supp. 1123, 1133 n.13 (S.D.N.Y. 1992)(favoritism based on friendship does not suggest discriminatory animus against a plaintiff); *Balazs v. Libenthal*, 32 F.3d 151, 159 (4th Cir. 1994)("to hold that favoritism toward friends and relatives is per se violative of Title VII would be, in effect, to rewrite federal law").

**3.   Plaintiff cannot survive summary judgment based on the theory that her work hours were "steadily reduced" for discriminatory reasons or that she was discharged for discriminatory reasons.**

Plaintiff cannot base her case on the claim that her work hours were steadily reduced or that she was discharged. ___First___, Plaintiff cannot establish a *prima facie* case on either issue because she cannot show she was "qualified" to continue to hold the position of shoe sales. ___Second___, Plaintiff cannot establish a *prima facie* case because she cannot show that any similarly-situated salesperson – i.e., one who had as poor a relationship with Ms. Rybitwa as Plaintiff – was treated better.[30] ___Finally___, Plaintiff cannot rebut Marty Shoes legitimate, nondiscriminatory reason why her work hours were reduced and why she was ultimately fired.[31]

**(a).   *Plaintiff's continued problems with Ms. Rybitwa made Plaintiff unqualified for continued employment.***

Plaintiff cannot survive summary judgment because she cannot establish, as she must, that she was "qualified" to do the job of salesperson. *Holifield*, 115 F.3d at 1562.

Marty's Shoes strives to provide its customers with a friendly atmosphere. (Exhibit 16). The company expects that its employees will be cooperative with, and respectful to, supervisors and managers. (Dzioba Declaration, ¶ 7)(Exhibit 2). Like every employer, Marty Shoes demands teamwork and professional conduct from its workforce. (Dzioba Declaration, ¶ 7)(Exhibit 2).

It is ___undisputed___ that Plaintiff failed to maintain a professional demeanor with Ms. Rybitwa and daily engaged in argumentative and disruptive behavior. In the last three months of her employment, Plaintiff had more than one argument a day with Ms. Rybitwa. (Plaintiff's Depo., 182/4-6). It is also undisputed that Plaintiff lost her temper with Ms. Rybitwa "numerous" times. (Plaintiff's Depo., 183/1-5). Plaintiff had "[a] thousand" arguments with Ms.

---

[30] Marty Shoes does not here dispute that a reduction in work hours or a discharge is an "adverse employment action" within the meaning of Section 1981, or that Plaintiff was a member of a protected class. However, Plaintiff cannot establish either of the two remaining elements of a *prima facie* case under that law.

[31] The *prima facie* elements of Plaintiff's discriminatory discharge claim are comparable to those in her disparate treatment claim (*see* fn. 19 above). In addition to showing membership in a protected class and showing that she was discharged (both of which are undisputed), Plaintiff must show that she was qualified and that "similarly situated employees outside [her] classification [were treated] more favorably." *Vincent*, 3 F. Supp. 2d at 1420.

16

Rybitwa during the three or so months they worked together after their initial conflicts began. (Plaintiff's Depo., 181/25-182/6).

Thus, Plaintiff cannot show she was "qualified" to continue as a salesperson in the Sawgrass Mills store, and Marty Shoes is entitled to summary judgment. *Cf. Joseph v. Publix Super Markets, Inc.*, 983 F. Supp. 1431, 1444 (S.D. Fla. 1997)(granting summary judgment and noting plaintiff's failure to show he was qualified for his position based on undisputed poor job performance).

**(b).**    ***Plaintiff cannot show that any other employee had as poor a relationship with Ms. Rybitwa as she did.***

Even if Plaintiff is assumed to be "qualified" for her sales position, her prima facie case of disparate treatment and discriminatory discharge still fails, because Plaintiff cannot show that any "similarly situated" employee was treated more favorably than she was. Specifically, Plaintiff cannot show that any other employee maintained as poor a relationship with Ms. Rybitwa as Plaintiff did. *Holifield*, 115 F.3d at 1561 (showing of "similarly situated" employee requires showing that compared employees are "similarly situated in all relevant respects").

But Plaintiff testified that she was the only person who argued regularly with Ms. Rybitwa. (Plaintiff's Depo., 245/19-246/6). Thus, no other store employee can be fairly characterized as "similarly situated."

**(c).**    ***Plaintiff's hours were reduced and she was ultimately fired for legitimate and nondiscriminatory reasons.***

Even if Plaintiff is assumed to have established a *prima facie* case, the reduction in her work hours and her eventual discharge was supported by legitimate, nondiscriminatory reasons.

The initial reduction in Plaintiff's work hours did not begin until Ms. Rybitwa was Store Manager for two months, and did not begin until Plaintiff twice asked for her schedule to be changed because of a conflict with her class schedule at BCC. (Plaintiff's Depo., 58/15-59/1). Plaintiff averaged twenty-two (22) hours a month in January and February of 1996 – ***while Ms. Rybitwa was Store Manager.*** (Composite Exhibit 3; *see also* fn. 6). In March and April of 1996, ***after*** Ms. Rybitwa began to accommodate Plaintiff's class schedule by adjusting her work schedule, Plaintiff's hours ranged from 16.75 to 16.00 to 16.25 to 9.5 to 4.75 to 12.25 to 6.00 to 9.00 a pay period. (Composite Exhibit 3).

In May and June of 1996, as Plaintiff's working relationship with Ms. Rybitwa continued to deteriorate, Plaintiff's work hours ranged from one to five hours a pay period. (Composite Exhibit 3). Finally, at the end of June of 1996, Plaintiff was fired. But this decline is not attributable to anything other than her poor relationship with Ms. Rybitwa – a legitimate, nondiscriminatory reason for the decrease in Plaintiff's work hours and her eventual discharge. *Neratko,* 31 F. Supp. 2d at 285 (employer's decision to deny an employment benefit to an employee does not violate the law when that decision is motivated by personal animosity).[32]

Thus, Plaintiff cannot establish a *prima facie* case of race discrimination nor can she rebut Marty Shoes legitimate, nondiscriminatory reasons for her declining work hours and ultimate discharge, and Marty Shoes is entitled to summary judgment on Plaintiff's claim for race discrimination under Section 1981.

## MARTY SHOES IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR RETALIATION

Plaintiff says she was subjected to "retaliation." (Amended Complaint, ¶ 7).[33] But here again, Plaintiff cannot establish a *prima facie* case. *First*, because Plaintiff's complaint of discrimination was not objectively reasonable in light of existing law, Plaintiff cannot be said to have engaged in "protected activity" under Section 1981. *Second*, Plaintiff's poor relationship with Ms. Rybitwa is a legitimate, nonretaliatory reason for any "adverse action" Plaintiff is assumed to have suffered.

### 1.    Plaintiff cannot show that she engaged in any protected activity.

To establish a *prima facie* case of retaliation, Plaintiff must show she engaged in "protected activity" under Section 1981 by showing that she opposed conduct which, when

---

[32] *See also McCollum,* 794 F.2d at 609-610 (evidence that "plaintiff did not get along with her supervisor" and "had a bad relationship with her supervisor" makes clear that the reason for disparate treatment is not discrimination).

[33] To establish a *prima facie* case of retaliation, Plaintiff must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal link between her protected activity and the adverse employment action. *Maniccia v. Brown,* 171 F.3d 1364, 1369 (11th Cir. 1999). If Plaintiff establishes a *prima facie* case of retaliation, the burden shifts to Marty Shoes to proffer a legitimate, nonretaliatory reason for any adverse employment action. *Balletti v. Sun-Sentinel Co.,* 909 F. Supp. 1539, 1549 (S.D. Fla. 1995). Once Marty Shoes meets this burden of production, Plaintiff must then raise a doubt about the proffered reason. *Id.* The burden of persuasion always remains with Plaintiff. *Id.*

viewed objectively and in light of existing law, could be viewed as an unlawful employment practice. *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351 (11ᵗʰ Cir. 1999).[34]

However, as detailed in pages 10 - 15 above, Plaintiff's May 27, 1996 letter cannot be viewed as an objectively reasonable complaint of an unlawful employment practice when viewed in light of existing law. Plaintiff's complaints of "derogatory remarks" and "biased counseling," as well as the other claims she asserted in her May 27, 1996 letter – when viewed in light of existing law – clearly do not constitute "objectively reasonable" complaints of an unlawful employment practice. *Clover*, 176 F.3d at 1346.[35]

### 2. Plaintiff cannot rebut Marty's Shoes' legitimate, nonretaliatory reason for her termination.

Even if Plaintiff is deemed to have engaged in protected activity, her retaliation claims must nevertheless fail. Marty Shoes, like any employer, need not tolerate continued disruptive and argumentative behavior – which Plaintiff has admitted – simply because she sent a letter complaining of race discrimination.[36]

The undisputed personality conflict between Plaintiff and Ms. Rybitwa – described in detail above and corroborated by Plaintiff's own testimony -- constitutes a legitimate, non-retaliatory reason for any adverse action Plaintiff claims to have suffered. *Cf. Pace v. Paris*

---

[34] It is not enough for Plaintiff to assert that her belief that was honest and bona fide, it must be *objectively* reasonable. *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 960 (11ᵗʰ Cir. 1997). If the conduct "opposed" cannot be viewed objectively as an "unlawful employment practice," the retaliation claim is meritless. *See Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 (11ᵗʰ Cir. 1998)(affirming dismissal of retaliation claims because conduct complained of was not reasonably viewed as an unlawful employment practice), *cert. denied*, 525 U.S. 1000, 119 S.Ct. 509, 142 L.Ed.2d 422 (1998).

[35] Nor can Plaintiff premise a retaliation claim on her complaints in her May 27, 1996 letter about the decrease in her hours, since there is no causal link between her letter and the decrease in her hours. It is undisputed that Plaintiff's hours had already decreased to near their lowest point by the time she sent the letter (see fn. 6). "[T]here can be no causal connection between engaging in protected activity and adverse personnel action when the latter precedes the former." *Lutes v. Goldin*, 62 F. Supp. 2d 118, 133 (D.D.C. 1999); *see also Rhone v. Texas Dept. of Transp.*, 1997 WL 560770, *7 (N.D. Tex. 1997)(noting that for a causal connection to exist, the protected activity "must obviously precede the adverse employment action.").

[36] *See, e.g., Paul v. Cohen*, 1998 WL 351581, *6 (D. Conn. 1998)(although an employer cannot hide behind general terminology such as "disloyalty" or "insubordination" or "poor performance" when these words are merely code for a retaliatory intent, "an employer is under no obligation to tolerate disruptive behavior from an employee simply because the employee has filed an EEO complaint."); *Garman v. United States Postal Service*, 509 F. Supp. 507, 510 (N.D.Ind. 1981)(employer need not tolerate disruptive unlawful conduct, even in the name of protest over alleged unconstitutional employment practices).

*Maintenance Company*, 107 F. Supp. 2d 251, 264 (S.D.N.Y. 2000)(granting summary judgment and noting that constant personality conflict between plaintiff and immediate supervisor is legitimate, nonretaliatory reason for adverse action)(ADA case).

Thus, Plaintiff can neither establish a *prima facie* case of retaliation, nor can she rebut Marty's Shoes explanation for why she suffered anything she now contends was an adverse employment action, including the decrease in her hours and her discharge.

## IV.    CONCLUSION.

Plaintiff could not get along with her Store Manager. She was fired for this reason, not because she is black and not because she complained about race discrimination. Marty Shoes should be granted summary judgment on Plaintiff's claims.

WHEREFORE, Defendant Marty Shoes, Inc., respectfully requests that the Court enter an Order: 1) granting summary judgment in its favor and against Plaintiff Denise Brookins on the claims in Plaintiff's Amended Complaint; 2) awarding Marty Shoes its costs incurred in defending this action; and 3) providing for such other and further relief as the Court deems appropriate.

Respectfully submitted,

**HOLLAND & KNIGHT LLP**
Attorneys for Defendant
One East Broward Boulevard, Suite 1300
Post Office Box 14070 (33302-4070)
Fort Lauderdale, Florida 33301
(954) 525-1000
(954) 463-2030 – fax
email:   egabriel@hklaw.com

By:

Thomas H. Loffredo, for the Firm.
Florida Bar No. 870323
Eric K. Gabrielle, for the Firm.
Florida Bar No. 160725

20

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by **hand delivery** to Stewart L. Karlin, Esq., Attorney for Plaintiff, 400 S.E. 8th Street, Fort Lauderdale, Florida 33316, this **3rd** day of November, 2000.

> HOLLAND & KNIGHT LLP
> Attorneys for Defendant
> One East Broward Boulevard
> Suite 1300
> Post Office Box 14070
> Fort Lauderdale, Florida 33302-4070
> (954) 525-1000
> (954) 463-2030 - fax
>
> By: _____
> Thomas H. Loffredo, for the Firm.
> Florida Bar No. 870323
> Eric K. Gabrielle, for the Firm.
> Florida Bar No. 160725

FTL1 #515744 v1

21