UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

_____D.C.

Case No. 00-6002 CIV-(Ungaro-Benages/Brown)

DENISE BROOKINS,

     Plaintiff,

vs.

MARTY'S SHOES, INC.,

     Defendant.
_____/

**ORIGINAL**

Fort Lauderdale, Florida
August 23, 2000
10:10 a.m.

### VIDEOTAPED DEPOSITION

### OF

### DENISE BROOKINS

- - - - - - - - -

APPEARANCES:

STEWART LEE KARLIN, ESQUIRE,
Appearing on behalf of the Plaintiff.

HOLLAND & KNIGHT, LLP
BY:  ERIC K. GABRIELLE, ESQUIRE,
Appearing on behalf of the Defendant.

ALSO PRESENT:
STANLEY DZIOBA


        Videotaped Deposition of Denise Brookins, taken

by the Defendant, for purposes of discovery and for use

as evidence in the above entitled cause, pursuant to

notice heretofore filed, before KIM TABOR, Shorthand

Reporter and Notary Public in and for the State of

Florida at Large, at 1 East Broward Boulevard, 13th

Floor, Fort Lauderdale, Florida.


                      I-N-D-E-X

THE WITNESS                              PAGE
DENISE BROOKINS
Direct Examination by Mr. Gabrielle         3



                  E-X-H-I-B-I-T-S

Defendant's Exhibit No. 1                  54
Defendant's Exhibit No. 2                  54
Defendant's Exhibit No. 3                  66
Defendant's Exhibit No. 4                  66
Defendant's Exhibit No. 5                  80
Defendant's Exhibit No. 6                  96
Defendant's Exhibit No. 7                 103
Defendant's Exhibit No. 8                 105

                          .

1          THE VIDEOGRAPHER:  We're now on the video

2     record.  Today is Wednesday, the 23rd day of

3     August, 2000.  The time is 10:13 a.m.

4          We're here 1 East Broward Boulevard in

5     Fort Lauderdale, Florida for the purpose of

6     taking the videotaped deposition of Denise

7     Brookins taken by the defendant in Case Number

8     00-6002, Denise Brookins versus Marty's Shoes.

9          The videographer is TB Ellis of Esquire

10    Legal Video and the court reporter is Kim Tabor

11    of Esquire Deposition Services.

12          Will counsel please announce their

13    appearances for the record.

14          MR. GABRIELLE:  Eric Gabrielle of Holland

15    and Knight for the Defendant Marty Shoes.  Also

16    present is Stan Dzioba, the corporate

17    representative of Marty's Shoes.

18          MR. KARLIN:  Stew Karlin for the

19    Plaintiff, Denise Brookins.

20  Thereupon:

21                  DENISE BROOKINS

22      having been first duly sworn to testify under

23  oath in the above titled cause, testified as follows:

24                DIRECT EXAMINATION

25      Q.    (By Mr. Gabrielle)  Good morning, Ms.

1    Brookins.  Thank you for coming in today.  I know we

2    met briefly before the deposition today, but my name is

3    Eric Gabrielle with the Law Firm of Holland and Knight.

4    We represent Marty's Shoes, Incorporated in the lawsuit

5    that you filed against it.

6              (Thereupon, the Plaintiff's pager went

7    off.)

8              THE WITNESS:  Let me shut it off.

9              (Thereupon, a discussion was had off the

10   record.)

11             THE VIDEOGRAPHER:  We're back on the video

12   record.

13       Q.    (By Mr. Gabrielle)  Have you ever given a

14   deposition before?

15       A.    Yes.

16       Q.    Okay.  I'm just going to go over some of

17   the basic ground rules for you so that, you know, if

18   you have any questions or anything, hopefully I'll

19   address them now.

20             I'm going to be asking you a series of

21   questions based around your lawsuit and the facts that

22   you've alleged through the course of it.

23             If I ask you any question that's unclear

24   or in a way that you don't understand as I often do

25   from time to time, will you let me know that so we can

1    clear up the question?

2          A.    Yes.

3          Q.    Okay.  If you would like to take a break

4    at any time, just say the word, let me know or let your

5    attorney know.

6                If you need to use the restroom, we have

7    some refreshments available for you, please let me

8    know.  It's not a marathon contest, please, let me

9    know.

10               You understand that you're under oath?

11         A.    Yes.

12         Q.    It's the same oath that you will be taking

13   at the trial.  There is not a judge here but the oath

14   is the same, you understand that?

15         A.    Yes.

16         Q.    Okay.  Can you give me your full legal

17   name for the record, please.

18         A.    My full legal name is Elaine Denise

19   Brookins.

20         Q.    Is that spelled Elaine?

21         A.    Yes.

22         Q.    Have you ever been known by any other

23   name?

24         A.    No.

25         Q.    What's your date of birth?

1     A.    December 19th, '66.

2     Q.    And what's your social security number?

3     A.    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.

4     Q.    What is your current residence address,

5  please?

6     A.    921 Northwest 33rd Way, Fort Lauderdale,

7  Florida 33311.

8     Q.    And how long have you lived at that

9  address?

10    A.    Thirty years.

11    Q.    Thirty years, okay.

12          Does anyone else live there?

13    A.    Yes.

14    Q.    Who?

15    A.    My grandmother.

16    Q.    Anyone besides you and your grandmother?

17    A.    No.

18    Q.    Okay.  Well, I don't have to ask you for a

19  previous address then.

20          Are you currently employed?

21    A.    Yes.

22    Q.    Where are you currently employed?

23    A.    Harbor Town Marina.

24    Q.    And do you know the address of Harbor Town

25  Marina?

```
 1              A.    801 Northeast 3rd Street.

 2              Q.    Is that in Fort Lauderdale?

 3              A.    Dania.

 4              Q.    How long have you worked at Harbor Town

 5    Marina?

 6              A.    Since July the 10th.

 7              Q.    Of 2000?

 8              A.    Yes.

 9              Q.    What position do you hold at Harbor Town

10    Marina?

11              A.    Security.

12              Q.    Security guard?

13              A.    Yes.

14              Q.    Do you have an immediate supervisor?

15              A.    Yes.

16              Q.    What is that person's name?

17              A.    Ross Slacks.

18              Q.    Can you spell Ross' last name for me.

19              A.    S-L-A-C-K-S.

20              Q.    And are you paid a salary or are you paid

21    by the hour at Harbor Town?

22              A.    Hourly.

23              Q.    Hourly?

24              A.    Yes.

25              Q.    What is your hourly wage?
```

```
 1          A.    Eight dollars an hour.

 2          Q.    Eight dollars an hour?

 3          A.    Yes.

 4          Q.    And has it been $8 an hour since you

 5   started on July 10th?

 6          A.    Yes.

 7          Q.    How many hours a week on average have you

 8   worked since July 10th?

 9          A.    Thirty.

10          Q.    Thirty hours a week?

11          A.    Thirty.

12          Q.    Have you ever been married?

13          A.    No.

14          Q.    Do you have any children?

15          A.    No.

16          Q.    Is there anyone who relies upon you for

17   financial support?

18          A.    No.

19          Q.    Where did you work before Harbor Town

20   Marina?

21          A.    Lauderdale Miami Auto Auction.

22          Q.    Lauderdale Miami Auto Auction?

23          A.    Lauderdale Miami Auto Auction.

24          Q.    Okay.  And where is that located?

25          A.    Fort Lauderdale.  5353 South State Road 7.
```

```
 1              Q.    When did you stop working at Lauderdale
 2    Miami Auto Auction?
 3              A.    June 4th.
 4              Q.    Of this year?
 5              A.    2000.
 6              Q.    How long had you worked at Lauderdale
 7    Miami Auto Auction before you stopped working there?
 8              A.    April 15, '99.
 9              Q.    And what did you, what position did you
10    hold at Lauderdale Miami Auto Auction?
11              A.    I hold various positions there; detailing,
12    registration and security operations, registration as
13    well.
14              Q.    Can you tell me about the order of the
15    positions you held from when you began working at
16    Lauderdale Miami Auto Auction to when you stopped.
17              A.    Beginning from the last security.
18              Q.    Okay.
19              A.    Registration, detailing operations.
20              Q.    Okay.  So you started in operations, you
21    went to detailing, then you went to registration, then
22    you went to security operations?
23              A.    Yes.
24              Q.    Okay.  As in security operations, were you
25    paid a salary or were you paid by the hour?
```

```
 1              A.    Hourly.

 2              Q.    What was your hourly wage?

 3              A.    Eight dollars an hour.

 4              Q.    And were you paid by the hour the entire

 5    time you were working at Lauderdale Miami Auto Auction?

 6              A.    No.

 7              Q.    Okay.  When you were in operations when

 8    you started, how were you paid, salary or hourly?

 9              A.    Hourly.

10              Q.    And what was your hourly rate?

11              A.    Six dollars.

12              Q.    Six dollars an hour.

13                    And how about in detailing?

14              A.    Six dollars.

15              Q.    How about in registration?

16              A.    Seven.

17              Q.    Was there any point where you were paid a

18    salary --

19              A.    No.

20              Q.    -- at Lauderdale Miami Auto Auction?

21              A.    No.

22              Q.    So you started at $6, you went up to $8?

23              A.    Yes.

24              Q.    Why did you -- why did your employment end

25    at Lauderdale Miami Auto Auction?
```

```
 1          A.    They accused, they falsely accused me of
 2   harassing someone or saying inappropriate material.
 3          Q.    Who falsely accused you?  Was it one
 4   specific individual?
 5          A.    Yes.
 6          Q.    What was that person's name?
 7          A.    Benjamin Oulovio, O-U-L-O-V-I-O.
 8          Q.    I thank you for spelling the names
 9   automatically.  It's very helpful to the court reporter
10   when you do that, so I appreciate that.
11                Was Benjamin Oulovio a supervisor of
12   yours?
13          A.    No.
14          Q.    Was he a co-worker?
15          A.    Yes.
16          Q.    Is there someone in particular at
17   Lauderdale Miami Auto Auction who told you that your
18   employment was terminated?
19          A.    They never stated terminated.  They stated
20   verbatim I was separated from the company.
21          Q.    Okay.  Were you first told that in writing
22   or --
23          A.    Verbally.
24          Q.    Verbally.
25                Who told you that?
```

```
 1          A.     Jackie Elfers, E-L-F-E-R-S.

 2          Q.     And was that a man or woman?

 3          A.     Woman.

 4          Q.     Was Ms. Elfers your supervisor?

 5          A.     No.

 6          Q.     What position did Ms. Elfers hold at

 7   Lauderdale Miami Auto Auction?

 8          A.     Human resources.

 9          Q.     Did Ms. Elfers tell you what it is that

10   Mr. Oulovio had accused you of?

11          A.     Yes.

12          Q.     What specifically did she tell you?

13          A.     She stated that I -- he made a complaint

14   against me and I offered him a hundred dollars to

15   engage in sex, intercourse with me.

16          Q.     And that was not true?

17          A.     Correct.

18          Q.     Was there anything else that Ms. Elfers

19   told you that Mr. Oulovio had said in addition to what

20   you just described?

21          A.     No.

22          Q.     And did you tell Ms. Elfers that that was

23   false that what Mr. Oulovio had said was false?

24          A.     Yes.

25          Q.     Why do you believe that your employment
```

```
 1    was terminated at Lauderdale Miami Auto Auction?

 2         A.    Me and him had an argument, verbal

 3    argument prior to that.

 4         Q.    Yourself and Mr. Oulovio?

 5         A.    Yes.

 6         Q.    What was the argument about?

 7         A.    He left the gate, he left his work area

 8    for a minimum of two hours and that violates company

 9    policy and he felt like that I would report him.

10         Q.    When you spoke to Ms. Elfers, did you tell

11    her that Mr. Oulovio had left his work area and

12    violated company policy?

13         A.    I didn't have a chance to.

14         Q.    Do you believe that that Lauderdale Miami

15    Auto Auction discriminated against you in any way?

16         A.    No.

17         Q.    Before Lauderdale Miami Auto Auction,

18    where did you work?

19         A.    Tandem Temporary Services.

20         Q.    And where are they located?

21         A.    1850 Sheridan Street Hollywood, Florida.

22         Q.    What did you do for Tandem Temporary

23    Services?

24         A.    I stock, cleaned, manual labor,

25    construction.
```

```
 1              Q.     Is Tandem Temporary Services the kind of
 2    company that you were their employee but you worked for
 3    any number of other companies or locations?
 4              A.     Yes.
 5              Q.     How long were you employed by Tandem
 6    Temporary Services?
 7              A.     A year.
 8              Q.     How long before -- well, when did you end
 9    your employment with Tandem Temporary Services?
10              A.     July 4th, 2000.
11              Q.     So did your employment with Tandem
12    Temporary Services overlap with your employment with
13    Lauderdale Miami Auto Auction?
14              A.     No.
15              Q.     Did you work for Tandem Temporary Services
16    after Lauderdale Miami Auto Auction?
17              A.     Yes.
18              Q.     Okay.  Were you -- when did you begin
19    working for Tandem Temporary Services?
20              A.     March of '98.
21              Q.     March of '98?
22              A.     March of '98.
23              Q.     And it ended on July 4th of 2000?
24              A.     Yes.
25              Q.     While you were working for Tandem
```

```
 1    Temporary Services, did you start working for them and

 2    then go to work for Lauderdale Miami Auto Auction and

 3    then go back to work for Tandem?

 4          A.     Yes.

 5          Q.     Thank you.

 6                 And why did you stop working for Tandem

 7    Temporary Services?

 8          A.     I found stable employment.

 9          Q.     With Harbor Town Marina?

10          A.     Yes.

11          Q.     Where did you work before Tandem Temporary

12    Services?

13          A.     Sally's Beauty Supply.

14          Q.     And where is that located?

15          A.     Fort Lauderdale, Florida.

16          Q.     Any possibility you know the address?

17          A.     2750 Davie Boulevard.

18          Q.     You have an excellent memory for

19    addresses.

20                 What did you do for Sally's Beauty Supply?

21          A.     Cashier.

22          Q.     How long did you work for Sally's Beauty

23    Supply?

24          A.     Ten months.

25          Q.     Did you work for Sally's Beauty Supply
```

```
 1    before Tandem Temporary Services?

 2            A.    Yes.

 3            Q.    When did you begin work for Sally's Beauty

 4    Supply?

 5            A.    July of '96.

 6            Q.    And when did you for working for Sally's

 7    Beauty Supply?

 8            A.    June 30th, '97.

 9            Q.    Were you at Sally's Beauty Supply, were

10    you paid salary or paid by the hour?

11            A.    Hour.

12            Q.    What was your hourly wage?

13            A.    Five twenty-five.

14            Q.    Five twenty-five an hour and how many

15    hours a week did you work?

16            A.    About 38.

17            Q.    Why did you stop working for Sally's

18    Beauty Supply?

19            A.    I didn't get full-time hours.

20            Q.    Did you have an immediate supervisor at

21    Sally's Beauty Supply?

22            A.    Yes.

23            Q.    What was that person's name?

24            A.    Beatrice Baker.

25            Q.    Is that B-E-A-T-R-I-C-E?
```

```
1              A.    Yes.

2              Q.    Thank you.

3                    Did you work anywhere between Sally's

4    Beauty Supply and Tandem Temporary Services?

5              A.    No.

6              Q.    What did you do between June 30th of 1997

7    and March of 1998?

8              A.    School.

9              Q.    Where were you in school?

10             A.    Broward Community College.

11             Q.    Are you still in school at Broward

12   Community College?

13             A.    Yes.

14             Q.    What are you studying?

15             A.    Pre-law and emergency medical services.

16             Q.    How long have you been in school at BCC?

17             A.    Ninety-five, August, August of '95.

18             Q.    Were you a full-time student during part

19   of that period?

20             A.    Yes.

21             Q.    When was that?

22             A.    The whole time.

23             Q.    You have been a full-time student since

24   August of 1995?

25             A.    No.
```

```
 1              Q.    Okay.

 2              A.    Since which period?

 3              Q.    Well, you started at BCC in August of '95?

 4              A.    Yes.

 5              Q.    Was there ever -- have you been a

 6    part-time student or a full-time student during --

 7              A.    Both.

 8              Q.    Both.

 9                    When were you a full-time student?

10              A.    Can't recall.

11              Q.    Can you make an estimate in a particular

12    year?

13              A.    No.

14              Q.    What campus?  Is there more than one

15    campus at BCC, do you know?

16              A.    Yes.

17              Q.    Which campus is it that you're a student

18    at?

19              A.    Central.

20              Q.    Have you ever been a student at any other

21    campus at BCC?

22              A.    South Campus.

23              Q.    Besides Central and South?

24              A.    No.

25              Q.    When were you a student at the Central
```

```
 1    Campus and the South Campus, if you can just tell me.

 2            A.    Can't recall.

 3            Q.    Where are you a student now, at which

 4    campus?

 5            A.    Central.

 6            Q.    Are you a student in a particular

 7    department of the BCC?  Is there a college or a

 8    division that you're studying in?

 9            A.    Law.

10            Q.    Okay.  How long have you been a student in

11    the law department?

12            A.    A year and a half.

13            Q.    Are you at the same time studying

14    emergency medical services?

15            A.    Yes.

16            Q.    What degree are you working on or degrees?

17            A.    Criminal justice and emergency medical

18    services.

19            Q.    Do you have a specific date when you

20    anticipate graduating?

21            A.    The spring of 2001.

22            Q.    Where did you work before Tandem Temporary

23    Services?

24            A.    Marty's Shoes.

25            Q.    And before Marty's Shoes, where did you
```

```
 1    work?
 2           A.    Don't recall.
 3           Q.    Where did you attend high school?
 4           A.    Repeat the question.
 5           Q.    I'm sorry.  Where did you attend high
 6    school?
 7           A.    I attended high school in Tallahassee,
 8    Florida.
 9           Q.    What was the name of the high school?
10           A.    Lincoln High School.
11           Q.    When did you graduate?
12           A.    I didn't.
13           Q.    Did you get a GED?
14           A.    Yes.
15           Q.    When did you do that?
16           A.    Ninety-four.
17           Q.    And what was the -- when did you move from
18    Tallahassee to South Florida or did you live somewhere
19    in between?
20           A.    No.
21           Q.    When did you move from Tallahassee to
22    South Florida?
23           A.    Ninety.
24           Q.    Beginning in 1990, can you tell me the
25    names of any companies that you worked for before
```

```
 1    Marty's Shoes?

 2          A.    No.

 3          Q.    Did you work between 1990 and going to

 4    work for Marty's Shoes?

 5          A.    Yes.

 6          Q.    But you can't recall the name of any

 7    company that you worked for before Marty's Shoes?

 8          A.    Correct.

 9          Q.    Did you work full time or part time during

10    this period?

11          A.    Part time.

12          Q.    Part time?

13          A.    Yes.

14          Q.    At the time you went to work for Marty's

15    Shoes, were you working somewhere else?

16          A.    No.

17          Q.    To figure out where you were working

18    between 1990 and going to work for Marty's Shoes, what

19    would you have to look at, what documents would you

20    have to look at?

21          A.    I would have to pull my work history from

22    The Department of Labor.  I can't recall.

23          Q.    Do you have your tax returns for any of

24    the years between 1990 and when you went to work for

25    Marty's Shoes?
```

```
 1              A.    Yes.

 2              Q.    You have them for all of those years?

 3              A.    No.

 4              Q.    Do you know which years you have them for?

 5              A.    No.

 6              Q.    Do you have your tax returns for the last

 7    five years?

 8              A.    Not all.

 9              Q.    Okay.  Do you know which years you have

10    them for?

11              A.    Ninety-nine, '98.

12              Q.    Why don't you have your tax returns for

13    the years prior to 1998?

14              A.    Repeat the question.

15              Q.    Why don't you have your tax returns?

16              A.    For '98?

17              Q.    Before that.

18              A.    I wasn't working.

19              Q.    Do you have your tax return for the year

20    1997?

21              A.    No.

22              Q.    But you were working in 1997?

23              A.    Ninety-seven, I can't recall.

24              Q.    Well, if you want to correct this, please

25    do.
```

```
 1                      You told me that between July '96 and June

 2   30th of '97 you worked for Sally's Beauty Supply.

 3        A.    That's correct.

 4        Q.    Okay.  Do you recall if you filed a tax

 5   return for 1997?

 6        A.    Yes.

 7        Q.    Okay.  But you don't believe you have a

 8   copy of it?

 9        A.    No.

10        Q.    Do you have a copy of your tax return for

11   1996?

12        A.    No.

13        Q.    1995?

14        A.    No.

15        Q.    Okay.  Why did you leave employment at the

16   place that you were working to go to work for Marty's

17   Shoes?

18        A.    Which place?

19        Q.    You tell me if you remember the name of

20   the place.  You said you did, so I'm just assuming you

21   said you were working at the time you went to work for

22   Marty's Shoes.

23              So why did you go from one job to another?

24        A.    I don't remember the job before Marty's

25   Shoes.
```

```
 1              Q.    But you remember you had a job?

 2              A.    Yes.

 3              Q.    You don't remember why you left that job

 4      to go to Marty's Shoes?

 5              A.    No.

 6              Q.    Can you remember anywhere you've worked

 7      besides Sally's Beauty Supply, Tandem Temporary

 8      Services, Lauderdale Miami Auto Auction, Harbor Town

 9      Marina or Marty's Shoes?

10              A.    Can't recall.

11              Q.    So other than those locations that I have

12      just mentioned, you can't recall anywhere you've ever

13      worked?

14              A.    Yes.

15              Q.    Have you ever been a student at any

16      location other than BCC or after your going to high

17      school in Tallahassee, Florida, have you ever been a

18      student anywhere else besides BCC?

19              A.    No.

20              Q.    You testified that before today you've

21      given a deposition before, is that correct?

22              A.    Yes.

23              Q.    How many times?

24              A.    Once.

25              Q.    What was that deposition in?  What kind of
```

```
 1   case was that?

 2          A.     Medical.

 3          Q.     Was it your lawsuit?

 4          A.     Yes.

 5          Q.     Were you the plaintiff or the defendant?

 6          A.     Plaintiff.

 7          Q.     Who was it against?

 8          A.     Wells Fargo.

 9          Q.     What were you suing Wells Fargo for?

10          A.     Workmans' comp.

11          Q.     Did you work at Wells Fargo?

12          A.     Yes.

13          Q.     When did you work at Well's Fargo?

14          A.     Ninety-one till 5/22/92.

15          Q.     Well, now, Ms. Brookins, I just asked you

16   you if you recalled any locations where you worked

17   between 1990 and when you worked for Marty's Shoes.  So

18   you recall at least that you worked at Wells Fargo?

19          A.     Yes.

20          Q.     What did you do for Wells Fargo?

21          A.     Security.

22          Q.     And how much were you paid?

23          A.     Five dollars.

24          Q.     And why did you leave or why did your

25   employment end at Wells Fargo?
```

```
 1          A.     Accident.

 2          Q.     Is that the same accident that gave rise

 3   to your lawsuit against Wells Fargo?

 4          A.     Yes.

 5          Q.     And what was the outcome of the lawsuit

 6   against Wells Fargo?

 7          A.     Pending.

 8          Q.     It's still pending?

 9          A.     Yes.

10          Q.     What is the name of the lawyer that

11   represents you in that lawsuit?

12          A.     I'm unrepresented.

13          Q.     Okay.  Have you ever been represented by a

14   lawyer in that lawsuit?

15          A.     Yes.

16          Q.     What was that lawyer's name?

17          A.     Michael Davis.

18          Q.     But you are no longer represented by any

19   lawyer in that lawsuit?

20          A.     Yes.

21          Q.     Correct?

22          A.     Correct.

23          Q.     Where is -- what's the court that that

24   lawsuit is pending in, do you know?  Is it Broward

25   Circuit Court, Dade Circuit Court?
```

```
 1          A.    Broward Circuit Court.

 2          Q.    Broward Circuit Court.

 3                Is there anyone else besides Wells Fargo

 4    that you worked that you can recall between 1990 and

 5    when you went to work for Marty's Shoes?

 6          A.    I can't recall at the moment.

 7          Q.    Okay.  Other than the lawsuit against

 8    Marty's Shoes and the lawsuit against Wells Fargo, have

 9    you ever been a party to a lawsuit?

10          A.    No.

11          Q.    Have you ever been convicted of a crime?

12          A.    No.

13          Q.    Other than Marty's Shoes, have you ever

14    filed any other type of charge of discrimination

15    against anyone?

16          A.    No.

17          Q.    How did it come about that you began to

18    work at Marty's Shoes?  How did you locate the

19    employment there?

20          A.    Shopping in the mall and I seen the sign.

21          Q.    And what mall was that?

22          A.    Sawgrass Mills Mall.

23          Q.    Is that the location of the Marty's Shoes

24    where you worked?

25          A.    Yes.
```

```
 1              Q.    Did you ever work at any other Marty's

 2   Shoes location?

 3              A.    No.

 4              Q.    Who did you first talk to at Marty's Shoes

 5   about a job there?

 6              A.    Carmen.

 7              Q.    Do you know Carmen's last name?

 8              A.    No.

 9              Q.    Do you remember approximately what

10   position Carmen held?

11              A.    Store manager.

12              Q.    How long before you began to work for

13   Marty's Shoes did you talk to Carmen about the job?

14              A.    Twice.

15              Q.    Were you interviewed for the job?

16              A.    Yes.

17              Q.    By Carmen?

18              A.    Yes.

19              Q.    Were you interviewed by anyone else

20   besides Carmen?

21              A.    No.

22              Q.    Is Carmen the person who hired you?

23              A.    Yes.

24              Q.    And when were you hired by Marty's Shoes?

25              A.    12/5/95.
```

```
 1          Q.    What position were you hired into?

 2          A.    Sales, shoe sales.

 3          Q.    And what hourly wage were you hired at?

 4          A.    Five seventy-five.

 5          Q.    Five seventy-five an hour?

 6          A.    Yes.

 7          Q.    During the entire time that you worked for

 8    Marty's Shoes, was your hourly wage anything other than

 9    $5.75 an hour?

10          A.    No.

11          Q.    During the -- can you give me the names of

12    as many of your co-workers and supervisors that you can

13    recall during the time you worked at Marty's Shoes?

14          A.    Yes.

15          Q.    Please do.

16          A.    Carmen, Roma Rybitha.

17          Q.    Can you try to spell that.

18          A.    R-Y-B-I-T-H-A.

19          Q.    Anyone else?

20          A.    Michael Torres, T-O-R-R-E-S.

21          Q.    Thank you.

22          A.    Chris Torres, T-O-R-R-E-S.

23          Q.    Okay.

24          A.    Nu, N-U  C-H-I-N, Orlando Gonzalez, Alia,

25    A-L-I-A Fernandez, Peter and I believe that's it.
```

```
 1              Q.    Do you know Peter's last name?

 2              A.    No.

 3              Q.    If you know, was there any relationship

 4     between Michael Torres and Chris Torres?

 5              A.    Brothers.

 6                    And there was another Carla Reiss.

 7              Q.    Is Carla with a C or a K, do you know?

 8              A.    C-A-R-L-A.

 9              Q.    Thank you.

10                    Was there a time when Carmen was no longer

11     your manager?

12              A.    Yes.

13              Q.    When was that?

14              A.    Shortly after I was hired.

15              Q.    Do you recall approximately how long after

16     you were hired that Carmen was no longer the manager?

17              A.    Approximately two months.

18              Q.    And who replaced Carmen as the manager?

19              A.    Roma.

20              Q.    Is Roma a male or female?

21              A.    Female.

22              Q.    Do you know why Carmen was no longer the

23     manager?

24              A.    No.

25              Q.    During the time that Carmen was the
```

```
 1    manager of the Marty's Shoes where you worked, did

 2    anything happen which you felt was discriminatory?

 3           A.    Repeat the question.

 4           Q.    During the time that Carmen was the

 5    manager of the Marty's Shoes where you worked

 6    approximately two months, did anything happen which to

 7    you which you felt was discriminatory?

 8           A.    No.

 9           Q.    When you were hired, shortly after you

10    were hired, were you ever given a copy of an employee

11    handbook?

12           A.    No.

13           Q.    Did you ever see a copy of an employee

14    handbook?

15           A.    No.

16           Q.    Did Carmen ever criticize you in any way

17    while she was your manager?

18           MR. STEWART:  I'll object to the form of

19           the question.  I think it's very vague but I'll

20           allow her to answer the question.

21           Q.    (By Mr. Gabrielle)  Okay.  Did Carmen ever

22    talk to you about your attendance?

23           A.    No.

24           Q.    Did Carmen ever talk to you about your job

25    performance as a -- I'm sorry, could you --
```

```
 1                    Did Carmen ever talk to you about your job

 2   performance in shoe sales?

 3         A.    Yes.

 4         Q.    What did she tell you?

 5         A.    She commended that I do a good job selling

 6   the shoes, pricing the tags and the order.

 7         Q.    So Carmen complimented your job

 8   performance?

 9         A.    Yes.

10         Q.    During the time that Carmen was your

11   manager, what was your work schedule?

12         A.    During the day, some weekend hours.

13         Q.    How many days a week would you work?

14         A.    Five or six.

15         Q.    And how many hours per day?

16         A.    Can't recall.

17         Q.    Did you have a regular schedule, did you

18   work certain specific days of every week while Carmen

19   was your manager?

20         A.    No.

21         Q.    During the time that Carmen was the

22   manager, how would you find out what days you were

23   supposed to work?

24         A.    The schedule is printed in the office.

25         Q.    If you know, who made up the schedule?
```

1          A.    Store manager.

2          Q.    Would you tell Carmen what days and hours

3     you were available to work?

4          A.    Yes.

5          Q.    And then in your experience she would make

6     the schedule on that basis?

7          A.    Yes.

8          Q.    During the time that Carmen was your

9     manager, were you also a student at BCC?

10         A.    Yes.

11         Q.    Full time or part time?

12         A.    Full time.

13         Q.    And what days or what hours of the day

14    would you attend classes during the time that Carmen

15    was your manager?

16         A.    Days and nights, I believe.

17         Q.    Days and nights both?

18         A.    Yes.

19         Q.    What specific days of the week?

20         A.    Can't recall.

21         Q.    How many hours a week would you attend

22    school as a full-time student?

23         A.    Twelve hours.

24         Q.    And you would also work five or six hours

25    a day?

```
 1              A.    Yes.

 2              Q.    That's a long day.

 3                    Would you also go to classes on the

 4    weekend?

 5              A.    No.

 6              Q.    Would you work on the weekends?

 7              A.    Yes.

 8              Q.    Both days Saturday and Sunday while Carmen

 9    was your manager?

10              A.    Yes.

11              Q.    Do you have any pay checks or payroll

12    stubs for your employment while Carmen was your

13    manager?

14              A.    I can't recall.

15              Q.    Do you have your tax return for the year,

16    the end of the year during which you started employment

17    at Marty's Shoes?

18              A.    No.

19              Q.    Can you remember how much you earned

20    during one month of December of that year that you

21    worked for Marty's Shoes?

22              A.    No.

23              Q.    How would you rate just excellent, good,

24    fair or poor, how would you rate your own job

25    performance while you were an employee with Marty's
```

1  Shoes?

2          A.      Repeat the question.

3          Q.      During the time period that you were an

4  employee with Marty's Shoes from when you started to

5  when your employment ended, if you were asked to

6  evaluate your own job performance as excellent or good,

7  very good, good, fair or poor, how would you yourself

8  evaluate your job performance?

9          A.      Excellent.

10          Q.      Do you feel like that was true the entire

11  time you worked there?

12          A.      Yes.

13          Q.      Do you feel like there was ever any day

14  that you didn't give a hundred percent on the job?

15          A.      Yes.

16          Q.      There were days when you didn't give a

17  hundred percent?

18          A.      Yes.

19          Q.      Why is that?

20          A.      Because I worked a half hour.

21          Q.      Okay.  Did you ever feel like that during

22  the time frame that you were actually at Marty's Shoes,

23  however brief that was on a particular day, during the

24  time that you were actually on the clock, do you ever

25  feel like you gave less than a hundred percent?

```
 1              A.    Yes.

 2              Q.    Why is that?

 3              A.    I worked, I came in for an hour and I just

 4    took out the trash.

 5              Q.    Okay.  During that hour did you give a

 6    hundred percent?

 7              A.    Yes.

 8              Q.    Did you ever receive during any time

 9    period that you were employed by Marty's Shoes a

10    written evaluation of your job performance?

11              A.    One.

12              Q.    You said one?

13              A.    One.

14              Q.    Do you have a copy of that?

15              A.    Yes.

16              Q.    Who gave you that evaluation?

17              A.    Roma.

18              Q.    When?

19              A.    Can't recall the date.

20              Q.    Approximately how long before your

21    employment ended did you get that evaluation?

22              A.    Shortly.

23              Q.    Shortly before?

24              A.    (Nods head.)

25              Q.    What did that evaluation say?
```

```
 1            A.    It stated that I was not to inform the
 2    assistant manager when I was leaving to inform her.
 3            Q.    Okay.  Who was the assistant manager that
 4    was being referred to?
 5            A.    Michael Torres.
 6            Q.    Were you ever disciplined, docked any pay
 7    or sent home while you were an employee of Marty's
 8    Shoes?
 9            A.    Yes.
10            Q.    By whom?
11            A.    Roma.
12            Q.    When was the first time that happened?
13            A.    I can't recall that date.
14            Q.    How many times did that happen?
15            A.    She did it several times.
16            Q.    And what reason were you given for that?
17            A.    For what question?
18            Q.    For being sent home or disciplined, how
19    were you disciplined?
20            A.    Don't understand the question.
21            Q.    Were you ever, were you ever docked any
22    pay?  Were you ever paid for any less hours than you
23    actually worked?
24            A.    Yes.
25            Q.    When did that happen?
```

```
 1              A.      During the course she took on store

 2      manager.

 3              Q.      You're talking about Roma?

 4              A.      Yes.

 5              Q.      When was the first time that happened?

 6              A.      I can't recall.

 7              Q.      How many times did it happen?

 8              A.      Several.

 9              Q.      And how did it happen?  How was it that

10      your pay were less than the hours you worked?

11              A.      Well, the hours that I work are posted on

12      the board and I never called in.  I never was late and

13      when you get your pay check the hours are inaccurate

14      with the hours that you worked.

15              Q.      Was there -- at any point while you worked

16      for Marty's Shoes, was there ever a time clock?

17              A.      Yes.

18              Q.      Did you punch in and punch out?

19              A.      You punched in and I believe it

20      malfunctioned and you just sign in.

21              Q.      Okay.  Malfunctioned the entire time?

22              A.      Part time that I was there.

23              Q.      Okay.  How many times did it malfunction?

24              A.      Once.

25              Q.      So other than the one time that the time
```

```
 1   clock malfunctioned, you always punched in and punched

 2   out?

 3        A.    Yes.

 4        Q.    Do you have any copies of your time cards

 5   or time records?

 6        A.    No.

 7        Q.    Did you ever ask anyone to take a look at

 8   your time cards or time records and your pay check to

 9   see where there was a difference?

10        A.    Yes.

11        Q.    Who did you ask?

12        A.    Roma.

13        Q.    And what happened?

14        A.    She notified the New Jersey office and

15   they never mailed out an additional check.

16        Q.    How much time was it that you worked that

17   you weren't paid for?

18        A.    I can't recall.

19        Q.    Can you estimate?

20        A.    How much time or --

21        Q.    How many, you know -- in other words, how

22   large or how small was the mistake that Roma was

23   notifying the New Jersey office about?

24        A.    Between 25 and $50.

25        Q.    And how long before your employment ended
```

```
 1    did this happen?

 2            A.    How long?

 3            Q.    When did it happen?  What was the time

 4    period that you were shorted between 25 and $50?

 5            A.    Between the period of January and June.

 6            Q.    Okay.  But you, you're not -- can you be

 7    anymore specific than that?

 8            A.    No.

 9            Q.    So you went to Roma and told Roma that you

10    weren't paid for between 25 and $50 of the time that

11    you worked and Roma notified the New Jersey office?

12            A.    No.

13            Q.    What happened?

14            A.    I notified her that the check hours that

15    they were being paid for was inaccurate of what I

16    worked.

17            Q.    And what did she say?

18            A.    She would have to notify the New Jersey

19    office and they'll mail another check.

20            Q.    Okay.  Did she ever tell you that she had

21    notified the New Jersey office?

22            A.    Yes.

23            Q.    And did you ever follow up with Roma and

24    ask her what happened?

25            A.    Yes.
```

```
 1            Q.    What did she say?

 2            A.    She said that the person from New Jersey

 3    said that those were correct with what the hours were

 4    that they sent in.

 5            Q.    So she looked into it and the person from

 6    New Jersey said the checks were correct with the hours

 7    that had been sent in?

 8            A.    Yes.

 9            Q.    Did Roma tell you the name of the person

10    in New Jersey that she had talked to?

11            A.    No.

12            Q.    Did she tell you a department that she had

13    talked to?

14            A.    No.

15            Q.    Did you believe Roma was telling you the

16    truth at that time?

17            A.    Yes.

18            Q.    Have you ever seen a psychiatrist or

19    psychologist because of anything that happened to you

20    during your employment with Marty's Shoes?

21            A.    No.

22            Q.    I'm sorry?

23            A.    No.

24            Q.    Have you ever gone to see a medical doctor

25    of any type because of anything that happened to you
```

```
 1    because of your employment at Marty's Shoes?

 2         A.    No.

 3         Q.    Have you ever gone -- other than lawyers,

 4    have you ever gone to see any other type of

 5    professional whether it's medical or psychological or

 6    therapeutic because of what happened to you during your

 7    employment at Marty's Shoes?

 8         A.    Yes.

 9         Q.    Who is that?

10         A.    Stewart Karlin.

11         MR. KARLIN:  Other than an attorney.

12         Q.    (By Mr. Gabrielle)  Other than lawyers?

13         A.    No.

14         Q.    Thank you.

15         Other than Mr. Karlin, who have you spoken

16    to about anything that happened during your employment

17    with Marty's Shoes that you felt was discriminatory?

18         A.    No one.

19         MR. KARLIN:  I'll object.  It's very vague

20         but I'll let her answer.

21         THE WITNESS:  No one.

22         Q.    (By Mr. Gabrielle)  So other than your

23    attorney, have you spoken with anyone else about what

24    happened to you, what happened to you during your

25    employment that you felt was discrimination?
```

```
 1              A.    I spoke with Stanley, I spoke with John
 2    Adams.
 3              Q.    Okay.  Let me -- I think your attorney is
 4    right, I should make the question a little clearer.
 5              Since your employment ended with Marty's
 6    Shoes, other than Mr. Karlin, have you spoken with
 7    anyone about anything that happened during your
 8    employment that you felt was discriminatory?
 9              A.    No.
10              Q.    Thank you.
11              Since your employment ended with Marty's
12    Shoes, have you ever spoken to any other person who you
13    worked with at Marty's Shoes?
14              A.    Repeat the question.
15              Q.    Since your employment ended with Marty's
16    Shoes, have you ever spoken to any of your former
17    co-workers?
18              A.    Yes.
19              Q.    Who is that?
20              A.    Agnes.
21              Q.    What's Agnes' last name?
22              A.    Can't recall.
23              Q.    When was the last time you spoke with
24    Agnes?
25              A.    I can't recall.
```

```
 1              Q.    What did you speak with Agnes about?

 2              A.    Roma.

 3              Q.    What specifically about Roma did you speak

 4    with Agnes about?

 5              A.    I didn't speak specifically about

 6    anything.  It was a coincidence that I had seen her in

 7    the mall.

 8              Q.    Okay.

 9              A.    And we reviewed the conduct and the

10    problems I had with Roma.

11              Q.    Okay.  Did you tell Agnes that you felt

12    that what happened during your employment was

13    discriminatory?

14              A.    Yes.

15              Q.    So Agnes is a person that you spoke with

16    about something that happened during your employment

17    that you thought was discriminatory?

18              A.    Yes.

19              Q.    Besides Agnes, is there anyone else that

20    you spoke with after your employment ended other than

21    Mr. Karlin about anything that happened during your

22    employment that you thought was discriminatory?

23              A.    Yes.

24              Q.    Who was that?

25              A.    Orlando.
```

```
 1              Q.    When did you speak with Orlando?

 2              A.    Can't recall.

 3              Q.    What did you speak with Orlando about?

 4              A.    We spoke about the times we had at Marty's

 5    Shoes.

 6              Q.    Approximately how long ago was it that you

 7    spoke with Orlando?

 8              A.    Can't recall.

 9              Q.    Can you -- was it this year?

10              A.    No.

11              Q.    Last year?

12              A.    No.

13              Q.    Approximately how long ago was it that you

14    spoke with Agnes?

15              A.    Can't recall.

16              Q.    Was it this year?

17              A.    No.

18              Q.    Last year?

19              A.    No.

20              Q.    So it's been at least since the beginning

21    of 1999 if not longer that you've spoken with either

22    Agnes or Orlando?

23              A.    Yes.

24              Q.    Besides Agnes, Orlando and Mr. Karlin, is

25    there anyone else who you've spoke with about anything
```

```
 1    that happened during your employment with Marty's Shoes
 2    that you thought was discriminatory since that
 3    employment ended?
 4         A.    Stanley.
 5         Q.    Since the employment ended?
 6         A.    Yes.
 7         Q.    When did you speak with Stanley, before or
 8    after your employment ended?
 9         A.    The day after I was terminated.
10         Q.    Did you speak with him on the telephone or
11    in person?
12         A.    Telephone.
13         Q.    Did you call him or he call you?
14         A.    I called him.
15         Q.    And what did you say?
16         A.    I asked him why was I taken off the
17    schedule.
18         Q.    And what did he say?
19         A.    He said I was terminated.
20         Q.    And what did you say in response to that?
21         A.    Why.
22         Q.    And what did he say?
23         A.    He didn't have to answer that.
24         Q.    Stanley said --
25         A.    He didn't have to give me an answer.
```

1        Q.    Okay.  Did either of you say anything else

2    in that conversation?

3        A.    Yes.

4        Q.    Who said it?

5        A.    What did I do.  I questioned what did I

6    do, why was I terminated.

7        Q.    And what was Stanley's response?

8        A.    He didn't have to give a reason.

9        Q.    Okay.  Did he say why he didn't have to

10   give a reason?

11       A.    No.

12       Q.    Did you ever talk with Roma about your

13   employment after it terminated?

14       A.    No.

15       Q.    Why didn't you call Roma after you were

16   taken offer the schedule?

17       A.    I didn't call, I showed up.

18       Q.    You showed up?  You showed up at the

19   Marty's Shoe store?

20       A.    Yes.

21       Q.    Was Roma there?

22       A.    Yes.

23       Q.    Did you talk with Roma?

24       A.    Yes.

25       Q.    And what happened?  Tell me about that

1    conversation.

2         A.    She said that she was going on vacation a

3    certain day and the next week's schedule wasn't printed

4    and she left a note to me that I should speak to

5    Stanley about the work schedule for the following week.

6         Q.    Was that the last time you ever spoken

7    with Roma?

8         A.    Yes.

9         Q.    Did Roma ever tell you that your

10   employment was going to be terminated?

11        A.    No.

12        Q.    Before you talked to Stanley, after you

13   spoke with Roma and said she was going to vacation and

14   said you should speak with Stanley about the schedule

15   for the following week, how long was it after that that

16   you found out your employment was terminated?

17        A.    She left a -- repeat the question.

18        Q.    Sure.  I should repeat the question.

19             You went into the store and you spoke with

20   Roma and she told you that she was going on vacation,

21   that you should speak with Stanley about the schedule

22   for the following week, is that correct?

23        A.    Yes.

24        Q.    And after that you called Stanley and

25   asked him why you were taken offer the schedule.  So

```
 1    what happened between when you spoke with Roma and when

 2    you called Stanley?

 3         A.    I showed up for my work schedule and I

 4    seen the letter that she wrote to me.  The next day I

 5    notified Stanley.

 6         Q.    What letter are you referring to?

 7         A.    She left me a letter.

 8         Q.    Roma left you a letter?

 9         A.    Yes.

10         Q.    Do you have a copy of that letter?

11         A.    Yes.

12         Q.    What did the letter say?

13         A.    Denise, speak to Stanley about the

14    schedule.  He took you off the schedule.

15         Q.    And that's when you called Stanley?

16         A.    Yes.

17              MR. GABRIELLE:  Okay.  Would you like to

18         take a break?  Why don't we take a short break?

19         It's about an hour.  I want to give the two of

20         them a rest.

21              (Thereupon, a short break was had.)

22              THE VIDEOGRAPHER:  We're back on the

23         record.

24         Q.    (By Mr. Gabrielle)  You understand you're

25    still under oath?
```

1          A.      Yes.

2          Q.      So you began working for Sally's Beauty

3    Supply about a month after your employment with Marty's

4    Shoes ended, is that correct?

5          A.      Yes.

6          Q.      During the time between when your

7    employment with Marty's Shoes ended and going to work

8    for Sally's Beauty Supply, did you collect

9    unemployment?

10         A.      No.

11         Q.      Did you apply for unemployment?

12         A.      Yes.

13         Q.      And what happened, why did you not receive

14   unemployment?

15         A.      They stated I was not there long enough.

16         Q.      Have you ever received unemployment

17   compensation during any of the periods between when you

18   worked?

19         A.      No.

20         Q.      Have you ever received workers'

21   compensation?

22         A.      Yes.

23         Q.      When was that?

24         A.      After I was in the accident.

25         Q.      At Wells Fargo?

1          A.     Yes.

2          Q.     Are you still receiving workers'

3    compensation?

4          A.     No.

5          Q.     From when to when did you receive it?

6          A.     Can't recall.

7          Q.     Did you receive it at any time after you

8    worked for Marty's Shoes?

9          A.     Yes.

10         Q.     For how long?

11         A.     I can't recall.

12         A.     So you were receiving workers'

13   compensation -- were you receiving it during the time

14   period that you worked for Marty's Shoes?

15         A.     I can't recall that.

16         Q.     But you do recall receiving it after you

17   worked for Marty's Shoes?

18         A.     Possibly.

19         Q.     Do you have any records of any workers'

20   compensation benefits that you've received?

21         A.     No.

22         Q.     Why not?

23         A.     I don't have the records.

24         Q.     Did you have them at one time?

25         A.     No.

```
 1              Q.    Did you have to report the workers'

 2   compensation benefits that you received on your tax

 3   returns?

 4              A.    Yes.

 5                    THE VIDEOGRAPHER:    Excuse me.    Somebody's

 6         microphone isn't right.    Okay, back on.

 7              Q.    (By Mr. Gabrielle)  During the time that

 8   you were receiving workers' compensation benefits,

 9   approximately how much were you receiving per week?

10              A.    Can't recall.

11              Q.    Was it more than $100?

12              A.    Yes.

13              Q.    More than $200?

14              A.    I can't recall.

15              Q.    At least $100?

16              A.    Yes.

17              Q.    What was the nature of the injury that you

18   received at Wells Fargo?

19              A.    Ruptured disc.

20              Q.    In your back?

21              A.    Yes.

22              Q.    Does that ruptured disc still give you

23   pain?

24              A.    Yes.

25              Q.    How often?
```

53

```
 1              A.    Every day.
 2              Q.    Is any part of the pain that you suffer
 3     from from the ruptured disc, do you believe that
 4     Marty's Shoes was responsible for any part of that?
 5              A.    No.
 6              Q.    Does that ruptured disc prevent you from
 7     doing certain types of jobs?
 8              A.    Yes.
 9              Q.    What types of jobs?
10              A.    I don't know.
11              Q.    Well, what things does the ruptured disc
12     prevent you from doing?
13              A.    Standing long periods of time, sitting
14     long periods of time, walking long distance, picking up
15     objects.
16              Q.    Anything else?
17              A.    Bending.  That's it.
18              Q.    Okay.  Given that it may trouble you for
19     sitting long periods of time, I want you to tell me if
20     at any point during the day today you need a break.
21     That makes it even more important, okay.
22              A.    Yes.
23              Q.    I'm going to show you a document I'm going
24     to ask the court reporter to mark as Exhibit 1 to your
25     deposition.  It is labeled as an employee handbook.
```

```
 1                    (Thereupon, Defendant's Exhibit No. 1 was

 2     marked for identification.)

 3            Q.    (By Mr. Gabrielle)  I'll ask you to take

 4     as much time as you need, Ms. Brookins, to look through

 5     the document that's been labeled Exhibit 1 and tell me

 6     if you recognize it.

 7                    Do you you recognize that document?

 8            A.    No.

 9            Q.    Do you ever recall having seen this

10     document before?

11            A.    No.

12            Q.    Ms. Brookins, I'm going to show you a

13     document I'm going to ask the court reporter to mark as

14     Exhibit 2 to your deposition.

15                    For purposes of the record, there is a

16     letter dated March 31, 1997, on letter head from the

17     United States Equal Employment Opportunity Commission

18     which is bate stamped DB 00049.

19                    (Thereupon, Defendant's Exhibit No. 2 was

20     marked for identification.)

21            Q.    (By Mr. Gabrielle)  I would like you to

22     take your time, as much time as you need to look

23     through the document that has been marked as Exhibit 2,

24     and then once you have, tell me if you recognize it,

25     please.
```

1        A.    Yes.

2        Q.    How do you recognize it?

3        A.    A copy was mailed to me.

4        Q.    Okay.  Did you receive it on or shortly

5   after March 31st of 1997?

6        A.    Yes.

7        Q.    Shortly after?

8              I would like you to read in the second

9   paragraph the sentence beginning with the word

10  "examination".

11       A.    "Based on the evidence examined"?

12       Q.    I'm sorry, the first word in the sentence

13  is examined.  I'm sorry, excuse me.  The first word in

14  the sentence is examination.  It says "examination of

15  the evidence."

16             MR. KARLIN:  Note my objection.  The

17        document really speaks for itself.  It's kind of

18        cluttering up the record but it's your nickel.

19       Q.    (By Mr. Gabrielle)  Well, can you read the

20  sentence that begins with the word "examination",

21  please.

22       A.    "Examine in your case it appears the

23  commission is unable to conclude that the information

24  obtained established a violation of the statutes we

25  enforce."

```
 1              Q.    I'm sorry.  I've got you reading -- I
 2    wasn't clear enough, I guess.
 3                    In the second paragraph here, second full
 4    paragraph.
 5              A.    "Examination of the evidence of record
 6    shows that you were terminated for violating company
 7    rules with regard to time, attendance and failure to
 8    perform to the respondent's expectations."
 9              Q.    Okay.  That's fine.  I take it you
10    disagree with that sentence?
11              A.    Yes.
12              Q.    Why do you disagree with it?
13              A.    Because it says "The examination of the
14    evidence of record shows that you were terminated for
15    violating company rules with regard to time, attendance
16    and failure to perform to the respondent's
17    expectations."
18              Q.    Okay.  You believe that you adhered to all
19    of Marty's Shoes rule with regard to time and
20    attendance?
21              A.    Yes.
22              Q.    You believed that you performed to the
23    expectations of Marty's Shoes the entire time you
24    worked there?
25              A.    Yes.
```

```
 1              Q.    Did Roma ever criticize you while you were
 2     an employee with Marty's Shoes?
 3              A.    Yes.
 4              Q.    When was the first time she criticized
 5     you?
 6              A.    Can't recall that date.
 7              Q.    How soon after she became the manager did
 8     she criticize you?
 9              A.    Two months.
10              Q.    About two months after?
11              A.    About two months.
12              Q.    She became the manager in approximately
13     January of '96?
14              A.    I can't recall the exact date.
15              Q.    But -- well, how long was Carmen the
16     manager?
17              A.    I don't know.
18              Q.    You testified that Carmen was the manager
19     for about two months?
20              A.    Yes.
21              Q.    Does that seem right to you?
22              A.    Yes.
23              Q.    How soon after Carmen was no longer the
24     manager did Roma become the manager?  Was it right
25     away?
```

```
 1          A.    Probably one or two months.  Shortly after
 2   she left.
 3          Q.    Was there a time period between when
 4   Carmen was the manager and when Roma became the
 5   manager?
 6          A.    No.
 7          Q.    Okay.
 8          A.    It was right after, I believe.
 9          Q.    Okay.  So for approximately the first two
10   months of your employment Carmen was the manager?
11          A.    Yes.
12          Q.    And then Roma became the manager
13   immediately?
14          A.    Yes.
15          Q.    And approximately two months after Roma
16   became the manager is when she began criticizing you?
17          A.    Yes.
18          Q.    What was the first thing that Roma did to
19   criticize you, what was the first criticism she made of
20   you?
21          A.    If my memory serves me correct, the first
22   criticism was the attendance.
23          Q.    Okay.  And what did Roma say that was a
24   criticism of your attendance?
25          A.    The school schedule I have and the work
```

```
 1    schedule conflict that I had to rearrange my schedule.
 2         Q.    Okay.  You had to be in school at the time
 3    that you were scheduled, otherwise scheduled to work?
 4         A.    Certain days.
 5         Q.    Do you remember what days?
 6         A.    No.
 7         Q.    And how did it conflict?  Were you late or
 8    did you miss any days because of school?
 9         A.    She would schedule me for the times that I
10    was in class.
11         Q.    Okay.  And did you tell her, did you tell
12    Roma that she was scheduling you for work at the time
13    that you were in class?
14         A.    Yes.
15         Q.    And what did she say in response?
16         A.    She said she would change it at first.
17         Q.    Had Roma -- before you told Roma that the
18    school schedule was conflicting with your work
19    schedule, had she criticized your attendance?
20         A.    No.
21         Q.    So you went to Roma and told her that she
22    had scheduled you to work at times that would conflict
23    with your school schedule?
24         A.    Yes.
25         Q.    And her response was she would change your
```

```
 1    work schedule?

 2         A.    Yes.

 3         Q.    Did she?

 4         A.    Yes.

 5         Q.    And when did that, when did that happen

 6    that you had that conversation with her where you told

 7    her that the schedule, the work schedule conflicted

 8    with your school schedule?

 9         A.    When my schedule was printed.

10         Q.    All right.  I'm sorry.  I just want to

11    make it clear.

12               How long after Roma became the manager --

13    I'm not asking questions in the clearest way.

14         A.    Exactly.

15         Q.    How long after Roma became the manager did

16    you go to her and tell her that the work schedule that

17    she had made conflicted with your school schedule?

18         A.    A month.

19         Q.    About a month after?

20         A.    About a month.

21         Q.    And at that time how many hours a week

22    were you going to school?

23         A.    Twelve.

24         Q.    And at that time how many hours a week

25    were you working?
```

1        A.    Can't recall.

2        Q.    Can you give me an estimate?  Was it more

3    or less than 12?

4        A.    More than 12.

5        Q.    So you were in school for 12 hours a week

6    and you were working more than 12 hours a week?

7        A.    Yes.

8        Q.    Was there ever a conflict after that

9    between your school schedule and your work schedule?

10       A.    Yes.

11       Q.    What happened?

12       A.    Repeat the question.

13       Q.    What happened when there was a conflict?

14    What did you do?  Did you do anything about it?

15       A.    I complained to her.

16       Q.    Okay.  You told her that she had scheduled

17    you for a time that you were supposed -- to work at a

18    time you were to be in school?

19       A.    Yes.

20       Q.    And what did she do?

21       A.    She looked at my school schedule and she

22    changed the schedule around my school.

23       Q.    Do you still have copies of your school

24    schedule from that time period?

25       A.    Can't recall.

1          Q.    But you don't remember what it was during

2    that time period?

3          A.    What was?

4          Q.    Your school schedule.

5          A.    No.

6          Q.    Okay.  How long after the first time you

7    talked to Roma about your school schedule was the

8    conversation where she looked at your school schedule?

9    How long of a time period went by between those

10   conversations?

11         A.    A few days.

12         Q.    After that, after Roma saw a copy of your

13   school schedule, was there ever a time period after

14   that where your school schedule conflicted with your

15   work schedule?

16         A.    No.

17         Q.    So the first time that Roma criticized you

18   at your job, it was for attendance, is that right?

19         A.    I can't recall what the first criticism

20   was.

21         Q.    Okay.  What did she criticize you for

22   besides attendance?

23         A.    Several things.

24         Q.    Can you tell me what they were?

25         A.    She criticized my socialization with Agnes

1   and Orlando.  She criticized me not telling the

2   security that four black males had taken shoes.  She

3   criticized why was my eyes red.  She criticized my

4   dress code.  She criticized me standing up for her with

5   the derogatory remarks.  She criticized the time

6   conflict with the hours that she gave me.  She

7   criticized me notifying John Adams.  She criticized me

8   going to the rest room at will.  She criticized the

9   work performance that I had.  She criticized me

10  answering the phone.  She criticized me telling her she

11  discriminated against me.

12          Q.    Can you think of anything else that Roma

13  criticized you for?

14          A.    Not at the moment.

15          Q.    Do you have any kind of a diary or notes

16  that you took while you were employed by Marty's Shoes?

17          A.    Yes.

18          Q.    Do you -- have you written down the kinds

19  of things Roma criticized you for?

20          A.    Yes.

21              MR. GABRIELLE:  I'm going to put on the

22          record that that document would clearly be

23          within the scope of at least one if not more

24          than one discovery requests and I'm going to

25          note if that document is produced in discovery,

1    I'm going to ask the opportunity to reexamine

2    the plaintiff on that document as well as the

3    tax returns that were requested.

4         MR. KARLIN:  Well, we gave you the

5    documents she has in her possession.

6         MR. GABRIELLE:  My objection is noted.

7    I'd like for an effort to be made to review that

8    request for production and determine if there

9    are still documents which are responsive to

10   those requests.

11        It sounds like there is at least one that

12   needs to be produced for me to take a complete

13   deposition.

14        MR. KARLIN:  I'll double check.  I don't

15   think there is anything else.

16        MR. GABRIELLE:  I'm going to reserve the

17   right to reopen the deposition upon the

18   production of those notes that we've just

19   discussed.

20        THE WITNESS:  I need to make a correction.

21   When you stated was there a diary, I didn't per

22   say exactly have a diary.  I wrote down several

23   things over the course of my employment that

24   took place.  It's not per say a book or journal.

25   It's per say notes that I wrote down as to the

1          shocking statements that were made to me.  It's

2          not a diary or book or cover.

3               Q.    (By Mr. Gabrielle)  I appreciate your

4     clarification.

5               How many pages of notes would you say

6     there are?

7               A.    One.

8               Q.    One page?

9               A.    One page.

10              Q.    I'm going to show you some notes and I'm

11    going to ask you if there are anymore.  There may not

12    be anymore.  I may have, I may have them all.

13              A.    Correct.

14              Q.    There is no diary?

15              A.    No diary, no book, no journal.  It's a

16    piece of paper that I comprised of of things that took

17    place at that job.

18              Q.    When did you write that down?

19              A.    As they went along.

20              Q.    Okay.  So after something would happen,

21    you would write it down?

22              A.    Yes.

23              Q.    Every time something happened, would you

24    write it down?

25              A.    No.

```
 1          Q.    What did you write down?  Why did you

 2   choose to write some things down and not others?

 3          A.    Certain things were shocking to me as far

 4   as the words that she used, the language, the time that

 5   I came in to verify that I was correct with my

 6   attendance, the days.  Certain situations when the

 7   owner came in, I didn't know who he was.

 8                Certain situations where there were people

 9   that allegedly complained against me.  I would write

10   down the people's name that I seen and we would compare

11   notes as to what she complained about me and I had to

12   be precise with every day that I worked there with her

13   complaints of criticism.

14          Q.    Would it be accurate to say you wrote down

15   what was the worst to you of what she did?

16          A.    Exactly.

17          Q.    Is there anything that you recall -- well

18   let's do this the fair way.

19                I'm going to ask the court reporter to

20   mark two documents as Exhibit 3 and 4 to your

21   deposition.

22                (Thereupon, Defendant's Exhibit No. 3 and

23   4 was marked for identification.)

24          Q.    (By Mr. Gabrielle)  Ms. Brookins I would

25   like you to take your time and read through all the
```

1    pages of the two exhibits.  I've handed you for the

2    record, Exhibit 3 is a two page handwritten statements

3    bate stamp DB 00033 and DB 00034.  Exhibit 4 is a three

4    page handwritten statement, bate stamped DB 00035, 36

5    and 37.

6            Ms. Brookins, please take your time to

7    read all pages of both exhibits and we can go off the

8    record offer.

9            (Thereupon, we went off the record while

10   the witness reviewed documents.)

11           THE VIDEOGRAPHER:  Back on the record.

12       Q.    (By Mr. Gabrielle)  Ms. Brookins, have you

13   had the opportunity to look at both Exhibit 3 and

14   Exhibit 4?

15       A.    Yes.

16       Q.    I would just ask you to look at Exhibit 3

17   for the moment which is the two page document.  Do you

18   recognize Exhibit 3?

19       A.    Yes.

20       Q.    Is this your handwriting?

21       A.    Yes.

22       Q.    When did you write this?

23       A.    I wrote this during the course of my

24   employment between January and June 30th, '96.

25       Q.    So Exhibit 3 is a document that you wrote

```
 1    over a period of six months?

 2         A.    Yes.  I can't recall the exact day.

 3         Q.    What is the first thing on Exhibit 3 that

 4    you wrote?

 5         A.    "During the course of my employment at

 6    Marty's Shoes."

 7         Q.    Did you write the first sentence of this

 8    before or after your employment ended?

 9         A.    After.

10         Q.    Well, help me understand.  You said that

11    you wrote this over six months.

12         A.    I can't give you the exact date.

13         MR. KARLIN:  I don't think that's what

14         she said.

15         Q.    (By Mr. Gabrielle)  Okay.

16         MR. KARLIN:  I think you think this is

17         something that she wrote over a long period of

18         time.

19         MR. GABRIELLE:  Well, I'm about to

20         clarify.

21         Q.    (By Mr. Gabrielle)  Is this something you

22    wrote over a long period of time or is this something

23    you sat down and wrote all at once, Exhibit 3?

24         A.    All at once.

25         Q.    Okay.  Are there other notes that you
```

1    wrote, that you took down of things that happened to

2    you during your employment that you thought were

3    discriminatory?

4         A.    Yes.

5         Q.    You still have those notes?

6         A.    Yes.

7         Q.    So Exhibit 3 is something you sat down and

8    you wrote after your employment ended?

9         A.    Yes.

10         Q.    Did you use those notes that you had taken

11    during your employment to assist you in writing Exhibit

12    3?

13         A.    Yes.

14         Q.    Thank you.  I think we've clarified and I

15    appreciate your help with that.

16              I'm going to ask you about both Exhibit 3

17    and Exhibit 4.

18              Is there anything that happened during

19    your employment that you felt was discriminatory or

20    retaliatory that you didn't write done in Exhibit 3 or

21    Exhibit 4?

22         A.    Okay.  You're asking two questions at one

23    time, I believe.

24         Q.    Is there anything that happened to you

25    during your employment that you thought was

1    discrimination against you because of your race or

2    retaliation against you that you didn't write in

3    Exhibit 3?

4         A.    I can't recall.

5         Q.    Okay.  As far as you know as you sit here

6    today, did Exhibit 3 cover everything that happen to

7    you during your employment which you felt was

8    discriminatory?

9         A.    Yes.

10         Q.    As far as you know, as you sit here today,

11    does Exhibit 3 cover everything that happened to you

12    during your employment that you thought was

13    retaliation?

14         A.    Yes.

15         Q.    Who at Marty's Shoes do you feel

16    discriminated against you?

17         A.    Roma, Roberta and Stanley.

18         Q.    Anyone else?

19         A.    No.

20         Q.    Who at Marty's Shoes do you feel

21    retaliated against you?

22         A.    Roma and Stanley.

23         Q.    Anyone else?

24         A.    Stanley.

25         Q.    Anyone else besides Roma and Stanley?

```
 1            A.    No.

 2            Q.    Okay.  So Roma, Roberta Rybitha and

 3    Stanley Dzioba are the only two people at Marty's Shoes

 4    who you feel discriminated against you or retaliated

 5    against you?

 6            A.    Yes.

 7            Q.    Okay.  In first -- I'm sorry, the second

 8    sentence of Exhibit 3.  You state that your job hours

 9    were consistently reduced from 24 to one hour per week.

10            Who do you believe did that?  Who do you

11    believe was responsible for that?

12            A.    Roma.

13            Q.    And when did your job hours, when did you

14    first feel that your job hours had been reduced?

15            A.    When new people were hired and my hours

16    were being reduced.

17            Q.    When is the first time that you noticed

18    that new people were hired and your hours were being

19    reduced?

20            A.    When they were hired.

21            Q.    Well, what month of 1996?

22            A.    I can't recall the exact month.

23            Q.    Can you approximate?

24            A.    Approximately, March.

25            Q.    Okay.  Who were the new people that were
```

```
 1    hired that you said after they were hired your hours
 2    were reduced?
 3          A.    Nu Chin, I'm sorry.
 4          Q.    Okay.
 5          A.    Chris Torres, Orlando, Alia, and there
 6    were several other peoples.  I can't remember the name.
 7          Q.    Do you have anything written down that
 8    would help you remember their names?
 9          A.    Yes.
10          Q.    What is that?
11          A.    The schedules.
12          Q.    The schedules.
13                Did you ever talk to Roma about why your
14    hours were being reduced?
15          A.    Yes.
16          Q.    What did you say to Roma?
17          A.    At that moment she stated that she had a
18    certain amount of hours that the store could operate
19    under and her or the assistant manager were only given
20    full time and anybody else was part time.
21          Q.    Okay.  Did she ever tell you why it was
22    your hours that were being reduced?
23          A.    Yes.
24          Q.    What did she say?
25          A.    Because I don't deserve to work here.
```

73

```
 1              Q.    When did she tell you that?

 2              A.    I don't have an exact date.

 3              Q.    Approximately how long before your

 4    employment ended did Roma tell you you don't deserve to

 5    work at Marty's Shoes?

 6              A.    Four months.

 7              Q.    What was your response?

 8              A.    I deserve to work here just like anyone

 9    else.

10              Q.    Did you ever talk to Stanley about an

11    argument or arguments that you had with Roma?

12              A.    Yes.

13              Q.    When did you talk to Stanley about the

14    arguments?

15              A.    I talked to Stan -- I don't have an exact

16    date when I spoke to him.  I called him a few times on

17    the 1-800 Marty's lines.  I stated that we were having

18    some problems.  I stated to him the words that she used

19    to me.  I stated to him that my hours are being reduced

20    and that she's constantly harassing me.

21              Q.    Did you ever say anything to Roma that you

22    regretted saying?

23              A.    No.

24              Q.    Did you ever tell Stanley that you said

25    anything to Roma that you felt sorry about saying?
```

1          A.    No.

2          Q.    Did you ever say to Roma -- did you ever

3    make any threats even statements which you didn't

4    consider threats but which Roma interpreted as threats?

5          A.    No.

6          Q.    Did you ever tell Roma that you would fuck

7    her up?

8          A.    No.

9          Q.    Did you ever tell Roma that you had

10   friends who would take care of her or do anything to

11   her?

12         A.    No.

13         Q.    Did you ever tell Stanley that you had

14   made any of those types of statements to Roma?

15         A.    Absolutely not.

16         Q.    Is this the first time sitting here today

17   that you've ever heard anything like that?

18         A.    Yes.

19         Q.    Did you ever have an argument with Roma

20   where both of you were arguing with one another?

21         A.    Yes.

22         Q.    What was that argument about?

23         A.    There was -- which argument?

24         Q.    Oh, is there more than one?

25         A.    Yes.

```
 1          Q.     What was the first one about?

 2          A.     I believe the first argument that we had

 3    was there was a situation in the store with theft.

 4          Q.     With theft?

 5          A.     Yes.

 6          Q.     And can you tell me about that, please.

 7          A.     She asked me to watch a certain character

 8    and a color of person entering the store.

 9          Q.     And what did you do?

10          A.     I asked her why do you want me to just

11    watch a certain color of people, a certain kind of

12    person.

13          Q.     What exactly did Roma say or as best you

14    can recall sitting here today what did Roma say when

15    she asked you to watch a certain person?

16          A.     She said, she stated to me that theft was

17    rising in the store, that shoes were being taken out.

18    Black females, watch all of them of all ages.  Black

19    males, watch all ages; old, young, kids.

20          Q.     And when did this happen?

21          A.     During the course of my employment.

22          Q.     How many times did she make that statement

23    to you?

24          A.     Twice probably.

25          Q.     When was the first time?
```

```
 1          A.    I don't recall.

 2          Q.    When was the second time?

 3          A.    I don't recall the exact date.

 4          Q.    How many times, how much time went by

 5    between the time she made that first statement and the

 6    second time?

 7          A.    A few days.

 8          Q.    Do you believe that Roma was

 9    discriminating against your customers by making that

10    statement?

11          A.    I don't understand your question, my

12    customers?

13          Q.    Marty's Shoes customers.

14                Do you believe that Roma was prejudiced

15    against black people based on that statement?

16          A.    Yes.

17          Q.    Did you write anything about that

18    statement in Exhibit 3?

19          A.    Yes.

20          Q.    Can you show me where.

21          A.    It's the bottom of the page in Exhibit 3

22    or --

23          Q.    Just in Exhibit 3 for now then we'll look

24    at Exhibit 4.

25          A.    No.
```

1      Q.    Can you take a look through Exhibit 4 and
2  see if you wrote anything about it in Exhibit 4 off the
3  statement that Roma made to you about about watching
4  black customers.
5      A.    Yes.
6      Q.    Did you write anything in Exhibit 4 about
7  the statements that Roma made to you about watching
8  black customers?
9      A.    Yes.
10     Q.    Where is that?  Can you show me?
11     A.    "She accused four african americans of
12 stealing shoes."
13     Q.    Okay.  Was that four specific african
14 americans?
15     A.    Yes.
16     Q.    You also said that Roma -- you testified
17 that Roma told you to watch all the black people who
18 came into the store.  Is that right?
19     A.    Yes.
20     Q.    Did you write that anywhere in Exhibit 4?
21     A.    No.
22     Q.    Okay.  Now tell me about this statement
23 that you pointed to in Exhibit 4.
24          When did Roma accuse four african
25 americans of stealing shoes?

```
 1          A.    It was on a weekend and four black males

 2    entered the store and they were noticing the

 3    Timberlanes or the Ballys shoes and I guess one of the

 4    guys had on a pair of Timberlane shoes and Marty's only

 5    carries a certain style of Timberlanes and I guess

 6    because it had the Timberlane emblem on it too, she

 7    immediately thought that they switched the shoes and

 8    she told me to watch those set of four gentlemen while

 9    they were shopping in the store.

10          After they left the store, she called

11    security and told security that they left with shoes

12    and Sunrise Police came there and the security they

13    walked them back to the store to compare the shoes and

14    they discovered that the shoes wasn't a brand style

15    that Marty's carried and they asked me did I see the

16    gentleman take the shoes and I told them no.

17          Q.    Okay.  Did Roma say to you that she

18    thought that the gentlemen took the shoes because they

19    were black?

20          A.    No.

21          Q.    So Roma thought that one of those four

22    gentlemen had taken a pair of Timberlane shoes.

23          MR. KARLIN:  I'll object to the form.

24          Q.    (By Mr. Gabrielle)  As far as your

25    understanding of what Roma said to you was that she
```

```
 1    thought of one of those four gentlemen took a pair of

 2    Timberlane shoes from Marty's?

 3              MR. KARLIN:  I'll object to the form.

 4              MR. GABRIELLE:  You can answer.

 5              MR. KARLIN:  Answer the question.

 6              THE WITNESS:  Yes.

 7         Q.   (By Mr. Gabrielle)  Okay.  Do you think

 8    that in your opinion did Roma think that because they

 9    were african american?

10         A.   Yes.

11         Q.   Did she say anything to you at the time

12    which would make you think that?

13         A.   Yes.

14         Q.   What was that?

15         A.   She stated to me to watch the gentleman,

16    um, they look suspicious or whatever along those lines.

17         Q.   Okay.  And she mentioned that one of them

18    was wearing Timberlane shoes?

19         A.   She didn't mention it to me, no.

20         Q.   One of them was wearing Timberlane shoes?

21         A.   Yes.

22         Q.   Just not Marty's Shoes?

23         A.   That's correct.

24         Q.   Let's go back to Exhibit 3 although this

25    might be a good time to take a lunch break.  Why don't
```

```
 1   we do that and come at 1:15.

 2              MR. GABRIELLE:   Thank you.

 3              (Thereupon, a lunch break was had,

 4   afterwhich the following proceedings were had.)

 5              THE VIDEOGRAPHER:   Back on the record.

 6         Q.    (By Mr. Gabrielle)  Ms. Brookins, I'm

 7   going to show you a composite document which the court

 8   reporter has marked as Exhibit 5.

 9              (Thereupon, Defendant's Exhibit No. 5 was

10   marked for identification.)

11         Q.    (By Mr. Gabrielle)  It consists of a

12   series of pages.  Can we stipulate as to the dates or

13   should I read them quickly with the bate numbers?

14              MR. KARLIN:  The document speaks for

15         itself so --

16         Q.    (By Mr. Gabrielle)  Okay.  I'm going to

17   ask you to flip through those and tell me after you

18   have done so if you recognize them as copies of pay

19   checks stubs in the time period you were employed by

20   Marty's Shoes.

21              Have you had the opportunity look through

22   what has been marked as Exhibit 5?

23         A.    Yes.

24         Q.    Do these documents appear to you to be

25   copies of your earnings as an employee of Marty's
```

1    Shoes?

2         A.    Yes.

3         Q.    Do you have any payroll stubs for any time

4    period other than these?

5         A.    No.

6         Q.    Do you have the payroll stub for the

7    period ending April 13th of '96?

8         A.    April 13th?

9         Q.    Yes.  It's not in there, I'll tell you

10   that.

11              Do you have that payroll stub?  Somewhere

12   other than in front of you I mean.

13        A.    No.

14        Q.    Do you have the payroll stub somewhere

15   other than in front of you for the period of, ending

16   April 27th of '96?

17        A.    No.

18        Q.    Do you recall as you sit here today how

19   many hours you worked in the payroll period of April

20   13th of '96?

21        A.    Can't recall.

22        Q.    Do you recall as you sit here today how

23   many hours you worked in the period of April 27th of

24   '96?

25        A.    No.

1          Q.    Do you believe that Roma reduced your

2     hours that you were working?  Do you believe that the

3     reason why Roma reduce your hours you were working at

4     Marty's Shoes was because of discrimination or

5     retaliation?

6          A.    Yes.

7          Q.    Do you feel that it had anything to do

8     with your conflict with your school schedule?

9          A.    No.

10         Q.    Isn't it correct that your hours at

11    Marty's Shoes began to be reduced at about the same

12    time that you talked to Roma about conflicts with your

13    school schedule?

14         A.    No.

15         Q.    When did your hours at Marty's Shoes begin

16    to be reduced?

17         A.    My hours were reduced as new people came

18    on board hired.

19         Q.    And when was that?

20         A.    They were hired at various times.

21         Q.    When was the first time that you felt like

22    your hours were being reduced?

23         A.    When Chris Torres came on.

24         Q.    And what time frame was that, what month

25    was that?

```
 1            A.    I can't recall the exact date.

 2            Q.    Okay.  Would you say that before your

 3   hours were reduced you were working about 16 hours a

 4   week on average?

 5            A.    No, I was working more than that.

 6            Q.    Okay.  Well, let's just look at the first

 7   document on Exhibit 5.  It's the period ending March

 8   2nd of 1996.  It has your regular earnings for the

 9   hours of 16 and three quarter hours for that pay

10   period.  Is that true?  Is that what it reflects?

11            A.    Yes.

12            Q.    Is that a week or a two-week pay period?

13            A.    That's a week.

14            Q.    Okay.  So 16 hours a week?

15            A.    Yes.

16            Q.    There was a time when your hours were on

17   average more than 16 hours a week?

18            A.    Yes.

19            Q.    And on average you would say how many

20   hours a week before that?

21                  Let me ask that question again.

22                  Before March of '96, what would you say

23   your, the average number of hours a week that you

24   worked?

25            A.    The average, 30.
```

ESQUIRE DEPOSITION SERVICES (954) 331-4400

```
 1         Q.    Thirty.

 2               So is it your opinion then or is it your

 3    contention then your hours were reduced before March of

 4    '96?

 5         A.    No, not before, shortly here, thereafter.

 6         Q.    Okay.  When is it that you felt that

 7    your -- the number of hours you worked had something to

 8    do with discrimination or retaliation?  When did you

 9    first feel that way?

10         A.    As new people were hired, my hours were

11    steadily reduced.

12         Q.    But you don't know when?  You can't

13    estimate today when the new people were hired?

14         A.    No.

15         Q.    I'm going to ask you to turn to the pay

16    period for April 20th of 1996.  It's about middle of

17    the way through there.

18               It's stamped DB 00020.  It says, if you

19    look under gross pay, it says your gross pay, year to

20    date is $1,551.10.

21         A.    Yes.

22         Q.    Do you have any reason to believe that

23    that is incorrect?

24         A.    Yes.

25         Q.    Why?
```

```
 1              A.    Because my checks were inaccurate pretty

 2    much the whole time I was there.

 3              Q.    Were they inaccurately high or

 4    inaccurately low?

 5              A.    Inaccurately low.

 6              Q.    What would you say the total amount of

 7    inaccuracy would be in dollars?

 8              A.    Um, I haven't sat down to compute the

 9    loss.

10              Q.    Well, earlier in your deposition when I

11    asked you about that you said between 25 and $50.

12              A.    I think the question you asked -- you mean

13    over the whole course?

14              Q.    Yes.

15              A.    The whole course, it would be roughly six,

16    $700.

17              Q.    Okay.  Why do you feel like your payroll,

18    your pay checks were inaccurate?

19              A.    They wanted to save labor.

20              Q.    Do you personally know whether or not the

21    time cards that you punched were the information on the

22    time cards you punched were accurately conveyed to

23    payroll?

24              A.    No.

25              Q.    Have you ever looked at copies of the time
```

```
 1    cards you punched after you actually punched them?

 2         A.    No.

 3         Q.    Have you ever done any calculations of

 4    your own?

 5         A.    I've done calculations keeping my own

 6    hours there when I was present working at the store,

 7    the begin time and the ending time.  They're inaccurate

 8    with the pay check.

 9         Q.    Did you ever talk with anyone else besides

10    Roma about inaccuracy in pay checks?

11         A.    No.

12         Q.    Did any other employees ever talk to you

13    about their pay checks being inaccurate?

14         A.    Orlando.

15         Q.    What did Orlando say to you about it?

16         A.    Orlando stated to me and Roma that his

17    check was inaccurate a few times.

18         Q.    Did he say whether it was inaccurately low

19    or inaccurately high?

20         A.    He said it was short.

21         Q.    Okay.  Roma told -- excuse me.

22               Orlando told Roma that his pay check was

23    short a few times?

24         A.    Yes.

25         Q.    Is Orlando black?
```

```
 1          A.    No.

 2          Q.    Let me ask you to take a look back at that

 3    pay period ending April 20th of 1996.  It reflects at

 4    least that year to date you were paid $1,551.10.

 5                Do you have any reason to believe that the

 6    amount you paid, you were paid was less than that?

 7          A.    Repeat the question.

 8          Q.    Do you have any reason to believe that the

 9    earning statement dated April 20th of 1996 which

10    reflects that year to date in '96 you were paid

11    $1,551.10?

12                Do you have any reason to believe that

13    that is not the amount that you were actually paid?

14                In other words, whether or not it reflects

15    accurately the hours that you worked, do you believe

16    that that is, that could be the amount you were

17    actually paid?

18          A.    I'm not sure.

19          Q.    Okay.  Did you receive this earning

20    statement for the period ending April 20th of 1996?

21          A.    Yes.

22          Q.    Did you file a tax return for the year

23    1996?

24          A.    Yes.

25          Q.    And you accurately completed the
```

```
 1   information on your tax return, correct?

 2          A.    Yes.

 3          Q.    Okay.  Did you receive a W-2 for Marty's

 4   Shoes for the year 1996?

 5          A.    Yes, I did.

 6          Q.    Do you believe that that was accurate, the

 7   W-2?

 8          A.    I'm not sure.

 9          Q.    Okay.  Let me ask you to take a look at

10   the earning statement that's for the period ending

11   April 6th of 1996 which reflects that year to date you

12   had earned $1,480.66.

13          Do you have any reason to believe that

14   that is incorrect, that you had actually been paid that

15   amount?

16          A.    Yes.

17          Q.    What is that reason?

18          A.    If they took hours from me as far as

19   shortening my hours, then how can I assume that the

20   hours that they already paid me was correct, the year

21   to date is correct as well?

22          Q.    Okay.  Do you believe that your checks

23   were actually less than the amounts reflected in these

24   earnings statements?

25          A.    Yes.
```

```
 1              Q.    Do you have any way of verifying that?

 2              A.    No.

 3              Q.    Is the amount that you reported to the IRS

 4    for the year 1996 as your earnings from Marty's Shoes,

 5    is that correct?

 6              A.    It's not accurate, no.

 7              Q.    You reported inaccurate information to the

 8    IRS?

 9              A.    If my pay checks were short then I'm

10    reporting inaccurate information from their shortage.

11              Q.    Did you tell the IRS that you had actually

12    earned more money in 1996 than you were paid?

13              A.    No.

14              Q.    Why didn't you do that?

15              A.    This is the best record that I have as far

16    as how much money that I worked.

17              Q.    Okay.  So whether or not you agree with

18    its accuracy, the earnings statement from Marty's Shoes

19    are the best records you have?

20              A.    Yes.

21              Q.    I would ask you to just, and I've done the

22    mathematics myself, but I would ask you to take a look

23    at the difference between your earnings for year to

24    date on the April 20th of '96 statement and on the

25    April 6th of '96 statement.
```

1                    One reads $1,551.10 and the prior one

2      reads $1,480.66.

3            A.    Uh-huh.

4            Q.    If I told you that the difference between

5      those two amounts was $70.44, would you have any reason

6      to disagree with me?

7                    I subtract $1,480.66 from $1,551.10, I

8      come up with $70.44.

9            Q.    Does that seem right to you?

10           A.    Yes.

11           Q.    Can we conclude based on that that the

12     amount that you earned during the week between April

13     6th of '96 and April 20th of '96 was approximately

14     $70.44?

15           A.    Yes.

16           Q.    And at that time you were paid $5.75 an

17     hour, is that correct?

18           A.    Yes.

19           Q.    It's about 12 hours, is that correct?

20           A.    Yes.

21           Q.    So in conclusion, you could have worked

22     approximately 12 hours in the week of April, the week

23     ending April 13th of '96?

24           A.    Yes.

25           Q.    Let's do the same thing, and this is the

1    only other time we'll do it, for the May 4th of '96

2    statement.

3              The year-to-date earnings on the May 4th

4    of '96 statement are $1,602.85.

5              Is that the best record you have of your

6    earnings for the period ending of May 4th of '96?

7         A.   Yes.

8         Q.   And if we look at the immediate, previous

9    one of April 20th of '96, it reflects year to date of

10   $1,551.10.

11             Is that the best record you have of your

12   earnings?

13        A.   Yes.

14        Q.   The difference between those two amounts

15   I'll tell you is $51.75.

16             Do that subtraction quickly in your head.

17        A.   Yes.

18        Q.   At $5.75 an hour, that's approximately

19   nine hours.  Does that sound right to you?

20        A.   Yes.

21        Q.   Can we conclude based on that that you

22   worked approximately nine hours during the week between

23   the pay period between April 20th, '96 and May 4th,

24   '96?

25        A.   Approximately, yes.

```
 1              Q.    Okay.  Was there anyone else other than

 2    Roma responsible for making up the schedule for Marty's

 3    Shoes?

 4              A.    No.

 5              Q.    Did you ever, did anyone ever tell you

 6    that they had made up the schedule instead of Roma once

 7    she became the manager?

 8              A.    No.

 9              Q.    Was there a time period in '96 when you

10    were on break from your classes at BCC?

11              A.    May.

12              Q.    May, okay.

13                    And how long was that break?

14              A.    A few weeks.

15              Q.    A few weeks.  Was it spring break?

16              A.    Yes.

17              Q.    Do you have copies of your academic

18    transcript from BCC?

19              A.    No.

20              Q.    Your grades?

21              A.    No.

22              Q.    Report cards, anything like that?

23              A.    No.

24              Q.    Do they -- are you in a program where

25    grades are given?
```

```
 1              A.    Yes.
 2              Q.    Have you ever seen a copy of your
 3     transcript from BCC?
 4              A.    No.
 5              Q.    After you were hired at Marty's Shoes, the
 6     entire time you worked there, were there any other
 7     black people hired to work there?
 8              A.    No.
 9              Q.    Why do you laugh when you say that?
10              A.    I was the only black.
11              Q.    You were the only black person working
12     there?
13              A.    Yes.
14              Q.    The entire time you worked for Marty's
15     Shoes you were the only black person working there?
16              A.    Yes.
17              Q.    Do you know if Roma ever hired any other
18     black employees?
19              A.    No.
20              Q.    Has anyone ever told you that Roma had
21     hired other black employees?
22              A.    No.
23              Q.    Do you know if -- do you know who was
24     responsible for terminating your employment?
25              A.    Roma and Stanley.
```

```
 1            Q.    Did either Roma or Stanley tell you whose
 2   decision it was to terminate your employment?
 3            A.    No.
 4            Q.    Do you know if Roma was responsible for
 5   terminating the employment of any other employees at
 6   Marty's Shoes?
 7            A.    No.
 8            Q.    Do you know if Stanley was responsible for
 9   terminating the employment of any other employees at
10   Marty's Shoes?
11            A.    No.
12            Q.    To your knowledge, while you were working
13   there at Marty's Shoes, was anyone else fired?
14            A.    Michael Torres.
15            Q.    Do you -- what is your understanding, what
16   were you told or what have you heard about why Michael
17   Torres was fired?
18            A.    From my understanding, he had fraudulently
19   lied on his application and had a criminal history.
20            Q.    And who told you that?
21            A.    Roma.
22            Q.    Did you ever talk with Michael Torres
23   about the reason why he was fired?
24            A.    No.
25            Q.    Is Michael Torres black?
```

```
 1              A.    No.

 2              Q.    What did you say to Roma when she told you

 3    that you should watch black customers when they come

 4    into the store?

 5              A.    My words were to her that all people

 6    steal.

 7              Q.    And what was her response?

 8              A.    Watch them because they're taking the

 9    shoes.

10              Q.    Okay.  Now we're not talking about the

11    four african american gentlemen that you mentioned

12    before, this is a separate occasion?

13              A.    No.

14              Q.    It's the same occasion?

15              A.    Watch them.

16              Q.    Okay.  Was there more than one occasion on

17    which Roma told you to watch black customers in the

18    store?

19              A.    No.

20              Q.    There was the only one occasion?

21              A.    One occasion.

22              Q.    And she was talking about those four

23    gentlemen specifically?

24              A.    Yes.

25              Q.    Okay.  You already testified about the
```

1    Timberlane shoes that one of them was wearing.

2         A.    Yes.

3              THE VIDEOGRAPHER:  Can we go off the

4         record?

5              MR. GABRIELLE:  Sure.

6              (Thereupon, the videographer changed the

7    tape.)

8              (Thereupon, Defendant's Exhibit No. 6 was

9    marked for identification.)

10        Q.    (By Mr. Gabrielle)  Ma'am, I'm going to

11   ask you to look at what I've asked the court reporter

12   to mark as Exhibit 6 to your deposition.  We're done

13   with that.

14              If you could take a look over, please, and

15   tell me if you recognize it.

16        A.    Yes.

17        Q.    Do you recognize Exhibit 6 as a copy of

18   the W-2 you received from Marty's Shoes for the year

19   1996?

20        A.    Yes.

21        Q.    And is it your testimony that the amount

22   of wages, tips or other compensation of $1,735.10 that

23   is reflected on here is inaccurate?

24        A.    Yes.

25        Q.    And do you believe it is inaccurately low

```
 1   or inaccurately high?

 2          A.    Inaccurately low.

 3          Q.    Did you ever, after you left employment

 4   with Marty's Shoes, did you ever raise that issue with

 5   anyone at the company?

 6          A.    Yes.

 7          Q.    Who was that?

 8          A.    John Adams.

 9          Q.    How did you raise that issue with Mr.

10   Adams?

11          A.    I notified John Adams that my checks were

12   always inaccurate, they were short.

13                MR. KARLIN:  I just want to note I think

14          there's a little confusion.  I think you're

15          asking her a question and she's answering a

16          different question.

17                MR. GABRIELLE:  Let me try again.

18                MR. KARLIN:  Because I think your question

19          goes to whether or not the income she actually

20          received, is that accurate in this W-2 and she's

21          responding that she was shorted money.

22                MR. GABRIELLE:  Okay.

23                MR. KARLIN:  And therefore that's why this

24          is inaccurate.

25                MR. GABRIELLE:  I understand.  Let
```

```
 1              me try to --
 2                   MR. KARLIN:  What?
 3                   THE WITNESS:  That's correct.
 4                   MR. GABRIELLE:  We had that same sort of
 5              conversation about the pay checks.
 6              Q.    (By Mr. Gabrielle)  Do you believe that
 7    the amount of money you actually received from Marty's
 8    Shoes in wages for the year 1996 was or was not
 9    $1,735.10?
10              A.    Repeat the question.
11              Q.    This number here on Exhibit 6.  Exhibit 6
12    reflects that you were actually paid by Marty's Shoes
13    an amount in wages of $1,735.10.
14              A.    Yes.
15              Q.    Do you believe that that is the amount of
16    wages that you actually received from Marty's Shoes?
17              A.    Yes.
18              Q.    But you believe that that amount was less
19    than the amount you were entitled to?
20              A.    Exactly.
21              Q.    And you've mentioned that you had raised
22    the issue with John Adams.
23                   When did you raise the issue with Mr.
24    Adams?
25              A.    I raised the issue with Mr. Adams before I
```

```
 1   was terminated.

 2              Q.    And did you do it verbally or in writing?

 3              A.    I did it in writing and over the phone.

 4              Q.    Okay.  What in writing did you send to Mr.

 5   Adams?

 6              A.    I believe it's in Exhibit 3.

 7              Q.    Okay.

 8              A.    I stated to him that my checks were

 9   constantly week after week were being short.

10              Q.    When did you raise it verbally with him?

11              A.    Over the phone.

12              Q.    When did you have that phone call?

13              A.    It was before I was terminated.

14              Q.    And you actually spoke with Mr. Adams?

15              A.    Yes.

16              Q.    What did he say to you?

17              A.    He told me to write down the hours that I

18   worked that I felt like I was being short for a week,

19   give it to Roma and they would send it up to New

20   Jersey.

21              Q.    Did you do that?

22              A.    Yes.

23              Q.    Did you give it to Roma?

24              A.    Yes.

25              Q.    Did she tell you she had sent it to New
```

1    Jersey?

2         A.    She told me that she sent it in.

3         Q.    Did she ever tell you what the response

4    was?

5         A.    She told me to, if I have a problem in the

6    store to contact her first.

7         Q.    Was Roma upset that -- well, strike that.

8               Did Roma tell you that she was upset

9    because you had called Mr. Adams directly?

10        A.    Yes.

11        Q.    Was Mr. Adams the vice president of

12   Marty's Shoes?

13        A.    Yes.

14        Q.    Did -- is this the topic that you've

15   already testified to that Roma sent the information to

16   New Jersey and New Jersey reported back to her that the

17   information they had was -- that you were paid for

18   based on the time that they had?

19        A.    This is a continuance, it was still going

20   on.

21        Q.    Okay.  Do you have any estimate that

22   you've done or any document that you've prepared which

23   shows the amount that you think you were underpaid by

24   Marty's Shoes?

25        A.    No.

1          Q.    You estimate that amount to be what?

2          A.    The whole period I was employed by them.

3    It appears by my record week to week roughly $700 off.

4          Q.    Okay.  And how have you made that

5    calculation?

6          A.    Every week if you work, for example, 14

7    hours they will pay you for four but as my hours got

8    short, they couldn't exactly deduct anything from three

9    or one hours or five hours.  So this was a time frame

10   when I was accumulating more hours.

11         Q.    Did you keep a record week to week as to

12   how many hours you worked or are you using the actual

13   copy of the schedule?

14         A.    I kept a copy that reflect the hours that

15   I was there in the store.

16         Q.    Okay.  And is that, is that a document

17   which you prepared yourself or is that a Marty's Shoes

18   document?

19         A.    That's a document I prepared.

20         Q.    Do you still have that document?

21         A.    No.

22         Q.    What happened to it?

23         A.    It could have gotten lost.  I could have

24   lost it.

25         Q.    Okay.  Is that the document in which you

1    estimated that you were underpaid by about $700?

2        A.    Yes.

3        Q.    And what documents did you use to come up

4    with that calculation?

5        A.    When I entered the store I wrote the time

6    that I began starting work.  When I ended, I wrote it

7    down.  When I received the payroll, it's inaccurate, it

8    was not the hours that I was actually, physically

9    there.

10        Q.    Okay.  Do you know if it was accurate

11    based on the time that you actually punched the time

12    clock?

13        A.    No.

14        Q.    You don't know?

15        A.    No, it wasn't.

16        Q.    How do you know?

17        A.    Because when I received the check, the

18    check was always shorter than the actual time I was

19    there.

20        Q.    Did you ever compare your check to your

21    time card?

22        A.    I didn't see the time cards.

23        Q.    Tell me about the time cards.  Was there

24    actually a physical time card?  Were there actual --

25        A.    Yes.

1        Q.    And was there actually a time clock that

2   you inserted the time card into?

3        A.    Yes.

4        Q.    Did you put the time card back in the

5   slot?

6        A.    Yes.

7        Q.    Did you ever take the actual -- did you

8   use the same time card week after week?

9        A.    No, after a week, the week was ending,

10  it's mailed into New Jersey to process the payroll.

11       Q.    Did you ever ask to see the old time

12  cards?

13       A.    Yes.

14       Q.    And who did you ask?

15       A.    Roma.

16       Q.    And what did she say?

17       A.    I wasn't allowed to see company documents.

18       Q.    Okay.  Other than Orlando, did anyone else

19  ever complain about their hours being shorted?

20       A.    Not to my knowledge.

21       Q.    If you would please take a look at the

22  document which has been marked Exhibit 7 which for the

23  record is bate stamped DB 00040.

24            (Thereupon, Defendant's Exhibit No. 7 was

25  marked for identification.)

```
 1              Q.     (By Mr. Gabrielle)  Tell me if you

 2      recognize it, please.

 3              A.     Yes, I recognize it.

 4              Q.     Is this the note that you testified Roma

 5      left for you to call Stanley?

 6              A.     Yes.

 7              Q.     Where did she leave this note?

 8              A.     Inside the office.

 9              Q.     Where did she leave it, on a bulletin

10      board or was it somewhere else?

11              A.     Inside the office where you begin to sign

12      in.

13              Q.     Okay.  And your response to this note was

14      to call Stanley?

15              A.     Yes.

16              Q.     And that's when you were told you were

17      terminated?

18              A.     Yes.

19              Q.     Prior to you calling Stanley, did you have

20      any knowledge as to whether or not you were still

21      employed by Marty's Shoes?

22              A.     Repeat the question.

23              Q.     Prior to when Stanley told you you were

24      terminated --

25              A.     Uh-huh.
```

1          Q.     -- did you still believe you were employed

2     by Marty's Shoes?

3          A.     Yes.

4          Q.     If you could take a look at the document

5     which has been marked as Exhibit 8.  For the record

6     it's bate stamped DB 00041.

7                 (Thereupon, Defendant's Exhibit No. 8 was

8     marked for identification.)

9          Q.     (By Mr. Gabrielle)  Tell me, please, after

10    you look at it if you recognize it.

11         A.     Yes.

12         Q.     Is that your signature which appears sort

13    of in the center at the bottom?

14         A.     Yes.

15         Q.     What is this document that has been marked

16    as Exhibit 8?

17         A.     This is a warning that she gave me when I

18    left to go to the bank.  I told Michael and her that I

19    had to cash my check and she stated to me that I left

20    work early and I left work without notifying the

21    management.

22         Q.     Okay.  When I asked you earlier in your

23    deposition if anyone had given you any written

24    evaluations and you testified yes, is this what you

25    were talking about?

```
  1              A.     Yes.

  2              Q.     Is that your writing above?  It says "Left

  3    work early not telling anybody."

  4                     Do you believe that to be Roma's writing?

  5              A.     That's my writing.

  6              Q.     But where it says "Left work early?"

  7              A.     Yes.  No.  Above that.

  8              Q.     I'll figure it out.  First where the

  9    statement says "Left work early, not telling anybody",

 10    do you believe that to be Roma's writing?

 11              A.     Yes.

 12              Q.     And the writing above that, "Did tell you

 13    and Michael because I am having my check", that is your

 14    writing?

 15              A.     Yes.

 16              Q.     Is it your testimony you told Roma you

 17    were leaving early?

 18              A.     I told her that I was going to cash my

 19    check and I would return.

 20              Q.     And that you would return?

 21              A.     Yes.

 22              Q.     And did you return?

 23              A.     Yeah.

 24              Q.     Did you ever receive any other warnings of

 25    any type from Roma?
```

```
 1         A.     No.

 2         Q.     Verbal warnings or written warnings?

 3         A.     No.

 4                I have a correction.

 5                She did notify me too when I am to go to

 6    the rest room to notify her when I'm leaving and when I

 7    come back.  When I am reporting for duty, to let her

 8    observe my shoes and when I am leaving.  And when I

 9    purchase shoes, to call only her specifically, not

10    Michael, no other management.

11         Q.     Okay.  Do you believe that Roma was

12    discriminating against you when she asked you to let

13    her know when you were leaving?

14                MR. KARLIN:  I'll object.  You can answer

15         the question.

16                THE WITNESS:  Yes.

17         Q.     (By Mr. Gabrielle)  Why?

18         A.     Because everybody else had the obligation

19    of leaving when their shift was completed.

20         Q.     Did Roma ask you to notify her if you were

21    leaving after your shift was completed?

22         A.     Before.

23         Q.     Okay.  So Roma told you if you were going

24    to leave before your shift was over you should let her

25    know?
```

```
 1              A.    Yes.
 2              Q.    And everyone else you testified had the
 3    option of leaving when their shift was over?
 4              A.    Yeah.
 5              Q.    That's different.  Two things are
 6    different.  Roma -- help me understand.
 7              A.    Okay.
 8              Q.    Roma told you that if you're going to
 9    leave early before your shift is over, you have to let
10    me know.
11              A.    That's what she told me.
12              Q.    And everyone else, you testified, could
13    leave when their shift was over.
14              A.    That was a correction.  Everybody had the
15    opportunity of leaving when they're finished, but I had
16    to report to her to say hey, I'm leaving.
17              Q.    How do you know that Roma didn't require
18    other employees to let her know before they were
19    leaving?
20              A.    They just walked off.
21              Q.    How do you know that they didn't talk --
22              A.    I seen them.
23              Q.    How do you know that they didn't talk to
24    Roma before they left?
25              A.    They didn't, I seen it.
```

```
 1              Q.    Is there a back room at the store where
 2    you worked at Marty's Shoes?
 3              A.    Yes.
 4              Q.    Where was Roma?  Was she ever in the back
 5    room?
 6              A.    No.
 7              Q.    She was always out front?
 8              A.    Yes.
 9              Q.    Did you observe every conversation between
10    every other employee at Marty's Shoes and Roma?
11              A.    No.
12              Q.    Did you hear every conversation between
13    every other employee of Marty's Shoes and Roma?
14              A.    No.
15              Q.    As you sit here today, how do you know
16    whether or not those employees, any ever them, told
17    Roma that they were leaving?
18              A.    I don't.
19              Q.    Okay.  Do you believe that -- where was
20    the rest room?  Was there one at the actual location of
21    Marty's Shoes, was it somewhere else inside the
22    building?
23              A.    It's approximately 150 feet north of
24    Marty's Shoes.
25              Q.    How many people were working on average at
```

```
 1    Marty's Shoes at any one time while you were there?

 2                In other words, on duty at the time?

 3         A.    To my knowledge, maybe four.

 4         Q.    Maybe four?

 5                Did you think that Roma telling you that

 6    you had to notify her when you went to the rest room,

 7    did you feel like she was doing that to discriminate

 8    against you?

 9         A.    Yes.

10         Q.    Why?

11         A.    Because nobody -- she had no other

12    problems or situations that arose where other employees

13    had to do it as well.

14         Q.    How do you know that?

15         A.    She stated to me I'm the only one giving

16    her problems.

17         Q.    What did she mean when she -- strike that.

18                Tell me about the conversation where she

19    told you you were the only employee giving her

20    problems.

21         A.    Notifying Stanley about the problems,

22    arguments between her, her name calling me, her

23    shortening my hours, notifying the home office about

24    the problems at the store.  She assumed I was trying to

25    get her in trouble instead of clarifying the situations
```

 1    we have with each other.

 2         Q.    As far as you know, were you the only

 3    employee that was having problems with Roma?

 4         A.    Yes.

 5         Q.    What -- is it your testimony that Roma

 6    called you derogatory names?

 7         A.    Yes.

 8         Q.    Can you tell me what those were.

 9         A.    She called me a street person.  She

10    referred to me or my character or color or you people.

11    Uh, street person, vagabond, street walker.

12         Q.    Okay.  Why do you feel like -- do you feel

13    like Roma calling you a street person was derogatory

14    based on your race?

15         A.    Exactly.

16         Q.    Why?

17         A.    That's the word she used.  She has no

18    other -- I believe she has no other knowledge to call

19    me that other than my race.  She never seen me walking

20    the street.

21         Q.    Well, what's your understanding of what a

22    street person is?

23         A.    A street person is someone who lives on

24    the street, I guess.  I couldn't even tell.  I don't

25    know.

```
 1          Q.     So do you know, what does the phrase or

 2    the word street person have any significance to you?

 3                 Do you believe that has any connection to

 4    black people?

 5          A.     Yes.

 6          Q.     Why?

 7          A.     Because black people primarily, the

 8    majority, walk the streets, sleep on the streets.

 9          Q.     So you interpreted the phrase street

10    person to be discriminatory against black people?

11          A.     Yes.

12          Q.     And the reason you believe that is because

13    the majority of the people that are homeless are black?

14          A.     And I'm the only black person there.

15          Q.     When did Roma call you a street person?

16          A.     I don't have the exact date.

17          Q.     Approximately.

18          A.     April.

19          Q.     Tell me about the conversation that

20    occurred, what she said and what you said when she

21    called you a street person.

22          A.     I asked her she doesn't even know what a

23    street person is, what is a street person.

24          Q.     But what happened before?  I mean what did

25    she say when she called you a street person.  Tell me
```

```
 1   everything you can remember about that.  --

 2        A.    What prompted that?

 3        Q.    Yes.

 4        A.    We were working on a rack and Michael

 5   Torres was there giving me the shoes to put on the rack

 6   and when she came by she disagreed with the way we were

 7   working or I was working.  And when she came, she

 8   changed the whole rack and she said that's not the way

 9   it's done at Marty's, you don't want to work and I said

10   what do you mean I don't want to work.  We exchanged

11   words back and forth and she says you're a street

12   person, you are a street walker.

13        Q.    Okay.  You had an argument with Roma

14   before she called you a street person?

15        A.    Yes.

16        Q.    And the argument was about her rearranging

17   the rack that you had worked on?

18        A.    Yes.

19        Q.    In that conversation she called you a

20   street person and a street walker?

21        A.    Yes.

22        Q.    What's your understanding of the meaning

23   of the phrase street walker?

24        A.    Someone who is homeless in a negative

25   connotation; homeless, dirty, doesn't want to work, a
```

114

```
 1    low life, a bum.
 2            Q.    Okay.  Why did any of those things have to
 3    do with being black?
 4            A.    I was the only black person there.
 5            Q.    So the reason why you believed that street
 6    person or street walker is discriminatory based on your
 7    race is because you were the only person that Roma
 8    called a street person and a street walker?
 9            A.    Yes.
10            Q.    And you were the only black employee?
11            A.    Yes.
12            Q.    You said she called you a vagabond.  Did
13    she use the word vagabond in reference to you?
14            A.    Yes.
15            Q.    Was that in the same conversation that you
16    just testified to?
17            A.    No.
18            Q.    When did Roma use the word vagabond in
19    reference to you?
20            A.    After the complaint, after John Adams.
21            Q.    Tell me about the conversation in which
22    Roma --
23            A.    After I wrote the letter to John Adams, I
24    guess she received a call from Stanley or the home
25    office asking her what was the problem.
```

```
 1              She communicated with the home office and
 2    when I reported to work, she disclosed that she had
 3    contact with the home office and not to contact them
 4    concerning anything at that store and the word,
 5    language that she used, you people is commonly and
 6    known, referred to as black people and when I asked her
 7    what a vagabond was, you people don't want to work, you
 8    just want to come and cause problems.  That's the word
 9    that she used to me.
10         Q.    Okay.  There's a couple things that I want
11    to ask you about in that statement.
12              When did she use the word vagabond?
13         A.    After, when I reported for work that day,
14    after I made the complaint to John Adams.
15         Q.    Roma called you a vagabond?
16         A.    Yes.
17         Q.    And what was your response?
18         A.    I asked her what a vagabond was.
19         Q.    And then what did she say?
20         A.    She didn't give me a definition of what a
21    vagabond was and I told her that's not my name.  She
22    referred to you people, she went to you people.  She
23    didn't give me a definition or tell me why she was
24    calling or labeling me a vagabond.
25         Q.    Okay.  When she said "you people" you
```

```
 1    interpreted that to mean black people?
 2         A.    Yes.
 3         Q.    Did you ask her if she meant black people?
 4         A.    No.
 5         Q.    Did she say that she meant black people?
 6         A.    No.
 7         Q.    Has anyone else used that phrase you
 8    people referring to you?
 9         A.    No.
10         Q.    What makes you feel like you people means
11    black people?
12         A.    Because that's the phrase that mostly
13    white counterparts or people from other races refer to
14    black people, you people, that's the -- you people are
15    commonly known as you people in that.
16         Q.    Okay.  What experiences have you had that
17    you're basing that on?
18         A.    Repeat the question.
19         Q.    You said it's commonly known that when
20    white people refer to blacks they say you people, and
21    I'm asking you what experience are you basing that on?
22         A.    The experience that I base that on is my
23    education from reading history, how white people and
24    black people interact with people as humans.  They
25    refer to them as you people in a hostile environment.
```

```
 1              Q.    Other than what you've already described,

 2    has Roma used any other words derogatory terms

 3    referring to you that you felt was discrimination based

 4    on your race other than what you already testified to?

 5              A.    No.

 6              Q.    Did Stanley ever use any words towards you

 7    which you thought were discriminatory to you based on

 8    your race?

 9              A.    No.

10              MR. GABRIELLE:  Let me take a quick

11         break and I might -- this might be the time

12         to conclude this part.

13              MR. KARLIN:  All right.

14              THE VIDEOGRAPHER:  Going off the video

15         record.

16              (Thereupon, a short break was had.)

17              THE VIDEOGRAPHER:  Back on the video

18         record.

19              MR. GABRIELLE:  This is going to conclude,

20         Ms. Brookins, your deposition for today.  Your

21         lawyer and I have agreed that we'll resume and

22         complete your deposition on a mutually

23         convenient date and time.

24              MR. KARLIN:  That's correct.

25              MR. GABRIELLE:  Thank you very much for
```

1          coming in.

2                  (Whereupon, the deposition was concluded

3     at 1:20 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

_____

**Deponent**


           Sworn to and subscribed before me this


_____ day of _____, 2000.




                              _____

                              Notary Public,

                              State of Florida at Large


My commission expires:










                              .

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF BROWARD

I, the undersigned authority, certify that the aforementioned witness personally appeared before me and was duly sworn.

WITNESS my hand and official seal this

_8_ day of _September_, 2000.

*Kim Tabor*

-------------------------

KIM TABOR

Notary Public – State of Florida

My commission expires:  1/21/2001

## REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA

COUNTY OF BROWARD

    I, KIM TABOR, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true record of the testimony given by the witness.

    I further certify that I am not a relative or employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

    Dated this _8_ day of September, 2000.

_Kim Tabor_

Kim Tabor,

Shorthand Reporter.

Denise Brookins

c/o Stewart Lee Karlin, Esq.

400 Southeast 8th Street

Fort Lauderdale, Florida 33316

September 8, 2000

RE:  Denise Brookins vs. Marty's Shoes

     Please take notice that on the 23rd day of August, 2000, you gave your deposition in the above-styled case.  At that time, you did not waive your signature.  It is now necessary that you come in to our office to read and sign your deposition.

     Please come by our office, which is located at 1218 Southeast Third Avenue, Fort Lauderdale, Florida (954) 463-9506 between the hours of 9:00 a.m. and 4:30 p.m., Monday through Friday.  No appointment is necessary.  Please notice that this address may be different than the one at which you gave your deposition.

     If you do not appear to read and sign your deposition withing thirty (30) days, the original will be forwarded to the attorney who requested your appearance for the deposition for filing with the Clerk of the Court.  If you wish to waive your signature at this time, you may sign your name in the blank at the bottom of this page and return it to us.  Your thirty. (30) days begins from the date of this letter.

     Thank you,

Esquire Deposition Services

I do hereby waive my signature

_____

Said deponent did ( )  did not ( )  appear to read and sign deposition.

Case 3:98-cv-00092-UU Document 20 Entered on FLSD Docket 11/06/2000 Page 123 of 171




**Welcome to marty's warehouse shoe outlets**

Marty's Shoes Outlet was founded in 1974 by Marty Samowitz. The first store was in Little Ferry, New Jersey. John Adams and Paulette Purcar were there from the beginning. As a matter of fact, John and Paulette started with Marty in his previous company. John started as a stockboy and was manager of the first store. Paulette was an office clerk and cashier in the first store. Today these professionals serve as President and Treasurer, respectively. In addition John, as CEO, is the architect of our future expansion.

Marty began Marty Shoes Outlet with the idea that a self-service shoe selling name brand shoes at reduced prices might be something the public needed. Over the years, we have been true to our average customer. That is individuals who, under the pressure of family finances or inflation or whatever, are budgeted but still want to dress well. These customers look for stylish footwear at a considerable savings.

Why are we still successful? Other retailers try to maximize business with private label footwear. Marty's offers consumers brand name footwear at discount prices. Marty's price is always an everyday low price. The biggest difference between Marty Shoe Outlet and other retailers is our employees. We are blessed with some of the best employees in the industry. Because of their dedication and hard work, Marty Shoe Outlet is one of the most sucessful retailers in America.

How will Marty Shoe Outlet be sucessful in the future? First we will need talented and hard working employees. We offer a tremendous benefit package that includes a 401K savings plan and a comprehensive medical and prescription plan. We will need more stores in prime areas that have inexpensive rents. We will need to continue to offer or customers the same savings that have made them our customers in the first place.

The most important ingredient to our success is you. Our future depends on all employees knowing who the real boss is "OUR CUSTOMERS". If we provide our customers with a friendly atmosphere and superior customer service, our future will be unlimited.





DEFENDANT'S EXHIBIT

1

KT 8·23·00

# EMPLOYEE HANDBOOK

Welcome to **Marty Shoes Inc.**

**Marty Shoes Inc.** Wishes you a warm "welcome aboard."

We are a Company attempting to create a pleasant working environment for all our employees. We hope that your employment with us is pleasant and mutually beneficial.

This Handbook summarizes the various employment policies and procedures at **Marty Shoes Inc.** None of the policies or procedures can be amended or altered in any way by any oral statements, but can only be altered by written amendment by authorized personnel.

**Marty Shoes Inc.** is a drug free company!

THIS HANDBOOK MUST STAY IN THE STORE.  NEW EMPLOYEES ARE ENCOURAGED TO READ THIS HANDBOOK AND ASK ANY QUESTIONS.

THIS HANDBOOK IS NOT INTENDED EITHER AS AN EXPRESS OR IMPLIED CONTRACT OF EMPLOYMENT BETWEEN THE COMPANY AND ANY OF ITS EMPLOYEES.

# Employment Guidelines

## Equal Employment Opportunity

It is the policy of **Marty Shoes Inc.** to be fair and impartial in all of its relations with its employees and applicants for employment without regard to race, color, religion, sex, age, disability, national origin, marital status, ancestry or medical condition.

## Sexual Harassment

It is unlawful and against the policy of **Marty Shoes Inc.** for any employee, male or female, to sexually harass another employee by:

1. Making unwelcome sexual advances or requests for sexual favors, or other verbal or physical conduct of a sexual nature, a condition of an employee's continued employment;

2. Making submission to, or rejections of such conduct, the basis for employment decisions affecting any employee.

3. Creating an intimidating, hostile or offensive working environment.

In recognition of each employee's individual dignity, **Marty Shoes Inc.** will not tolerate the harassing of individuals with words or actions relating to sexual activities.

Any employee who believes he or she has been the subject of sexual harassment, should report the alleged act immediately to the Store Manager or the Corporate Office, to Paulette Purcar, our Treasurer, Bob Schmidt, our Vice President or to John Adams, our President. An investigation of all complaints will be immediately undertaken. Any supervisor or employee, or agent of **Marty Shoes Inc.** who has been found by **Marty Shoes Inc.**, after appropriate investigation, to have sexually harassed another employee, will be subject to appropriate disciplinary action which may include termination.

## Immigration Reform and Control Act

A Federal law, the Immigration Reform and Control Act, effective November 6, 1986, makes it unlawful for us to knowingly hire a non-U.S. citizen not authorized to work in the United States or to continue to employ an employee once we know the employee is not authorized to work in the United States.

We must verify the employment status and the personal identification of all new hires by examining specific documents. The Company must state on a special Federal form (I-9) that an employee's right to work status has been verified and that the employee has attested to his or her lawful right to work in the United States.

## Employee Classification

REGULAR FULL-TIME: You are considered to be a Regular full-time Employee after having satisfactorily completed the Introductory Period of three (3) months and your normal work schedule calls for at least thirty (30) hours per week on a continuing basis. Under these circumstances, you are entitled to all benefits available to Regular full-time Employees as described elsewhere in this booklet.

REGULAR PART-TIME: You are considered to be a Regular Part-time Employee after having satisfactorily completed the Introductory Period of three (3) months and are scheduled to work more than twenty (20) but less than thirty-nine (29) hours weekly. Paid holiday benefits are earned at an average rate of their total hours worked. All regulations on the use of this benefit apply.

TEMPORARY: If you are hired for a specific assignment or for a specific period of time not to exceed three (3) calendar months with the understanding that your employment may end at the completion of the assignment or period of time, you are considered to be a Temporary Employee, and are entitled to limited benefits.

PER DIEM: If you come to work only when called to do so and work less than 20 hours per week, you are considered a Per Diem Employee and are not entitled to benefits.

## Exempt Employees

Employees assigned to management, administrative, professional or supervisory positions, who by the nature of their assignments are exempt from overtime pay requirements of the Fair Labor Standards Act are classified as exempt.

Such employees are paid on a salary basis and are required to record specific hours worked. They are also required to report use of vacation, sick or holiday time. Exempt employees are not eligible for overtime pay.

## Non-Exempt Employee (Hourly)

Those employees covered by the state and federal wage and hour laws are subject to their provisions and are paid on an hourly basis for the actual hours worked.

## New Employee Training Period

The training period for all new employees is the first three- (3) months following the date of hire. During this period, you will have the opportunity to learn about **Marty Shoes Inc.** and the requirements of your job. During this time, we will have an opportunity to observe your skills, abilities and attitude. You will not have the benefits of our progressive discipline policy as described in this handbook during the Introductory Period.

After your training period, you may become a regular employee with **Marty Shoes Inc.** The satisfactory completion of your introductory period does not, of course, mean that you have any preferred employment status. The Company will continue to monitor your work performance and expect you to do a satisfactory job.

During your training period you will earn benefit hours toward vacation and paid leave. After satisfactory completion of the introductory period, you will be eligible for all benefits and may use those earned.

# WORK SCHEDULE

## Work Hours

For pay purposes, **Marty Shoes Inc.** official workweek is seven (7) consecutive days, beginning at 12:01 am on Sunday and ending at midnight the following Saturday.

Due to the nature of our business, you will be requested to work weekends and holidays. Your specific shift hours of work are posted on the bulletin board in your store. If you have any questions about your hours, please contact your manager.

## Wage and Salary Policy

To assure you a fair wage or salary for the work you perform, our policy is to keep wage and salary rates in line with companies of similar size in the areas where we do business that require the same job skills.

## Payday

You will receive your weekly paycheck by Saturday of the following week (unless circumstances are beyond our control). Your supervisor will inform you of how your paycheck/pay stub will be delivered to you, or where you may pick it up. When you pick up your check you will be required to sign for it. All paychecks are confidential and you must never discuss it with another employee.

## Meal Periods

All employees who work over six (6) hours per day are required to take a lunch period of thirty (30) minutes to one (1) hour without pay (management option). If you are scheduled to work under six (6) hours you may take a thirty (30) minute unpaid meal break upon request and approval. Your supervisor will post your scheduled meal period on the bulletin board. This time must be reflected on your time card or time sheet. All employees who work (10) or more hours are scheduled for (2) lunch periods of thirty (30) minutes to two (1) hour lunch periods without pay (management option).


## Overtime Pay

Overtime is defined as time worked in excess of forty (40) hours in a week. Overtime is paid at 1.5 times the employee's hourly rate. All overtime must be approved in writing in advance by your supervisor.

## Attendance and Punctuality

Regularity of attendance and punctuality is expected of each employee. However, there are times when absence or tardiness is unavoidable. In this instance, you should notify your supervisor at least one hour before your scheduled work time. Excessive absenteeism or tardiness can result in disciplinary action up to and including dismissal. Excessive absenteeism is defined as more than five (5)-unscheduled absences in any sixty-(60) day period. Tardiness is defined as more than five (5) minutes late, without notice; excessive tardiness is defined as more than five (5) days in any ninety (90) day period.

## Reporting Absences

If it is necessary for you to be unexpectedly absent for any reason, you must notify your supervisor by telephone at least one (1) hour before you are due to report to work. This is mandatory so that plans can be made for your duties to be assumed by someone else or divided among your coworkers. Reporting your absence to one of your coworkers does not satisfy this requirement.

You should report daily if your absence extends beyond one (1) day. If you do not report as required for three (3) consecutive days, it will be deemed that you have resigned from your position and your employment can be terminated.

Absence due to personal business should be discussed with your supervisor and scheduled prior to making your plans.

## Swipe Cards and Time Logs

All personnel will use swipe cards and or time logs provided for recording hours worked. It is important that your time keeping records accurately reflect all hours worked. If there is a mistake with your swipe card or time log that needs correction, your supervisor is to make the correction on the Payroll Correction Form. Any corrections made will be paid the following week. Swiping in or out when not scheduled or having someone else swipe for you when you are not working is considered to be grounds for immediate termination. Time logs are to be signed by each employee at the end of each pay period.

## Payroll Deductions

There are two kinds of deductions from your paycheck: (1) Mandatory deductions are those we are required to deduct by law, and (2) Voluntary Deductions are those you authorize in writing to be deducted.

1. Mandatory Deductions

**Social Security - F.I.C.A.**

The Federal Insurance Contributions Act (FICA) requires matching contributions from you and the Company, which are deposited in your Social Security account with the federal government.

In the event you change your name, it is of the utmost importance that you report this fact immediately to the social security office in your area and to the company accounting department. Payroll records cannot be changed until your social security card has been changed, and the changes verified and recorded by the personnel department.

### Withholding Taxes

Deductions for federal and state income tax are withheld from your earnings in accordance with legal requirements. If the number of your dependents changes, you should report it to the accounting department and complete a new withholding statement. After the end of each calendar year and prior to January 31, you will receive a withholding tax statement showing your total deductions.

### State Disability Insurance (S.D.I.)*

The **state** Unemployment Insurance Code provides for disability insurance payments when you cannot work as a result of illness or injury that is not work related. **Marty Shoes Inc.** by state law is required to deduct a percentage of your earnings up to an established maximum to provide these state disability insurance benefits.

## 2. Voluntary Deductions

### Health Insurance

Health insurance coverage for you and for your dependents.

### Miscellaneous

Other deductions that you may authorize from time to time with administrative approval, (such as our 401k plan).

Employee Handbook

# COMPANY BENEFITS

## Vacations

Vacation time will be scheduled based upon business requirements and your needs and desires. You are normally required to have your vacation time request submitted to your supervisor well in advance of the date when you want to begin taking your vacation. If a conflict arises where two employees request the same dates for vacation at the same time, it shall be resolved at management's discretion.

Regular full-time employees who work at least 30 hours per week on a continuing basis will accrue paid vacation as follows:

| Length of Employment | Days of Vacation |
| --- | --- |
| 1 year of continuous service as of June 1. | One week |
| 2 years of continuous service as of June 1. | Two weeks |
| 10 years or more of continuous service as of June 1. | Three weeks |

Employees must use earned vacation time for needed rest and relaxation. Vacation time can't be paid if not used. All earned vacation time must be used by May 31st. of any year.

Marty Shoes Inc. has certain busy times during the year when taking vacations would create undue hardships. Marty Shoes Inc. reserves the right to restrict vacation time during peak business period during the year.

If a holiday falls within an employee's vacation, the day is counted as a paid holiday and not as vacation. If an employee would prefer to take that holiday in the week following the vacation (instead of during the vacation), this should be arranged with the Store Manager before leaving for vacation.

## Paid Holidays

The Company pays wages to all full-time hourly managers (after 3 months) for the following designated holidays: New Years Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day and Christmas Day. Holiday hours paid will be **an average of the hours you work in a day** (in a designated time period usually 1 year before the holiday). If you are required to work on a holiday, you shall receive your holiday pay and you will be paid your regular rate of pay. To receive holiday pay you must work the scheduled day before the holiday and the scheduled day after the holiday (unless you worked the holiday). If you are scheduled off for the holiday you will work (1) one day less than your normal week. To receive overtime pay during a week with a holiday you must work over 40 hours (holiday pay doesn't count towards overtime).

The Company pays wages to all exempt employees (after 3 months) for the following designated holidays: New Years Day, Memorial Day, July 4th, Labor Day, Thanksgiving Day and Christmas Day. **Holiday pay will be (1) day.** If you are required to work on a holiday, you shall receive your holiday pay and you will be paid your regular rate of pay. To receive holiday pay you must work the scheduled day before the holiday and the scheduled day after the holiday (unless you worked the holiday). If you are scheduled off for the holiday, the holiday will count as a day worked and you will be paid your regular salary for the week. (You will work (1) one day less than your normal week.)

The Company pays holiday pay to all regular full timers (after 3 months) and regular part-timers (after 6 months) that work the following holidays (New Years Day, Memorial Day, July 4th and Labor Day). You will be **paid time and ½ if you work the holiday.**

## Sick Leave

Regular full-time and regular part-time employees are eligible for paid sick leave benefits. The paid sick leave day benefit program established at **Marty Shoes Inc** is to provide employees with leave in case of illness.

Employees may not take sick leave benefits during the introductory period. After the introductory period, the employee's benefits accrue from the first day of employment at the rate of one-half day per month, or six (6) days per year.

Sick leave will be cumulative to a maximum of six (6) days for regular full-time employees and six (6) days for regular part-time employees and there will be no advance on a future year's leave time. There will be no carryover of sick time from year to year.

Accumulated sick pay is forfeited when an employee terminates his or her employment with **Marty Shoes Inc.**

10

## Group Health Insurance

Regular full-time management employees are eligible to be covered by group insurance. Enrollment applications and claim forms may be obtained from the personnel department. Employees become eligible for single insurance coverage after ninety (90) days of employment. Employees become eligible for family insurance coverage after 15 months of employment. The employee is responsible to request the insurance coverage. **Marty Shoes Inc.** will pay 80% of the premium for the insurance plan. If the employee declines coverage, they must wait until November 1 of any year to join the plan during open enrollment. To receive family coverage during open enrollment, the employee must have worked at least 15 months.

## 401K Savings Plan

Employees who have completed 1 year of service (by January 1 of any year), have worked over 1000 hours during the year and are over 21 years old are eligible to participate in this plan. **Marty Shoes Inc.** will match 50% on the first 6% of employee deferral. Employees can set aside up to 15% of their salary tax-free. The money **Marty Shoes Inc.** gives to the employee will go into the employee account. The employee can invest all funds various ways available in the plan. To be fully vested you must complete 6 years of service (see table below). For more information about this plan, contact the Human Resources Department.

| EMPLOYEES YEARS OF SERVICE | PERCENTAGE OF EMPLOYERS CONTRIBUTION OWNED BY EMPLOYEE |
|---|---|
| 0-2 | 0% |
| 2-3 | 20% |
| 3-4 | 40% |
| 4-5 | 60% |
| 5-6 | 80% |
| 6 or more | 100% |

**Vesting Service**          **Includes all years from employees hire date.**

## COBRA

A Federal law, the Consolidated Omnibus Budget Reconciliation Act, commonly known as "COBRA" requires **Marty Shoes Inc.** to offer employees and their dependents special rights to temporarily continue medical and hospitalization coverage when group benefits are lost as a result of your no longer being employed. Please be certain to contact the company personnel department if you have any questions regarding this benefit.

## PERSONAL DAYS

Marty Shoes Inc. recognizes that employees have certain "Personal Business" that requires that they take time off from work. To assist the employee is this matter, all eligible employees (part-time or full-time only) can take two (2) days off with pay each year. Personal day hours paid will be an average of the hours you work a day (in a designated time period usually 1-year before the personal day)

## LEAVES OF ABSENCE

The following information applies to all Leaves of Absence:

- In the event of personal emergencies, an employee may be granted a leave of absence without pay at the discretion of the Company.
- A request for a leave of absence must be submitted in writing to your supervisor and approved by the company.
- An extended leave of absence will be limited to six (6) weeks in duration. In extraordinary cases, extensions may be granted.
- No benefits will accrue during the leave of absence and full insurance premiums will be paid by employee.
- Should you fail to return to work at the end of an approved leave without notice, you will be deemed to have resigned your position and all benefits paid by the company will be terminated. At this time you will offered COBRA benefits (see page 10).

## Military Leave of Absence

Existing military obligations of the employee, such as National Guard of Military Reserve duty on weekends and during the summer must be disclosed to the Company in writing on the employees' application before an employee is hired.  Employees do not earn pay or benefits from the Company while on limited military leave of absence.

## Medical Leave of Absence

Upon receipt of a medical statement that your personal health or physical condition requires you to be away from your job for a period of time of three (3) working days or more, and you have worked for **Marty Shoes Inc.** more than one month, the Company will automatically grant you an unpaid medical leave of absence.  These medical leaves normally do not exceed thirty (30) days, but may be extended for an additional thirty (30) calendar days depending on the circumstances.

## Maternity Leave

As soon as an employee becomes aware she is pregnant, she should promptly provide her manager with a statement in writing as to her expected continued employment.  This statement must state a date after which her doctor no longer feels she may work and at that time the Company will grant a maternity leave of absence for a period not to exceed the date the doctor puts this employee off work to six (6) to eight (8) weeks from the delivery date.  The employee will be responsible for the full insurance premiums during the leave period.

Extensions to maternity leaves will normally not exceed a total of four (4) months.

## Unemployment Benefits

The Company pays substantial dollars to the State unemployment compensation reserve account.  You do not make any contributions to this fund.  Unemployment compensation normally provides a weekly benefit for a specified period of time should you become unemployed due to no fault of your own.  These benefits change periodically as established by law.

## Workers' Compensation Insurance

All employees of **Marty Shoes Inc.** are covered by Workers' Compensation insurance effective the first day of employment. Workers' Compensation insurance provides you or your beneficiaries with certain benefits in the event of a job-related illness, injury or accidental death.

The Company pays the full cost of this insurance. If you sustain an on-the-job or job-related illness or injury, you must report the illness or injury to your superior the same day. Failure to do so could result in a delay or denial of benefits by the insurance carrier. In some states, you are required to see a designated doctor supplied by the insurance company. When you do see a doctor, tell the doctor that your injury occurred at work and don't use you personal medical insurance card.

## State Disability Insurance (SDI)*

All **state** employees are covered by State Disability Insurance effective your first day of employment. State disability insurance provides you with certain benefits in the event of illness or injury, which are not job-related. By state law, employees are required to pay the cost of this protection through payroll taxes on your earnings. The Company, also by state law, is required to withhold this tax from your paycheck.

## Disability and Workers' Compensation Leaves

Disability and Workers' Compensation leaves may be granted for situations in which there is a physician's written statement that a leave of absence is required because of illness, injury, or other physical disability. The physician's statement must provide adequate details acceptable to **Marty Shoes Inc.** regarding the nature of the disability and the anticipated length of absence from work. **Marty Shoes Inc** may, at its discretion, require another medical opinion by an appointed physician at the Company's expense. Upon expiration of a disability or Workers' Compensation leave and prior to returning to work, employee must obtain a physician's release. Failure to do so may result in termination. At the Company's sole option, another medical release may be required from an appointed physician at the Company's expense.

## Employee Purchase Discounts

All employees shall receive an employee purchase discount at the commencement of employment. For more detail, ask your manager.

# COMPANY POLICIES

## Outside Employment

**Marty Shoes Inc.** prefers that regular full-time employees not accept employment with another Company. However, your personal activities outside working hours are a private matter and the Company's primary concern is to avoid a conflict of interest and the possible negative effect outside activities may have on your job performance. If you believe a conflict of interest will arise by virtue of outside business or work activities, please discuss them with your immediate supervisor.

## Employee Files

**Marty Shoes Inc.** will have a file established for each employee. The file will include:

1. The employee's application and a resume if available;
2. Copy of Employee's W-4 form;
3. Enrollment card for group insurance, if eligible;
4. Card for tabulating paid sick leave, vacation and holiday time earned and used;
5. Completed Form I-9 verifying employment eligibility;
6. Record of military obligation, if any;
7. Signed receipt for keys issued, if any;
8. Signed receipt for copy of employee manual;
9. Signed release form;
10. Working papers if required (copy only, original should stay in store)
11. All records concerning job performance.

## Personnel Records

**Marty Shoes Inc.** keeps records regarding your home address telephone number, marital status, the person to notify in case of an emergency, and other pertinent information regarding you and your employment. You are required to keep this information current and correct by reporting to your supervisor any changes that might affect these records.

## Jury Duty

It is the policy of **Marty Shoes Inc.** to encourage you in the performance of your civic responsibilities. When on jury/witness duty, you must report for work whenever your presence is not required in court. In the event of compelling business reasons, we may assist you in requesting a postponement of your jury/witness duty. Upon receiving a jury notice you are required to inform your supervisor of the dates you will be serving as a juror. Proof of such notice is to be submitted prior to serving on the jury and will be forwarded to Company offices for retention in your personnel file.

## Bereavement

Full time employees are granted three (3) days with pay in the event of a death in their immediate family. Immediate family includes Husband, Wife, Children, Mother, Father, Sister and Brother.

## Keys

You may be given a key(s) for an area within the store -- a desk, a cabinet, or for the store itself. There are to be no unauthorized duplicates of keys made. All keys issued to you are entered into your employment file. Should you take a leave of absence, resign or be terminated, the company will require the return of all keys issued.

## Housekeeping

Each employee is responsible for keeping the selling floor, the break areas, the rest rooms and storage areas neat and clean. Refrigerators and any cabinets are not to be used as overnight storage areas. Merchandise or personal belongings are not to be placed on the floor, under tables or in the immediate vicinity of POS terminals. No food is permitted on or about the vicinity of the selling floor.

## Rules and Regulations

The purpose of rules and regulations is not to restrict the rights of anyone but to define them and protect the rights of all.

The list below is not all-inclusive, but the offenses listed are among those, which will be considered sufficient grounds for disciplinary action, up to, and including discharge:

The following violations will result in immediate discharge:

1. Altering your time log.
2. Knowingly altering the time log of another employee or swiping in or out for them.
3. Having another employee swipe in or out for you or having another employee fill out your time log.
4. Possession of firearms, explosives or weapons within the Company building.
5. Theft or removal of any Company property from the premises without proper authorization.
6. Willful destruction, or damage to any property of the Company or of employees.
7. Falsification of records or statements to obtain employment, disability or other insurance, medical records, etc.
8. Failure to return to work for over three (3) working days without notifying the Company (considered as a resignation).
9. Introduction, use or possession of intoxicants or narcotics (except as prescribed by your physician) on Company premises at any time, or being under the influence while on duty.
10. Delivering, revealing, reproducing and/or divulging any company data considered by **Marty Shoes Inc.** to be confidential and of a proprietary nature.

## Counseling And Discipline

To ensure the well being of all employees, violations of **Marty Shoes Inc.** regulations or standards will result in corrective action appropriate to the offense. The severity of corrective action in response to the violation will be determined by such considerations as the impact of the offense on the store's operations, the extent of damage caused and the circumstances of the offense. Routine disciplinary procedures normally begin with an informal verbal counseling session, followed by formal documentation in writing and ultimately to possible termination.

As a guideline to normal corrective action, **Marty Shoes Inc.** has established a sequence of progressive steps in the disciplinary process:

1. Verbal counseling (informal) with documentation to the personnel file.
2. Written warning (formal) with documentation to the personnel file.
3. Suspension or termination.

## Termination

If terminated for cause an employee shall forfeit accrued and unused vacation time.

At the time of departure from **Marty Shoes Inc** each employee will turn in any keys, equipment, uniforms, documents, files or literature collected by or issued to them.

## Performance Evaluations

Managers will meet with every employee formally and individually at the end of the employee's first twelve months of employment and from time to time thereafter. This particular performance discussion is the time for an extensive assessment of your performance. It shall be a summary of the ongoing review and feedback that has been conducted and discussed throughout the year.

## Personal Appearance and Attire

Employees should dress neatly and appropriately for their work. Women may wear dresses, suits, dress slacks or skirts with blouses or sweaters. Proper undergarments must be worn at all times. Jeans, low cut, back less or halter tops are not allowed (Jeans are allowed on truck days). A smock and badge must also be worn. Excessive make-up or spiked hair of unusual colors is not allowed.

Men may wear suits, sport coats or company smock with dress slacks. Ties should be worn at all times. Jeans, hats and caps are not allowed (Jeans are allowed on truck days). Men with mustaches or beards must have them neatly trimmed at all times. Shoulder length hair must be clean and well groomed.

Thong sandals, tennis shoes and house slippers are not allowed.

Name badges are to be worn at all times during working hours.

## No Smoking in the Store

**Marty Shoes Inc. is a smoke free environment. Smoking is permitted only outside company property.**

## You and Your Supervisor

Your supervisor is your primary link to **Marty Shoes Inc.** He or she is your major source of information and conduit of communication. If you have a problem, please channel it through your supervisor. This includes, but is not limited to, swipe card and payroll matters, vacation, and sick leave and questions regarding company benefits, requests for repairs or maintenance or your observation of any specific problem or any questions you may have. If your supervisor can't handle your problems, feel free to contact the corporate office.

## Package Inspection

**Marty Shoes Inc.** reserves the right to inspect any bundle or package taken from or brought into the Company's premises. This includes suspicion of alcohol or illegal drug use.

## Lost and Found

The Company cannot assume responsibility for personal belongings, which are lost. However, lost or found articles should be reported immediately to your supervisor.

## Personal Mail/Phone Calls

The Company is not in a position to handle your personal mail. You should request that your mail be sent to your home. Similarly, outgoing personal phone calls should be rare and on an emergency basis. Incoming personal phone calls should be limited to 2 minutes and redirected to after-work hours and locations.

## Communications

Relationships often suffer in companies that are not successful because people fail to communicate with each other. We believe that work-related problems, questions or complaints can best be resolved by frank and prompt discussions. Should you have any problems in regard to your work situation, please discuss them with your supervisor.

## Solicitation Rules

**Marty Shoes Inc.** prohibits any form of solicitation of employees during working hours on Company premises. This is to ensure that disruption of the store's business operations and disturbances of employees and customers will not occur on Company premises or on Company time and to make certain that employees are not subject to actual or perceived pressure to support an activity which they might not ordinarily support.

Employees may not solicit during working time for any purpose. Working time does not include meal breaks, rest periods and other times during which employees are not required to be on duty. Working time does include the working time of both the employee doing the soliciting or distributing and the employee to whom the soliciting or distributing is directed.

Persons not employed by the Company may not solicit or distribute literature in the store or on the selling floor at any time for any purpose.

## Employment Relationship

Every employee hired by the Company is hired with the hope that their employment will be productive and beneficial. However, the continuing employment relationship is based on mutual consent of the employee and the Company. An employee who resigns without notice will not be eligible for rehire. This policy cannot be modified except in writing by the President /Owner of the Company.

## Closing

This Handbook has been designed to briefly summarize some of the major policies and benefits of Marty Shoes Inc. If you have any questions or desire additional information, your supervisor will be able to assist you. The **Marty Shoes Inc.** Policy and Procedures Manual which expands the information in this Handbook is always available for your review with the Store Manager.

In the future, if change of conditions cause revisions of these policies, we will attempt to inform you of these changes and how they will affect you within a reasonable period of time.

**March 1, 1997**

# Acknowledgment of Understanding

I acknowledge receipt of the **Marty Shoes Inc.** Employee Handbook and the policies stated in it. **(I understand my employment is terminable at will by Marty Shoes Inc. with or without cause and with or without notice.)**

Should I have any questions, I will contact my immediate supervisor or higher management. I agree to abide by the Company's policies and procedures as well as any future policies, practices and regulations that may be put into effect during the term of my employment.

_____    Date:_____
Employee's Signature

**Marty Shoes Inc.**

By:_____    Date:_____
    (Title)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Miami District Office**

1 Biscayne Tower, Suite 2700
2 South Biscayne Boulevard
Miami, FL 33131-1805
PH: (305) 536-1491
TDD: (305) 536-5721
FAX: (305) 536-1011

March 31, 1997

Ms. Denise Brookings
921 N.W. 33rd Way
Ft. Lauderdale, FL 33311

RE:    Brookins v Marty Shoe, Inc.
       EEOC Charge No.: 150 97 0909

Dear Ms. Brookings:

The Equal Employment Opportunity Commission has made a determination regarding your charge. The Commission will not continue the processing and/or investigation of your charge. This decision does not certify that the Respondent is in compliance with the statute(s).

You alleged in your charge that Marty Shoes discriminated against you, because of your race, Black, and retaliated against you for complaining about being subjected to derogatory remarks, by discharging you from the a sales position, July 1996, in violation of Title VII of the 1964 Civil Rights Act, as amended. Examination of the evidence of record shows that you were terminated for violating company rules with regard to time, attendance, and failing to perform to the Respondent's expectations. There is no direct evidence of race discrimination and none which would show the Respondent's defense is a pretext.

Based on the evidence examined in your case it appears the Commission is unable to conclude that the information obtained establishes a violation of the statutes we enforce. However, this decision does not certify that the Respondent is in compliance with the statute. Additionally, this notice will not interfere with your decision to pursue this matter in federal or state court.

For additional information and clarification please contact Investigator **Robert K. Metaxa**, at (305) 530-6050 within the next five days or a final dismissal notice will be mailed to you. Once you receive the final dismissal notice you will have **90 days** to file a private suit in federal or state court.

Sincerely,

Robert K. Metaxa,
Supervisor

cc:   Stewart Lee Karlin, Esq.
      400 S.E. 8th Street
      Ft. Lauderdale, FL 33316



DEFENDANT'S
EXHIBIT

KT 8.23.00

**DB 00049**

DEFENDANT'S
EXHIBIT
3
KT 8-23-00

DB 00033

During the Course of Employment at Marty's Shoes I Was treated unequaly as the others. my job hours were Consistenly reduced from 24 to 1 hour per week. My questioning the manager for what reason has led me to believe that I was being discriminted against. After I didn't get any satisfaction from the Store Manager I took my Complaint To the district manager. And I asked him why The Store Manager answer was I wasn't a man And They wanted a male & that he could get 40 hrs a week. I told him in January of 96 That the Store manger treated me unequaly than the others workers. Meaning I was blocked or refrained from Answering the shoe DepT telephone when the Store called for A shoe associate for a price check I was Told by the Store Manager that some one else would go. And not to talk to the Customers. After that new employees were hired And the New Employees began to work more to work hours than me and were given better working hours. I Always had to Close and always worked on Weekend hours. When I went to the restroom & I notified Another Employee that I Was going She told me she would give only 2 mins to go and return only If I returned late I would be Clocked out. As I Continued to Work there I Was Constanly and Consistence to harrassment from the Store Manager about 15 to 28 different accusations. She Verbally accused me of leaving my job with permission, and was alledgely seen walking and or shopping in the mall During on the job reccoming to work entoxicated, Because my Eyes were red, Being late to work when the Manager change the work schdule without notifing me. My work time arrival was change after I new down arrival time and was penalized if i worked later And was sent home earlier than the schdule. My Paycheck was never accurate with the exact amout of hours i worked. I was Accused of being rude to Customers when they Couldn't say I was the per

She accused me of trying to open a safe or retrieve the safe numbers. On June 6 an employee graduated from H.S. and took Sunday off. The assistance Michael Torres gave me her work hours from 3 to 8 p.m. I worked that schedule and the next day Roma told me I wasn't gonna work anymore that the 2 hours a week and that I was a street person because she felt like I wanted to do what I wanted to and not follow her direction. She in response to reducing my hours she threatened Michael Torres if he me more work hours he would be fired. Every new employee came to work there started at more hours than me. Her husband friend Peter he had 40 hours, Alia Hernandez started from 30 to 36 hours, New chin started at 28 hours Michael Torre's brother Chies started from 25 to 30 hours. Orland lee apartment neighbor started at 30 to 48 hours When I asked for more hours she told me that Stanley only gave the store manager a certain amount of hours to work with, My hours was the only was being reduced to 30 min to 1 hour. a week. After an employee graduated from H.S. She asked for more hours and received full time 40 hour a week. I called Stanley on 1-800 line And he told me he never cut my hours and that he didn't make decisions of that store But while Roma went on vacation He gave her 40 hrs a week. In March I had to prove myself of being worthy to work there me & District Manager waged a $10 bet that I could complete a job Task within a certain amount of Time I did & he never paid the $10 bet. Roma would leave other employees checks around the work table & call the store back and ask another person in Polish language was the checks still there. and what is Denise doing with these problems and harrassment I can truly believe that being harrased or pressured to quit because the store Managers didn't like me and refused to acknowledge my protest when I stood up for my innocence when she labeled me a street person or accused me false accusation in a pattern.

DB 00034

To District Managers of Marty's Shoes.

I'm writing this letter to inform you of several problems I'm having while employed in Marty's Shoes of Ft. Laud, Fla. I was hired by Store Manager Carmen of 12-5-95. And Roma Rykitta became manager. I soon became involved her preferential treatment practice. And involved in that She Continued to accused of walking off my job, being seen in mall while working, drinking on the job, She even told me that the owner Marty Complained that I was rude to him. If I was Why didn't he tell me or Fire me. None of her accusations took place. In Addition to that She has called me innuendos like a Street person, a Thug, Vaga-bond, or maybe I'm on drugs. And has deliberately cut my hours for not standing on her side when She accused 4 African-Americans of stealing shoes. Which later turned out to be false. The Manager of Security Fran & Tony Menitoli were outraged that she told them she seen the men take the shoes. The Timberland shoes he had on our store didn't carry that Style. I told me that I didn't stand up for the store and I shouldn't work here. I couldn't stand up for her because I honestly didn't see him steal the shoes. I feel

DB 00035



DEFENDANT'S
EXHIBIT
4
KT 8-23-00

She she fired me out. She has never complained of my work performance. I would like to know why Stanley is cutting my hours intentionally & he never gave me a reason why. She constantly complaines of my Character. If i arrive early she makes me clock in late & leave early. Everything i told Stanly in the past about home is the truth. The last week Michall gave me 5 hrs. to work And she threatened him saying. If she gave me more hrs he would be fired. What's the harm done here. Why am i the only whose work hours are being decreased. I would like an explanate from Stanley. I writing because she told that i would have to work (1) hour a week from now on. because he (Michael) gave me 5 hours one day. If Stanley can bring someone from off the street to work then i know i should be able to work more than (1) hour a week. I ask for a reason why she says Stanley says so. These problems should be resolve between the store employees only. But when a person is practing Racism i feel the District manager should be aware of what she's doing. I like my job even though i don't work Full-time. It's still my job. And i don't deserve this Racist treatment. I never violated any Rules. I came there to work not to be accused of anything. I hope you will believe me And

DB 00036

*look into it or investigate that's what i'm saying*

i'm not writing this letter because i'm angry. i'm writing because i never did anything to deserve this treatment or harrassment. i feel that i shouldn't quit to make her happy. Because she honestly dosen't like me. Michael has never had a problem with me. he tells us a job tasks & that's it. if you made a mistake he'll correct you & tell you not tell you you're a street person. Please use you're methods of Looking into these problems). i know i can't do anything if Stanley Fire me But i didn't deserve it. you're prompt attention is appreciated.

Please understand that i can't apologize for something i didn't do. i Just want to work

Elaine Denise Brokins
921. N.W. 33 way
Ft. Laud, Fla. 33311
(954) 327-7390

DB 00037

# Earnings Statement

**MARTY SHOES, INC.**

CO      FILE      DEPT.      CLOCK   NUMBER
2GG  000747 098    X 50X  0000222452  1

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
Federal:    1
State:      No State Income Tax

Period Ending:   03/02/96
Pay Date:        03/07/96

**DENISE F BROOKINS**
**921 N .W. 33 WAY**
**FT KAYDERDALE FL 33311**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 5.7500 | 16.75 | 96.31 | |
| Holida | | | | 14.38 |
| **Gross Pay** | | | **$96.31** | 1,128.47 |

| Deductions | | | |
|------------|--|--|--|
| **Statutory** | | | |
| Social Security Tax | | -5.98 | 69.97 |
| Medicare Tax | | -1.39 | 19.36 |
| Federal Income Tax | | | 25.80 |
| **Net Pay** | | **$88.94** | |

Your federal taxable wages this period are $96.31

©1993 Automatic Data Processing, Inc.

DB 00021


DEFENDANT'S EXHIBIT

# Earnings Statement

**ADP**

| CO | FILE | DEPT. | CLOCK NUMBER |
| --- | --- | --- | --- |
| 2QG | 000747 | 098 | X 50X  000022274I  1 |

Period Ending:   03/09/96
Pay Date:   03/14/96

MARTY SHOES, INC.

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 1
  State:  No State Income Tax

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

| Earnings | rate | hours | this period | year to date |
| --- | --- | --- | --- | --- |
| Regular | 5.7500 | 16.00 | 92.00 | |
| Holida | | | | 14.38 |
| **Gross Pay** | | | **$92.00** | 1,220.47 |

| Deductions | Statutory | | | |
| --- | --- | --- | --- | --- |
| | Social Security Tax | -5.70 | | 75.67 |
| | Medicare Tax | -1.34 | | 17.70 |
| | Federal Income Tax | | | 25.80 |
| | **Net Pay** | **$84.96** | | |

Your federal taxable wages this period are $92.00

DB 00017

©1993 Automatic Data Processing, Inc.

**Earnings Statement**

ADP

| CO | FILE | DEPT. | CLOCK | NUMBER |
|----|------|-------|-------|--------|
| 20Q | 000747 | 098 | X 50X | 0000223026 1 |

MARTY SHOES, INC.

Period Ending: 03/16/96
Pay Date: 03/21/96

DENISE F BROOKINS
921 N.W. 33 WAY
FT. KAYDERDALE FL 33311

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
   Federal: 1
   State: No State Income Tax

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 5.7500 | 16.25 | 93.44 | |
| Holida | | | | |
| **Gross Pay** | | | **$93.44** | 1,313.91 |

| Deductions | | | |
|------------|------|-------------|--------------|
| Statutory | | this period | year to date |
| Social Security Tax | | -5.*. | 81.46 |
| Medicare Tax | | -1.35 | 19.05 |
| Federal Income Tax | | | 25.80 |
| **Net Pay** | | **$86.30** | |

Your federal taxable wages this period are $93.44

◄ TEAR HERE                    ©1993 Automatic Data Processing, Inc.



**Earnings Statement**

Period Ending:    03/23/96
Pay Date:    03/28/96

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

CO  FILE  DEPT.  CLOCK  NUMBER
2QG  000747 098  X 50X  000022317  1

MARTY SHOES, INC.

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
Federal:  1
State:  No State Income Tax

**Earnings**

| | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.7500 | 14.75 | 84.81 | 14.38 |
| Holida | | | | 1,398.72 |

**Gross Pay** | | | **$84.81** |

**Deductions**

| Statutory | | | |
|---|---|---|---|
| Social Security Tax | -5.26 | 86.72 |
| Medicare Tax | -1.23 | 20.28 |
| Federal Income Tax | | 25.80 |

**Net Pay** | **$78.32** |

Your federal taxable wages this period are $84.81

DB 00023

EAR HERE

©1993 Automatic Data Processing, Inc.



||||| |

MARTY SHOES, INC.

| CO | FILE | DEPT. | CLOCK | NUMBER |
|----|------|-------|-------|--------|
| 2QG | 000747 | 098 | X 50X | 0000223603 | 1 |

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State:    No State Income Tax

**Earnings Statement**

Period Ending:    03/30/96
Pay Date:         04/04/96

**DENISE F BROOKINS**
**921 N.W. 33 WAY**
**FT KAYDERDALE FL 33311**

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 5.7500 | 9.50 | 54.63 | 14.38 |
| Holida |  |  |  | 1,453.35 |
| **Gross Pay** |  |  | **$54.63** |  |

| Deductions | | | |
|------------|--|--|--|
| **Statutory** | | | |
| Social Security Tax | -3.39 | 90 11 |
| Medicare Tax | -0.79 | 21.07 |
| Federal Income Tax |  | 25.80 |
| **Net Pay** | **$50.45** |  |

Your federal taxable wages this period are $54.63

**DB 00024**

*1991 Automatic Data Processing, Inc.

**Earnings Statement**

ADP

MARTY SHOES, INC.

| CO. | FILE | DEPT. | CLOCK | NUMBER | |
|-----|------|-------|-------|--------|---|
| 20G | 000747 098 | | X | 0000223909 | 1 |

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: No State Income Tax

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

Period Ending:     04/05/96
Pay Date:          04/11/96

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 5.7500 | 4.75 | 27.31 | 14.38 |
| Holida | | | | |
| **Gross Pay** | | | **$27.31** | 1,480.66 |

| Deductions | | | |
|------------|---|---|---|
| **Statutory** | | | |
| Social Security Tax | -1.69 | | 2.30 |
| Medicare Tax | -0.40 | | 21.47 |
| Federal Income Tax | | | 25.80 |
| **Net Pay** | | **$25.22** | |

Your federal taxable wages this period are $27.31

DB 00032

"EAR HERE     ©1991 Automatic Data Processing, Inc.

**Earnings Statement**

ADP

Period Ending: 04/20/96
Pay Date: 04/25/96

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

| CO | FILE | DEPT. | CLOCK NUMBER | | |
|---|---|---|---|---|---|
| 20G | 000747 | 098 | X 50X | 0000224489 | 1 |

MARTY SHOES, INC.

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: No State Income Tax

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.7500 | 6.00 | 34.50 | |
| Holida | | | | 14.38 |
| **Gross Pay** | | | **$34.50** | 1,551.10 |

| Deductions | | | |
|---|---|---|---|
| **Statutory** | | | |
| Social Security Tax | -2.14 | | 96.17 |
| Medicare Tax | -0.50 | | 22.49 |
| Federal Income Tax | | | 25.80 |
| **Net Pay** | | **$31.86** | |

Your federal taxable wages this period are $34.50

**DB 00020**

◄ TEAR HERE    ©1991 Automatic Data Processing, Inc.

**Earnings Statement**

ADP

Period Ending: 05/04/96
Pay Date: 05/09/96

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

CO    FILE    DEPT.    CLOCK NUMBER
20G   000747 098    X 5   0000225078   1

MARTY SHOES, INC.

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 1
  State:   No State Income Tax

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.7500 | 3.00 | 17.25 | 14.38 |
| Holida |  |  |  | 1,602.85 |
| **Gross Pay** |  |  | **$17.25** |  |

| Deductions | | this period | year to date |
|---|---|---|---|
| **Statutory** | | | |
| Social Security Tax | | -1.07 | 99.38 |
| Medicare Tax | | -0.25 | 23.24 |
| Federal Income Tax | | | 25.80 |
| **Net Pay** | | **$15.93** | |

Your federal taxable wages this period are $17.25

DB 00031

◄ TEAR HERE    ©1991 Automatic Data Processing, Inc.



| CO | FILE | DEPT. | CLOCK NUMBER |
| 2QQ | 000747 | 098 | 0000225373 1 |

**MARTY SHOES, INC.**

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State: No State Income Tax

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.7500 | 3.00 | 17.25 | 14.38 |
| Holida | | | | 1,620.10 |
| **Gross Pay** | | | **$17.25** | |

| Deductions | | | |
|---|---|---|---|
| **Statutory** | | | |
| Social Security Tax | -1.07 | | 100.45 |
| Medicare Tax | -0.25 | | 15.49 |
| Federal Income Tax | | | 25.80 |
| **Net Pay** | | | **$15.93** |

Your federal taxable wages this period are $17.25

**DENISE F BROOKINS**
**921 N.W. 33 WAY**
**FT KAYDERDALE FL 33311**

## Earning Statement

ADP

Period Ending: 05/11/96
Pay Date: 05/16/96

DB 00030

◄ TEAR HERE    ©1991 Automatic Data Processing, Inc.

**Earnings Statement**

ADP

CO   FILE   DEPT.   CLOCK   NUMBER
20G  000747  098   X E     0000225671  1

MARTY SHOES, INC.

Period Ending:   05/18/96
Pay Date:        05/23/96

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 1
  State:   No State Income Tax

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.7500 | 3.00 | 17.25 | |
| Holida | | | | |
| **Gross Pay** | | | **$17.25** | 1,637.35 |

| Deductions | | | |
|---|---|---|---|
| Statutory | | | |
| Social Security Tax | -1.07 | | 101.52 |
| Medicare Tax | -0.25 | | 23.74 |
| Federal Income Tax | | | 25.80 |
| **Net Pay** | **$15.93** | | 14.38 |

Your federal taxable wages this period are $17.25

DB 00029

◄ TEAR HERE     ⓒ1991 Automatic Data Processing, Inc.

# Earnings Statement

**ADP**

MARTY SHOES, INC.

| CO. | FILE | DEPT. | CLOCK | NUMBER |
|-----|------|-------|-------|--------|
| 2QG | 000747 | 098 | X 50X | 0000225991  1 |

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State:  No State Income Tax  ✓

Period Ending:   05/25/96
Pay Date:        05/30/96

DENISE F BROOKINS
921 N .W . 33 WAY
FT KAYDERDALE FL 33311

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 5.7500 | 5.00 | 28.75 | |
| Holida | | | | 14.38 |
| **Gross Pay** | | | **$28.75** | 1,666.10 |

| Deductions | | | |
|------------|--|--|--|
| Statutory | | | |
| Social Security Tax | -1.78 | | 103.30 |
| Medicare Tax | -0.42 | | 24.16 |
| Federal Income Tax | | | 25.80 |
| **Net Pay** | **$26.55** | | |

Your federal taxable wages this period are $28.75

DB 00018

◄ TEAR HERE      ℃1991 Automatic Data Processing, Inc.

|| ||| |

MARTY SHOES, INC.

| CO | FILE | DEPT. | CLOCK | NUMBER | |
|---|---|---|---|---|---|
| 2QG | 000747 | 098 | X : : | 000226296 | 1 |

**Earnings Statement**

ADP

**DENISE F BROOKINS**
**921 N.W. 33 WAY**
**FT KAYDERDALE FL 33311**

Period Ending: 06/01/96
Pay Date: 06/06/96

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 1
  State:   No State Income Tax

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.7500 | 1.00 | 5.75 | |
| Holida | | | | |
| **Gross Pay** | | | **$5.75** | 1,671.85 |

| Deductions | | | |
|---|---|---|---|
| Statutory | | | |
| Social Security Tax | -0.35 | | 103.65 |
| Medicare Tax | -0.08 | | 24.24 |
| Federal Income Tax | | | 25.60 |
| **Net Pay** | | | **$5.32** |

Your federal taxable wages this period are $5.75

14.38

**DB 00028**

◄ TEAR HERE   ©1991 Automatic Data Processing, Inc.

MARTY SHOES, INC.

| CO | FILE | DEPT. | CLOCK | NUMBER |
|----|------|-------|-------|--------|
| 20Q | 000747 | 098 | X 5 | 0000226615  1 |

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State:   No State Income Tax

**Earnings**

| | rate | hours | this period | year to date |
|------|------|-------|-------------|--------------|
| Regular | 5.7500 | 1.00 | 5.75 | |
| Holida | | | | |
| **Gross Pay** | | | **$5.75** | 1,677.60 |

**Deductions**

| Statutory | | | |
|-----------|------|------|--------|
| Social Security Tax | -0.36 | | 104.01 |
| Medicare Tax | -0.08 | | 24.32 |
| Federal Income Tax | | | 24.80 |
| **Net Pay** | **$5.31** | | |

Your federal taxable wages this period are $5.75.

# Earnin○Statement

**DENISE F BROOKINS**
**921 N. W. 33 WAY**
**FT KAYDERDALE FL 33311**

Period Ending:   06/08/96
Pay Date:        06/13/96

ADP.

**DB 00027**

◄ TEAR HERE      ©1991 Automatic Data Processing, Inc.

**Earnings Statement**

ADP

CO  FILE  DEPT.  CLOCK  NUMBER
20Q  007747 098  X 5  0000226947  1

MARTY SHOES, INC.

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 1
  State:  No State Income Tax

Period Ending:  06/15/96
Pay Date:  06/20/96

DENISE F BROOKINS
921 N .W. 33 WAY
FT KAYDERDALE FL 33311

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 5.7500 | 2.00 | 11.50 | |
| Holida | | | | 14.38 |
| **Gross Pay** | | | **$11.50** | 1,689.10 |

| Deductions | Statutory | | |
|------------|-----------|--|--|
| | Social Security Tax | -0.71 | 104.72 |
| | Medicare Tax | -0.17 | 24.49 |
| | Federal Income Tax | | 25.80 |
| | **Net Pay** | **$10.62** | |

Your federal taxable wages this period are $11.50

DB 00026

◄ TEAR HERE    ©1991 Automatic Data Processing, Inc.

CO    FILE    DEPT.    CLOCK    NUMBER
20G    000747    09R    X    0000227280    1

**MARTY SHOES, INC.**



**Earnin s Statement**

Period Ending:    06/22/96
Pay Date:    06/27/96

**DENISE F BROOKINS**
**921 N.W. 33 WAY**
**FT KAYDERDALE FL 33311**

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
Federal: 1
State:    No State Income Tax

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.7500 | 3.00 | 17.25 | 14.38 |
| Holida |  |  |  | 1,706.35 |
| **Gross Pay** |  |  | **$17.25** |  |

| Deductions | Statutory | | |
|---|---|---|---|
| Social Security Tax | -1.07 | 105.79 |
| Medicare Tax | -0.25 | 24.74 |
| Federal Income Tax |  | 25.80 |
| **Net Pay** | **$15.93** |  |

Your federal taxable wages this period are $17.25

◄ TEAR HERE      ©1991 Automatic Data Processing, Inc.

DB 00025

**Earnings Statement**

**ADP**

| CO | FILE | DEPT. | CLOCK | NUMBER |
|---|---|---|---|---|
| 2QO | 000747 | 098 | X 50X | 000027615 | 1 |

MARTY SHOES, INC.

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
  Federal:   1
  State:    No State Income Tax

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 5.7500 | 5.00 | 28.75 | |
| Holida | | | | |
| **Gross Pay** | | | **$28.75** | |

| Deductions | | | |
|---|---|---|---|
| Statutory | | | |
| Social Security Tax | -1.79 | 107.58 |
| Medicare Tax | -0.42 | 25.16 |
| Federal Income Tax | | 25.80 |
| **Net Pay** | **$26.54** | |

year to date:
14.38
1,735.10

Your federal taxable wages this period are $28.75

**Period Ending:** 06/29/96
**Pay Date:** 07/03/96

**Important Notes**
HAPPY INDEPENDENCE DAY!!!

**DENISE F BROOKINS**
**921 N.W. 33 WAY**
**FT KAYDERDALE FL 33311**

◀ TEAR HERE    ©1991 Automatic Data Processing, Inc.

DB 00019

## 1996 W-2 and EARNINGS SUMMARY

| | | | | |
|---|---|---|---|---|
| 1 Wages, tips, other comp. 1735.10 | 2 Federal income tax withheld 25.80 | | | |
| 3 Social security wages 1735.10 | 4 Social security tax withheld 107.58 | | | |
| 5 Medicare wages and tips 1735.10 | 6 Medicare tax withheld 25.16 | | | |

| a Control Number 000747 2QG | Dept. 098 | Corp. T | Employer use only 82 |
|---|---|---|---|

**c Employer's name, address, and ZIP code**

MARTY SHOES INC
60 ENTERPRISE AVE NORTH
SECAUCUS NJ 07094

Batch #00950

| b Employer's FED ID number 22-2031150 | d Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12 Benefits included in box 1 |
| 13 See Instrs. for box 13 | 14 Other |
| 15 Stat emp. Deceased Pension plan | Legal rep. Hshld. emp. Deferred comp. |

**e/f Employee's name, address and ZIP code**

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

| 16 State FL | Employer's state ID | 17 State wages, tips, etc. |
|---|---|---|
| 18 State income tax | | 19 Locality name |
| 20 Local wages, tips, etc. | | 21 Local income tax |

**Employee Reference Copy**

**W-2 Wage and Tax Statement 1996**
Copy C for Employee's Records.    OMB No. 1545-0008

---

### 1996 W-2 and EARNINGS SUMMARY

This summary section of your Earnings Summary will help you understand and check your W-2. The reverse side includes general information that you may also find helpful.

**1. The following information reflects your final 1996 paystub plus any adjustments submitted by your employer.**

| | | | |
|---|---|---|---|
| Gross Pay | 1735.10 | Social Security Tax Withheld Box 4 of W-2 | 107.58 |
| | | | FL State Income Tax Box 18 of W-2 |
| | | | SUI/SDI Box 14 of W-2 |
| Fed. Income Tax Withheld Box 2 of W-2 | 25.80 | Medicare Tax Withheld Box 6 of W-2 | 25.16 |

**2. Your Gross Pay Was Adjusted as follows to produce your W-2 Statement.**

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | FL State Wages, Tips, Etc. Box 17 of W-2 |
|---|---|---|---|---|
| Gross Pay | 1,735.10 | 1,735.10 | 1,735.10 | |
| Reported W-2 Wages | 1,735.10 | 1,735.10 | 1,735.10 | |

**3. Employee W-4 Profile** To change your Employee W-4 Profile Information, file a new W-4 with your payroll dept.

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

Social Security Number: 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
Taxable Marital Status: SINGLE
Exemptions/Allowances:
FEDERAL: 1
STATE:    No State Income Tax

DEFENDANT'S EXHIBIT 6 KT 82300

© 1996 AUTOMATIC DATA PROCESSING, INC.    DB 00016

---- FOLD AND DETACH HERE ----

---

| | | | | |
|---|---|---|---|---|
| 1 Wages, tips, other comp. 1735.10 | 2 Federal income tax withheld 25.80 | | | |
| 3 Social security wages 1735.10 | 4 Social security tax withheld 107.58 | | | |
| 5 Medicare wages and tips 1735.10 | 6 Medicare tax withheld 25.16 | | | |

| a Control Number 000747 2QG | Dept. 098 | Corp. | Employer use only 82 |
|---|---|---|---|

**c Employer's name, address, and ZIP code**

MARTY SHOES INC
60 ENTERPRISE AVE NORTH
SECAUCUS NJ 07094

| b Employer's FED ID number 22-2031150 | d Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12 Benefits included in box 1 |
| 13 See Instrs. for box 13 | 14 Other |
| 15 Stat emp. Deceased Pension plan | Legal rep. Hshld. emp. Deferred comp. |

**e/f Employee's name, address and ZIP code**

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

| 16 State FL | Employer's state ID | 17 State wages, tips, etc. |
|---|---|---|
| 18 State income tax | | 19 Locality name |
| 20 Local wages, tips, etc. | | 21 Local income tax |

**Federal Filing Copy**

**W-2 Wage and Tax Statement 1996**
Copy B To be filed with employee's Federal Income Tax Return.    OMB No. 1545-0008

---

| | | | | |
|---|---|---|---|---|
| 1 Wages, tips, other comp. 1735.10 | 2 Federal income tax withheld 25.80 | | | |
| 3 Social security wages 1735.10 | 4 Social security tax withheld 107.58 | | | |
| 5 Medicare wages and tips 1735.10 | 6 Medicare tax withheld 25.16 | | | |

| a Control Number 000747 2QG | Dept. 098 | Corp. | Employer use only 82 |
|---|---|---|---|

**c Employer's name, address, and ZIP code**

MARTY SHOES INC
60 ENTERPRISE AVE NORTH
SECAUCUS NJ 07094

| b Employer's FED ID number 22-2031150 | d Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12 Benefits included in box 1 |
| 13 | 14 Other |
| 15 Stat emp. Deceased Pension plan | Legal rep. Hshld. emp. Deferred comp. |

**e/f Employee's name, address and ZIP code**

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

| 16 State FL | Employer's state ID | 17 State wages, tips, etc. |
|---|---|---|
| 18 State income tax | | 19 Locality name |
| 20 Local wages, tips, etc. | | 21 Local income tax |

**FL.State Reference Copy**

**W-2 Wage and Tax Statement 1996**
Copy 2 to be filed with employee's STATE Tax Return.    OMB No. 1545-0008

---

| | | | | |
|---|---|---|---|---|
| 1 Wages, tips, other comp. 1735.10 | 2 Federal income tax withheld 25.80 | | | |
| 3 Social security wages 1735.10 | 4 Social security tax withheld 107.58 | | | |
| 5 Medicare wages and tips 1735.10 | 6 Medicare tax withheld 25.16 | | | |

| a Control Number 000747 2QG | Dept. 098 | Corp. | Employer use only 82 |
|---|---|---|---|

**c Employer's name, address, and ZIP code**

MARTY SHOES INC
60 ENTERPRISE AVE NORTH
SECAUCUS NJ 07094

| b Employer's FED ID number 22-2031150 | d Employee's SSA number 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 |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| 9 Advance EIC payment | 10 Dependent care benefits |
| 11 Nonqualified plans | 12 Benefits included in box 1 |
| 13 | 14 Other |
| 15 Stat emp. Deceased Pension plan | Legal rep. Hshld. emp. Deferred comp. |

**e/f Employee's name, address and ZIP code**

DENISE F BROOKINS
921 N.W. 33 WAY
FT KAYDERDALE FL 33311

| 16 State FL | Employer's state ID | 17 State wages, tips, etc. |
|---|---|---|
| 18 State income tax | | 19 Locality name |
| 20 Local wages, tips, etc. | | 21 Local income tax |

**FL.State Filing Copy**

**W-2 Wage and Tax Statement 1996**
Copy 2 to be filed with employee's State Income Tax Return.    OMB No. 1545-0008

DENISE YOU MUST
call STALLEY. ROMA
DIDN'T PUT YOU ON
THE SCHEDULE FOR THIS
WEEK SO call Him
HE WANTS TO TALK TO
YOU.

DB 00040

DEFENDANT'S
EXHIBIT
Z
KT 8-23-00

# EMPLOYEE WARNING NOTICE

DENISE BROOKS

CLOCK NO. _____    DEPT. _Shoes_

OF WARNING  3-23-96    ①1ST NOTICE    2ND NOTICE

OF VIOLATION  3-18-96    TIME _____    PLACE _Shoes Dept._

| VIOLATION | EXPLANATION |
|---|---|
| STANDARD WORK | |
| BUSINESS | |
| EDUCATION | |
| SAFETY | |
| NEGLIGENCE | I'm did tell you & Michael Because |
| CONDUCT | I am having my check. |
| OBEDIENCE | |
| TARDINESS | LEFT WORK EARLY (NOT TELLING EMYBODY) |
| OTHER | |

D THIS NOTICE AND UNDERSTAND IT.  _Denise Brooks_    SIGNATURE OF EMPLOYEE

BY _R. Martio_    APPROVED BY _Gilbert Q. Camano_    SIGNATURE

© 1992 BROWNTEN/BS/GOSPICS INC. OYSTER BAY, NY — TO REORDER CALL TOLL FREE 1-800-645-1115

DB 00041



DEFENDANT'S EXHIBIT 8