UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6002-CIV-(UNGARO-BENAGES/Brown)

DENISE BROOKINS,

        Plaintiff,         **ORIGINAL**

vs.

MARTY SHOES, INC.,

        Defendant.

--------------------------------/

Fort Lauderdale, Florida

October 10, 2000

1:16 o'clock p.m.

VOLUME II  PAGES 122 - 287

- - - - - - - - -

VIDEOTAPED DEPOSITION

OF

DENISE BROOKINS

- - - - - - - - -

```
 1   APPEARANCES:

 2

 3       STEWART L. KARLIN, P.A.,
         BY:  STEWART L. KARLIN, ESQUIRE,
         Appearing on behalf of the Plaintiff.

 4

 5       HOLLAND & KNIGHT, LLP.,
         BY:  ERIC K. GABRIELLE, ESQUIRE,
 6       Appearing on behalf of the Defendant.

 7

         ALSO PRESENT:  STANLEY DZIOBA, of
 8       Marty Shoes, Inc.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    I N D E X

2    WITNESS:                              PAGE

3    DENISE BROOKINS

4    DIRECT EXAM CONTINUED BY MR. GABRIELLE:   126

5

6                  E X H I B I T S

7    DEFENDANT'S                    FOR IDENTIFICATION

8    NO.   9                             193

9    NO.  10                             197

10   No.  11                             200

11   NO.  12                             201

12   NO.  13                             202

13   NO.  14                             206

14   NO.  15                             213

15   NO.  16                             240

16

17

18

19

20

21

22

23

24

25
```

1              Video-taped Deposition of DENISE BROOKINS,

2      a witness of lawful age, taken by the Defendant, for

3      the purpose of discovery and for use as evidence in

4      the above-entitled cause, wherein DENISE BROOKINS is

5      the Plaintiff and MARTY SHOES, INC. is the

6      Defendant, pending in the United States District

7      Court Southern District of Florida, pursuant to

8      notice heretofore filed, before EVAN FERGUSON, a

9      Notary Public in and for the State of Florida at

10     Large, at the Law Offices of Holland & Knight, LLP.,

11     One East Broward Boulevard, 13th Floor, Fort

12     Lauderdale, Broward County, Florida, on the 10th day

13     of October, 2000, commencing at 1:00 o'clock p.m.

14                      -  -  -  -  -  -  -

15              THE VIDEOGRAPHER:  We are now on

16         the video record.  Today is Tuesday the

17         10th day of October 2000.  The time is

18         1:16 p.m.

19              We are here at One East Broward

20         Boulevard, Fort Lauderdale, Florida, for

21         the purpose of taking the videotaped

22         deposition of Denise Brookins.  The case

23         is Brookins versus Marty Shoes,

24         Incorporated.  The videographer is Don

25         Savoy of Esquire Legal Video.

126

```
 1              The court reporter is Evan Ferguson
 2         of Esquire Deposition Services.
 3              Will counsel please announce their
 4         appearances for the record?
 5              MR. GABRIELLE:  Eric Gabrielle and
 6         Holland & Knight for the Defendant Marty
 7         Shoes.  Also present is Stanley Dzioba of
 8         Marty Shoes.
 9              MR. KARLIN:  Stew Karlin for the
10         Plaintiff, Denise Brookins.
11                   - - - - -
12   Thereupon:
13              DENISE BROOKINS,
14       a witness named in the notice heretofore
15   filed, being of lawful age, and being first duly
16   sworn in the above cause, testified under oath as
17   follows:
18              DIRECT EXAMINATION CONTINUED
19   BY MR. GABRIELLE:
20         Q    Good afternoon, Ms. Brookins.
21         A    Good afternoon.
22              MR. GABRIELLE:  I need to put
23         something on the record before we get
24         started, it's really between myself and
25         your attorney.
```

```
 1              Mr. Karlin and I have agreed that

 2         as the Plaintiff's responses to the

 3         second set of interrogatories were due on

 4         September 29th and are still being

 5         prepared, Marty Shoes will have the

 6         option to reopen Plaintiff's deposition

 7         to examine her based on those responses

 8         when they are received; would you agree

 9         with that Mr. Karlin?

10              MR. KARLIN:  Yes.

11              MR. GABRIELLE:  Thank you.

12   BY MR. GABRIELLE:

13         Q    I know I talked to you about the

14   instructions for a deposition when we went

15   through the first one, but as it was sometime ago

16   I would like to just go over with you again.

17              I am going to be asking you a

18   series of questions, you are under oath, the same

19   oath that you will take at the trial of this case

20   and so you have the same obligation to tell the

21   truth as you do if you were in front of a jury

22   and if we were in a courtroom.

23              If I ask you a question that you

24   don't understand or ask it in a way that is

25   unclear, please let me know, it's your right
```

```
 1    sitting there today to understand every question
 2    I ask you before you answer it.
 3                At the same time it's also Marty
 4    Shoes' right to a truthful and complete answer to
 5    all the questions, so please I would encourage
 6    you if anything is unclear about my question let
 7    me know, let your attorney know and we will fix
 8    it.
 9                If at any point you would like a
10    break, please say the word, we have some sodas
11    and I think coffee, I'm not sure how long it's
12    been there, but say the word if you need to use
13    the restroom, again, this is not an endurance
14    contest.
15                I'm going to ask you some basic
16    questions again as I did in your first
17    deposition.  Other than your attorney Mr. Karlin
18    between the time of your first deposition and
19    today, who have you spoken with about your
20    lawsuit?
21          A     No one.
22          Q     I'm sorry?
23          A     No one.
24          Q     And other than Mr. Karlin between
25    the time of your first deposition and today who
```

```
 1    have you spoken with about your employment with

 2    Marty Shoes?

 3            A       No one.

 4            Q       I would like to show you a document

 5    which we were looking at previously in your first

 6    deposition, and it has already been marked as

 7    Exhibit 3.

 8                    And also I would like to show you a

 9    document which we looked at in your first

10    deposition and it's already been marked as

11    Exhibit 4.

12                    And I would ask you, as it has been

13    some time, if you would like to review them again

14    please do so now because I am going to ask you

15    some questions on those documents and we can go

16    off the video record.

17                    THE VIDEOGRAPHER:  We are going off

18            the video record 1:20 p.m.

19                    (Whereupon, a short recess was

20            had.)

21                    THE VIDEOGRAPHER:  We are back on

22            the video record 1:23 p.m.

23    BY MR. GABRIELLE:

24            Q       Ms. Brookins, I'm going to ask you

25    to take a look at Exhibit 3, which for the record
```

130

 1    is stamped DB 00033 and 34, I'm just going to

 2    take you through it line by line and ask you some

 3    specific questions about what you have written

 4    down here.

 5                 First of all when did you write

 6    Exhibit 3?

 7         A    I can't recall.

 8         Q    Did you write it in the year 2000?

 9         A    No.

10         Q    Did you write it in the year 1999?

11         A    No.

12         Q    Did you write it in the year 1998?

13         A    No.

14         Q    As best as you can recall you wrote

15    this document prior to January 1st of 1998?

16         A    Yes.

17         Q    Can you recall with any more

18    specificity when you wrote this document?

19         A    If I had the other page attached to

20    this I can give you exact details.

21         Q    You only have one page there?

22         A    One page.

23         Q    I am sorry.

24         MR. KARLIN:  I have one page also.

25         MR. GABRIELLE:  Off the record.

131

```
1              THE VIDEOGRAPHER:  We are going off
2         the video record 1:25 p.m.
3              (Whereupon, a short recess was
4         had.)
5              THE VIDEOGRAPHER:  We are back on
6         the video record 1:31 p.m.
7    BY MR. GABRIELLE:
8         Q    My apologies for the interruption.
9    Exhibit 3 now has 2 pages DB 00033 and DB 00034.
10   I will ask you again, since you didn't have both
11   pages the first time and you have now had an
12   opportunity to review both pages, can you recall
13   when you wrote the document that is marked as
14   Exhibit 3?
15        A    I can't recall because I still
16   believe it's another page connected to this.
17        Q    You believe there is a third page
18   to this document?
19        A    Yes, I do.
20        Q    Okay.  Do you recall whether or not
21   the third page was attached to the document when
22   we first reviewed it in your deposition?
23        A    I don't recall.
24        Q    What makes you think there was a
25   third page attached?
```

A The story from beginning to end is not telling the full detail of the accounts of what happened, it cuts off false accusations and a pattern.

Q Would you take a look, please, at Exhibit 4.

Now, Ms. Brookins in your first deposition, and I will represent to you that this is what it contains, we identified Exhibit 3 as a 2 page document, and you testified that you wrote it during the course of your employment between January and June 30th of 1996, but you could not recall the exact day.

Why I am mentioning that is because in the first part of your deposition it was a 2 page document. Is it possible that you have confused Exhibit 3 and Exhibit 4, which is a 3 page document, that's why I asked you to look at Exhibit 4, to see if we can clarify that because when we first looked at it in your first deposition it was a 2 page document.

A Okay. First I can't disclose what day it is Monday through Sunday, and number 2 is I can't recall if it was this document or the next document.

```
1              If this is document 4, if that is
2   what you are pertaining to, it doesn't label 4 so
3   I can't really state it.
4        Q    I will represent to you that page
5   DB00034 is the second page of Exhibit 3.  And
6   that in your first deposition when we looked at
7   Exhibit 3 it was a 2 page document DB00033 and
8   DB00034, and at that time there was no discussion
9   as to whether or not this document was
10  incomplete.
11             All I want to know is by looking at
12  these 2 pages, DB00033 and 34, can you tell when,
13  what year you wrote this document?
14       A    No.
15       Q    Can you tell whether you wrote this
16  document in the year 2000?
17       A    No.
18       Q    Can you tell whether you wrote this
19  document in the year 1999?
20       A    No.
21       Q    Can you tell within any year what
22  year you wrote this document?
23       A    No, I can't.
24       Q    I'm going to ask you about the
25  first page DB00033.
```

```
 1            The first sentence reads:  During
 2   the course of employment at Marty's Shoes I was
 3   treated unequally as the others.
 4            My question to you is what other
 5   employees of Marty's Shoes do you feel you were
 6   treated unequally as compared to?
 7        A     The ones that were hired after I
 8   was hired.  Kim Chin; Michael Torres; Chris
 9   Torres; Agnes; Orlando Gonzalez, Anna, Peter.
10        Q     What is Anna's last name?
11        A     I don't have the last names in
12   front of me.
13        Q     What is Peter's last name, do you
14   know?
15        A     No, I can't recall.
16        Q     So you feel you were treated
17   unequally to Kim Chin; is that the last name you
18   gave, C-H-I-N?
19        A     Yes.
20        Q     Michael Torres?
21        A     Yes.
22        Q     Chris Torres?
23        A     Yes.
24        Q     Orlando Gonzalez?
25        A     Yes.
```

```
 1            Q      And two people, Anna and Peter, for

 2   whom you don't have a last name?

 3            A      Right.

 4            Q      How do you feel you were treated

 5   unequally as compared to Kim Chin?

 6            A      Kim Chin was hired after I was.

 7   She was a descendent of a Korean or Asian race.

 8                   She immediately got more hours,

 9   received more hours than I worked.  After I had

10   issued the complaint to Stanley and John Adams

11   and Roma Rybitwa.

12            Q      And when did Kim begin working for

13   Marty Shoes?

14            A      I have no -- After I was hired.

15            Q      How long after you were hired?

16            A      A few months.

17            Q      Can you be any more specific than a

18   few months after you were hired?

19            A      No.

20            Q      When were you hired?

21            A      I was hired in the year of '95.

22            Q      What month?

23            A      I can't recall.

24            Q      So you don't recall whether it was

25   1995 or 1996 when Kim was hired?
```

```
 1              A       It was '96.

 2              Q       So you know Kim was hired in the

 3      year 1996?

 4              A       Yes.

 5              Q       Do you know if Kim was a student

 6      while she was working for Marty Shoes?

 7              A       I believe she was.

 8              Q       Where was she a student?

 9              A       I don't remember.

10              Q       How do you know Kim -- What makes

11      you think Kim was a student?

12              A       Her hours, the hours had to be

13      adjusted around her schedule.

14              Q       How do you know that?

15              A       She got more hours than I did

16      because the way that Roma changed the schedule

17      she got more hours than I did.  My hours were

18      cut.

19              Q       How do you know Kim was a student?

20              A       She told me so.

21              Q       When did she tell you?

22              A       In the course of my employment.

23              Q       How long after she started working

24      for Marty Shoes did she tell you she was a

25      student?
```

```
 1          A      A few months after I got to know
 2   her.
 3          Q      And when did you get to know her?
 4          A      After she was hired.
 5          Q      Can you be any more specific about
 6   when Kim told you she was a student?
 7          A      No.
 8          Q      Sometime in the year 1996?
 9          A      Exactly.
10          Q      Do you know which month?
11          A      No.
12          Q      Do you know whether Kim was a
13   student when she began working for Marty Shoes?
14          A      I don't know.
15          Q      Do you know when Kim began being a
16   student during her employment with Marty Shoes?
17          A      No.
18          Q      When was the last time you spoke
19   with Kim?
20          A      The last time I worked there.
21          Q      You haven't spoken with Kim since
22   your employment ended at Marty Shoes?
23          A      No.
24          Q      Other than what you have already
25   described about Kim, is there any other reason --
```

1    Strike that.  Other than what you have already

2    testified to, is there any other way in which

3    Marty Shoes treated you differently than it

4    treated Kim?

5         A      There were several ways that I was

6    treated differently.

7         Q      How specifically with reference to

8    Kim, how were you treated differently than Kim?

9         A      She was able to go to the restroom

10   without notifying the manager.

11              She was able to come to work

12   without disclosing her shoes.  She was allowed to

13   use the telephone.  She was allowed to take her

14   breaks when necessary.

15        Q      Where was the -- How do you know

16   Kim was able to go to the restroom without

17   telling the manager?

18        A      I seen her go.

19        Q      Did you see every conversation that

20   Kim had with the manager on duty at Marty's

21   Shoes?

22        A      No.

23        Q      How do you know Kim didn't ask the

24   manager for permission before she went to the

25   restroom?

```
 1          A      That's not really a rule that they
 2   had.  It was only a rule that was created between
 3   Roma and I.
 4          Q      And how do you know that?
 5          A      She told me to tell her.
 6          Q      Roma told you to tell her when you
 7   were going?
 8          A      When I were going.
 9          Q      How do you know she didn't tell Kim
10   the same thing?
11          A      She didn't have a problem with Kim.
12          Q      How do you know that?
13          A      I could see the way they
14   interacted.  They laughed together.  They went to
15   lunch together.  They had a pleasant
16   relationship.
17          Q      But how do you -- Did you ever hear
18   Roma tell Kim that she could go to the restroom
19   without permission?
20          A      No.
21          Q      Did Kim ever tell you that she
22   could go to the restroom without permission?
23          A      No.
24          Q      Did Roma ever tell you that Kim
25   could go to the restroom without permission?
```

```
 1          A      No.

 2          Q      You mentioned that Kim didn't have

 3   to disclose her shoes, what do you mean by that?

 4          A      Well, one of the accusations that

 5   Roma accused me of was taking shoes from the

 6   store and wearing them out leaving my old shoes

 7   in the store.

 8                 And every time I reported to work I

 9   had to show either her or Michael my shoes that I

10   had on and the soles to verify that those were my

11   shoes.

12          Q      And did Roma ever dispute that you

13   were wearing your own shoes to work?

14          A      No.

15          Q      Did she ever make you give the

16   shoes that you were wearing back to the store?

17          A      No.

18          Q      You said you also had to tell

19   Michael?

20          A      Michael was the assistant manager.

21          Q      Is that Michael Torres?

22          A      Torres.

23          Q      Did Roma ever discipline you for

24   stealing shoes from Marty's Shoes?

25          A      No.
```

```
 1              Q      Did Michael ever discipline you

 2    from stealing shoes from Marty's Shoes?

 3              A      No.

 4              Q      How do you know that Kim didn't

 5    have to show Michael or Roma her shoes when she

 6    arrived to work?

 7              A      I remember Kim coming in in the

 8    evenings, afternoons, and when she left she would

 9    just walk off the floor and carry her belongings

10    and there was never a verification from Roma that

11    she had to stop and show her shoes.

12              Q      Well, did you see every

13    conversation between Roma and Kim before she left

14    the store?

15              A      No.

16              Q      Did you hear every conversation I

17    should have said.  Did you hear every

18    conversation between Roma and Kim before she left

19    the store?

20              A      No, I didn't.

21              Q      You mentioned that Kim was allowed

22    to use the telephone?

23              A      Yes.

24              Q      And you were not; were you not

25    allowed to use the telephone at Marty's Shoes?
```

```
 1              A      No, I was not.
 2              Q      Did you ever ask to use the
 3      telephone and were told you couldn't?
 4              A      I asked -- She told me I couldn't
 5      use the phone.
 6              Q      Roma told you?
 7              A      Yes.
 8              Q      You couldn't use the phone?
 9              A      Yes.
10              Q      And when did that happen?
11              A      During the course of my employment.
12              Q      Can you be any more specific?
13              A      No.
14              Q      Do you know how long after Roma
15      became the manager at the Marty's Shoes where you
16      worked that she told you you couldn't use the
17      phone?
18              A      A few months.
19              Q      Where was the phone at Marty's
20      Shoes in reference to the rest of the store?
21              A      Well, the store is sublet in
22      Sawgrass, if you enter through the north door and
23      make a left turn, you go all the way to the back
24      wall of the store, that's where the phone is
25      located by the office.
```

```
1          Q     The phone at Marty's Shoes is next
2    to the office of Marty's Shoes?
3          A     Yes.
4          Q     Is it Marty's Shoes business line,
5    is that the line that calls come in on?
6          A     That's a extension of Burlington,
7    they don't have a separate line when I was
8    working there.  You have to ask for Marty's
9    Shoes.
10         Q     Was the phone physically located
11   inside the Marty's Shoes store?
12         A     Yes.
13         Q     Did you have to walk out of the
14   Marty's Shoes area to use the phone?
15         A     Yes.
16         Q     Could you see the phone from the
17   Marty's Shoes area?
18         A     No.
19         Q     How do you know that other
20   employees were allowed to use the phone and you
21   were not?
22         A     Roma gave me a verbal warning not
23   to answer the phone.  At that time she disclosed
24   to us, the employees that Agnes was the only one
25   permitted to use the phone at that time.
```

```
 1              Shortly after Mike was hired
 2    Michael was the only one authorized to use the
 3    phone as far as answering calls.
 4         Q    Do you remember Agnes' last name?
 5         A    I don't have it in front of me.
 6         Q    So when Roma was the manager Agnes
 7    was the only one allowed to use the phone?
 8         A    Yes.
 9         Q    And when Michael was the manager
10    Michael was the only one allowed to use the
11    phone?
12         A    And Agnes.
13         Q    And Agnes.  So there were other
14    employees in addition to yourself who were not
15    allowed to use the phone; is that correct?
16         A    No.
17         Q    Who else was allowed to use the
18    phone besides Agnes and Michael?
19         A    Chris, Anna, the guys.  Every other
20    employee except me.  Orlando used it.
21         Q    So Roma explained to the employees
22    that the only one allowed to use the phone was
23    Agnes; is that correct?
24         A    And Michael.
25         Q    And Michael, but other employees
```

```
1    used the phone?

2            A     Yes.

3            Q     Did you ever use the phone?

4            A     No.

5            Q     So there was a rule that other

6    employees broke but you didn't; is that correct?

7            A     Excuse me?

8            Q     There was a rule not to use the

9    phone and other employees broke it; is that what

10   you are testifying to?

11           A     No, there is rules that only I

12   couldn't use the phone.  She had no issue or

13   discrepancy with other employees using the phone.

14           Q     If you never tried to use the phone

15   and these other employees did, how do you know

16   that you were being treated differently?

17           A     She told me not to use the phone.

18           Q     But the other employees were also

19   told not to use the phone; is that correct?

20                 MR. KARLIN:  I will object, that's

21           not what she is saying.

22   BY MR. GABRIELLE:

23           Q     Did you ever try to use the phone?

24           A     Not after she told me not to use

25   it, no.
```

```
 1              MR. KARLIN:  Just to clarify, I
 2         don't want to put words in her mouth, but
 3         I think she testified about answering the
 4         phone as opposed to making telephone
 5         calls, there is a distinction.
 6    BY MR. GABRIELLE:
 7         Q     Let me pursue that then, I
 8    appreciate the clarification.
 9              Were you ever told by anyone that
10    you were not allowed to use, make your own calls
11    from the telephone that you have described at
12    Marty's Shoes?
13         A     Yes.
14         Q     Were you ever told by anyone not to
15    answer the phone at Marty's Shoes?
16         A     Yes.
17         Q     And who told you not to make your
18    own calls from the phone?
19         A     Roma.
20         Q     Anyone else?
21         A     No.
22         Q     Who told you not to answer the
23    calls?
24         A     Roma.
25         Q     Anyone else?
```

```
 1            A     No.
 2            Q     What were the other employees
 3    allowed to do that you were not allowed to do in
 4    reference to the telephone?
 5            A     Again, I was not allowed to use the
 6    phone.  I was not allowed to answer the phone.
 7    The other employees there, they were not
 8    confronted to use or answer the phone by Roma.
 9            Q     You testified that Roma told the
10    employees that the only persons allowed to use
11    the phone were Agnes and Michael; is that
12    correct?
13            A     Yes.
14            Q     When Roma said that, do you mean
15    that those were the only employees allowed to
16    answer the phone, or do you mean that those were
17    the only employees allowed to make their own
18    calls from the phone?
19            A     Answer and make their own calls.
20            Q     But you testified that other people
21    did answer the phone in addition to Agnes and
22    Michael, right?
23            A     Before me and her had the problem.
24            Q     When did Roma make the announcement
25    that only Agnes and Michael were allowed to use
```

```
1    the phone?

2         A     One day I was using the phone and

3    she came and she asked me who was I talking to

4    and I told her it was my sister and right then

5    and there she had a problem with it.  She said I

6    was tying up the phone and it could be the New

7    Jersey store calling and she unplugged the phone.

8         Q     And so you were on a personal call

9    and Roma told you not to use the store phone?

10        A     No, she asked me who was I talking

11   to.

12        Q     Were you talking to your sister?

13        A     Yes.

14        Q     Were you talking to your sister

15   about the business of Marty's Shoes?

16        A     No.

17        Q     So it was a personal call that you

18   were on?

19        A     Yes.

20        Q     And when did Roma -- Did Roma make

21   an announcement to the work force at Marty's

22   Shoes that the only people allowed to use the

23   phone were Agnes and Michael?

24        A     Yes, she did.

25        Q     When did she make that announcement
```

```
 1    as compared to the conversation you just

 2    described about the phone call with your sister,

 3    before or after?

 4              A      After.

 5              Q      And after Roma made the

 6    announcement that the only people allowed to use

 7    the phone were Agnes and Michael, did employees

 8    other than Agnes and Michael use the phone?

 9              A      Yes.

10              Q      Did you ever use the phone?

11              A      No.

12              Q      So as far as you are concerned,

13    those other employees broke the rule about using

14    the phone; is that correct?

15              A      Yes.

16              Q      And they weren't disciplined for

17    it?

18              A      No.

19              Q      But you never used the phone after

20    Roma made the announcement; is that correct?

21              A      No, I never touched it.

22              Q      You mentioned about Kim Chin that

23    she was allowed to take breaks and you were not;

24    can you explain what you mean by that?

25              A      I witnessed Kim, as well as other
```

```
 1    several employees, when they got ready to go to

 2    lunch they just say to the other workers that

 3    they just went to lunch or went for a break.

 4            Q     And how is that different from what

 5    you did?

 6            A     I wasn't given the normal allotted

 7    time that the rest of them had.

 8                  I had to tell her when I was going

 9    and when I came back.  She timed me.

10            Q     And how long were your breaks?

11            A     Sometimes you can take 15 to 30.

12    If you are going to be gone longer than that you

13    have to punch out.

14            Q     And how do you know that Roma

15    didn't time the breaks of other employees?

16            A     They extended their time with the

17    lunch breaks.  They came back longer than normal.

18            Q     So you took the right amount of

19    time on your breaks; is that correct?

20            A     I was forced to.

21            Q     You were forced to take the amount

22    of time that was allotted for breaks?

23            A     Yes.

24            Q     And how were you forced to do that?

25            A     She told me if I was going to be
```

```
 1    gone longer than I guess 10 minutes for example,
 2    she would punch me out.
 3            Q    And how do you know that other
 4    employees were not -- and punched out I assume
 5    you mean punched out on the time clock?
 6            A    Yes.
 7            Q    How do you know that Roma didn't
 8    tell other employees that if they were going to
 9    be gone longer for 10 minutes they would be
10    clocked out?
11            A    Well, when they left, somebody had
12    to cover their job task.  And if you only have a
13    set amount of time to go for lunch and you have
14    been working that task longer than expected, then
15    they took longer coming back from lunch.
16            Q    So your testimony is that other
17    employees took longer than the allotted lunch
18    break while you were employed by Marty's Shoes?
19            A    Yes.
20            Q    And did you ever take longer than
21    the allotted lunch break while you were employed
22    by Marty's Shoes?
23            A    No.
24            Q    So Roma explained to you that the
25    rule was if you were gone longer than 10 minutes
```

```
 1    you would be clocked out?

 2            A      Yes.

 3            Q      And after she explained that rule

 4    to you were you ever gone longer than 10 minutes?

 5            A      No.

 6            Q      But the other employees did take

 7    longer than 10 minutes?

 8            A      Yes.

 9            Q      And do you know whether or not Roma

10    clocked them out?

11            A      No.

12            Q      You don't know?

13            A      I can't recall.

14            Q      Is there anything that would help

15    you recall?

16            A      No.

17            Q      How about Michael Torres, was

18    Michael Torres -- did he become a manager right

19    when he was hired?

20            A      Yes.

21            Q      I should ask that question a little

22    better.  Was Michael Torres hired as a manager as

23    far as you know?

24            A      He was hired as assistant manager

25    to Roma.
```

```
 1          Q      And how did Marty's Shoes treat you
 2   differently than it treated Michael Torres?
 3          A      Well, when I first applied for the
 4   job, Carmen was the store manager and I applied
 5   for the management training position.
 6                 And after I was hired by Carmen
 7   they let Carmen go, and when I questioned the
 8   position again to Roma, she said she would have
 9   to clear it with home office or whatever.  And I
10   told her I would like to apply for it, and
11   shortly after that Michael came in and then she
12   hired Michael.
13          Q      Do you know what Michael's
14   experience or education was before he was hired?
15          A      Yes.
16          Q      What was that?
17          A      Michael had a criminal history.  He
18   told me he didn't finish high school.  He had no
19   college experience.
20          Q      How do you know Michael had a
21   criminal history?
22          A      Because he lied on his application
23   that he spent time in Florida State Corrections
24   Institution to get that job.
25          Q      How do you know that Michael lied
```

```
 1    on his application?
 2            A      He was terminated for that reason.
 3            Q      But how do you know, how do you
 4    yourself know that Michael lied on his
 5    application?
 6            A      I pulled his criminal history at
 7    Broward Sheriff's Office.
 8            Q      Were you working for Broward
 9    Sheriff's Office?
10            A      No.
11            Q      When did you pull Michael's
12    criminal history at Broward Sheriff's Office?
13            A      When we were working there.
14            Q      When was that?
15            A      During the course of my employment
16    there.
17            Q      What caused you to pull Michael's
18    criminal history?
19            A      Well, he was kind of nervous to go
20    in there and pull it himself.  He had some
21    discrepancies with the dates and he wanted to
22    make sure he get it right.
23            Q      Michael asked you to pull his
24    criminal history?
25            A      Yes.
```

155

```
 1              Q      When did he ask you to do that?
 2              A      In the course of my employment at
 3     Marty's.
 4              Q      And Michael was ultimately fired
 5     for having a criminal history?
 6              A      He was fired for not disclosing on
 7     his application.
 8              Q      What is your understanding of how
 9     Marty's Shoes found out that Michael had a
10     criminal history?
11              A      I think Stanley did a background
12     check.
13              Q      You don't have a criminal history?
14              A      No.
15              Q      Do you know what Michael's
16     experience was; do you know what any of Michael's
17     prior jobs were before Marty's Shoes?
18              A      No.
19              Q      How do you know whether Michael had
20     more experience selling shoes than you did?
21              A      I didn't.
22              Q      You don't know?
23              A      No, he didn't.
24              Q      How do you know that?
25              A      Because when he -- He didn't know
```

```
 1      the name brand shoes.  He didn't know an

 2      expensive pair of shoes from a non versus brand.

 3      He didn't know the soles.  He didn't know whether

 4      it was leather or plastic.

 5               Q      And did you ever work in a shoe

 6      store before that?

 7               A      Yes.

 8               Q      Where did you work?

 9               A      I worked at a shoe store in

10      Tallahassee Mall.

11               Q      What was it called?

12               A      Gordon & Bakers.

13               Q      Gordon & Bakers?

14               A      Yes.

15               Q      When did you work at Gordon &

16      Bakers?

17               A      I believe it was '82.

18               Q      1982?

19               A      Yes.

20               Q      So you lived in Tallahassee at the

21      time?

22               A      Yes.

23               Q      Other than Gordon & Bakers did you

24      work at any other shoe stores before Marty's

25      Shoes?
```

```
 1              A      I believe, no.

 2              Q      Why did your employment end at

 3    Gordon & Bakers?

 4              A      It was undersold.

 5              Q      I'm sorry?

 6              A      Bankruptcy.

 7              Q      The company went bankrupt?

 8              A      Yes.

 9              Q      So after Marty's Shoes found out

10    that Michael had a criminal history that he did

11    not disclose on his application he was fired?

12              A      Yes.

13              Q      Do you have any knowledge as to how

14    Marty's Shoes learned that Michael had the

15    criminal history?

16              A      No, I think it was random.  It was

17    just a check.

18              Q      How long after you went and did the

19    search at the Broward Sheriff's Office did

20    Michael get fired?

21              A      At least 4 months, at least 3 or 4

22    months.

23              Q      Do you know if Michael was hired as

24    a stock boy?

25              A      No, he wasn't.
```

1        Q      How do you know that?

2        A      Because he assumed the managerial

3   duties of a manager.

4        Q      And what were those managerial

5   duties?

6        A      He had access to the safe.  He had

7   access to the payroll.  When Roma was on vacation

8   he attempted to make the schedule, and we

9   received instructions from him as a manager.

10       Q      How long was Michael employed by

11  Marty's Shoes to your knowledge?

12       A      I can't recall.  A few months.

13       Q      Just a few months?

14       A      Yes.

15       Q      Did anyone replace Michael as

16  assistant manager after he was fired?

17       A      I can't recall.  I don't think so.

18       Q      Do you know who else applied for

19  the position of assistant manager that Michael

20  received other than yourself?

21       A      No.

22       Q      Did Roma ever give you a reason why

23  Michael was hired for the position of assistant

24  manager?

25       A      She told me that the company with

1     the stocking and the bringing in of the

2     merchandise on the palets that they prefer that

3     they have a man because it's lifting and it's

4     strenuous work.

5          Q     So Roma told you that the company

6     would rather hire a man for the position of

7     assistant manager because the position involved

8     lifting and strenuous work?

9          A     Lifting, yes.

10         Q     Did it also involve strenuous work?

11         A     Yes, it did.

12         Q     Do you believe that you can

13    perform, or at the time you could perform lifting

14    and strenuous work?

15         A     At the time I applied for it I felt

16    like I could do that job.

17         Q     When did that change?

18         A     When did that change?

19         Q     Do you still feel like you could do

20    that job?

21         A     Yes.

22         Q     Did you ever talk with anyone at

23    Marty's Shoes about the injury that you suffered

24    while you were employed with Wells Fargo?

25         A     No.

```
 1          Q      You worked for Wells Fargo before
 2  you worked for Marty's Shoes; is that correct?
 3          A      That is correct.
 4          Q      And you suffered an injury while
 5  you were employed by Wells Fargo?
 6          A      Yes.
 7          Q      Tell me a little bit about that;
 8  how did that injury occur?
 9          A      The golf cart, it was raining and I
10  was patrolling the parking lot of the industrial
11  park and when I put the golf cart into the drive
12  position it jerked violently and when it jerked
13  violently there was a sharp pain radiating down
14  my back to my leg.
15          Q      And when did this happen, what
16  year?
17          A      '92.
18          Q      1992?
19          A      Yes.
20          Q      And I believe you testified to this
21  in your first deposition, are you currently suing
22  Wells Fargo for that event, that accident,
23  incident?
24          A      When you say suing, what do you
25  mean?
```

```
 1            Q      Have you filed a Workers'
 2   Compensation claim against Wells Fargo?
 3            A      Yes.
 4            Q      Has that claim been resolved?
 5            A      No.
 6            Q      Is it still pending?
 7            A      Yes.
 8            Q      Have you filed an actual lawsuit
 9   against Wells Fargo?
10            A      No.
11            Q      Is there any other way that Marty's
12   Shoes treated you differently than it treated
13   Michael Torres?
14            A      Repeat the question.
15            Q      Is there any way, other than what
16   you have already described, that Marty's Shoes
17   treated you differently than it treated Michael
18   Torres?
19            A      Michael was allowed to give larger
20   discounts to shoes.
21                   He was allowed to take lunch breaks
22   and come back when he wanted to.  He was allowed
23   to cash his check while on the clock and come
24   back.
25            Q      Did Michael have to punch in and
```

```
 1    out?  Did you ever see Michael punching in and

 2    out?

 3           A      Yes.

 4           Q      Were there any other assistant

 5    managers employed by Marty's Shoes at any time

 6    while you worked there?

 7           A      Michael was the first assistant

 8    manager, and before Michael the store manager was

 9    Carmen and assistant manager was Roma.

10           Q      So while Carmen was the manager,

11    Roma was the assistant manager?

12           A      Yes.

13           Q      Other than Michael were there any

14    other employees allowed to give larger discounts

15    than you were?

16           A      Chris and Agnes.

17           Q      Other than Michael were there any

18    other employees allowed to cash their check at

19    the store?

20           A      No, he never cashed it at the

21    store, he left and came back while on the clock.

22           Q      I thought you testified, and please

23    correct me if this is incorrect.  Oh, I see what

24    you mean, Michael was allowed to leave the store

25    and cash his check and return to the store?
```

```
 1              A     Yes.

 2              Q     So he cashed his check at somewhere

 3       other than the store?

 4              A     Yes.

 5              Q     And Michael was allowed to take

 6       longer lunch breaks than you were?

 7              A     Yes.

 8              Q     Was there anyone other than Michael

 9       who was allowed to take longer -- Well, you

10       already testified, never mind, strike that.

11                    Did you ever ask to leave the store

12       to cash your check and come back?

13              A     No.

14              Q     How do you know you wouldn't have

15       been allowed to leave the store to cash your

16       check and come back?

17              A     Because I didn't have a car to go

18       cash it.

19              Q     I'm sorry, I didn't -- Oh, you

20       didn't have a car.  I'm sorry, you had to drive

21       away from the store to go to a bank or something

22       and come back?

23              A     Yes.

24              Q     Did you ever ask anyone whether you

25       were allowed, whether you could give larger
```

```
 1   discounts than you were allowed to give?
 2          A      Repeat the question.
 3          Q      I'm going to rephrase it.  Did you
 4   ever ask permission to give, were you allowed to
 5   give a discount to customers as a employee of
 6   Marty's Shoes?
 7          A      No.
 8          Q      Who was allowed to give discounts?
 9          A      Roma, Carmen, Michael and Chris.
10          Q      Anyone else?
11          A      No.  Agnes.
12          Q      Was Kim allowed to give discounts?
13          A      No.
14          Q      Orlando Gonzalez, was he allowed to
15   give discounts?
16          A      No.
17          Q      How, in what ways did Marty's Shoes
18   treat you differently than it treated Chris
19   Torres?
20          A      Chris was allowed to come to work
21   without showing his shoes.  He was allowed to use
22   the phone.  He was allowed to give larger
23   discounts to his family or friends on shoes.  He
24   was allowed to assist customers in take back
25   shoes from the register.
```

```
 1          Q       When you say assist customers in

 2    taking back shoes from the register, what do you

 3    mean?

 4          A       When customers doesn't want the

 5    shoes or it was a price conflict or it was a

 6    markdown, they usually call an associate from the

 7    store to go up to the register and assist.

 8          Q       And Chris was allowed to go up to

 9    the register and assist?

10          A       Yes.

11          Q       Were you ever told not to go up to

12    the register and assist?

13          A       Yes.

14          Q       By who?

15          A       Roma.

16          Q       Who else went up to the register

17    and assisted?

18          A       Agnes.

19          Q       Anyone else?

20          A       Michael and Roma.

21          Q       Do you know whether or not Roma

22    told any of the other employees that they were

23    not allowed to go up to the register and assist

24    customers?

25          A       No.
```

1        Q      How did Marty's Shoes treat you

2   differently than Orlando Gonzalez?

3        A      Orlando had the option some

4   weekends of not working the weekends.  He had the

5   option of using the phone because his girlfriend

6   worked there and she too was Polish.

7               He had the option of coming in

8   late.  He had the option of going to the restroom

9   and to lunch.

10       Q      You say Orlando had the option of

11  using the phone because his girlfriend worked

12  there and she too was Polish?

13       A      Yes.

14       Q      Do you mean that someone at Marty's

15  Shoes favored Orlando because his girlfriend was

16  Polish?

17       A      Yes.

18       Q      Who did that?

19       A      Roma.

20       Q      Is it your understanding that Roma

21  was Polish?

22       A      She is.

23       Q      She is Polish?

24       A      Yes.

25       Q      So you believe that Roma favored

1    Orlando because his girlfriend was Polish?

2         A    Yes.

3         Q    Any other reason why you believe

4    that Roma favored Orlando?

5         A    They lived in the same complex and

6    they got along well.

7         Q    Would it be accurate to say that

8    you and Roma did not get along well?

9         A    Perfect.

10        Q    Perfectly accurate?

11        A    Yes.

12        Q    How did Marty's Shoes treat you

13   differently than it treated Anna?

14        A    Anna was Michael's girlfriend.  She

15   had the option of coming to work late whenever

16   she wanted to.

17             She had the option of using the

18   phone.  And she had the option of not showing her

19   shoes when she came to work.

20        Q    Were you ever late to work?

21        A    A few times.

22        Q    What happened?

23        A    She asked me why was I late, and I

24   told her the bus was late, the bus broke down and

25   so forth.

```
 1          Q      And what happened, you mean she
 2   asked you, you mean Roma?
 3          A      Yes.
 4          Q      And what happened after you
 5   explained why you were late?
 6          A      She kept telling me don't let it
 7   happen again.
 8          Q      Did Roma ever dock you any pay for
 9   being late?
10          A      No.
11          Q      How many times were you late would
12   you say while Roma was the manager?
13          A      Roughly three.
14          Q      And how many times was Anna late?
15          A      Just about every day.
16          Q      How do you know that Roma didn't
17   say something to Anna about being late?
18          A      She was Michael's girlfriend and at
19   that time she had no transportation so she would
20   have to bum rides to work and she came up short a
21   lot of times.
22          Q      But how do you know that Roma
23   didn't say to Anna the same sorts of things that
24   Roma said to you about being late?
25          A      I don't know.
```

```
 1              Q      So Anna was Polish?

 2              A      No, Anna was Puerto Rican.

 3              Q      Anna was Michael's girlfriend?

 4              A      Yes.

 5              Q      And Orlando's girlfriend was

 6      Polish?

 7              A      Yes.

 8              Q      Is it your opinion that Anna and

 9      Roma got along well?

10              A      Yes, they did.

11              Q      How about Peter, how did Marty's

12      Shoes treat Peter different than it treated you?

13              A      Peter came on the scene, Peter is

14      an associate of Roma's husband or brother and

15      they all lived in the same complex.  He

16      immediately got 40 hours when Roma went on

17      vacation.

18              Q      When did Roma go on vacation?

19              A      I can't recall.

20              Q      How long before your employment

21      ended did Roma go on vacation?

22              A      Before June 31st, '96.

23              Q      How do you know it was before June

24      31st of '96?

25              A      Because she went before I was
```

```
 1   terminated.
 2              MR. KARLIN:  Just take about three
 3         minutes to use the restroom.
 4              MR. GABRIELLE:  I'm sorry?
 5              MR. KARLIN:  Take a three, four
 6         minute break.
 7              MR. GABRIELLE:  Sure, off the
 8         record.
 9              THE VIDEOGRAPHER:  We are going off
10         the record 2:11 p.m.
11              (Whereupon, a short recess was
12         had.)
13              THE VIDEOGRAPHER:  Back on the
14         video record.
15   BY MR. GABRIELLE:
16         Q    You understand, Ms. Brookins, that
17   you are still under oath?
18         A    Yes.
19         Q    Do you believe that Roma favored
20   Peter because Peter was an associate of Roma's
21   husband or her brother?
22         A    Yes.
23         Q    When you say they lived in the same
24   complex, you mean the same apartment complex?
25         A    Yes.
```

```
 1          Q      And you testified that Peter
 2   immediately got 40 hours when Roma went on
 3   vacation; can you recall with any more
 4   specificity other than before June of '96 when
 5   Roma went on vacation?
 6          A      The last three weeks had to be of
 7   June.
 8          Q      And how do you know that?
 9          A      Well, when I got the notice that
10   Roma took me off of vacation, when Roma took me
11   off the schedule, correction.  I phoned Stanley
12   and Stanley told me via phone that I was
13   terminated.  Roma was not present at the store.
14          Q      And do you believe that's because
15   Roma was on vacation?
16          A      Yes.
17          Q      So while Roma was on vacation Peter
18   was given 40 hours to work?
19          A      Uhm-hum.
20          Q      I'm sorry, you have to answer.
21          A      Yes.
22          Q      How long before your employment was
23   terminated did Roma go on vacation?
24          A      How long?
25          Q      Yes.  Was she on vacation when you
```

```
 1    were fired, was Roma on vacation?
 2           A      Yes, she was.
 3           Q      Was she on vacation before you were
 4    fired?
 5           A      Yes.
 6           Q      Did you ever work any days in the
 7    store while Roma was on vacation?
 8           A      No.
 9           Q      How do you know that Peter was
10    given 40 hours to work while Roma was on
11    vacation?
12           A      He was there and the schedule
13    states that he was there and the total amount of
14    hours for that week was 40.
15           Q      So you don't know if Peter actually
16    worked 40 hours that week?
17           A      The schedule said so.
18           Q      And this is the schedule that was
19    posted while Roma was on vacation?
20           A      Yes.
21           Q      Did you go in to Marty's Shoes and
22    look at the schedule on a day that you weren't
23    scheduled to work?
24           A      No.
25           Q      Were you working on the day that
```

```
 1      the schedule was posted that showed that Peter

 2      was given 40 hours to work?

 3              A      I can't recall.

 4              Q      I'm just trying to figure out how

 5      you know if you didn't work on any days when Roma

 6      was on vacation, and you didn't go in and look at

 7      the schedule at Marty's Shoes on a day you

 8      weren't scheduled to work, but that the schedule

 9      showed Peter was given 40 hours to work how you

10      know that?

11              A      He was there 40 hours.

12              Q      How do you know he was there 40

13      hours if you weren't there 40 hours?

14              A      I was going by what the schedule

15      states.

16              Q      When did you see the schedule?

17              A      Every week.

18              Q      When was the schedule posted for

19      the next working period; was there a particular

20      day the schedule was posted?

21              A      No.

22              Q      How long in advance of a particular

23      week would the schedule be posted?

24              A      A week.

25              Q      So one week before, in other words
```

```
 1    the schedule would be posted during one week for

 2    the following week?

 3         A    Exactly.

 4         Q    Do you have a copy of the schedule

 5    showing that Peter was given 40 hours to work?

 6         A    No.

 7         Q    So you are basing this on your

 8    memory from approximately June of 1996?

 9         A    Exactly.

10         Q    Who else was on the schedule for

11    that week?

12         A    Agnes and Kim.

13         Q    And how many hours was Agnes

14    scheduled to work?

15         A    I can't recall.

16         Q    How many hours was Kim scheduled to

17    work?

18         A    I can't recall.

19         Q    You weren't on the schedule that

20    week; is that your testimony?

21         A    Correct.

22         Q    And that's when you called Stanley?

23         A    Yes.

24         Q    Agnes is not black, is she?

25         A    No.
```

1       Q       And Kim is not black, is she?

2       A       No.

3       Q       Is there any way other than what

4   you have already testified to that Marty's Shoes

5   treated you differently than it treated Peter?

6       A       Because I was black.

7       Q       Why do you think Marty's Shoes

8   treated Peter better than you because you were

9   black, what makes you think that?

10      A       The allegations and the statements

11  I made to John Adams and Martin Samowitz and

12  Stanley, they never got back with me concerning

13  the problems I was having at the stores, the

14  innuendoes, the statements, the stereotypes that

15  Roma used.

16      Q       When did you talk to Martin

17  Samowitz?

18      A       When he came to the store.

19      Q       When was that?

20      A       Before June 31st, '96.

21      Q       How long before June 31st of 1996?

22      A       I can't recall.

23      Q       There are only 30 days in June, so

24  let's just assume it's June 30th of 1996; was it

25  the year 1996?

```
 1            A     Yes.

 2            Q     What did you talk about with Martin

 3   Samowitz?

 4            A     He asked me how did I like the

 5   store.  Was I happy at the job.

 6            Q     And what did you say?

 7            A     Yes.

 8            Q     You told Martin Samowitz you were

 9   happy?

10            A     Yes.

11            Q     Was this while Roma was the

12   manager?

13            A     No.

14            Q     So it was before Roma became the

15   manager that you spoke with Martin Samowitz?

16            A     I can't recall that date.

17            Q     Well, when you spoke with Martin

18   Samowitz, it was before Roma became the manager;

19   is that correct?

20            A     I can't recall.

21            Q     Well, you don't know for sure

22   whether you spoke with Martin Samowitz while Roma

23   was the manager or while Carmen was the manager;

24   is that correct?

25            A     Carmen introduced me to him, that's
```

```
 1    how I knew he was the owner.
 2            Q      And was Roma the manager while
 3    Carmen was employed by Marty's Shoes?
 4            A      No, she wasn't.
 5            Q      Did Carmen work any days at Marty's
 6    Shoes after Roma became the manager?
 7            A      No.
 8            Q      And Carmen is the one who
 9    introduced you to Martin Samowitz?
10            A      Yes.
11            Q      Did you say anything else to Martin
12    Samowitz other than what you have already
13    described?
14            A      No.
15            Q      Did you send any documents to
16    Martin Samowitz?
17            A      No.
18            Q      Did you complain about
19    discrimination to Martin Samowitz?
20            A      No.
21            Q      What stereotypes did Roma use?
22            A      You people; street person; a thug;
23    a vagabond; and not the right person.
24            Q      Is there any -- We talked about
25    this in your first deposition, is there anything
```

    1      that Roma said to you that you felt was

    2      discriminatory that you didn't already testify

    3      about?

    4              A      I can't recall.

    5              Q      Well, you feel like -- Roma called

    6      you a street person?

    7              A      Yes.

    8              Q      And you feel like that was

    9      discriminatory based on your race?

   10              A      Yes.

   11              Q      Roma called you a thug?

   12              A      Yes.

   13              Q      When did she do that?

   14              A      She called me a thug when she tried

   15      to accuse the African-Americans of stealing the

   16      shoes, and she took the side that I was taking up

   17      from them, and they were dressed like someone

   18      representing themself in a gang, and she said I'm

   19      one of them, too, because I took their side.

   20              Q      When you say they were dressed like

   21      someone in a gang, what do you mean?

   22              A      They had the bandanas.  They had

   23      the boots.  They had the baggy jeans, the loose

   24      clothes.  The language.

   25              Q      Do you believe that the clothing

```
 1    that you described just now reflects that someone
 2    is in a gang?
 3          A    Yes.
 4          Q    Were you having an argument with
 5    Roma when she called you a thug?
 6          A    Yes.
 7          Q    And what was the argument about?
 8          A    I didn't get the guys stealing the
 9    shoes.  They didn't really steal the shoes.
10          Q    And she was angry with you why?
11    Roma was angry with you, that was your
12    impression?
13          A    Yes.
14          Q    What else did she say in that
15    argument?
16          A    I'm taking up for them because they
17    are black.
18          Q    Roma said that you were talking up
19    for the four African-American customers because
20    they were black?
21          A    Yes.
22          Q    And what did you say?
23          A    I told her that's not true, I
24    didn't see them steal the shoes.
25          Q    Other than a thug and a street
```

1    person, what else did Roma say to you that you

2    thought was discriminatory?

3             A      I didn't deserve the right to work

4    there.

5             Q      And when did she say that?

6             A      During that argument.

7             Q      During the argument about the four

8    customers?

9             A      Yes.

10            Q      Did she call you a street person in

11   that same argument or was that another time?

12            A      That was another time.

13            Q      So on one occasion Roma called you

14   a street person, correct?

15            A      Yes.

16            Q      Was that in an argument as well?

17            A      Yes, it was.

18            Q      And on another occasion she called

19   you a thug and she said that you didn't have the

20   right to work there?

21            A      That is correct.

22            Q      Was there anything else that Roma

23   said to you that you feel is discriminatory?

24            A      That you people, the thugs, the

25   vagabond, the street person, those are all the

```
 1    same.

 2            Q      When did she call you a vagabond?

 3            A      During the course of my employmen

 4    at Marty's.

 5            Q      Did she call you a vagabond in on

 6    of the two arguments that we have already talke

 7    about?

 8            A      I can't recall.

 9            Q      It might have been in one of thos

10    two arguments?

11            A      Yes.

12            Q      And when did she use the phrase y

13    people?

14            A      During the course of the

15    African-Americans allegedly to stealing the

16    shoes.

17            Q      Did she use it any other time?

18            A      No.

19            Q      Other than those two arguments di

20    you have any other arguments with Roma while yo

21    were employed by Marty's Shoes?

22            A      Yes.

23            Q      How many would you say during the

24    time that Roma was the manager, how many

25    arguments would you have had with her?
```

1           A       A thousand.

2           Q       A thousand?

3           A       Yes.

4           Q       So would you have more than one

5   argument a day with Roma?

6           A       Correct.

7           Q       What would you argue about?

8           A       It varied.  She accused me of

9   drinking on the job.  She accused me of walking

10  off.  She accused me of giving shoes to

11  Burlington employees.  She accused me of a dozen

12  different things.

13          Q       And that's what the arguments were

14  about?

15          A       No, they were arguments about she

16  had complaints about my wardrobe.  She had

17  complaints about my school schedule.  She had

18  complaints about the way I wore my hair.

19                  She had complaints about the way I

20  answered the phone.  She had complaints about my

21  skin color.

22          Q       How do you know she had complaints

23  about your skin color?  Did Roma ever say

24  anything to you about your skin color?

25          A       No.

```
 1              Q      Did you ever lose your temper
 2    Roma?
 3              A      Yes.
 4              Q      How many times?
 5              A      I can't recall, numerous.
 6              Q      Is it your opinion that she lo
 7    her temper with you?
 8              A      Yes.
 9              Q      Have you spoken with Roma sinc
10    your employment ended at Marty's Shoes?
11              A      No.
12              Q      Do you have any knowledge as t
13    where Roma may live or work right now?
14              A      I'm not sure where she works.
15    think she still lives at Sunrise.
16              Q      In the City of Sunrise?
17              A      Yes.
18              Q      Have you ever been to Roma's
19              A      No.
20              Q      What makes you think she stil
21    lives in the City of Sunrise?
22              A      Her last known address.
23              Q      Do you have Roma's last known
24    address?
25              A      No.
```

```
 1              Q       Do you have an address for Roma?

 2              A       No.

 3              Q       But as far as you know that while

 4     you still worked still worked for Marty's Shoes

 5     Roma still lived in the City of Sunrise?

 6              A       Yes.

 7              Q       Do you remember the name of the

 8     apartment complex where Roma lived in?

 9              A       No.

10              Q       I know you have never been there,

11     but do you know approximately where it was

12     located?

13              A       100 Hiatus Road if my memory serves

14     me correctly.

15              Q       Thank you.  Other than the

16     following people, do you feel like anyone else at

17     Marty's Shoes was treated better than you; Kim

18     Chin; Michael Torres; Chris Torres; Orlando

19     Gonzalez; Anna and Peter; is there anyone else

20     other than those people I have just named who was

21     treated better than you by Marty's Shoes?

22              A       That is correct.

23              Q       That's all of them?

24              A       Yes.

25              Q       Have you had a chance to look at
```

1    the transcript from your first deposition?

2         A    No.

3         Q    Is there anything you testified to

4    in your first deposition that you would like to

5    revise or explain?

6              MR. KARLIN:  I will object to the

7              form.

8    BY MR. GABRIELLE:

9         Q    Anything I questioned you about

10   that you --

11             MR. KARLIN:  I think it's a very

12             broad question.

13             MR. GABRIELLE:  I will narrow it.

14             I will narrow it.

15   BY MR. GABRIELLE:

16        Q    Is there anything that you

17   testified to in your first deposition that you

18   now know to be incorrect?

19        A    Not to my knowledge.  I can't

20   recall.

21        Q    Is there anything that you

22   testified to in your first deposition that you

23   would like to expand upon, any question I asked

24   you that you feel like you want to add more to?

25             MR. KARLIN:  I will object to the

```
 1              form.
 2                   THE WITNESS:  I can't recall.  You
 3              can't do that.
 4    BY MR. GABRIELLE:
 5              Q     You can't recall?
 6              A     No, you can't do that.  I'm sorry,
 7    I can't recall.
 8              Q     Okay.  Did you ever work for a
 9    company called Argenbright?  That is
10    A-R-G-E-N-B-R-I-G-H-T.
11              A     Yes.
12              Q     When did you work for Argenbright?
13              A     I can't recall.
14              Q     Was it before or after Marty's
15    Shoes?
16              A     Before.
17              Q     What did you do for Argenbright?
18              A     Security.
19              Q     You were a security officer?
20              A     Yes.
21              Q     Where did you work when you worked
22    for Argenbright?
23              A     At Port Everglades.
24              Q     How long did you work for
25    Argenbright?
```

187

```
 1              A     A few months.
 2              Q     Why did your employment end at
 3    Argenbright?
 4              A     The ship got seized.
 5              Q     There was one particular ship that
 6    you worked on?
 7              A     Yes.
 8              Q     And it was seized by whom?
 9              A     Customs.
10              Q     And was that the only ship that
11    Argenbright had at the port?
12              A     I can't recall.
13              Q     What is your understanding of what
14    the ship was seized for?
15              A     Drugs and stowaways.
16              Q     Were you fired by Argenbright?
17              A     No.
18              Q     Did you resign from Argenbright?
19              A     Yes.
20              Q     And you worked for Wells Fargo; is
21    that correct?
22              A     Yes.
23              Q     When did you work for Wells Fargo?
24              MR. KARLIN:  I think you covered
25    this --
```

```
 1                    THE WITNESS:  In the first
 2          deposition.
 3                    MR. KARLIN:  -- In the other
 4          deposition.
 5   BY MR. GABRIELLE:
 6          Q    I'm sorry, when did you work for
 7   Wells Fargo?
 8          A    '92.
 9          Q    Was that before or after
10   Argenbright?
11          A    After.
12          Q    What did you do for Wells Fargo?
13          A    Security.
14          Q    How long did you work for Wells
15   Fargo?
16          A    I can't recall.
17          Q    Was it more than a year?
18          A    I can't recall.
19                    MR. KARLIN:  I think this was
20          covered at the prior depo.
21                    MR. GABRIELLE:  Your objection is
22          noted.
23   BY MR. GABRIELLE:
24          Q    Why did your employment end at
25   Wells Fargo?
```

1          A      Accident.

2          Q      The accident, okay.  Between Wells

3    Fargo and Marty's Shoes can you recall anywhere

4    else you worked?

5          A      No.

6          Q      Did you ever work for Sawgrass

7    Security?

8          A      I can't recall.

9          Q      You testified that you worked for a

10   company called Sally's Beauty Supply; is that

11   correct?

12         A      I can't recall testifying to that.

13         Q      Well, did you work for a company

14   called Sally's Beauty Supply?

15         A      Yes.

16         Q      What did you do for Sally's Beauty

17   Supply?

18         A      Assistant manager.

19         Q      Why did your employment end at

20   Sally's Beauty Supply?

21         A      New management came in.

22         Q      Did you resign from Sally's Beauty

23   Supply?

24         A      No.

25         Q      Were you fired?

```
 1              A     Yes.

 2              Q     Why were you fired?

 3              A     New management.

 4              Q     Is that the only reason you were

 5     fired?

 6              A     Yes.

 7              Q     Did you ever work for a company

 8     called Feick, F-E-I-C-K Security?

 9              A     No.

10              Q     Did you ever work for a company

11     called Alliance Entertainment?

12              A     I can't recall.

13              Q     Did you ever work for a company

14     called Allied Security?

15              A     Yes, I did.

16              Q     When did you work for Allied

17     Security?

18              A     I believe it was '91.

19              Q     What did you do for Allied

20     Security?

21              A     Security.

22              Q     Why did your employment end at

23     Allied Security?

24              A     They didn't have steady employme

25              Q     Were you fired from Allied
```

```
 1    Security?
 2          A     No.
 3          Q     Did you resign?
 4          A     Yes, I did.
 5          Q     Did you ever work for a company
 6    called West Staff?  W-E-S-T  S-T-A-F-F.
 7          A     I can't recall.
 8          Q     Did you ever work for a company
 9    called Tandem Temporary Services?
10          A     Yes.
11          Q     When did you work for Tandem
12    Temporary Services?
13          A     July 4, 2000.
14          Q     Until when?
15          A     July 21st, I believe.
16          Q     Did you ever work for a company
17    called Spin Cycle Laundry?
18          A     I can't recall.
19          Q     Did you ever work for a company
20    called Neptune Fireworks?
21          A     No.
22          Q     Did you ever work for a company
23    called Thrift World?
24          A     I can't recall.
25          Q     Did you ever work for a company
```

```
 1     called Westrec W-E-S-T-R-E-C Marinas?
 2              A     Yes.
 3              Q     What did you do for Westrec
 4     Marinas?
 5              A     Security.
 6              Q     When did you work for Westrec
 7     Marinas?
 8              A     I am employed there now.
 9              Q     I'm sorry, I didn't hear.
10              A     I am employed there now.
11                    Stewart, I went through all this in
12     the first deposition.  It's repetitive.
13                    MR. GABRIELLE:  For the record in
14               her first deposition I asked all of these
15               questions and I didn't -- She identified
16               Wells Fargo, she identified Sally's, she
17               identified Tandem, and she identified
18               Westrec so all of the other ones were not
19               identified, that's why I am having to ask
20               these questions for the record.
21                    MR. KARLIN:  I think she covered
22               most of it.  It seems to me that she
23               identified more than five employers.
24     BY MR. GABRIELLE:
25              Q     Is there any doubt in your mind
```

1    that you were fired by Marty's Shoes?

2                    MR. KARLIN:   Object to the form.

3            You can answer the question.

4                    THE WITNESS:   I was terminated by

5            Marty's Shoes.

6    BY MR. GABRIELLE:

7            Q    Against your will?

8            A    Yes.

9                    (Whereupon, the below referred to

10           document was marked as Defendant's Exhibit

11           No. 9 by the Court Reporter.)

12   BY MR. GABRIELLE:

13           Q    I'm going to show you a document

14   I'm going to ask the court reporter to mark as

15   Exhibit 9 to your deposition.

16                    I would like you to take a look

17   through it, please, it's 2 pages.  It's Bate

18   Stamped SBS 00020 and SBS 00021.  After you have

19   had and opportunity to look at those pages,

20   please let me know.

21           A    Okay.

22           Q    Do you recognize Exhibit 9?

23           A    Yes.

24           Q    And is that your signature that

25   appears on the bottom of the second page SBS

```
 1    00021?
 2         A      Yes.
 3         Q      Do you recognize Exhibit 9 as an
 4    application for employment that you completed
 5    with Sally's Beauty Company?
 6         A      Yes.
 7         Q      And did you complete this
 8    application on or about July 26th of 1996?
 9         A      I can't recall.  There is no date
10    on it.
11         Q      If you look by your signature on
12    the second page.
13         A      Yes.
14         Q      Do you have any reason to believe
15    that that date is incorrect?
16                Does that date seem correct to you
17         A      Yes.
18         Q      If you look at the top of that
19    second page you are asked to list your employmen
20    history, and you indicate Marty's Shoes, and the
21    you indicate the reason for leaving no steady
22    hours; was that the reason why you left Marty's
23    Shoes because of no steady hours?
24         A      That was the reason that was given
25    to me by Stanley.
```

```
 1              Q       Stanley told you that you
 2   for leaving was that you did not have s
 3   hours?
 4              A       That's what I was taken o
 5   schedule, that means I didn't have any.
 6              Q       Did Stanley tell you that
 7   Shoes did not have steady hours for you
 8              A       No.
 9              Q       Did anyone tell you that
10   Shoes did not have steady hours for you
11              A       Yes.
12              Q       Who?
13              A       The letter.
14              Q       What letter?
15              A       The letter that I got whe
16   to work.
17              Q       You got a letter from who
18   went to work?
19              A       I believe it was Roma.
20              Q       Do you still have a copy
21   letter?
22              A       Yes.
23              Q       Was that letter typed or
24   handwritten?
25              A       Handwritten.
```

1        Q     What did it say?

2        A     I have been taken off of the

3 schedule.

4        Q     What else did it say?

5        A     Call Stanley, he wants to talk to

6 you.

7        Q     Anything else?

8        A     I can't recall.

9        Q     Did it say that Marty's Shoes did

10 not have steady hours for you?

11       A     It said that I have been taken off

12 the schedule meaning I have no hours.

13       Q     Did you ask anyone why your

14 employment was being terminated?

15       A     Yes.

16       Q     Who did you ask?

17       A     Stanley.

18       Q     And what did he tell you?

19       A     He said that I was terminated.

20       Q     What else did he tell you?

21       A     I can't recall.

22       Q     Do you believe that the answer no

23 steady hours as your reason for leaving Marty's

24 Shoes is truthful?

25       A     Yes.

```
 1          Q      Other than new management is there
 2  any other reason why you were fired by Sally's
 3  Beauty Supply?
 4          A      I can't recall.
 5          Q      Were you fired by Sally's Beauty
 6  Supply for improper cash handling procedures?
 7          A      No.
 8          Q      Were you fired by Sally's Beauty
 9  Supply for poor performance?
10          A      No.
11          Q      Do you recognize the name Denicka
12  Harris?
13          A      No, I don't.
14                 (Whereupon, the below referred to
15          document was marked as Defendant's Exhibit
16          No. 10 by the Court Reporter.)
17  BY MR. GABRIELLE:
18          Q      I'm going to show you a document
19  I'm going to ask the court reporter to mark as
20  Exhibit 10 to your deposition, ask you to take a
21  look through it it's one page stamped SBS 00007;
22  tell me if you recognize it, please.
23          A      Yes.
24          Q      Is that your signature next to the
25  where it's Employee's Acknowledgment?
```

```
 1              A      Yes.
 2              Q      What is this document that is
 3     Exhibit 10?
 4              A      It appears to be a Record Of
 5     Correction Action.
 6              Q      What employment did this document
 7     relate to?
 8              A      Assistant manager.
 9              Q      Where?
10              A      Sally's.
11              Q      It's checked Discharge
12     Documentation, were you fired after you received
13     this document?
14              A      I can't recall that.
15              Q      Did you work any days after you
16     received this document?
17              A      I can't recall that.
18              Q      The first line says:  "Reference
19     verbal discussion 3/24/97.  Written warning for
20     4/9/97.  Termination warning 5/5/97 for cash
21     shortage/register accountability.
22                     Denise Brookins has continued to
23     demonstrate unacceptable performance in the area
24     of cash handling on 6/18/97.  Denise's assigned
25     register drawer was 9.26 short.
```

1           As a result of Denise's poor

2   performance her employment has been terminated.

3   66 performance."

4           You were terminated from Sally's

5   Beauty Supply for cash shortage or poor

6   performance, were you not?

7       A    Yes.

8       Q    It had nothing to do with new

9   management, did it?

10      A    She is new management.

11      Q    You were terminated by someone in

12  new management; is that --

13      A    New management, the head office of

14  Sally's put in new management, we had to leave.

15      Q    Did you also receive all of the

16  other warnings that are described in Exhibit 10,

17  the verbal discussion on March 24th of 1997, the

18  written warning on April 9th of '97 and the

19  termination warning of May 5th of '97?

20      A    I can't recall.

21      Q    Do you have any reason to believe

22  you didn't receive them?

23      A    Yes.

24      Q    You believe you didn't receive

25  them?

1        A        Yes.

2        Q        Why do you believe that?

3        A        Well, new management came in, they

4   have to state a reason that is verifiable to the

5   unemployment that employees are leaving in order

6   to attempt not to have a legal action set against

7   them.

8        Q        So Denicka Harris was new

9   management in June of 1997?

10        A        I can't relate that when she

11   started.

12        Q        Did you receive a corrective action

13   from Sally's Beauty Supply in November of 1996?

14        A        From Sally's?

15        Q        Yes.

16        A        I can't recall that.

17                (Whereupon, the below referred to

18        document was marked as Defendant's Exhibit

19        No. 11 by the Court Reporter.)

20                MR. GABRIELLE:   Exhibit 11.

21   BY MR. GABRIELLE:

22        Q        Ask you to look through a document

23   that has been marked Exhibit 11.  For the record

24   it's stamped SBS 00014, tell me if you recognize

25   it, please.

```
 1                A     Yes.

 2                Q     Is that your signature which

 3    appears next to the words Employee's

 4    Acknowledgement?

 5                A     Yes.

 6                Q     Is this in fact a copy of a

 7    corrective action that you received in November

 8    of 1996 from Sally's Beauty Supply?

 9                A     Yes.

10                (Whereupon, the below referred to

11         document was marked as Defendant's Exhibit

12         No. 12 by the Court Reporter.)

13    BY MR. GABRIELLE:

14                Q     Ms. Brookins, I'm going to show you

15    a document that I am going to ask the court

16    reporter to mark as Exhibit 12 to your

17    deposition, I would like you to read through it,

18    please.  For the record it's stamped SBS 00012;

19    tell me if you recognize it, please.

20                A     Yes.

21                Q     Is that your signature which

22    appears next to the words Employee's

23    Acknowledgment?

24                A     Yes.

25                Q     Is this in fact a copy of a record
```

1    of corrective action that you received from

2    Sally's Beauty Supply in March of 1997?

3         A    Yes.

4         Q    And it identifies about two thirds

5    of the way down the page that failure to correct

6    the problem will result in written warning or

7    termination; do you see that?

8         A    Yes.

9         Q    It's signed by Denicka Harris; do

10   you see that?

11        A    Yes.

12             (Whereupon, the below referred to

13        document was marked as Defendant's Exhibit

14        No. 13 by the Court Reporter.)

15   BY MR. GABRIELLE:

16        Q    Ms. Brookins, I'm going to show you

17   a document, ask the court reporter mark as

18   Exhibit 13 to your deposition.  For the record

19   it's stamped SBS 00011 ask you if you could look

20   at it and tell me if you recognize it, please.

21        A    Yes.

22        Q    Is that your signature which

23   appears next to the words Employee's

24   Acknowledgment?

25        A    Yes.

1        Q      And is this in fact a copy of a

2   record of corrective action that you received

3   from Sally's Beauty Supply in April of '97?

4        A      Yes.

5        Q      Ms. Brookins, is it still your

6   position that you were terminated because new

7   management took over?

8        A      Yes.

9        Q      Is it your sworn testimony that you

10  were terminated from Sally's beauty supply

11  because new management took over?

12       A      That is correct.

13       Q      How do you explain the Exhibits

14  that you have been shown?

15       A      The Exhibits, the way that I can

16  explain it is, I never worked under the manager

17  of Denicka Harris.  Beatrice Baker was the

18  manager I was employed under.

19              When there are discrepancies with

20  the money and the merchandise there was only one

21  person who had full control over that was

22  Beatrice Baker.

23              In an attempt to confuse the State

24  Attorney's Office and the Fort Lauderdale Police,

25  my account is that she trumped up the charges

1    that the thefts and the merchandise leaving were

2    the responsibility of other crew.

3         Q    You believe that Sally's Beauty

4    Supply manufactured or made up a reason for your

5    termination?

6         A    Exactly.

7         Q    And why do you believe that was an

8    effort to confuse the State Attorney's Office or

9    the police?

10        A    Well, Beatrice Baker was being

11   investigated.  She was being investigated as I

12   came on, and they investigated her for thousands

13   of dollars missing, not just a few dollars and

14   merchandise unaccountable for, and that happened

15   prior to me coming.

16        Q    But none of those warnings were

17   issued by Beatrice Baker?

18        A    One of them was.

19        Q    Which one?  Oh, I see it, Number

20   11.  How about the Exhibit 13 or 12 or 10, were

21   they issued by Beatrice Baker?

22        A    No, they were not.

23        Q    Was there any one else who was

24   fired by Sally's Beauty Supply at the same time

25   you were?

```
 1              A      Yes.

 2              Q      Who?

 3              A      The whole crew.  The general

 4     manager, I think it was Maricio.  Another

 5     named Doreen.  The whole crew, the whole st

 6     Doreen Yates.

 7              Q      As far as you know during the

 8     or since the time that you worked for Marty

 9     Shoes in that particular store, did that st

10     ever close?

11              A      That store closed, yes.

12              Q      When did it close?

13              A      It closed temporarily with be

14     of the alarm, and it closed temporarily bec

15     of theft.

16              Q      When did that happen?

17              A      Merchandise.  Prior to me com

18     and after I came.

19              Q      Okay.  As far as you know did

20     store closing have anything to do with you

21     fired by Marty's Shoes?

22              A      Repeat the question.

23              Q      Did the store closing have an

24     to do with you being fired by Marty's Shoes

25     far as you know?
```

```
 1            A     Sally's?

 2            Q     No, Marty's Shoes.  I'm sorry if I

 3    confused you.

 4                  MR. KARLIN:  It sounded like the

 5            question was whether or not the Sally's

 6            store closed.

 7                  THE WITNESS:  That's what you said,

 8            the Sally's store.

 9    BY MR. GABRIELLE:

10            Q     Okay.  Then it was my mistake.  Let

11    me clarify that by asking the question again so

12    that you understand it in case I made a mistake.

13    I'm talking about Marty's Shoes now.

14            A     Yes.

15            Q     Did your being fired by Marty's

16    Shoes have anything to do with Marty's Shoe Store

17    closing?

18            A     Not to my knowledge.

19            Q     As far as you know did the Marty's

20    Shoes where you worked ever close?

21            A     No.

22                  (Whereupon, the below referred to

23         document was marked as Defendant's Exhibit

24         No. 14 by the Court Reporter.)

25    BY MR. GABRIELLE:
```

1       Q       Ms. Brookins, I'm going to show you

2   a document I have asked the court reporter to

3   mark as Exhibit 14 to your deposition.  For the

4   record it is 2 pages stamped WM 0007 and 0008.

5   Please look at it and let me know when you are

6   finished.

7       A       I identify it.

8       Q       Is that your signature that appears

9   on the bottom of page WM 0008?

10      A       Yes.

11      Q       You recognize Exhibit 14?

12      A       Yes.

13      Q       What is it?

14      A       It's a Fidelity Bond Application

15  and it's an employment record.

16      Q       Why were you filling out a Fidelity

17  Bond Application?

18      A       To drive the company vehicles.

19      Q       And this was Westrec Marinas?

20      A       Yes.

21      Q       On the first page it says:  "Have

22  you ever been discharged from any employment?  If

23  yes, explain below."  And you answered none.

24      A       That is correct.

25      Q       Is that a truthful answer?

1          A       Yes.

2          Q       You have never been discharged from

3   any employment?

4          A       Correction, I'm sorry, yes, I have.

5          Q       So it's not a truthful answer?

6          A       Right.

7          Q       On the second page starting from

8   the bottom you list your employment and it

9   indicates Marty's Shoes Sawgrass Mall.  Reason

10  for leaving, store closed, shoe department; is

11  that a truthful answer?

12         A       No.

13         Q       Is there anything else that you

14  filled out on this Westrec Marinas Fidelity Bond

15  Application that is untruthful?

16         A       The reason for leaving Marty's

17  Shoes.

18         Q       Anything else besides that?

19         A       Yes.

20         Q       What else?

21         A       That's it.

22         Q       So the only thing that is

23  untruthful is the reason for leaving Marty's

24  Shoes?

25         A       Right.

```
 1              Q      It's also untruthful on page 1
 2    where you are asked have you ever been discharged
 3    from any employment and you say none?
 4              A      That is correct.
 5              Q      Why did you complete those 2
 6    sections untruthfully?
 7              A      I didn't want the other -- This job
 8    I had in the future to interfere with the
 9    background I have at Marty's.
10              Q      You also indicate on Sally's Beauty
11    Supply your reason for leaving was new management
12    on this page WM 0008?
13              A      That is correct.
14              Q      Have you ever completed any other
15    job applications or employment documents with
16    untruthful information?
17              A      I can't recall.
18              Q      You believe you may have done so?
19              A      I can't recall.
20              Q      Did you complete a job application
21    for Marty's Shoes?
22              A      Did I complete it, yes, I filled
23    out one.
24              Q      Did you list your employment with
25    Wells Fargo on that job application?
```

 1          A      I can't recall that.

 2          Q      Did you list your employment with

 3   Argenbright Company on that job application?

 4          A      I can't recall that.

 5          Q      Did you list employment with any

 6   other company prior to Marty's Shoes on the

 7   Marty's Shoes job application?

 8          A      I can't recall that.

 9          Q      Did you provide any untruthful

10   information on the Marty's Shoes job application?

11          A      I can't recall that.

12          Q      Is it possible that you provided

13   untruthful information on the Marty's Shoes job

14   application?

15               MR. KARLIN:   I will object to the

16          form.

17               THE WITNESS:   If I don't have it in

18          front of me.   I can't recall that.   To

19          answer honestly I can't recall that.   The

20          documents are not in front of me.

21   BY MR. GABRIELLE:

22          Q      How many times have you provided

23   untruthful information to a potential employer?

24          A      I can't recall that.

25          Q      Can you estimate?

```
 1           A      No, I can't.

 2           Q      Did your provide untruthful

 3    information at any point during your employment

 4    with Marty's Shoes?

 5           A      I can't recall that.

 6           Q      Do you know for sure whether you

 7    did or did not provide untruthful information

 8    during your employment with Marty's Shoes?

 9           A      No, I can't.

10                  MR. KARLIN:  I'm going to object to

11              the form.

12    BY MR. GABRIELLE:

13           Q      Were you ever prevented from

14    attending a class at BCC because of accusations

15    against you for disruptive behavior?

16           A      I can't recall that.

17           Q      Did you ever have a teacher or

18    professor at BCC named Mrs. Luck?  L-U-C-K.

19           A      I don't have my transcript in front

20    of me to answer that.

21           Q      Well, do you know without your

22    transcript whether you had a teacher or professor

23    named Mrs. Luck?

24           A      No.

25           Q      Did Mrs. Luck exclude you from her
```

```
 1    class at BCC?

 2           A      I can't recall that.

 3           Q      Were you ever issued any

 4    disciplinary document by BCC, Broward Community

 5    College?

 6           A      No.

 7           Q      Did you ever learn that Mrs. Luck

 8    had asked that you be excluded from her class at

 9    BCC?

10           A      I can't recall that.

11           Q      Did you ever announce to a class a

12    BCC that it was cancelled?

13           A      I can't recall that.

14           Q      Can you recall ever calling

15    Mrs. Luck a bitch?

16           A      No, I can't.

17           Q      Did you ever speak with someone

18    named Dr. Grasso?  G-R-A-S-S-O.

19           A      No, I can't recall.

20           Q      You can't recall whether you did o

21    not?

22           A      I can't recall Dr. Grasso.  I can'

23    recall if I spoke to her or not.

24           Q      Is Dr. Grasso a he or a she, do yc

25    know?
```

```
 1              A     I can't recall that.

 2              Q     Did you ever speak to anyone at

 3    named Stan Mitchell?

 4              A     No.

 5              Q     Did you ever speak to anyone,

 6    Dr. Glen Rose; do you remember anyone named

 7    Dr. Glen Rose?

 8              A     Not to my recollection, no.

 9                    (Whereupon, the below referred t

10         document was marked as Defendant's Exhibi

11         No. 15 by the Court Reporter.)

12    BY MR. GABRIELLE:

13              Q     Ms. Brookins, I'm going to show

14    a document I have asked the court reporter to

15    mark as Exhibit 15 to your deposition.

16                    For the record it is 5 pages, as

17    you to take a look through it and tell me if y

18    recognize it, please.

19              A     Yes.

20              Q     And is that your signature which

21    appears at the top of the last page?

22              A     Yes, it is.

23              Q     I would like to ask you to turn

24    the first page, please.  You identify in respo

25    to No. 2:  Agnes; when was the last time you
```

```
 1   spoke with Agnes?

 2        A    I can't recall that.

 3        Q    Do you recognize that phone number

 4   that is listed next to Agnes' name?

 5        A    Yes.

 6        Q    What is that phone number, who is

 7   it to?

 8        A    Who or what?

 9        Q    Or what.

10        A    Burlington Coat Factory.

11        Q    I would like you to turn to the

12   second page, please at the top it reads Denise

13   Brookins working one hour a week, Plaintiff asked

14   for an explanation of why one hour and he

15   continually advised her to direct it to Roma; and

16   who is the he in that sentence?

17        A    Stanley Dzioba.

18        Q    At the end he had nothing to do

19   with the matter, is that again is that Stanley?

20        A    Yes.

21        Q    After Stanley didn't resolve the

22   matter Denise took her complaints to vice

23   president John Adams of New Jersey; when did you

24   complain to John Adams?

25        A    Before I was terminated.
```

```
 1              Q       How long before you were
 2      terminated?
 3              A       I can't recall that.
 4              Q       Was it more than a month, more than
 5      a week?
 6              A       5/27/96.
 7              Q       You recall the date as 5/27/96?
 8              A       If my memory serves me correct.
 9              Q       A moment ago I asked you and you
10      said you couldn't recall but now you specifically
11      recall May 27th of 1996?
12              A       Yes.
13              Q       Why can you recall it as May 27th
14      of 1996; what makes that date stick out in your
15      mind?
16              A       That is the letter I wrote to him
17      of the racial discrimination I was receiving from
18      Roma, I wrote him a letter.
19              Q       Was it a typed letter or a
20      handwritten letter?
21              A       Handwritten.
22              Q       Is it Exhibit 4 to your deposition?
23              A       No, it is not.
24              Q       Do you have a copy of it?
25              A       No.
```

```
1           Q      You don't have a copy of the letter
2    you wrote to John Adams?
3           A      Not with me.
4           Q      Do you have a copy of it in your
5    possession?
6           A      Yes.
7           Q      Did you mail that letter?
8           A      Yes, I did.
9           Q      When did you mail it?
10          A      The year of '96.
11          Q      Do you remember when in 1996?
12          A      No, it's dated.  The letter is
13   dated.
14          Q      When was the last time you saw that
15   letter?
16          A      I can't recall.
17          Q      Did you ever talk to John Adams on
18   the telephone?
19          A      No.
20          Q      Other than the one letter that you
21   testified that you have sent him, did you ever
22   try to reach John Adams in any other way by
23   telephone or by mail?
24          A      No.
25          Q      What did the letter say?
```

```
 1          Q      How many times?
 2          A      Whenever I needed a ride.
 3          Q      Did Oxca Wright ever witness any
 4   conversation or argument between you and Roma
 5   Rybitwa?
 6          A      Argument?
 7          Q      Yes.
 8          A      No.
 9          Q      Did Oxca Wright ever witness any of
10   the things that you have testified to that Roma
11   did to you that were discriminatory?
12          A      Yes.
13          Q      What did Oxca Wright see; what did
14   she witness?
15          A      She witnessed me working one hour a
16   week at the store.  She witnessed Roma telling
17   other jobs not to hire me.
18          Q      Anything that happened to you while
19   were you employed by Marty's Shoes; did Oxca
20   Wright ever see anything, physically see anything
21   that happened to you during your employment while
22   you were at Marty's Shoes store?
23          A      No.
24          Q      In this interrogatory answer you
25   state that Oxca Wright called Roma on or about
```

```
 1    the month of June 1996 and pretended to be a job

 2    to confirm what kind of reference she would give

 3    you, and Roma stated that Denise Brookins is a

 4    lot of problems and that she was a street person

 5    that can't be trusted.

 6                    Were you on the telephone when Oxca

 7    Wright made this call to Roma?

 8          A     Yes.

 9          Q     And did you tape the telephone

10    call?

11          A     No.

12          Q     What day in June of 1996 did that

13    occur?

14          A     I can't recall.

15          Q     Did you make any notes during the

16    telephone call about what Oxca Wright said or

17    what Roma said?

18          A     She stated that she was given a

19    reference for me and what was the job performance

20    of Marty's, would she recommend Denise Brookins

21    for employment.

22          Q     And that's what Oxca Wright said?

23          A     Yes.

24          Q     And what did Roma say in response

25    as close as you can remember to an exact quote?
```

```
 1          A      She said she wouldn't hired me if
 2   she could because I caused a lot of problems.
 3          Q      Did she say anything else?  Did
 4   Roma say anything else?
 5          A      No.
 6          Q      Did Oxca Wright say anything else?
 7          A      No.
 8          Q      Did you say anything during that
 9   telephone conversation?
10          A      No, I didn't.
11          Q      Did Oxca Wright indicate that you
12   were on the telephone during that telephone
13   conversation?
14          A      No, she didn't.
15          Q      Did you make any notes about what
16   was said during that conversation between Oxca
17   Wright and Roma Rybitwa?
18          A      No.
19          Q      Did you ask Oxca Wright to call
20   Roma and pretend that she was seeking a job
21   reference?
22          A      Yes, I did.
23          Q      Why did you do that?
24          A      Well, based on the discriminatory
25   conduct I received from Roma, and she was
```

```
 1    threatened to get rid of me, I knew that that job
 2    probably would prevent me from getting another
 3    one by her testimony.
 4              Q     By whose testimony?
 5              A     Roma's.
 6              Q     Do you have any knowledge that any
 7    real employer contacted Marty's Shoes for a
 8    reference for you?
 9              A     Repeat the question.
10              Q     Did any of your future employers
11    ever contact Marty's Shoes and ask Marty's Shoes
12    for a reference?
13              A     I can't recall.
14              Q     Do you have any knowledge that that
15    may have occurred; did anyone ever tell you that
16    they had called Marty's Shoes for a reference for
17    you?
18              A     No.
19              Q     So as far as you know the only
20    person that ever called Marty's Shoes and asked
21    for a reference was Oxca Wright?
22              A     I had another friend of mine that
23    called.
24              Q     And who was that other friend?
25              A     Leonard Taylor.
```

```
 1              Q      I'm sorry?

 2              A      Leonard Taylor.

 3              Q      And when was the last time you

 4     spoke with Leonard Taylor?

 5              A      Last week.

 6              Q      Last week.  When did Leonard Taylor

 7     call Marty's Shoes and ask for a reference?

 8              A      Before I was terminated.

 9              Q      Before you were terminated?

10              A      Yes.

11              Q      So in the year 1996?

12              A      Yes.

13              Q      Did you speak with Leonard Taylor

14     since 1996 about your lawsuit against Marty's

15     Shoes?

16              A      Yes.

17              Q      Did you speak with Leonard Taylor

18     about what you felt was discrimination?

19              A      Yes, I did.

20              Q      Does Leonard Taylor have any

21     knowledge himself about Marty's Shoes

22     discriminating against you?

23              A      Yes.

24              MR. GABRIELLE:  I'm going to note

25          for the record that Leonard Taylor is
```

```
 1            certainly a person who should have been

 2            disclosed on this answers to

 3            interrogatories and here we are past the

 4            close of discovery.  He is clearly a

 5            person with knowledge.  He is clearly a

 6            person with an obligation to be

 7            disclosed.  I'm not sure what steps we

 8            need to take at this point, but I just

 9            need that noted for the record.

10                 THE WITNESS:  He is on there, isn't

11            he, the last page?

12  BY MR. GABRIELLE:

13       Q     Leonard Taylor is the person that

14  called Marty's Shoes and pretended he was an

15  employer of yours?

16       A     Yes.

17       Q     So both Oxca Wright and Leonard

18  Taylor called Marty's Shoes?

19       A     Yes.

20                 MR. KARLIN:  I would note for the

21            record that he is listed with a telephone

22            number.

23                 MR. GABRIELLE:  I withdraw my

24            notation, and I apologize to you,

25            Mr. Karlin.
```

```
 1                    MR. KARLIN:  That's okay.
 2    BY MR. GABRIELLE:
 3         Q    Was Leonard Taylor actually
 4    intending on offering you a job to your
 5    knowledge?
 6         A    No.
 7         Q    Was Oxca Wright actually intending
 8    on offering you a job?
 9         A    No.
10         Q    To your knowledge was there any
11    employer who intended on offering you a job who
12    contacted Marty's Shoes for a reference?
13         A    No.
14         Q    As far as you know did Marty's
15    Shoes ever give a poor reference to you to any
16    real employer?
17         A    No.  Not to my knowledge.
18         Q    When was the last time you spoke
19    with Gail Williams?
20         A    A couple of years ago.
21         Q    Not in the year 2000?
22         A    No.
23         Q    Not in the year 1999?
24         A    No.
25         Q    What did Gail -- You say that Gail
```

```
 1    Williams witnessed verbal accusations from Roma
 2    to Denise on several occasions; had knowledge
 3    that Roma had problems with only Denise Brookins;
 4    what did Gail Williams witness specifically?
 5         A    She witnessed the relations, the
 6    interactions between Roma and myself.  She
 7    witnessed Roma and me in the shouting matches and
 8    calling each other names and so forth.
 9         Q    So Gail Williams saw Roma call you
10    names and you call Roma names?
11         A    Yes.
12         Q    Now, Gail Williams didn't work for
13    Marty's Shoes; is that correct, she worked for
14    Burlington?
15         A    She worked there for a while.
16         Q    She worked at Marty's Shoes?
17         A    Yes.
18         Q    It's indicated that she is a
19    Burlington Coat Factory employee; did she also
20    work for Burlington Coat Factory?
21         A    Yes.
22         Q    Was that at the same time that she
23    worked for Marty's Shoes or after or before?
24         A    She worked for Burlington first I
25    believe, and I think she could have worked for
```

```
 1    Marty's, if they hired her, I don't know.
 2         Q    You don't know for sure whether
 3    Gail Williams worked for Marty's Shoes or not?
 4         A    She was trying to come to the shoe
 5    store.
 6         Q    Is there anyone else other than
 7    Stanley Dzioba, Oxca Wright, Gail Williams,
 8    Leonard Taylor or John Adams or Roma Rybitwa and
 9    yourself that has personal knowledge about
10    anything you feel was discrimination by Marty's
11    Shoes against you?
12         A    Okay.  Repeat those names again.
13         Q    Sure.  Yourself, Roma Rybitwa,
14    Stanley Dzioba, John Adams, Oxca Wright, Gail
15    Williams, Leonard Taylor, is there anyone else
16    who has personal knowledge about anything you
17    feel was discrimination by Marty's Shoes against
18    you?
19         A    Agnes, Michael Torres, Chris
20    Torres, Orlando, and the receptionist at Marty's
21    Shoes.
22         Q    Who was the receptionist at Marty's
23    Shoes?
24         A    I think her name was Peggy.  It
25    started with a P.
```

```
 1              Q       Peggy was in New Jersey?

 2              A       Yes.

 3              Q       Did you ever meet Peggy?

 4              A       No.

 5              Q       Anything Peggy knows about

 6     discrimination by Marty's Shoes against you based

 7     on what you have told Peggy?

 8              A       Well, I mailed the letter to her

 9     and she opened it.  I confirmed that they had got

10     it.

11              Q       You talked to Peggy about the

12     letter?

13              A       Yes.

14              Q       What is Peggy's last name?

15              A       I don't know her last name.

16              Q       What does Agnes know about your

17     allegation that Marty's Shoes discriminated

18     against you?

19              A       She knew that Roma had a

20     discriminatory problem with me.

21              Q       And how did she know that?

22              A       She witnessed the interactions

23     between me and Roma and she knew that I worked

24     for one hour reason for no apparent reason.

25              Q       How do you know that?  Well, strike
```

```
 1    that.  What does Michael Torres know?  Does Agnes

 2    know anything else about discrimination by

 3    Marty's Shoes against you to your knowledge?

 4          A    She knew that I worked for one hour

 5    a week without justification.  She knew that Roma

 6    didn't want me to work there.

 7          Q    How did she know that Roma didn't

 8    want you to work there?

 9          A    Roma said that I shouldn't be

10    allowed to work there.  I'm not the right person.

11          Q    And Roma said that to Agnes?

12          A    No, she said it to me.

13          Q    Was Agnes there, did Agnes hear it?

14          A    Yes.

15          Q    So Agnes heard Roma say to you that

16    you shouldn't be allowed to work at Marty's

17    Shoes?

18          A    Yes.

19          Q    When did that happen?

20          A    At the course of my employment.

21          Q    Any more specific than that?

22          A    No.

23          Q    Anything else that Agnes saw or

24    heard that you feel was discrimination?

25          A    Not at the moment, no.
```

1       Q      You can't think of anything else at
2  the moment?
3       A      Not at the moment.
4       Q      Do you have anything, any document
5  that would help you remember anything that Agnes
6  saw or heard that you think was discrimination?
7       A      I don't have the documents in front
8  of me to answer that.
9       Q      Do you have a document in your
10 possession which would help you recall what Agnes
11 saw or heard that you feel was discrimination
12 against you?
13      A      No.
14      Q      Is there anything else that you
15 could look at or anyone you could talk to other
16 than Agnes which would help you remember anything
17 that Agnes saw or heard which you feel was
18 discrimination?
19      A      No.
20      Q      Did Michael Torres ever see or hear
21 anything to your knowledge that you thought was
22 discrimination?
23      A      He heard Roma call me a street
24 person.
25      Q      And this was in the argument we

```
 1    have already talked about?

 2           A     Correct.

 3           Q     Did Michael Torres see or hear

 4    anything else other than that which you feel was

 5    discrimination?

 6           A     Yes.

 7           Q     What was that?

 8           A     He seen that Roma allowed me to

 9    work on the schedule for one week.

10           Q     Okay.  Go ahead, I'm sorry.

11           A     He witnessed Roma telling him he

12    would be fired if he gave me more hours.

13           Q     Roma told Michael Torres that he

14    would be fired if Michael Torres gave you more

15    hours?

16           A     Correct.

17           Q     Did you witness that conversation,

18    did you hear it?

19           A     Yes.

20           Q     Between Roma and Michael Torres?

21           A     Yes.

22           Q     You heard Roma tell Michael Torres

23    he would be fired if Michael Torres gave you more

24    hours?

25           A     That is correct.
```

233

1          Q     Did Roma say anything else to

2    Michael Torres in that conversation that you

3    heard?

4          A     If any other hours have to be given

5    to me she have to approve it.

6          Q     Anything else that you can recall

7    Roma saying?

8          A     Not at the moment.

9          Q     When did that conversation occur

10   between Roma and Michael Torres?

11         A     Agnes graduated from high school,

12   Michael gave me five extra hours, and the five

13   extra hours plus the one I had six hours, and

14   when she came in and she figured out I had worked

15   six hours that week, that's when she made the

16   statement.

17         Q     Okay.  So the way you remember when

18   it was is because Agnes was out because she

19   graduated from high school?

20         A     Yes.

21         Q     And so you were covering Agnes'

22   time?

23         A     No.

24         Q     How do you remember it has to do

25   with --

```
 1              A      I only had worked one hour a week

 2     and Agnes was out, and I had five hours and I

 3     thought my hours would be increased, but they

 4     weren't.

 5              Q      Okay.  Anything else that Michael

 6     Torres saw or heard that you believe was

 7     discrimination?

 8              A      I can't recall at the moment.

 9              Q      Anything that, any document you

10     could look at that would help you recall what

11     Michael Torres saw or heard that you feel is

12     discrimination?

13              A      He saw the schedule.

14              Q      Anything other than the schedule?

15              A      The write up that Roma gave me

16     concerning me leaving.

17              Q      Okay.  Anything else?

18              A      Not to my knowledge.

19              Q      How about Chris Torres, what did

20     Chris Torres see or hear which you feel was

21     discrimination?

22              A      He heard me question Roma why was I

23     working one hour a week and everybody else got

24     more hours than me and they started after me.  He

25     witnessed me and Roma argue.
```

```
 1              He witnessed me telling Roma I
 2    don't steal shoes and showing my shoes when I
 3    report to work and so forth.
 4         Q     Anything else?
 5         A     No.
 6         Q     How about Orlando, what did Orlando
 7    see or hear that you feel was discrimination?
 8         A     Orlando heard Roma tell him he was
 9    not allowed to socialize with me, and he was not
10    allowed to I guess fraternize or talk to me while
11    we were at work, and he received more hours than
12    me and not to tell me why.
13         Q     Okay.  Did you hear Roma say to
14    Orlando not to socialize or fraternize with you?
15         A     Yes.
16         Q     Did you hear Roma say to Orlando
17    that he was going to be given more hours than you
18    were and not to let you know, not to tell you?
19         A     Repeat the question.
20         Q     Let me find it.  You testified that
21    Orlando heard Roma tell him that he was not
22    allowed to socialize with you and he was not
23    allowed to fraternize with you; you heard that,
24    Roma had that conversation with Orlando?
25         A     Yes.
```

```
 1              Q       Okay.  And did Roma tell Orlando
 2    not to tell you why he received more hours than
 3    you did?
 4              A       That is correct.
 5              Q       Did you hear Roma say that to
 6    Orlando, that not to tell you why Orlando
 7    received more hours than you did?
 8              A       No.
 9              Q       How do you know that Roma said that
10    to Orlando?
11              A       When he was working for JC Penny he
12    stated to me that he couldn't talk to me because
13    he would get some kind of bad treatment from
14    Roma.
15              Q       But my question was it's your
16    testimony that Roma said to Orlando not to tell
17    you why Orlando received more hours than you did?
18              A       That is correct.
19              Q       Did Orlando tell you that Roma said
20    that?
21              A       Yes.
22              Q       When?
23              A       During the course of my employment.
24              Q       Any more specific than that?
25              A       No.
```

```
 1          Q      Were you there when -- Strike that.
 2   Were you there when Roma said to Orlando not to
 3   tell Denise why you get more hours than she does,
 4   were you there?
 5          A      No.
 6          Q      So the only reason you know that is
 7   because Orlando told you?
 8          A      Exactly.
 9          Q      And when did Orlando work for JC
10   Penny's?
11          A      After Marty's Shoes.
12          Q      Whose employment ended first, yours
13   or Orlando's?
14          A      Mine.
15          Q      So you talked to Orlando after your
16   employment ended with Marty's Shoes?
17          A      Correct.
18          Q      When was the last time you talked
19   to Orlando?
20          A      I can't recall the date.
21          Q      Was it in the year 2000?
22          A      No.
23          Q      Was it in the year 1999?
24          A      No.
25          Q      Where does Oxca Wright live now?
```

```
 1              A      Fort Lauderdale.

 2              Q      Do you have her address?

 3              A      Not with me.

 4              Q      Do you know her address?

 5              A      No.

 6              Q      Do you have her address written

 7   down anywhere?

 8              A      No.

 9              Q      Do you know her telephone number?

10              A      No, I don't.

11              Q      When was the last time you spoke

12   with Oxca Wright?

13                     MR. KARLIN:  You asked that

14              already.

15                     MR. GABRIELLE:  Yes, I did, I'm

16              sorry.  Never mind.

17   BY MR. GABRIELLE:

18              Q      Where does Leonard Taylor live?

19              A      Atlanta.

20              Q      And you have spoken with Leonard

21   Taylor recently about what you feel was

22   discrimination by Marty's Shoes against you?

23              A      No.

24              Q      When was the last time you spoke

25   with Leonard Taylor about what you feel was
```

```
1    discrimination by Marty's Shoes against you?

2         A     I can't recall.

3         Q     Was it in the year 2000?

4         A     Yes.

5         Q     Was it between your last deposition

6    and this one?

7         A     No, it wasn't.

8         Q     You have your income tax returns

9    from every year beginning in 1993 to the present?

10        A     No.

11        Q     What year do you have income tax

12   returns for?

13        A     '98 or '97, '99.

14        Q     But you don't have any from before

15   1997?

16        A     I don't recall.

17              THE VIDEOGRAPHER:  Excuse me,

18        counsel, I need to go off the record to

19        change the videotape.

20              MR. GABRIELLE:  Sure.  Would you

21        like a break?

22              THE VIDEOGRAPHER:  We are going off

23        the video record at 3:32 p.m.

24              (Whereupon, a short recess was

25        had.)
```

```
 1              THE VIDEOGRAPHER:  We are back on
 2         the video record 3:46 p.m.
 3              (Whereupon, the below referred to
 4         document was marked as Defendant's Exhibit
 5         No. 16 by the Court Reporter.)
 6   BY MR. GABRIELLE:
 7         Q     All right.  Ms. Brookins, I'm
 8   showing you a document I have asked the court
 9   reporter to mark as Exhibit 16 to your
10   deposition.  For the record it is 4 pages, and it
11   is the Amended Complaint and Jury Demand filed in
12   this action.  I would like you to take a look
13   through it, please, because I am going to ask you
14   some questions about it.
15              MR. KARLIN:  I should have ran
16         down, I think the maximum on the meter is
17         three hours.
18              MR. GABRIELLE:  I'm sorry?
19              MR. KARLIN:  I just realized I have
20         the meter.
21              MR. GABRIELLE:  Do you want to go
22         down there now?  I just got one last week
23         and I am still angry about it so we can
24         do it.  I don't want you to get a ticket.
25              THE VIDEOGRAPHER:  We are going off
```

```
 1              the video record at 3:49 p.m.

 2                   (Whereupon, a short recess was.

 3         had.)

 4                   THE VIDEOGRAPHER:  We are back on

 5         the video record 3:58 p.m.

 6   BY MR. GABRIELLE:

 7         Q      You understand you are still under

 8   oath?

 9         A      Yes, I do.

10         Q      I'm going to ask you some questions

11   about the document it has been marked as Exhibit

12   16; have you had the opportunity to look it over?

13         A      No, I haven't.

14         Q      Please take the opportunity to look

15   it over.

16         A      Yes, I have, I'm sorry.

17         Q      That's okay.  I would like you to

18   turn to page 2, please, specifically paragraph 7.

19              Paragraph 7. A. reads that:

20              "Plaintiff believes she has been

21   subjected to different terms, conditions and

22   privileges of employment by reason of her race,

23   color and retaliation which caused her

24   termination to wit:

25              A.  Terminated for conduct that
```

```
 1    similarly situated Caucasian employees were not

 2    even disciplined for."

 3                And what I would like to ask you is

 4    what were you fired for that white employees were

 5    not disciplined for?

 6         A    I believe I have answered

 7    everything.  They weren't disciplined for using

 8    the phone.  They weren't disciplined for showing

 9    their shoes.

10                They weren't disciplined for using

11    the restroom or they wasn't disciplined for

12    coming to work late.

13                They wasn't uttered derogatory

14    names or their hours weren't reduced to one hour

15    a week.

16         Q    Well, were you terminated for any

17    of those things; were you terminated for using

18    the phone?

19         A    No.

20         Q    Were you terminated for not showing

21    your shoes to the manager when you got to work?

22         A    No, I wasn't.

23         Q    Were you terminated for using the

24    restroom?

25         A    No.
```

```
 1              Q      Were you terminated for coming to
 2    work late?
 3              A      No.
 4              Q      I know you have some complaints
 5    about how you were treated during your
 6    employment, but I am trying to figure out if you
 7    feel like you were fired because you refused to
 8    follow any of the rules that you say Roma imposed
 9    on you.
10              A      No.
11              Q      Why do you feel like you were
12    fired?
13              A      I was fired because I wrote the
14    letter to New Jersey stating that she reduced my
15    hours for one hour a week, and that she subjected
16    me to racial discrimination remarks.
17              Q      So you believe you were fired for
18    complaining about discrimination by Roma?
19              A      Yes.
20              Q      You also say in here on 7. C. that
21    you were subjected to different terms, conditions
22    and privileges of employment by reason of your
23    race, color and retaliation, and one of them was
24    biased counseling; what is biased counseling?
25              A      Well, she only found a problem with
```

1   me.  She only biased me for wearing a gold shirt.

2   She only picked me out of all the employees to

3   counsel me for frivolous complaints.

4        Q     How do you know that?  How do you

5   know that Roma didn't counsel other employees?

6        A     I was there and I watched her

7   interactions with her Polish people, her friends

8   of another race and she got along well with them.

9        Q     The reason why you believe that

10  Roma discriminated against you was because she

11  got along better with other people than with you?

12       A     No, I think she discriminated me

13  because I was black.

14       Q     What makes you think that it was

15  because you were black as opposed to because she

16  got along better with other people than yourself?

17       A     I violated none of the policies at

18  Marty's.  I never took anything.  She said I

19  cussed the owner out, and when I phoned to New

20  Jersey, you know, the guy don't even know me.

21            She said that I done alcohol.  I

22  asked her to submit me to drug or alcohol testing

23  to verify she was lying.  Just a random of

24  things.

25       Q     You feel like it would be accurate

```
 1    to say that you and Roma didn't get along well?
 2         A    No.
 3         Q    You don't believe that would be
 4    accurate?
 5         A    No.
 6         Q    You said you had thousands of
 7    arguments with her.
 8         A    Yes.
 9         Q    And you said that she lost her
10    temper with you and you lost your temper with
11    her?
12         A    Yes.
13         Q    And wouldn't it be accurate to say
14    that did you not get along well with Roma?
15         A    No.
16         Q    Why not?
17         A    Because she discriminated against
18    me.  She was racial and prejudiced toward me.
19         Q    Did she have arguments with other
20    employees?
21         A    No, she didn't.
22         Q    Did she ever to your knowledge lose
23    her temper with other employees?
24         A    No.
25         Q    Did you ever see any other
```

```
1    employees arguing with her?

2         A    No.

3         Q    So as far as you know you are the

4    only person that Roma ever argued with that was

5    an employee of Marty's Shoes?

6         A    That is correct.

7         Q    Your complaint says that derogatory

8    remarks were uttered at you; did anyone other

9    than Roma ever say anything to you that you

10   thought was discriminatory?

11        A    No.

12        Q    Just Roma?

13        A    Yes.

14        Q    And have you already told me about

15   everything that Roma said which you feel was

16   discriminatory?

17        A    Repeat the question.

18        Q    Have you already testified to

19   everything that Roma said to you that you feel

20   was discrimination?

21        A    Yes.

22        Q    Who is it that you believe reduced

23   your hours for no apparent reason?

24        A    Stanley and Roma.

25        Q    You believe both of them reduced
```

```
 1    your hours?

 2            A       Yes.

 3            Q       Why do you believe that Stanley

 4    reduced your hours?

 5            A       She, Roma stated to me that Stanley

 6    reduced the hours, reduced my hours.

 7            Q       When did Roma state that to you?

 8            A       When I asked her why was my hours

 9    being reduced to one hour a week she told me that

10    ask Stanley.  I wrote Stanley the letter asking

11    him for an explanation why.  I didn't receive a

12    response.

13            Q       So your hours were reduced to one

14    hour a week, and then you wrote a letter to

15    Stanley asking him why?

16            A       No, I wrote the letter when they

17    started being like maybe under 10, before they

18    got to one hour a week I wrote him a letter, and

19    I wrote the vice president a letter as well

20    before one hour a week.

21            Q       So your hours were being reduced

22    from what they were, and then you wrote a letter

23    to Stanley and you wrote a letter to the vice

24    president?

25            A       Yes.
```

```
 1            Q       And the vice president of Marty's
 2   Shoes is John Adams or was at the time John
 3   Adams?
 4            A       I don't recall who it was at that
 5   time.  It should have been John Adams.
 6            Q       Can you take a look back at Exhibit
 7   4, it should be in that stack somewhere.
 8                    MR. KARLIN:  I think it's in front
 9            of you.  This is a copy.
10   BY MR. GABRIELLE:
11            Q       Let me make sure she is looking at
12   the one we are going to give the court reporter.
13   Here, take that one.  I just want to, take your
14   time and look through it.  Are you all set?
15            A    Yes.
16            Q       Is this the letter, is Exhibit 4 a
17   copy of the letter that you wrote to Stanley?
18            A    Yes.
19            Q       Did you send this same letter to
20   the vice president of Marty's Shoes?
21            A    No, not a copy of his.
22            Q       Did you send a different letter to
23   the vice president of Marty's Shoes?
24            A       This was the letter I sent to the
25   vice president.
```

```
 1          Q     Did you also send a letter to
 2    Stanley?
 3          A     Yes.
 4          Q     It was a different letter than this
 5    one?
 6          A     I sent him a copy of this one.
 7          Q     Let me just ask it this way.  Did
 8    you send more than one letter to anyone at
 9    Marty's Shoes, or did you just send one letter to
10    different people at Marty's Shoes?
11          A     I sent two letters, one to Stanley
12    and one to John Adams.
13          Q     And both of them were the same
14    document?
15          A     No, they were different letters.
16          Q     Okay.  Which one is Exhibit 4?
17          A     This one.
18          Q     And --
19          A     Exhibit 4.
20          Q     And that is the letter you sent to
21    John Adams?
22          A     Yes.
23          Q     And you also sent a letter to
24    Stanley?
25          A     Yes.
```

```
 1          Q    Was it the same document that you
 2   sent to John Adams?
 3               MR. KARLIN:  I think you are
 4          confusing her.  I think if you ask her
 5          did you make copies of the document.
 6   BY MR. GABRIELLE:
 7          Q    Did you send --
 8               MR. KARLIN:  Obviously she is
 9          saying the same document.
10               MR. GABRIELLE:  I understand.
11   BY MR. GABRIELLE:
12          Q    Did you send copies of Exhibit 4 to
13   more than one person?
14          A    No.  I sent a letter to -- I'm
15   sorry, repeat the question.
16          Q    Is this the letter you sent, is
17   this a copy of the letter you sent to Stanley?
18          A    That is a copy I sent to John
19   Adams.
20          Q    Is there a separate letter, not
21   this document, but a separate document different
22   from this one that you sent to Stanley?
23          A    Yes.
24          Q    Do you have a copy of that
25   document?
```

```
 1          A      Not with me.

 2          Q      Do you have a copy in your

 3   possession at home or somewhere else?

 4          A      I think so, yes.

 5          MR. KARLIN:  I think I have turned

 6     everything over that I have.

 7          THE WITNESS:  I think this is it.

 8     He is just rephrasing the question

 9     differently.

10          MR. GABRIELLE:  Will you stipulate

11     that Exhibit 4 is a copy of a letter sent

12     both to Stanley Dzioba and to John Adams

13     at Marty's Shoes?

14          MR. KARLIN:  Well, I think you need

15     to just ask her is this Exhibit 4, did

16     you send a copy of this to John Adams?

17          THE WITNESS:  Yes.

18          MR. KARLIN:  Did you also take this

19     letter, make a copy of it and also send

20     it to the district manager?

21          THE WITNESS:  No.

22          MR. KARLIN:  Did you send another

23     document to the district manager other

24     than Exhibit 4?

25          THE WITNESS:  I believe I did.
```

```
 1                    MR. KARLIN:  Okay.

 2                    MR. GABRIELLE:  All right.  For the

 3               record I need to know whether or not the

 4               document that was sent to Stanley, the

 5               district manager, still exists and if

 6               so --

 7                    MR. KARLIN:  Well, she just said

 8               she sent this -- Oh, to Stanley, I'm

 9               sorry.

10                    THE WITNESS:  Well, Stanley is the

11               district manager.

12   BY MR. GABRIELLE:

13          Q     Right.  This Exhibit 4 you did not

14   send to Stanley; is that true?

15          A     No, I didn't.

16          Q     You sent it to John Adams or

17   whoever the vice president was?

18          A     Yes.

19                    MR. GABRIELLE:  So what I need is

20               if it exists, a copy of the document that

21               was sent to Stanley, and I'm going to

22               reserve the right if it's different from

23               Exhibit 4 I'm going to reserve the right

24               to reopen and examine based on that

25               document.
```

```
 1              MR. KARLIN:  All right.  That's
 2       fine.
 3              MR. GABRIELLE:  You will agree?
 4              MR. KARLIN:  Yes.
 5              MR. GABRIELLE:  And can we just
 6       reach some conclusion at some point as to
 7       that?
 8              MR. KARLIN:  Right.
 9              MR. GABRIELLE:  I will let you do
10       it and just let me know.
11              MR. KARLIN:  Okay.
12              MR. GABRIELLE:  Whether that
13       document still exists or not.
14              MR. KARLIN:  Okay.
15              MR. GABRIELLE:  Or if it is in fact
16       a different document than Exhibit 4.
17              MR. KARLIN:  Okay.
18   BY MR. GABRIELLE:
19       Q     So Exhibit 4 is a copy of the
20   letter you sent to the vice president of Marty's
21   Shoes; did you send this letter, Exhibit 4,
22   before or after you sent the letter to Stanley?
23       A     Afterwards.
24       Q     Okay.  How long before you sent
25   this letter Exhibit 4 did you send the letter to
```

```
1   Stanley?

2          A      I can't recall.

3          Q      Was it a few days, a week, a month,

4   how long before?

5          A      I can't recall that.

6          Q      What did the letter to Stanley say

7   in it?

8          A      That Roma was reducing my hours for

9   one week and I wanted an explanation from him of

10  why my hours were being reduced.  We had some --

11  why was I the only racial.

12                MR. GABRIELLE:  Sorry for the

13         interruption, Ms. Brookins.  I apologize.

14         I will ask the question again so you can

15         start over because it's confusing.

16  BY MR. GABRIELLE:

17         Q      What did the letter that you sent

18  to Stanley say in it?

19         A      Why was he reducing my hours to one

20  hour a week.

21         Q      So your letter to Stanley, in your

22  letter to Stanley you were asking him why your

23  hours had been reduced to one hour a week?

24         A      Yes.

25         Q      And you don't recall how long
```

```
 1    before you sent the letter, that is Exhibit 4, to

 2    the district managers, you don't recall how long

 3    before that you sent the letter to Stanley?

 4         A    Correct.

 5         Q    Was the letter that you sent to

 6    Stanley the first time you had ever complained in

 7    writing to anyone at Marty's Shoes?

 8         A    Correct.

 9         Q    Is there anything else that the

10    letter to Stanley said in it?

11         A    I can't recall.

12         Q    You would be able to remember if

13    you had the letter to Stanley in front of you?

14         A    Yes.

15         Q    Did you ever have a conversation

16    with Stanley after you sent him the letter about

17    anything you felt was discrimination in your

18    employment?

19         A    Yes.

20         Q    And when did that conversation

21    occur?

22         A    Before I sent the letter to vice

23    president Adams.

24         Q    So between the time that you sent

25    the letter to Stanley, and you sent the letter to
```

```
 1    vice president Adams, did you have a meeting with

 2    Stanley?

 3           A     No.

 4           Q     How did you have a conversation

 5    with Stanley?

 6           A     When he came into the store I would

 7    ask him about it.

 8           Q     Stanley came into the store after

 9    you sent him the letter?

10           A     Yes.

11           Q     And did you speak with Stanley

12    about the letter?

13           A     I spoke to him about why didn't he

14    get back with me concerning my hours and other

15    problems I am having.

16           Q     And what did he say?

17           A     He said that he had no jurisdiction

18    over the store.  He wasn't the store manager and

19    that was separate from his job duties.  Anyway,

20    ask Roma.

21           Q     He said for you to ask Roma?

22           A     Yes.

23           Q     Did you say anything else in the

24    letter to Stanley that you can recall?

25           A     Not at the moment, no.
```

```
 1           Q     Other than what you have already
 2   testified to, is there anything else that you can
 3   recall being in the letter even generally than
 4   what you have testified to?
 5           A     I can't recall at the moment.
 6           Q     So you don't recall whether you
 7   said in the letter to Stanley that you thought
 8   you were being discriminated against because of
 9   your race?
10           A     I believe I put that in there.
11           Q     Are you sure?
12           A     Positive.
13           Q     You are positive?
14           A     Yes.
15           Q     So you didn't recall a moment ago
16   anything else in the letter, but when I asked you
17   if you complain about race discrimination you do
18   recall that?
19           A     That is correct.
20           Q     When was the last time you saw a
21   copy of that letter?
22           A     I don't remember.
23           Q     Was it in 2000?
24           A     Yes.
25           Q     It was in 2000?
```

```
 1            A    Yes.
 2            Q    Did you look at it before your
 3    first deposition in this case?
 4            A    Yes, I did.
 5            Q    Did you look at it before the
 6    deposition today?
 7            A    No.
 8            Q    Let's take a look at Exhibit 4
 9    again, you say that on the first page of Exhibit
10    4 and Roma Rybitwa became manager I soon became
11    involved in her preferential treatment practice.
12                 So it was soon after Roma became
13    manager that you felt like she was engaging in
14    preferential treatment toward other employees; is
15    that correct?
16            A    Yes.
17            Q    And discrimination against you?
18            A    Yes.
19            Q    When is the first time that Roma
20    said or did anything toward you that you feel was
21    discrimination?
22                 MR. KARLIN:  I'm going to object
23                 only because I think it's been asked and
24                 answered in the previous deposition.  You
25                 are covering matters that you have
```

```
 1              already gone over.

 2                   MR. GABRIELLE:  Your objection is

 3              noted.

 4    BY MR. GABRIELLE:

 5         Q    Please answer, when was the first

 6    time that Roma said or did anything toward you

 7    that you feel was discriminatory?

 8         A    I don't remember the exact date.

 9         Q    How long after she became manager?

10         A    Shortly after.

11         Q    How long before you wrote the

12    letter to Stanley did Roma do anything or say

13    anything that you felt was discriminatory?

14         A     Shortly after I wrote the letter to

15    the vice president.

16         Q    So Roma never did anything or said

17    anything to you that you thought was

18    discriminatory before you wrote the letter to the

19    vice president?

20         A    Yes, she did.

21         Q    How much time went by between when

22    Roma started discriminating against you and when

23    you wrote the letter to Stanley?

24         A    Probably a month.

25         Q    About a month?
```

```
 1              A      Yes.
 2              Q      So you wrote the letter to Stanley
 3    about a month after Roma started discriminating
 4    against you?
 5              A      Yes.
 6              Q      And Roma started discriminating
 7    against you shortly after she became the manager?
 8              A      Exactly.
 9              Q      How long after you wrote the letter
10    to Stanley did you write the letter to the
11    district managers of Marty's Shoes, the letter
12    that is Exhibit 4?
13              A      You mean to the vice president?
14              Q      Well, it reads to the district
15    managers of Marty's Shoes at the top.
16              A      Yes, but Stanley is the -- Okay, I
17    see what is going on.
18              Q      I don't want to make a mistake.
19              A      A month.
20              Q      A month.  So just, and I know it's
21    an approximation, but I just want to get
22    chronology down, Roma becomes the manager soon
23    after that she starts discriminating against you.
24              A      Yes.
25              Q      About a month after she starts
```

261

1    discriminating against you you write the letter

2    to Stanley?

3          A     Yes.

4          Q     About a month after you write the

5    letter to Stanley you write the letter that is

6    Exhibit 4?

7          A     Exactly.

8          Q     And before you ever wrote the

9    letter to Stanley Roma had cut your hours?

10         A     Yes.  Correction, I didn't get a

11   factual proof of who cut it.  Roma says it was

12   Stanley, Stanley says talk to Roma, so I can't

13   really answer that correctly.

14         Q     Before you wrote the letter to

15   Stanley somebody cut your hours?

16         A     Yes.

17         Q     It was either Roma or Stanley you

18   believe?

19         A     Stanley and Roma.

20         Q     Or both?

21         A     Both.

22         Q     Okay.  And before you ever wrote

23   the letter to Stanley, Roma was treating other

24   employees better than she was treating you?

25         A     Yes.

```
 1              Q     Did Roma ever say anything to you

 2    about the letter that you sent to Stanley?

 3              A     Yes.

 4              Q     What did she say?

 5              A     She said I was lying.

 6              Q     Tell me about the conversation you

 7    had with Roma where she mentioned the letter you

 8    sent to Stanley.

 9              A     After the letter was received and

10    no return address came back to me, when I went to

11    work she told me that I wrote a letter to her

12    trying to get her in trouble, and she told me

13    that they would believe her over me.

14              Q     Anything else she said in that

15    conversation?

16              A     I can't recall.

17              Q     Is there anything that would help

18    you recall?

19              A     No.

20              Q     You say you got the return, did you

21    send the letter to Stanley by certified mail?

22              A     Yes.

23              Q     Do you have a copy of the receipt

24    of the certified mail receipt?

25              A     No.
```

263

```
 1              Q       What happened to it?

 2              A       I don't know.

 3              Q       Do you have a copy of anything else

 4     other than the letter which would show the date

 5     on which it was received?

 6              A       No.

 7              Q       Do you have anything else other

 8     than a copy of the letter which would show the

 9     date on which it was sent?

10              A       No, I don't.

11              Q       But you do have a copy of the

12     letter that you sent to Stanley?

13              A       I believe I do.

14              Q       You had one before the first

15     deposition in this case; is that right?

16              A       Yes.

17              Q       The first argument, well, strike

18     that.  The argument that you had with Roma where

19     she called you a vagabond, was that before or

20     after you sent the letter to Stanley?

21              A       Before.

22              Q       The incident with the

23     African-American customers who Roma thought were

24     stealing shoes, was that before or after the

25     letter you wrote to Stanley?
```

```
 1              A      Before.

 2              Q      And the argument that you had with

 3     Roma where she called you a street person and a

 4     thug, that was at the same time of the incident

 5     with the African-American customers?

 6              A      No.

 7              Q      It was not?

 8              A      No, it wasn't.

 9              Q      You had an argument with Roma about

10     the incident with the African-American customers;

11     is that correct?

12              A      Yes.

13              Q      And in that argument did she say

14     anything to you that you thought was

15     discriminatory?

16              A      She said that I was taking their

17     sides and she called me a thug.  She stated that

18     I am taking their sides because, you know, they

19     are black and I am black.

20              Q      And did she also call you a street

21     person in that argument?

22              A      No.

23              Q      When did she call you a street

24     person?

25              A      Before that incident.
```

1      Q      So Roma had -- Before you sent the

2  letter to Stanley Roma had called you a thug, a

3  vagabond and a street person?

4      A      Yes.

5      Q      And the incident with the

6  African-American customers had occurred before

7  you sent the letter to Stanley?

8      A      I believe it was -- Yes, before,

9  before.

10     Q      Other than Roma and Stanley, have

11 you ever spoken to anyone else in management at

12 Marty's Shoes?

13     A      Yes.

14     Q      Who?

15     A      Martin.

16     Q      Martin Samowitz?

17     A      Yes.

18     Q      Okay.  Other than Roma, and Martin

19 Samowitz and Stanley, have you ever spoken to

20 anyone in management at Marty's Shoes?

21     A      Yes.

22     Q      Other than Roma -- Strike that.

23 Other than Roma and Stanley, have you ever spoken

24 to anyone in management at Marty's Shoes about

25 what you felt was discrimination?

```
 1           A     Yes.

 2           Q     Who?

 3           A     Michael.

 4           Q     Michael Torres?

 5           A     Yes.

 6           Q     What did you talk with Michael

 7    Torres about?

 8           A     About the hours that he gave me for

 9    when Agnes was, why was my hours being reduced.

10           Q     You have already testified about

11    that.

12           A     You asked me.

13           Q     I know, I just wanted to cover

14    everything.  Other than Michael Torres, Stanley

15    and Roma is there anyone else in management at

16    Marty's Shoes that you have spoken with about

17    what you thought was discrimination?

18           A     No.

19           Q     I'm almost done.  If you could turn

20    back to Exhibit 16.

21                 MR. KARLIN:  The Complaint.

22    BY MR. GABRIELLE:

23           Q     The Complaint.  And on page 2

24    paragraph 8 it says no investigation was done and

25    he further retaliated against Plaintiff which
```

```
1    also caused her termination.

2              When you say he in paragraph 8 on

3    page 2 of Exhibit 16, who are you referring to?

4         A    Well, the document could have a

5    typo, she retaliated against me or he.

6         Q    Well, which is it?

7         A    Both of them fired me.

8         Q    Okay.  Well, this is your complaint

9    so I want to know who retaliated against you; who

10   are you referring to in paragraph 8 when you say

11   someone retaliated against you?

12        A    Stanley and Roma.

13        Q    Okay.  In paragraph 7 G the lines

14   right above that, Plaintiff complained about the

15   racial discrimination at the store in the

16   Sawgrass Mall by her manager (Polish Caucasian),

17   her manager refers to Roma?

18        A    Yes.

19        Q    How do you know no investigation

20   was done?

21        A    I received no letters, I received

22   no phone call.  I received no justification for

23   racial discrimination.  I wasn't compensated for

24   the hours that were incorrect on my paycheck

25   stubs, and I wasn't given my job back.
```

268

```
1          Q      Well, after you were fired --
2    Strike that.  Did Stanley talk to you about what
3    you felt was discrimination?
4          A      No.
5          Q      When he came to the store that day
6    after you sent him the letter you talked to him
7    about the letter, didn't you?
8          A      Yes.
9          Q      What did you say to him?
10         A      I told him, I asked him for an
11   explanation why was he cutting my hours.
12         Q      And he said talk to Roma?
13         A      Yes.
14         Q      Did Stanley come down specifically
15   to meet with you on that day?
16         A      No.
17         Q      How do you know that?
18         A      Because he was stocking the shoes
19   from the truck.
20         Q      How do you know Stanley didn't talk
21   to Roma about what you thought was
22   discrimination?
23         A      I don't.
24         Q      So he may have, you just don't
25   know?
```

```
 1              A      I don't know.

 2              Q      In your first deposition you

 3    testified that you spoke with Stanley the day

 4    after you were terminated by telephone; do you

 5    recall that?

 6              A      Yes, I do.

 7              Q      Can you tell me everything that was

 8    said in the conversation between you and Stanley

 9    on the telephone the day after you were

10    terminated?

11              A      Well, I called him and I asked him

12    the letter stating to me that I was being taken

13    off the schedule.  I asked him for a explanation,

14    and I told him I was telling the truth about the

15    racial discrimination from Roma.

16              And I asked him why didn't he look

17    into the investigation, and I asked him why

18    was -- No, I asked him what did I do so bad to

19    deserve to work one hour a week?

20              Q      And what did Stanley say in

21    response?

22              A      He didn't answer the question.

23              Q      Is there anything else that you can

24    recall yourself saying in that conversation?

25              A      I asked him why didn't he get back
```

270

1    with me, and he said that as far as noted by the

2    letter I'm not going to be put back on the

3    schedule.

4           Q      What letter do you mean?

5           A      The letter that when I went to work

6    it was a letter stating that call Stanley about

7    my work.

8           Q      I just want to show you a document

9    that has been previously marked as Exhibit 7.

10          MR. KARLIN:   I've got it.

11   BY MR. GABRIELLE:

12          Q      Just to make sure of that, is that

13   the letter you are referring to.

14          A      Yes.

15          Q      Okay.  That's all, thank you with

16   that.

17          Now, there was also a time before

18   that when you showed up at the store and Roma was

19   there and you talked to Roma and she told you she

20   was going on vacation and the next week's

21   schedule wasn't printed and that you should speak

22   to Stanley; do you recall that?

23          A      No.

24          Q      Well, when was the last time you

25   spoke with Roma?

```
 1          A     Before she went on vacation.

 2          Q     And how long before she went on

 3   vacation?

 4          A     I think a few days, one or two

 5   days.

 6          Q     Just tell me everything you can

 7   remember either of you saying in that

 8   conversation.

 9          A     She said she wasn't finished with

10   the schedule.

11          Q     You had asked her for your work

12   schedule?

13          A     Yes.

14          Q     And she said she wasn't finished

15   with it?

16          A     Yes.

17          Q     And did she say anything else?

18          A     I can't recall.

19          Q     Did you say anything?

20          A     No.

21          Q     Is that the last time you spoke

22   with Roma?

23          A     Yes, it is.

24          Q     And is that -- Did you ever work

25   any days for Marty's Shoes after that?
```

1          A    No.

2          Q    Other than your attorney, other

3    than your attorney, who else have you spoken with

4    to prepare for your deposition?

5          A    No one.

6          Q    What documents have you looked at

7    to prepare for your deposition?

8          A    Exhibit 4, Exhibit 7, Exhibit 16,

9    Exhibit 9, 10, 11, 12, 3, 3, 5, 3, 3.

10         Q    Other than the documents that have

11   been marked as Exhibits in this case, have you

12   looked at any other documents to prepare for your

13   depositions?

14         A    The time and the date of my

15   deposition.

16         Q    Okay.  Fair enough.  Anything other

17   than your deposition notice and the documents

18   that have been marked as Exhibits, have you

19   looked at any other documents to prepare for your

20   deposition?

21         A    No.

22         Q    Throughout this deposition you have

23   been making notes on your napkin; may I see that?

24         A    No.

25              MR. GABRIELLE:  I think she has got

```
 1              an obligation to give it to me, it's a
 2              document created during the course of the
 3              deposition.
 4                   MR. KARLIN:  Let me take a look at
 5              the --
 6                   MR. GABRIELLE:  I will give it back
 7              to you.
 8                   MR. KARLIN:  Sure.
 9    BY MR. GABRIELLE:
10         Q    It says on here:  Do you think
11    Sally's would hurt case, if so she lives at two
12    floors from mom can give verification of new
13    management; what are you talking about there?
14         A    Well, the reason that Sally's got
15    rid of the whole crew is because the prior
16    management store manager she was taking the
17    merchandise.
18              The merchandise that they made the
19    police reports about and investigation were
20    months before I got hired.  Because I still
21    worked there under her and she did hire me they
22    let everybody go whether than prove that the
23    monies wasn't short, the merchandise wasn't
24    signed for.  She was the only person signed off
25    from the merchandise from the stock truck,
```

```
 1    meaning she is responsible.

 2              The other worker there she lives

 3    two doors down from my mom, she can verify that

 4    they just got rid of us for trumped up charges.

 5         Q    And what is that person's name that

 6    lives two floors from your mom?

 7         A    Doreen Yates.

 8         Q    Y-A-T-E-S, last name?

 9         A    I am not sure about the spelling.

10         Q    But her first name is Doreen?

11         A    Yes.

12         Q    Yates.  And I'm going to ask you

13    for the address of Doreen Yates.

14         A    I don't have it.  I just know she

15    lives two doors down.

16         Q    Do you have your mom's address?

17         A    Not in front of me, no.

18         Q    What city does your mom live in?

19         A    Broward.

20         Q    What city?

21         A    Fort Lauderdale.

22         Q    Fort Lauderdale.  What is your

23    mom's name?

24         A    Russ.

25         Q    I'm sorry?
```

275

```
 1           A     Russ.

 2           Q     R-U-S-S?

 3           A     Yes.

 4           Q     And what is her first name?

 5           A     Nancy.

 6           Q     Nancy Russ?

 7           A     Yes.

 8           Q     I'm not going to ask you what

 9   irrelevant means, I think I know.

10           A     You can ask.

11           Q     Well, that's okay.  Well, what do

12   you mean by irrelevant?

13           A     The school records, the old

14   employment records.

15                 MR. KARLIN:  Good objection.

16   BY MR. GABRIELLE:

17           Q     Your question says you have written

18   here who were you referring to as G manager; what

19   does that mean?

20           A     The general manager.

21           Q     Who are you referring to when you

22   say general manager?

23           A     It's not who I was referring to, I

24   made a notation that your records and who

25   actually was a general manager showed a conflict.
```

276

```
1            Q      Can you explain that for me?
2            A      I don't have the documents in front
3    of me to explain.
4            Q      What records do I have that show
5    the general manager being someone different than
6    you believe it was; in other words what is the
7    conflict?
8            A      I would have to look at my
9    documents to see my notes and see who it is, but
10   there was a discrepancy with that.
11           Q      Okay.  Who, to your belief, was the
12   general manager?
13           A      I don't have the documents in front
14   of me to answer it.
15           Q      Well, who do the records reflect
16   was the general manager?
17           A      I can't recall the name, but it
18   wasn't the name that I recognized.
19           Q      And general manager of what?
20           A      Marty's Shoes.
21           Q      Referring to the general manager of
22   the store?
23           A      General manager of Marty's Shoes.
24           Q      Of Marty's Shoes?
25           A      Yes.
```

```
 1           Q     Martin Samowitz, is that who you
 2     are referring to?
 3           A     Yes.
 4           Q     You believe that Martin Samowitz
 5     was not the general manager?
 6           A     Yes.
 7           Q     You believe it was someone else
 8     other than Martin Samowitz?
 9           A     Yes.
10           Q     Okay.  I will give you that back.
11     I'm going to take a two minute break and I think
12     we will be done.
13                 THE VIDEOGRAPHER:  We are going off
14           the video record 4:36 p.m.
15                 (Whereupon, a short recess was
16           had.)
17                 THE VIDEOGRAPHER:  We are back on
18           the video record 4:38 p.m.
19     BY MR. GABRIELLE:
20           Q     You believe you were discriminated
21     against by Marty's Shoes?
22           A     Yes.
23           Q     And you believe you were retaliated
24     against for complaining about that discrimination
25     by Marty's Shoes?
```

278

```
 1              A      Yes.
 2              Q      What do you feel Marty's Shoes
 3     should compensate you for?
 4              A      I can't determine that at this
 5     moment, because I don't have my taxes in front of
 6     me and I can't make a judgment on the pain and
 7     suffering right now because I haven't figured it
 8     out yet.
 9              Q      How would you figure out the pain
10     and suffering?
11              A      By the laws applicable.
12              Q      Do you have any facts that you
13     would use to figure out the pain and suffering?
14              A      Not at the moment.
15              Q      Well, what kinds of things would
16     you consider to be pain and suffering?
17              A      Well, I suffered a loss with the
18     job itself.  I suffered a loss with the paycheck
19     shortages while I was working there.  And all of
20     those factors have to be equated into a
21     settlement.
22              Q      Has your life changed at all since
23     you were employed by Marty's Shoes?
24              A      Yes.
25              Q      How has it changed?
```

```
 1            A     Well, I don't want to tell anybody
 2      about it.  I am staying a distance around other
 3      counterparts of a different race.
 4            Q     How would you compare being fired
 5      by Marty's Shoes to being fired by Sally's Beauty
 6      Supply?
 7            A     Well, see Sally's they just needed
 8      a reason to get rid of the crew instead of being
 9      sued, they can't just say, well, we just want to
10      fire you because we can, they will be violating
11      laws so they had to make up something.  This is
12      an actual truth to it.
13            Q     But the job you had right before
14      the job you had now you were fired from that one
15      as well?
16            A     Which one?
17            Q     The security guard job, they
18      accused you of sexual harassment?
19            A     Yes.  Well, I'm not really, like I
20      said I wasn't really terminated, they are still
21      investigating that.  They just took me off the
22      schedule.  I still have the ID and the uniforms.
23            Q     Have you worked any days for that
24      employer since you were taken off the schedule?
25            A     No.
```

```
 1          Q       How do you compare that experience

 2   to being fired by Marty's Shoes?

 3          A       Marty's Shoes I suffered some pain.

 4   My feelings was in it because I really wanted the

 5   job and I did everything right.  No matter what I

 6   did right I still wasn't good enough.

 7                  And I can't take the skin off of me

 8   to please somebody else.  I violated no laws.  I

 9   never took anything, and I was accused of that.

10          Q       Who accused you of that?

11          A       Roma.

12          Q       You are talking about the having to

13   show her your shoes when you came in?

14          A       Yes, and my bookbag, I had to open

15   my bookbag coming to work.

16          Q       When was the first time that

17   happened?

18          A       When I came from school.

19          Q       When was the first time Roma made

20   you open your bookbag?

21          A       When she seen me with a bookbag in

22   the course of my employment there.

23          Q       Is there anything that you feel

24   that was discriminatory during your employment

25   with Marty's Shoes that you haven't already
```

```
 1    testified about?
 2            A      I don't think so, that's it.
 3            Q      Is there anything that happened
 4    during or after your employment with Marty's
 5    Shoes that you feel was retaliation that you
 6    haven't already testified about?
 7            A      No.
 8            MR. GABRIELLE:  Do you have any
 9            questions?
10            MR. KARLIN:  No.
11            MR. GABRIELLE:  This deposition
12            will be typed up --
13            MR. KARLIN:  We will read.
14            MR. GABRIELLE:  Okay.  Let me just
15            explain it, I feel better when I do that.
16            MR. KARLIN:  That's okay, save it.
17            We will read.
18            MR. GABRIELLE:  I need to do it for
19            myself.
20            You will have the opportunity to
21            read it.  Your lawyer has already
22            indicated that you will exercise that
23            right.  I want you to understand that
24            after you read it if there is anything
25            about your testimony that you read that
```

1    is incorrect, you have the obligation to

2    let me know through your attorney so that

3    we can correct the transcript, and you

4    have already indicated you will read.

5        MR. KARLIN:  Right.

6        MR. GABRIELLE:  So thank you very

7    much for your time.

8        MR. KARLIN:  If we can just go on

9    the record you have agreed on the --

10       MR. GABRIELLE:  We have agreed in

11   response to Plaintiff's first request for

12   production that if the following

13   documents exist they will be produced,

14   and this is an agreement between opposing

15   counsel to avoid a need for a motion to

16   compel.

17       MR. KARLIN:  Right.

18       MR. GABRIELLE:  For the period of

19   March 1st, '96 through June 30th of 1996

20   for the Sawgrass Marty's Shoes Store only

21   work schedules, time cards, attendance or

22   lateness records and disciplinary

23   records.

24       MR. KARLIN:  Right.

25       MR. GABRIELLE:  We have also agreed

```
 1        for the -- We have also agreed that if
 2        documents exist relating to any
 3        investigation done by Marty's Shoes of
 4        the Plaintiff's complaints we would
 5        produce those documents, obviously
 6        subject to any attorney-client privilege.
 7              MR. KARLIN:  Right.
 8              MR. GABRIELLE:  And if Plaintiff
 9        was replaced in her position at Marty's
10        Shoes we have agreed to furnish the race
11        and the name of that replacement.
12              MR. KARLIN:  Right.
13              MR. GABRIELLE:  Okay.  Thank you.
14        Thank you.
15              THE VIDEOGRAPHER:  We are going off
16        the video record 4:43 p.m.
17              (Thereupon, the deposition was
18        concluded.  Signature and formalities
19        were not waived.)
20                   - - - - - -
21
22
23
24
25
```

284

```
 1
 2                      - - - - - -
 3             CERTIFICATE OF OATH
 4   STATE OF FLORIDA
 5   COUNTY OF BROWARD
 6
 7
 8        I, the undersigned authority, certify
 9   that DENISE BROOKINS personally appeared
10   before me and was duly sworn.
11        WITNESS my hand and official seal this
12   10th day of October 2000.
13
14
15   _____
16   Evan A. Ferguson
     Notary Public, State of Florida
17   My Commission Expires: 12/29/2001
     Commission No. CC 686692
18
19
20
21
22
23
24
25
```

285

CERTIFICATE OF REPORTER

STATE OF FLORIDA:

COUNTY OF BROWARD:

I, Evan A. Ferguson, Court Reporter, certify that pursuant to Notice of Taking Deposition in the above-styled cause, that I was authorized to and did stenographically report the foregoing deposition as hereinabove shown, and the testimony of said witness was reduced to computer transcription under my personal supervision.

I further certify that the said deposition was taken at the time and place specified hereinabove, and that I am neither of counsel nor solicitor to either of the parties in said suit nor interested in the event of the cause.

I further certify that I have delivered the original copy of said deposition to ERIC K. GABRIELLE, ESQUIRE, to be retained by him pending further order of the Court.

Witness my hand and official seal in the City of Fort Lauderdale, County of Broward, State of Florida, this 26th day of October 2000.


Evan A. Ferguson, Notary
Public at Large
My Commission expires 12/29/2001

286

1

2

3                        READING AND SIGNING

4

5

6

7

8    _____    _____
       (DATE)                        (NAME)

9

10

11

12   Sworn to and subscribed before
     me this ____ day of _____, 2000.

13                    _____
                              Notary Public
14               My Commission expires:

15

16

17

18

19

20

21

22

23

24

25

```
1               ESQUIRE DEPOSITION SERVICES
                    1218 S.E. 3rd Avenue
2               Fort Lauderdale, Florida 33316
                       (954) 463-9506
3
                      October 16, 2000
4


5    ATTENTION: DENISE BROOKINS, DEPONENT
     C/O STEWART KARLIN, ESQUIRE              ORIGINAL
6    400 S.E. 8TH STREET
     FORT LAUDERDALE, FLORIDA  33316
7
     RE:  BROOKINS VS. MARTY SHOES, INC.
8
     Dear Ms. Brookins:
9
     Your deposition which was taken in the above-styled
10   cause on October 10, 2000 is now ready for reading
     and signing.
11
     You may come to our office at any time between the
12   hours of 9:00 a.m. and 5:00 p.m. Monday through
     Friday and read and sign your deposition.  If for any
13   reason you wish to waive this right, or you wish not
     to read and sign your deposition, please so advise.
14
     Your deposition transcript will be held in this
15   office until November 15th 2000, after which time
     it will be delivered to Eric K. Gabrielle,
16   Esquire, to be retained by said counsel pending
     further order of the Court.
17

18   Sincerely,

19

20   Evan A. Ferguson
     Court reporter and
21   Notary Public,
     State of Florida at Large.
22   Associates/Certified Reporting, Inc.

23   cc:

24

25
```

995902

# SALLY BEAUTY COMPANY
## APPLICATION FOR EMPLOYMENT
P.O. Box 490    Denton, TX 76202

(PLEASE PRINT)

B.

| TODAY'S DATE _____ |
| POSITION DESIRED _____ |
| SALARY DESIRED _____ |
| DATE AVAILABLE FOR EMPLOYMENT _____ |

**PERSONAL INFORMATION**

NAME BROOKINS    DENISE    E

ADDRESS 1671 S.W. 44 AVE

CITY, STATE, ZIP FT. Lauderdale Florida 33317

SOCIAL SECURITY # 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

PHONE # 792-2029  327-7390

AGE (IF UNDER 18) _____

CAN YOU PROVIDE PROOF OF CITIZENSHIP, VISA OR ALIEN REGISTRATION NUMBER AFTER BEING HIRED?
YES ✓    NO ___

IF YOU ARE APPLYING FOR A POSITION WHICH REQUIRES YOU TO DRIVE A PERSONAL AUTOMOBILE, ANSWER THESE QUESTIONS.
DO YOU HAVE A VALID DRIVERS LICENSE?
YES ✓    NO ✓ B625-204-66-959-0
DO YOU HAVE A CAR WHICH YOU CAN USE TO PERFORM THE JOB?
YES ✓    NO ___

HAVE YOU EVER WORKED UNDER ANOTHER NAME?
YES ___ NO ✓ IF YES, PLEASE GIVE NAME AND DATES EMPLOYED UNDER THAT NAME.
_____

HAVE YOU BEEN CONVICTED FOR A CRIME OTHER THAN MINOR TRAFFIC VIOLATIONS IN THE LAST 7 YEARS?
YES ___ NO ✓
IF YES, PLEASE EXPLAIN _____

(A CONVICTION RECORD WILL NOT NECESSARILY BAR AN APPLICANT FROM EMPLOYMENT)

HAVE YOU EVER WORKED FOR SALLY BEAUTY CO?
YES ___ NO ✓ IF YES.
WHERE? _____
WHEN? _____

NAME OF RELATIVES EMPLOYED BY SALLY BEAUTY COMPANY
NAME None    DEPT ___
RELATIONSHIP _____

Please fill in the hours you are available to work

| | Sun. | Mon. | Tues. | Wed. | Thur. | Fri. | Sat. |
|---|---|---|---|---|---|---|---|
| FROM | Anytime | F | l | e | x | i | b l E | OPEN | OPEN |
| TO | Anytime | F | l | E | x | i | b l E | OPEN | OPEN |

ARE YOU ON LAYOFF OR LEAVE OF ABSENCE FROM ANY COMPANY OR ELIGIBLE FOR RECALL TO ANY OTHER COMPANY?
YES ___ NO ✓
IF YES, WHAT COMPANY _____

**EDUCATION & SPECIAL SKILLS**

| TYPE OF SCHOOL | NAME AND LOCATION OF SCHOOL | DATES ATTENDED FROM MO/YR | TO MO/YR | GRADUATED YES | NO | TYPE DIPLOMA OR DEGREE | MAJOR FIELD OF STUDY |
|---|---|---|---|---|---|---|---|
| HIGH SCHOOL | Plantation High School 6401 W. Sunrise Blvd. | | | ✓ | | Diploma | General Education |
| COLLEGE OR UNIVERSITY | Broward Comm College 3501 S.W. Davie RD | 1-95 | Present | Enrolled | | Degree | LAW |
| TECHNICAL OR VOCATIONAL | | | | | | | |

CURRENT LICENSES/CERTIFICATIONS/REGISTRATIONS (INDICATE TYPES AND DATES RECEIVED): _____
Broward's paramedics liscence & Certificate

| TYPING – WPM | DICTATION – WPM | OFFICE MACHINES OPERATED | OTHER MACHINES OPERATED |
|---|---|---|---|

| RETAIL SELLING SKILLS: LINES SOLD | NUMBER OF YEARS. | FIRMS |
|---|---|---|
| Shoes | 1 | Marty's Shoes |
| Strategic Selling Skills | 2 | Hollywood Honda |

OTHER SPECIALIZED SKILLS OR INFORMATION YOU FEEL IS PERTINENT

Rev. 3'18 92

DEFENDANT'S EXHIBIT 9
10/10/00

SBS 00020

START WITH YOUR PRESENT OR LAST JOB

| | DATES EMPLOYED | EMPLOYER | JOB TITLE | SALARY |
|---|---|---|---|---|
| **E M P L O Y M E N T** | FROM MO 11-4 YR 95 | Marlin Shoes ADDRESS 12801 W. Sunrise CITY, STATE, ZIP Ft. Lauderdale | Shoe Sales JOB DUTIES: Selling shoes, pricing Competition market SUPERVISOR AND TITLE Manager Michael Torres | BEGIN $5.75 FINAL $6.00 MAY WE CONTACT? |
| | TO MO 7-1 YR 96 | PHONE NUMBER 846-7977 | REASON FOR LEAVING no steady hours | YES — NO X |
| | DATES EMPLOYED | EMPLOYER Wells Fargo Svcs. | JOB TITLE Security officer | BEGIN $5.25 |
| | FROM MO 10-6 YR 95 | ADDRESS 6432 N.W. 5th WAY CITY, STATE, ZIP Ft Laud Fla 33309 | JOB DUTIES: Securing secured areas, monitoring Computers SUPERVISOR AND TITLE George Greene | FINAL $6.83 MAY WE CONTACT? |
| | TO MO 3-7 YR 92 | PHONE NUMBER 491-4660 | REASON FOR LEAVING accident | YES ✓ NO — |
| **H I S T O R Y** | DATES EMPLOYED | EMPLOYER Argenbright Co. | JOB TITLE Security Guard | BEGIN 5.25 |
| | FROM MO 10-5 YR 90 | ADDRESS 800 W. CYPRESS CK CITY, STATE, ZIP Ft. Laud Fla 33309 | JOB DUTIES: ship Security for Stow AWAYS, logging in & out q work personell Surveillance SUPERVISOR AND TITLE Angie | FINAL $5.25 MAY WE CONTACT? |
| | TO MO 4 YR 91 | PHONE NUMBER 771-1036 | REASON FOR LEAVING Company fired Chpt 7 | YES — NO — |
| | DATES EMPLOYED | EMPLOYER | JOB TITLE | SALARY BEGIN |
| | FROM MO YR | ADDRESS CITY, STATE, ZIP | JOB DUTIES: SUPERVISOR AND TITLE | FINAL MAY WE CONTACT? |
| | TO MO YR | PHONE NUMBER | REASON FOR LEAVING | YES — NO — |

| NAME | ADDRESS & PHONE | OCCUPATION |
|---|---|---|
| Dr. Joseph Smith | 1445-C N.W. 40 AVE 954 791-7111 | Chiropractic Doctor |

## PLEASE READ CAREFULLY BEFORE SIGNING THIS APPLICATION

I authorize the Company to investigate all statements in this application and to secure any necessary information from all my employers, references, and academic institutions. I hereby release all of those employers, references, academic institutions, and the Company from any and all liability arising from their giving or receiving information about my employment history, my academic credentials or qualifications, and my suitability for employment with the Company. I also authorize the Company to secure financial and credit information through an appropriate agency, and I understand that, upon my written request made within a reasonable period of time, the agency providing a consumer credit report to the company will provide me with a complete description of the nature and scope of the credit report investigation.

I understand that any offer of employment is contingent upon receipt of a satisfactory report concerning my consumer credit, academic credentials, and employment references. I further understand any false or misleading statements will be sufficient cause for rejection of my application if the Company has not employed me and for immediate dismissal if the Company has employed me.

In the event of my employment with the Company, I understand that submission to a drug test is a term and condition of employment and that I will comply with all rules, regulations, and policies set forth in the Company's policy manual or other communications distributed by the Company. I also agree to keep secret, where disclosure would be against the best interest of the Company, information obtained during my employment concerning the processes or operations of the Company.

I understand that nothing in this employment application, in the Company's policy statements or personnel guidelines, or in my communications with any company official is intended to create an employment contract between the Company and me. I also understand that the Company has the right to modify its policies without giving me any notice of the changes. No promises regarding employment have been made to me, and I understand that no such promise or guarantee is binding upon the Company unless it is made in writing and signed by a Company officer. I understand that if an employment relationship is established, I have the right to terminate my employment at any time for any reason.

SIGNATURE Denise Bright    DATE 7-26-96

SBS 00021

## RECORD OF CORRECTIVE ACTION

EMPLOYEE NAME _Denise Brookins_   DATE _6/19/97_

HIRE DATE _8-03 96_   STORE # _1007_   SS# _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_

| _____ VERBAL DISCUSSION | _____ TERMINATION WARNING |
|---|---|
| _____ WRITTEN WARNING | __✓__ DISCHARGE DOCUMENTATION |

### DESCRIBE THE PERFORMANCE/BEHAVIOR PROBLEM (S) AND THE EFFECTS ON THE BUSINESS

Relevance verbal discussion 3-24-97 Written warning for 4-9-97. Termination warning 5-5-97 Re cash shortage / register accountability. Denise Brookins has continued to demonstrate unacceptable performance in the area of cash handling on 6-18-97. Denise's assigned register drawer was 9.26¢ Short. As a result

### DESCRIBE THE CORRECTIVE ACTION STEPS TO BE TAKEN AND THE TIME FRAME TO ACHIEVE THE REQUIRED LEVEL OF PERFORMANCE.

of Denise's poor performance her employment has been terminated for performance.

FAILURE TO CORRECT PROBLEM WILL RESULT IN _____

FOLLOW UP DATE _____

EMPLOYEE'S ACKNOWLEDGMENT _Denise Brookins_   DATE _6-20-97_

My signature on this report acknowledges that I have been advised of its content. It does not necessarily mean that I agree with, or admit to the concern as stated above.

SUPERVISOR SIGNATURE _Denicka Harris_   DATE _6/20/97_

☐ Employee has been advised, but declines to acknowledge,

EMPLOYEE COMMENTS: (Attach additional pages as necessary) When Reg was short 9.26.

I Ask Denicka Harris to run a Daily transaction Report to verify that all sales rung up matched the Daily transaction report she didn't attempt to

White - Human Resources File Copy   Verify that the amount of sale matches or equals
Yellow - Supervisor's Copy   the cash call for. All written Corrective
Pink - Employee's Copy   actions were 1 month apart.

SBS 00007

DEFENDANT'S
EXHIBIT
10
10/10/00

# RECORD OF CORRECTIVE ACTION

EMPLOYEE NAME _Desiree Brodin_    DATE _11/07/96_

HIRE DATE _7-31-96_    STORE # _1007_    SS# _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_

_____ VERBAL DISCUSSION    _____ TERMINATION WARNING
_____ WRITTEN WARNING    _____ DISCHARGE DOCUMENTATION

## DESCRIBE THE PERFORMANCE/BEHAVIOR PROBLEM (S) AND THE EFFECTS ON THE BUSINESS

On Oct, 19-20-21- Desire, Was late on bank deposite. This is not tolerate according to company policy. Deposits on bank deposits need to be reveal before getting total in P.O.S., every night. There can not be any miscounts, if total doesn't Match need to be double checked, if there still a problem need to contact supervisor

## DESCRIBE THE CORRECTIVE ACTION STEPS TO BE TAKEN AND THE TIME FRAME TO ACHIEVE THE REQUIRED LEVEL OF PERFORMANCE.

I have review Store Operation Manual policy 3-5-1- with the Employee Which indicates Bank deposit need to be make on a daily before 1 pm local Time, if on Oct 8, Desiree Was short $49.09 she did not call me to let me know, not thing the she was short, The next time she do not call me and let me know I am going to have to Terminate her Oct 9, 1997

FAILURE TO CORRECT PROBLEM WILL RESULT IN _further Corrective action including Termination_

POLLOW UP DATE _This need to be done every day Schuluded to Close_

EMPLOYEE'S ACKNOWLEDGMENT _Denise Brodin_    DATE _11-07-96_

My signature on this report acknowledges that I have been advised of its content. It does not necessarily mean that I agree with, or admit to the concern as stated above.

SUPERVISOR SIGNATURE _Katherin Benten_    DATE _____

☐ Employee has been advised, but declines to acknowledge.

EMPLOYEE COMMENTS:  (Attach additional pages as necessary)

_____

_____

_____

White - Human Resources File Copy
Yellow - Supervisor's Copy
Pink - Employee's Copy

DEFENDANT'S
EXHIBIT
10/10/00

SBS 00014

Effective Date 9/1/92
Rev 9/1/92

# RECORD OF CORRECTIVE ACTION

EMPLOYEE NAME _Denise Brookins_          DATE _3-11-97_

HIRE DATE _____ STORE # _1007_ SS# _____

_____ VERBAL DISCUSSION          _✓___ TERMINATION WARNING
_____ WRITTEN WARNING            _____ DISCHARGE DOCUMENTATION

**DESCRIBE THE PERFORMANCE/BEHAVIOR PROBLEM (S)
AND THE EFFECTS ON THE BUSINESS**

On 3-10-97 Denise Brookins was scheduled
to work from 2pm to closing. Denise failed
to report to work leaving the manager to
run the store with a new employee, which
greatly affected customer service. Denise made
no attempt to call until 15 minutes before
closing. Denise's actions will not be tolerated.

**DESCRIBE THE CORRECTIVE ACTION STEPS TO BE TAKEN AND THE
TIME FRAME TO ACHIEVE THE REQUIRED LEVEL OF PERFORMANCE.**

Denise has been adviced that disregard
of unassigned or published schedule, or failer
to work an assigned shift with out notification, or
absence will result in termination.

FAILURE TO CORRECT PROBLEM WILL RESULT IN _termination_

FOLLOW UP DATE _as needed_

EMPLOYEE'S ACKNOWLEDGMENT _Denise Brookins_          DATE _3-12-97_

My signature on this report acknowledges that I have been advised of its content. It does not necessarily mean that I agree with, or admit to the concern as stated above.

SUPERVISOR SIGNATURE _Deniera Harris_          DATE _3-12-97_

☐  Employee has been advised, but declines to acknowledge,

EMPLOYEE COMMENTS: (Attach additional pages as necessary)

_____
_____
_____

White - Human Resources File Copy
Yellow - Supervisor's Copy
Pink - Employee's Copy



DEFENDANT'S
EXHIBIT
12
10/10/00

# RECORD OF CORRECTIVE ACTION

EMPLOYEE NAME _Denise Brookins_     DATE _4-9-97_

HIRE DATE _8-3-96_     STORE # _1007_     SS# _____

| | |
|---|---|
| _____ VERBAL DISCUSSION | _____ TERMINATION WARNING |
| __✓__ WRITTEN WARNING | _____ DISCHARGE DOCUMENTATION |

---

### DESCRIBE THE PERFORMANCE/BEHAVIOR PROBLEM (S) AND THE EFFECTS ON THE BUSINESS

Reference verbal discussion on 3-24-97 regarding store shortages on 4-4-97 Denise Brookins assigned register drawer was 13.87 short during her assigned register shift.

---

### DESCRIBE THE CORRECTIVE ACTION STEPS TO BE TAKEN AND THE TIME FRAME TO ACHIEVE THE REQUIRED LEVEL OF PERFORMANCE.

Denise must comply with all policy and procedures regarding sales transaction and cash handling. Denise assigned register draw may not be more than $3.00 over or short during her register shift

FAILURE TO CORRECT PROBLEM WILL RESULT IN _further corrective action_

FOLLOW UP DATE _as needed_

EMPLOYEE'S ACKNOWLEDGMENT _Denise Brookins_     DATE _4-14-97_

My signature on this report acknowledges that I have been advised of its content. It does not necessarily mean that I agree with, or admit to the concern as stated above.

SUPERVISOR SIGNATURE _Denicka Harris_     DATE _4-14-97_

☐   Employee has been advised, but declines to acknowledge,

EMPLOYEE COMMENTS: (Attach additional pages as necessary) I Understand and advice mgmt to follow up to verify Denise Brookins was the only one working on Reg 01 That Day.

White - Human Resources File Copy
Yellow - Supervisor's Copy
Pink - Employee's Copy

Inforce field WLW2
Rev. WLW2



DEFENDANT'S
EXHIBIT
13
10/10/00

SBS 00011

## WESTREC MARINAS
## FIDELITY BOND APPLICATION

**FORWARD:** Your Fidelity Bond, within its agreements, conditions and limitations, guarantees Westrec Marinas will not sustain reason of employee dishonesty. It also serves as notice to the employee that the high standards required by American Home Assurance Company, which issues your bond, have been met. Compliance with Westrec Marinas rules and policies and honest discharge required duties will assure the employee bond issuance in future employment.

### PLEASE ANSWER EVERY QUESTION IN PRINT AND INK

I hereby make application to The American Home Assurance Company for Fidelity coverage on my behalf in form and amount as my employer may desire.

| Full Name BROOKINS DENISE | Social Security No. 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 | Home Address 921 N.W. 33 Way Ft. Lauderdale Fla 33311 |
|---|---|---|
| Employment Date July 12, 2000 | Marina Name | County (Residence) BROWARD |
| Job Title Security | Pay Rate | How Long? STARTING |

Please list home addresses with county for the last ten years. 6028 Polk ST, Hollywood, Fla 33024, 921 N.W. 33 Way Ft Laud, Fla 33311;

Have you been convicted of any crime other than a traffic offense? NO (If yes, give details in a separate letter
Has any company refused to issue a bond for you? NO _____ If yes, name of bonding company? None Date of refusal: None
Name and address of employer at that time: None

Have you been discharged from any employment? If yes, explain below: None

DEFENDANT'S
EXHIBIT
14
10/10/00

WM 00007

## EMPLOYMENT RECORD FOR PAST SEVEN YEARS
### Use a separate sheet of paper for additional space

| FROM | TO | NAME/ADDRESS OF EMPLOYER | JOB TITLE | REASON FOR LEAVING |
|---|---|---|---|---|
| 5-29 | 7-49 | Spiney's Laundry | Laundry attendant | No fulltime work |
| 6-28 | July 44 | Neptune Fireworks ox Federal Bch Blvd | Cashier | Seasonal |
| 3-99 | Present | WESt stuff 470 7 STRDT | Director | None - present Seasonal |
| | | Thift World 2708 W. Davie | Clothes Sorter | No raise appl. |
| 10-99 | 6-99 | Kwik Security 159 S. Pompano Bch Blvd | Security Officer | Expired Accounts |
| 7-96 | 10-97 | Sally's Beauty Supply 2708 W. ___ Blvd | Cashier asst Mgr. | New Management |
| 12-95 | 1-5-96 | Sawgrass Security Sawgrass Mall 12801 W. Sunrise Blvd | Security Officer | temporary Seasonal |
| 5-96 | 6-31-97 | Marty's Shoe's Sawgrass Mall 12901 W. Sunrise Blvd | Shoes Sales | Store Closed Shoe Dept. |

I understand that I have an obligation to indemnify the American Home Assurance Company in the event it becomes obligated to pay claim resulting from my fraud or dishonesty and I hereby bind myself, my heirs, executors and administrators to keep indemnified an or reimburse the American Home Assurance for all loss, costs and expenses incurred or sustained by it or for which, by reason of such fraud or dishonesty, it may become liable under this bond issued by it.

The American Home Assurance Company is hereby authorized to make such pertinent inquiry about me as may be necessary from present and former employers and references listed above. If the American Home Assurance Company or any present or forme employer or other person shall in good faith furnish information concerning me, I hereby release them and each of them from an liability on account of such disclosure. I hereby agree that the American Home Assurance Company may decline to become Surety fo me or cancel any bond which it may issue or have issued in my behalf, and that, except as specifically provided in the laws of variou states, it need not disclose to me the reasons for such declination or cancellation. I shall, however, be given the opportunity to correct or clarify information received by the American Home Assurance Company and amend the record to a degree felt to be fair to both the American Home Assurance Company and me.

Signed and dated this _July_ day of _12_ _2000_

Applicant _Denise Perkins_    Witness _Dly Slach_

JUL 1 2 2000

WM 00008

DEFENDANT'S
EXHIBIT
15
10/10/00

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

DENISE BROOKINS,

                Plaintiff,

v.

MARTY'S SHOES OF NEW JERSEY, INC.,

                Defendant.

_____/

Case No.: 00-6002-CIV
UNGARO-BENAGES

INTERROGATORY RESPONSES

**S I R S :**

    Defendants by their attorneys, STEWART LEE KARLIN, hereby make their responses to defendant's interrogatories.  These responses are made without waiver and with preservation of:

    All questions as to competency, relevancy, materiality, privilege and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceeding in this action, and in any other action.

    The right at any time to revise, correct, add to, supplement or clarify any of the responses and any further responses and are made expressly without acknowledgment of materiality and relevance.

### RESPONSES TO INTERROGATORIES

**Response Nos. 1:**

    Denise Brookins
    921 N.W. 33rd Way
    Fort Lauderdale, Florida 33311

    Stewart Lee Karlin, Esq.

**Response No. 2:**

    Agnes - Wk. 954-846-7977

12801 W. Sunrise Blvd., Sunrise, FL (inside Burlington Coat Factory) was informed by Roma Rybitha to watch Denise to see if she was switching shoes, while at work, watched her to see if she worked or just slacked off. She reported to Toma when Denise went to restroom, lunch break and what time she left and returned.

**Orlando** - (last name unknown) Agne's boyfriend worked also for (Marty's) Sawgrass, and she was not allowed to speak, socialize, was separated from plaintiff when they spoke to each other, he was verbally reprimanded informed by Roma for him (Orlando) to oversee plaintiff or train her what to do or how to do it. He had more hours than plaintiff. Orlando was friendly with plaintiff only when (Roma) was not at work or looking. Agnes had no objection to Orlando and plaintiff being friends but due to the fact that Roma was the store manager, they followed her orders, he also was ordered by "Roma" to watch, follow a certain kind of character, color or person when observing for theft, he was told to watch African-American males, females of all ages.

**Michael Torres** - was hired through the 1st Store Manager, Carmen. After Carmen quit or was terminated, Roma was promoted to Store Manager. He had no college education and/or experience for Asst. Manager. He was trained for duties of store manager, shortly after he was Asst. Mgr. To (Roma Rybitha). He had no transportation to and from work, so either Marty's Shoes or "Roma" co/signed fro him to purchase a 96, 97 Toyota Corolla. When someone called in to report a (no-show) Michael Torres was warned by "Roma" not to give extra hours to Denise Brookins. She warned him not to give to Denise Brookins unless she approved it, but he could give them to anyone else. Was informed by "Roma" to write down description, kind, color, wear to Denise Brookins shoes when she reported for work, he was told by "Roma" to limit her break time to 10 minutes when others had 15-30 minutes of break time, when Shoes were damaged and store had trouble selling the shoes he had authority to give a bigger discount to others (Other than) Denise. He was given the privilege to give his friends, family

Denise Brookins working 1 hour a week. Plaintiff asked for an explanation of why 1 hour and he continually advised her to direct it to Roma. At the end he had nothing to do with the matter. After Stanley didn't resolve the matter, Denise took her complaints to Vice-president John Adams of New Jersey.

**Oxca Wright** - Oxca Wright knew of the harassment given by Roma Rybitha. She knew and has knowledge that Roma made her work 1 hour a week and that she didn't want her to work there. She called Roma on or about the month of June 1996 and pretended to be a job to confirm what kind of reference she would give me and she (Roma) stated that Denise Brookins is a lot of problems and that she was a street person that can't be trusted. Oxca also provided transportation for Denise Brookins to and from work. Oxca knew Denise worked for 1 hour a week on Saturdays and Sundays 6-7pm.

**Gail Williams** - (Burlington Coat Factory employee - (954) 846-7977 Women's Dept.) She witnessed verbal accusations from Roma to Denise on several occasions. She had knowledge that Roma had problems with only Denise Brookins. She knew Denise Brookins worked for 1 hour a week.

**Response No. 3:**

See response number 2.

**Response No. 4:**

Plaintiff has not retained an expert yet but has the right to do so.

**Response No. 5:**

N/A.

**Response No. 6 :**

Back pay - Plaintiff believes the loss pay is less than $10,000.00

Pain and suffering - whatever is reasonable and fair.

Punitive damages - cannot yet be determined.

**Response No. 7:**

Plaintiff's income tax returns from 1993 to date.

**Response No. 8:**

None.

**Response No. 9:**

Plaintiff and records custodians of defendants.

Dated: Fort Lauderdale, Florida
April 6, 2000

STEWART LEE KARLIN, ESQ.
Attorney for Plaintiff
400 SE 8th Street
Fort Lauderdale, Florida  33316
(954) 462-1201
Fla. Bar No.: 961159

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was furnished by U.S. Mail to: Thomas H. Loffredo, Esq., Holland & Knight, LLP, 1 East Broward Blvd., Suite 1300, P.O.Box 14070 Fort Lauderdale, Florida  33302, on this 20th day of March, 2000.

STEWART LEE KARLIN, ESQ.
Florida Bar No.:  0961159
400 Southeast Eighth Street
Fort Lauderdale, Florida 33316
(954) 462-1201

larger discounts for shoes he was ordered by "Roma" to inform Denise not to answer phones

for Marty Shoes (extension).  He had knowledge that "Roma" harassed Denise.  He witnessed

Roma calling Denise a "street person" or a not right person that should be allowed to work for

Marty's Shoes.  "Michael" knew Denise was the only employee who had to observe only a

specific (Description) African-American people.  He worked at Martys Shoes for approximately

3 months.  Chris Torres, he was allowed to give family discounts larger than what was

authorized.  He was allowed to mark discounts for price reduction markings.  He knew Roma

harassed Denise and didn't have justification for reducing her hours.  He too was allowed to

take a lengthy lunch-break, return, go to restroom when he needed.  He didn't have to show his

shoes to Roma or Michael when reporting for work

**John Adams** - Plaintiff complained to him about the discriminatory treatment.

**Rybitha** - Discriminatory official who became store manager was agitated that plaintiff would

tell her that she worked hard.  Mr. Torres a co-worker who had discrimination conduct.

**Leonard Taylor** - (954-316-1198), had present knowledge of the harassment, discrimination

that Roma put plaintiff through.  After she was terminated she had trouble getting a job.  So she

asked Leonard to call the last employer and pretended that he was an employer and was

asking for a reference for Denise Brookins.  She replied to him to not hire Denise Brookins

because she will cause a lot of problems.

**Stanley** - (Polish male Caucasian- District Manager for Marty's Shoes and Roma's Supervisor)

When problems arose concerning Denise Brookins, Stanley failed to call a meeting between

Roma and Denise.  Denise mailed a letter to Marty's Shoes or New Jersey Corporate office

detailing her accounts with harassment from Roma and not working her normal working hours.

He stated on several occasions that he was not the store manager and couldn't make a

decision concerning Roma because she was the store manager.  Plaintiff advised him of the

language (stereotypes) she used as well as showing him the schedule that Roma was allowing

DEFENDANT
EXHIBIT
16
10 /10/00

NIGHT BOX
FILED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

DENISE BROOKINS,                    CASE NO.: 00-6002-CIV-UNGARO-BENAGES

        Plaintiff,

v.                                  AMENDED COMPLAINT
                                    AND JURY DEMAND

MARTY SHOES, INC.,

        Defendant.
_____/

        Plaintiff, DENISE BROOKINS, (hereinafter "plaintiff") by and through her undersigned

counsel, sues the defendant, MARTYS SHOES, INC., and (hereinafter "defendant"), and in support

thereof, alleges as follows:

                                COUNT I

        1.      This is an action for damages in an amount in excess of Fifteen Thousand

($15,000.00) Dollars.

        2.      This action seeks declaratory, injunctive and equitable relief; liquidated,

compensatory and punitive damages; and costs and attorney's fees for race and discrimination and

retaliation suffered by plaintiff BROOKINS by defendant discharging her from her employment.

        3.      This action arises under 42 U.S.C. 1981 and jurisdiction is invoked pursuant to 42

U.S.C. 1343 and 1344. This Court has concurrent jurisdiction over 1981 claims. Venue is proper

in that all the parties reside in Broward County and that the conduct complained of occurred within

Broward County.

        4.      The relevant acts complained of herein occurred within Broward

County, Florida.

        5.      Upon information and belief, at all times hereinafter mentioned, defendant is a

corporation duly organized to do business in te State of Florida and conducts a significant amount of business in the State of Florida. Defendant is an employer within the meaning of FS 760.02 (7) in that it employees over 15 individuals.

6.      Plaintiff, DENISE BROOKINS (plaintiff or BROOKINS) is an African-American and was an employee of defendant.

7.      Plaintiff believes that she has been subjected to different terms, conditions and privileges of employment by reason of her race, color and retaliation which caused her termination to wit:

    a.      terminated for conduct that similarly situated Caucasian employees were not even disciplined for;

    b.      terminated for pre-textual reasons;

    c.      biased counseling;

    d.      steadily reduced her hours of employment for no apparent reason;

    e.      uttered derogatory remarks at her;

    f.      other discriminatory conduct

    g.      As a result of the foregoing conduct by defendant, plaintiff complained about the racial discrimination at the store in the Sawgrass Mall by her manager (Polish-Caucasian).

8.      However, no investigation was done and he further retaliated against plaintiff which also caused her termination.

9.      Based upon the foregoing, plaintiff was denied equal terms, privileges and conditions of employment which caused her termination by reason of her race and retaliation.

10.      As a result of the foregoing conduct by defendant, plaintiff lost wages, salary, suffered, pain and suffering, and employment benefits in excess of fifteen thousand dollars

2

FEB 14 2000 14:25 FR HOLLAND KNIGHT    305 789 0499 TO 27487#556784...

Case 0:00-cv-06002-... Document 27    Entered on FLSD Docket 11/06/2000    Page 179 of 181

($15,000.00).

11.    That it has been necessary for plaintiff to engage the services of an attorney to file and prosecute this action, and thus also request attorney's fees,

12.    Plaintiff has the right to equal contractual benefits as is enjoyed by Caucasian citizens.  This right is secured to plaintiff by section 1981 of Title 42 of the United States Code.

13.    Defendants denied plaintiff a contractual benefit (continued employment) for the sole reason that plaintiff is black and retaliation.

14.    This refusal deprives plaintiff of her right to make and enforce contracts and receive the full and equal benefit of all laws and proceedings for the security of persons and property, as guaranteed by Section 1981 of Title 42 of the United States Code.

WHEREFORE, plaintiff demands judgment in her favor and against the defendant as follows;

1.    That the Court find and declare that she has suffered from acts of discrimination at the hands of the defendant, its agents, servants and employees;

2.    That plaintiff be awarded back wages, together with related monetary benefits, had she not been unlawfully terminated;

3.    That the Court order such further equitable and injunctive relief as it deems appropriate and necessary to correct the conditions of discrimination complained of herein including
re-hiring plaintiff.

4.    That defendant pay plaintiff's costs of this suit, together with a reasonable attorney's fees.

5.    That defendant pay plaintiff for general damages for pain and suffering and

3

humiliation and special damages incurred as a result of defendant's conduct, and punitive damages

t be determined at the time of trial.

    8.    Any other relief that is just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury on all issues so triable as a matter of right.

Dated: Fort Lauderdale, Florida
      February 3, 2000

STEWART LEE KARLIN, ESQ.
Attorney for Plaintiff
400 S.E. 6th Street
Fort Lauderdale, Florida 33316
(954) 462-1201

Florida Bar No.: 961159

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was furnished by U.S. Mail to: Thomas H. Loffredo, Esq., Holland & Knight, LLP, 1 East Broward Blvd., Suite 1300, P.O. Box 14070 Fort Lauderdale, Florida 33302, on this 3rd day of February, 2000.

STEWART LEE KARLIN, ESQ.
Florida Bar No.: 0961159
400 Southeast Eighth Street
Fort Lauderdale, Florida 33316
(954) 462-1201

4

Scanned Image - 0:00CV8002 Document 8 page 4 Fri Feb 04 18:18:48 2000

DENISE YOU MUST
call STALLEY. ROMA
DIDNT PUT YOU ON
THE SCHEDULE FOR this
WEEK SO call Him
HE WANTS TO TALK to
YOU.

DB 00040

DEFENDANT'S
EXHIBIT

KT 8-23-00