## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6002-CIV-(UNGARO-BENAGES/Brown)

DENISE BROOKINS,

        Plaintiff,

vs.

MARTY SHOES, INC.,

        Defendant.

_____/

**PLEASE REFER TO UNITED STATES
MAGISTRATE JUDGE STEPHEN T. BROWN**

### DEFENDANT'S MOTION AND MEMORANDUM OF LAW TO STRIKE PLAINTIFF'S UNSWORN AND UNTIMELY "AFFIDAVIT" AND ALTERNATIVE MOTION TO STAY RULING ON DEFENDANT'S MOTION TO DISMISS

Defendant Marty Shoes, Inc. ("Marty Shoes"), through undersigned counsel, respectfully moves to strike an unsworn and untimely "affidavit" filed by Plaintiff, presumably in opposing to Defendant's Motion to Dismiss in Accordance with Settlement Reached by the Parties, and alternatively moves to stay disposition of that motion until Plaintiff can be deposed on the allegations made in her "Affidavit."

### I.    INTRODUCTION.

Over two weeks after submitting her Response (DE 73) to Marty's Shoes' Motion to Dismiss in Accordance with the Settlement Reached by the Parties (DE 67), and after Marty Shoes filed its Reply Memorandum (DE 76) in support of that Motion, Plaintiff filed an unsworn "Affidavit" with the Court asking that the Court "not enforce any agreement not signed by" her. (Plaintiff's "Affadavit [sic]")(DE 77)(emphasis deleted). Plaintiff failed to serve her "Affidavit" on

Marty Shoes' undersigned counsel or otherwise notify Marty Shoes that she was attempting to submit untimely papers to the Court.[1]

But Plaintiff's "Affidavit" has no evidentiary value, and should be stricken.[2]

## II.   LEGAL ARGUMENT AND MEMORANDUM OF LAW.

Unsworn representations, which are not subject to cross-examination, are not acceptable to prove the nonexistence of a settlement. *See U.S. v. Hardage Steering Committee*, 982 F.2d 1491, 1497 (10th Cir. 1993).

Plaintiff's "Affidavit" is not sworn, nor is it submitted under penalty of perjury pursuant to 28 U.S.C. § 1746. As such, its "evidentiary value is nil." *Brown v. McClellan*, 1996 WL 328209 at *5 n. 5 (W.D.N.Y.)(**at Tab 1**)(finding no evidentiary value to unsworn affidavit submitted in opposing to motion for summary judgment); *see also Grant v. Cornell University*, 87 F. Supp. 2d 153, 161 (N.D.N.Y. 2000)(evidence solely contained in unsworn and unsigned affidavit is not in admissible form and is of "no evidentiary value" to oppose summary judgment).

Moreover, Plaintiff's "Affidavit" is unauthorized by the Federal Rules of Civil Procedure or the Local Rules of this District. The rules of this District require that "[e]ach party opposing a

---

[1] Marty Shoes became aware that Plaintiff had filed her "Affidavit" only fortuitously, through a search regularly conducted of the docket. Thus, in addition to its untimeliness, Plaintiff's "Affidavit" was filed in violation of Southern District of Florida Local Rule 5.2, since Plaintiff filed to serve it on Marty Shoes as she was obligated to do under that Rule.

[2] As detailed below, Plaintiff's unsworn "Affidavit" has no evidentiary value and in no way prevents a finding that this case has settled. However, because Plaintiff failed to timely file her "Affidavit" – and failed even to serve it on Marty Shoes – Marty Shoes will be prejudiced by any consideration of Plaintiff's "Affidavit" unless Marty Shoes has the opportunity to depose Plaintiff and respond to the "Affidavit." Therefore, if Plaintiff's "Affidavit" is not stricken, Marty Shoes alternatively moves for a stay of the Court's disposition of that Motion until Plaintiff and her former counsel can be deposed, so that Marty Shoes may supplement the record with a response to Plaintiff's "Affidavit." *See Sippial Electric & Construction Company, Inc.*, 69 F.3d 555, 1995 WL 646344 at *5 (Fed.Cir. 1995)(unpublished opinion)(at **Tab 2**)(ordering that litigant be given "adequate opportunity to supplement the record" after "irregular submission" of "affidavit" which was neither sworn nor notarized). Those depositions are scheduled for June 7, 2001 and June 8, 2001.

motion shall serve an opposing memorandum of law not later than ten days after service of the motion," after which the movant is authorized to serve a reply memorandum. S.D. Fla. L.R. 7.1C. Beyond that, "no further or additional memoranda of law shall be filed without prior leave of Court." S.D. Fla. L.R. 7.1C. Here, not only did Plaintiff fail to seek leave of Court to file her untimely "Affidavit," Plaintiff failed to serve that "Affidavit" on Marty Shoes, as she is required to do.[3]

WHEREFORE, Defendant Marty Shoes, Inc., respectfully moves the Court for an Order: 1) striking Plaintiff's unsworn and untimely "Affidavit" (DE 77); or alternatively: 2) staying consideration of Defendant's pending Motion to Dismiss (DE 67) until Defendant is provided an opportunity to supplement the record with deposition testimony by Plaintiff and her counsel.[4]

Respectfully submitted,

HOLLAND & KNIGHT LLP
Attorneys for Defendant
One East Broward Boulevard, 13th Floor
Post Office Box 14070
Fort Lauderdale, FL 33302-4070
(954) 525-1000
(954) 463-2030 – fax
e-mail: egabriel@hklaw.com

By: _____
Thomas H. Loffredo
Florida Bar No. 870323
Eric K. Gabrielle
Florida Bar No. 160725

---

[3] Plaintiff's *pro se* status does not excuse her conduct or permit her "Affidavit" to become admissible. On April 27, 2001, the District Court granted Plaintiff thirty (30) days to secure new counsel. (DE 72). Those thirty days have nearly elapsed as of the date of this Motion, and no counsel has entered any appearance on behalf of Plaintiff.

[4] Proposed Orders are attached hereto at **Tab 3**.

3

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by UPS next day delivery to **Denise Brookins**, 921 N.W. 33rd Way, Fort Lauderdale, Florida, 33311, this 25th day of May, 2001.

HOLLAND & KNIGHT LLP

By: _____
Thomas H. Loffredo
Florida Bar No. 870323
Eric K. Gabrielle
Florida Bar No. 160725

4

## SERVICE LIST

**Thomas H. Loffredo, Esq.**
**Eric K. Gabrielle, Esq.**
Attorneys for Defendant
HOLLAND & KNIGHT LLP
Post Office Box 14070
Fort Lauderdale, Florida 33302-4070
(954) 525-1000 – phone
(954) 463-2030 – fax (mail)
(954) 468-7932 – fax (Court Orders)
Counsel for Defendant Marty Shoes, Inc.

**Denise Brookins**, *pro se*
Plaintiff
921 N.W. 33rd Way
Fort Lauderdale, Florida 33311
(954) 792-2029 - phone

FTL1 #540946 v1

# TAB 1

1996 WL 328209                                                    Page 1
(Cite as: 1996 WL 328209 (W.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.

Nathan BROWN, Plaintiff,
v.
R.J. MCCLELLAN, Superintendent, Southport
Correctional Facility; L. Bates,
Civilian Hearing Officer, DOCS; R. Morse, Captain,
Hearing Officer, DOCS,
Defendants.

No. 93-CV-0901E(F).

June 11, 1996.

MEMORANDUM and ORDER

ELFVIN, District Judge.

**\*1** In this civil rights action, brought pursuant to 42 U.S.C. §1983, [FN1] the *pro se* plaintiff alleges that the defendants deprived him of his liberty on three instances without due process of law, each deprivation being in violation of the Fourteenth Amendment to the United States Constitution. Such deprivations are said to have occurred while the plaintiff-inmate was incarcerated at Southport Correctional Facility; the plaintiff is currently lodging at the Shawangunk Correctional Facility. This Court has jurisdiction over this matter under 28 U.S.C. §§1331 & 1343. Presently before this Court are the plaintiff's motion for summary judgment and the defendants' motion for summary judgment, both brought pursuant to FRCvP [FN2] 56. The first will be denied, the second will be granted and the result will be the dismissal of the Complaint and closing of this case.

Summary judgment, where appropriate, secures the just, speedy and inexpensive determination of an action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). A motion for summary judgment shall be granted if it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.\*\*\*" FRCvP 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849 (1991). Summary judgment is appropriate if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. The moving party need not negate the non-moving party's position, he simply has to note the lack of evidence supporting the non-moving party's claim. The party opposing the motion, on the other hand, must present competent evidence showing that there is a genuine issue for trial -- the "mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment; "there must be evidence on which the jury could reasonably find for" such party. *Anderson,* 477 U.S. at 252. In reviewing a summary judgment motion, "a district court must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Const. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir. 1985). Also pertinent to the instant motions is the fact that, although the plaintiff is proceeding *pro se,* his litigious nature weighs somewhat against the leniency that is normally accorded *pro se* litigants. [FN3]

The facts underlying the plaintiff's claims arise within the context of three prison disciplinary hearings addressing misbehavior reports filed against him. These reports allege his violation of inmate behavior rules while incarcerated at Southport. The plaintiff claims that he was denied the opportunity to be present during the testimony of witnesses at a disciplinary hearing conducted by defendant Morse June 27, 1993 and at another disciplinary hearing conducted by defendant Bates July 27, 1993. He also protests that, at an August 10, 1993 hearing conducted by Bates, he was denied the opportunity to call witnesses altogether. He further claims that he was "routinely given the same reasons for the denial of favorable witnesses to testify in his presence," that Bates and Morse failed to make individual determinations of the threat to institutional safety that the plaintiff's presence would have had and that Bates did not personally ascertain the reason why certain witnesses declined to testify at the August 10th hearing. Defendant McClellan is alleged to be responsible for a policy which automatically excluded the plaintiff from hearings when witnesses would be testifying. Plaintiff's Unsworn Affidavit, dated March 12, 1996 [FN4]; Plaintiff's Statement Pursuant to Local Rule 56.

**\*2** The June 27th hearing addressed violations of inmate behavior rule ("Rule") 104.11 (violent conduct), Rule 107.10 (interference with employee)

1996 WL 328209                                                                   Page 2
(Cite as: 1996 WL 328209, *2 (W.D.N.Y.))

and Rule 107.11 (harassment). *See* Section 270.2 of Title 7 of New York's Code of Rules and Regulations ("NYCRR"). The misbehavior report related to these infractions states that the plaintiff told a corrections officer to "get your fucking hands off my chain you white cracker mother fucker" and that he then began to pull away in an aggressive matter. The situation was diffused without further incident. Exhibit A, attached to Defendants' Notice of Cross Motion for Summary Judgment ("Notice of Cross Motion"). During the hearing that was prompted by this misbehavior report, Morse asked the plaintiff what questions he wanted Morse to ask his witnesses. Morse then stated that "this is an all SHU [special housing unit] facility, the inmates will be interviewed outside your presence. I will call you back, play the tape and let you hear their testimony." Exhibit F attached to the Notice of Cross Motion. The testimony of the witnesses was thus taken. The pertinent regulation states:

> "Inmate Witnesses. (a) The inmate may call witnesses on his behalf provided their testimony is material, is not redundant, and doing so does not jeopardize institutional safety or correctional goals. If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented.
>
> "(b) Any witness shall be allowed to testify at the hearing in the presence of the inmate unless the hearing officer determines that so doing will jeopardize institutional safety or correctional goals. Where an inmate is not permitted to have a witness present, such witness may be interviewed out of the presence of the inmate and such interview tape recorded. The recording of the witness' statement is to be made available to the inmate at the hearing unless the hearing officer determines that so doing would jeopardize institutional safety or correctional goals." 7 NYCRR §254.5.

As stated above, the plaintiff was not permitted to have witnesses in his presence because Shawangunk is an all-SHU facility. The defendants state that Shawangunk is a maximum security, solitary confinement institution, the purpose of which is to isolate inmates and restrict their contact with one another. *See also* 7 NYCRR §300.2. At the conclusion of the hearing, the plaintiff was found guilty of all three rule violations and sentenced to sixty days SHU confinement from October 27, 1993 to December 25, 1993. [FN5]

The July 27th hearing addressed violations of Rule 107.11, Rule 101.2 (intentionally exposing private parts) and 118.22 (unhygienic act). The misbehavior report related to these infractions states that the plaintiff yelled to a female nurse that he would "put [his] dick deep in [her] ass, bitch" and that he was "beating it off for" her. When a corrections officer approached his cell and looked into its window, the plaintiff was unclothed from the waist down and had thrown what appeared to that officer to be semen on the window and told the officer to "[e]at that you cracker fuckin' homo." As the officer continued on his round, the plaintiff continued to yell racially and sexually explicit remarks to the officer and the nurse. Exhibit B, attached to Notice of Cross Motion. At the hearing prompted by this misbehavior report, the plaintiff requested the testimony of two witnesses, such testimony again being taken outside of his presence. Following the plaintiff's objection to his exclusion from the hearing during such testimony, Bates stated:

> **\*3** "Because you're in a special housing unit, highly sensitive area, and they're in a special housing unit highly sensitive, and this Hearing Officer is not allowing more than one special housing unit inmate into the hearing at the same time in consideration of the inmate's safety including your own. I will give that reason to you in writing before this hearing is over with." Exhibit G, attached to the Notice of Cross Motion.

At the conclusion of that hearing, the plaintiff was found guilty of violating Rule 107.11 and not guilty of violating Rule 101.20 and Rule 118.22. He was assessed sixty more days of SHU from December 26, 1993 to February 24, 1994.

The August 10th hearing addressed violations of Rule 102.10 (threats), Rule 104.11 and Rule 107.11. The pertinent misbehavior report states that the plaintiff told two corrections officers that he would kick them in the head the next time he had the chance, that the plaintiff had kicked his cell door three times while so stating and that he then called the officers "scum dogs." Exhibit C, attached to Notice of Cross Motion. At the hearing, the plaintiff requested the testimony of two inmates. Bates sent a corrections officer to escort these inmates to the hearing. Both inmates, however, refused to testify. Bates thereafter had the officer return and request again their presence, inform them that their testimony was requested by the plaintiff and, should they remain unwilling to testify, procure witness refusal forms from each witness. Such forms were procured, wherein each witness stated that he

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

refused to be involved in the proceeding. Exhibits I, J and K, attached to the Notice of Cross Motion. At the conclusion of the hearing, the plaintiff was found guilty of violating Rule 102.10 and Rule 107.11 and not guilty of Rule 104.11. His thirty-day SHU sentence was suspended.

In order to succeed on his section 1983 claim, the plaintiff must show that he had a liberty interest in being free from SHU for the respective sixty day periods he was so confined and, if so, that he was deprived of that interest without due process. *See, e.g., Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428 (1982); *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir. 1995). *Sandin v. Conner,* --- U.S. ----, 115 S.Ct. 2293 (1995), has established a new standard for determining whether there exists a protected liberty interest worthy of the procedural protections afforded under *Wolff v. McDonnell,* 418 U.S. 539 (1974). *Sandin* addressed a situation very similar to the instant: a Hawaii state prisoner claimed that his procedural due process rights had been violated by, *inter alia,* the state's refusal to allow him to call certain witnesses at a disciplinary hearing. The district court had dismissed the complaint upon the defendant's motion for summary judgment and the United States Court of Appeals for the Ninth Circuit reversed, holding as a matter of law that the mandatory language of Hawaii prison regulations created a protected liberty interest in not being confined to disciplinary segregation and that there was a disputed issue of fact as to whether the procedural safeguards afforded the prisoner had been sufficient. *Conner v. Sakai,* 15 F.3d 1463, 1466-1468 (9th Cir. 1993) (citing, *e.g., Hewitt, supra; Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454 (1989) and *Wolff v. McDonnell, supra*). The United States Supreme Court reversed, holding that neither the prison regulations in question nor the Due Process Clause itself created a liberty interest in being free from disciplinary segregation entitling the prisoner therein to the heightened procedural protections of *Wolff v. McDonnell. Sandin,* 115 S. Ct. at 2302. Such holding jettisoned the method of determining the existence of liberty interests adopted in *Hewitt v. Helms,* 459 U.S. 460 (1983). [FN6] Under the *Hewitt* approach, courts essentially scoured state prison regulations to determine if the language of such was of an unmistakable mandatory character, thereby creating a protected liberty interest. *Sandin* noted that such approach had two undesirable effects: first, it created a disincentive to the codification of prison management procedures and thus encouraged the standardless discretion of correctional personnel.

Second, it has also

**\*4** "led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone. In so doing, it has run counter to the view expressed in several of our cases that federal courts ought to afford appropriate deference to state officials trying to manage a volatile environment." 115 S. Ct. at 2299.

While states may create liberty interests protected by the Due Process Clause, such are

"generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own right, see, *e.g.,* [ *Vitek v. Jones,* 445 U.S. 480, 493 (1980)] (transfer to mental hospital), and [*Washington v. Harper,* 494 U.S. 210 221-222 (1990)] (involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant hardship in relation to the ordinary incidents of prison life." 115 S.Ct. at 2300.

*Sandin* rejected the contention that any action taken by prison personnel for punitive reasons encroaches upon a prisoner's liberty interest, noting that "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." *Id.* at 2301. It held that the discipline in segregated confinement imposed upon the prisoner therein "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Ibid.*

Noted is the post-*Sandin* hesitancy of the United States Court of Appeals for the Second Circuit to address the issue whether (or under what conditions) New York State inmates have a liberty interest in remaining free from disciplinary segregation. *See, e.g., Frazier v. Coughlin,* 81 F.3d 313 (2nd Cir. 1996) (extensive fact-finding by district court permitted claim to be measured under standards of *Sandin*); *Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir. 1995) (declining to reach the issue, instead holding that due process requirements were met regardless of existence of liberty interest). Also noted is a case originating in the United States District Court for the Southern District of New York which held that confinement to SHU for 376 days was a significant and atypical hardship and thus implicated a protected liberty interest. *Lee v. Coughlin,* 902 F. Supp. 424 (S.D.N.Y. 1995), *reconsideration granted,*

914 F.Supp. 1004 (1996). Such a determination was based on the length of the disciplinary sanction -- 376 days -- and pre-*Sandin* case law (*e.g., Walker v. Bates,* 23 F.3d 652 (2d Cir. 1994) (reviewing 7 NYCRR ch. V & VI (procedures for implementing standards of inmate behavior and describing special housing units), *cert. denied,* --- U.S. ----, 115 S. Ct. 2608 (1995)). This pre-*Sandin* case law relied upon the now-obsolete *Hewitt* approach and invariably stated that there was a liberty interest in remaining free from disciplinary confinement in SHU. Finally of note is a case originating in this District -- *Carter v. Carriero,* 905 F. Supp. 99 (W.D.N.Y. 1995) -- which holds that 270 days of disciplinary confinement in SHU was not an atypical or significant hardship. The analysis conducted therein had less to do with the length of the disciplinary sanction or the comparison of such length with that imposed in *Sandin* (30 days), than with the lack of any qualitative distinction between disciplinary and non-disciplinary (*e.g.,* administrative and protective) confinement to SHU under New York's prison regulations -- *see* 7 NYCRR pt. 301. "While [the *Carter* plaintiff's] penalty certainly was longer than the penalty in *Sandin,* the confinement itself did not exceed similar administrative confinement 'in either duration or degree of restriction."' *Carter,* 905 F.Supp. at 104 (quoting *Sandin,* 115 S. Ct. at 2301). This Court believes that the *Carter* approach is the more appropriate standard than that adopted in *Lee v. Coughlin, supra,* especially in light of the *Sandin* pronouncement that "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law" -- 115 S. Ct. at 2301 -- and the admonition that federal courts ought to afford appropriate deference and flexibility to prison officials. *Id.* at 2299. In this vein, this Court does not read the recent missive, *Frazier, supra,* which reviewed a bench trial decision under the standard set in *Sandin,* as *requiring* extensive fact finding in order to determine whether or not a given inmate-plaintiff has suffered a significant and atypical hardship within the context of disciplinary confinement. As *Carter* indicates, a simple review of the pertinent regulations is enough to show the absence of a material issue of fact. A picayune, fact-based inquiry into the conditions of every inmate's SHU confinement would essentially work a greater invasion into the discretion of prison officials than that effected under the *Hewitt* approach. Such would run contrary to the primary purpose of the *Sandin* rule -- to remove the courts from the day-to-day management of prisons and allow prison officials the leeway to manage the volatile

environments with which they have been entrusted.

**\*5** *Sandin* relies upon three factors in determining that the inmate therein possessed no liberty interest in remaining free from disciplinary segregation: (1) a comparison between disciplinary segregation and other forms of segregation; (2) a comparison between that inmate's confinement and conditions in the general population (whether the inmate suffered a "major disruption in his environment"); and (3) whether the length of the inmate's sentence was affected. *Sandin,* at 2301. Applying *Sandin* herein, it is no great leap to conclude that, as a matter of law, the plaintiff's two SHU confinements of sixty days each did not impose any "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." His third, suspended, thirty-day confinement faces the same conclusion. As noted in *Carter,* New York's prison regulations make little or no distinction between disciplinary and non-disciplinary segregation. There is also no indication that the conditions of the plaintiff's confinement were markedly different than those of the general population or that the plaintiff suffered any "major disruption in his environment." Finally, there is no indication that the plaintiff's sentence has been affected in any way. The discipline he received for his misconduct was within that contemplated by his sentence, especially in comparison to the cited examples in *Sandin* (*Vitek* and *Washington,* both of which involved the imposition of involuntary psychiatric treatment). Based on the above, the plaintiff does not have a protected liberty interest in being free of disciplinary segregation in SHU that would entitle him to the procedural protections set forth in *Wolff.*

Because the plaintiff was not deprived of a protected liberty interest, this Court need only note in passing that the process he nonetheless received was clearly adequate for both the exclusion of the plaintiff during the taking of testimony in the June 27th and July 27th hearings and for the unavailability of the witnesses for the August 10th hearing -- *see Ponte v. Real,* 471 U.S. 491, 495-499 (1985) (discussing limits on right to call witnesses); *Baxter v. Palmigiano,* 425 U.S. 308, 322-323 (1976)(no requirement that prison officials state reasons for refusing to allow inmate to confront and cross- examine witnesses); *Wolff v. McDonnell, supra,* at 567-568 (Constitution does not require confrontation or cross-examination in prison disciplinary cases); *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.) (hearing officer did not violate due process standards by taking witness testimony outside

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1996 WL 328209
(Cite as: 1996 WL 328209, *5 (W.D.N.Y.))

the presence of inmate), *cert. denied*, 484 U.S. 896 (1987). The defendants adequately complied with the pertinent regulations. *See* 7 NYCRR §254.5.

Accordingly, it is hereby *ORDERED* that the plaintiff's motion for summary judgment is denied, that the defendants' motion for summary judgment is granted and that this case shall be closed; it is further hereby *CERTIFIED* pursuant to 28 U.S.C. §1915 that an appeal of this Order would not be in good faith.

> FN1. Although the Complaint does not expressly assert a claim under 42 U.S.C. §1985, it asserts subject matter jurisdiction under *inter alia*, 28 U.S.C. §1343(a)(1), which pertains to a conspiracy claim under section 1985. Such a claim, were it asserted, would suffer the same fate as the section 1983 claim and thus need not be addressed further.

> FN2. Federal Rules of Civil Procedure.

> FN3. The plaintiff has brought no fewer than seven recent lawsuits against prison officials in this Court (Nos. 92-CV-0787E, 94-CV-0223E, 93-CV-0268E, 93-CV-6410L, 93-CV-0960E and 93-CV-0633E, as well as the present one).

> FN4. Because this affidavit is unsworn and also not submitted under penalty of perjury pursuant to 28 U.S.C. §1746, its evidentiary value is nil. Such nothingness is of little import, however, because, to the extent that such submission contains legal conclusions, it is ignored. To the extent that it contains factual assertions, such are not disputed by the defendants.

> FN5. The record does not reflect how one confined to an all-SHU facility can be further confined to SHU for sixty days without a lengthening of one's sentence. Because the record also does not reflect that any such lengthening has occurred, it is assumed that such additional SHU confinement merely results in the delay of the plaintiff's transfer to another facility's general population.

> FN6. *Sandin* applies retroactively to the instant matter. *Frazier v. Coughlin*, 81 F.3d 313, (2nd Cir. 1996); *see also Harper v. Virginia Dep't of Taxation*, 509 U.S. 86 (1993) (courts cannot refuse to apply rule of federal law retroactively once the United States Supreme Court applies it to the parties before it).

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

# TAB 2

69 F.3d 555 (Table)    Page 1
40 Cont.Cas.Fed. (CCH) P 76,866
**Unpublished Disposition**
(Cite as: 69 F.3d 555, 1995 WL 646344 (Fed.Cir.))
**H**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTAF Rule 47.6 and FI CTAF App. V, IOP 9 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Federal Circuit.

SIPPIAL ELECTRIC & CONSTRUCTION
COMPANY, INC., Appellant,
v.
Sheila WIDNALL, Secretary of the Air Force,
Appellee.

No. 93-1276.

Nov. 2, 1995.

ASBCA

REVERSED IN PART, VACATED IN PART,
REMANDED.

Before RICH, NEWMAN, and LOURIE, *Circuit Judges.*

PAULINE NEWMAN, *Circuit Judge.*

**1 For these two contracts subject of this appeal from the decision of the Armed Services Board of Contract Appeals, [FN1] the Board's decision is *reversed in part, vacated in part,* and *remanded.*

*The 0080 Contract*

Sippial Electric and Construction Company is a small minority-owned business in Montgomery, Alabama. It entered into a fixed-price contract for construction work at Gunter Air Force Base, in the amount of $68,310. The notice to proceed was given on October 4, 1989. On October 18, 1989 the government ordered that all work be suspended because of defective government specifications. The suspension was lifted on October 10, 1990, with a contract modification extending the completion date by the length of the suspension. The project was timely completed.

Sippial Electric requested delay damages calculated

in accordance with the Eichleay formula. The Chief of the Contract Management Section instructed the contracting officer that Sippial Electric "should be compensated for this Government delay." Sippial Electric's calculation of delay damages was $22,773.03. The claim was audited by the Defense Contract Audit Agency, who determined Sippial had incurred costs of $16,629 but questioned $6,144 of the amount sought. The contracting officer, without further inquiry of Sippial Electric, issued a final decision based on the audit report:
    Final decision.

            ....

    As such I find that you are only entitled to an equitable adjustment in the amount of $16,629. Your claim for an equitable adjustment for G & A/ Overhead is the amount of $22,773.03 is denied.
    The owner of Sippial Electric filed a *pro se* appeal to the Armed Services Board of Contract Appeals.

*The 0076 Contract*

The issue on appeal with respect to the 0076 contract is the same as that of the 0080 contract, in that all work was suspended at government order, except that in the 0076 contract the delay was stated to be to the end of the school year. The contracting officer, again after audit conducted by the Defense Contract Audit Agency, found entitlement to only the amount approved in the audit:
    Final decision

            ....

    As such I find that you are only entitled to an equitable adjustment in the amount of $22,576. Your claim for an equitable adjustment for G & A/ Overhead in the amount of $32,989.32 is denied.
    The owner of Sippial Electric again filed a *pro se* appeal to the ASBCA, seeking the disallowed amount. The appellant stated to the Board that there had been no interaction with the contracting officer or discussion of the items disallowed by the auditor, and complained that the agency had not negotiated these amounts before the contracting officer issued his final decision.

The Board consolidated the appeals. There was no hearing, for the parties had elected to proceed on the written record. At the end of the time set for supplementing the record the government submitted

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

an unsworn and undated "affidavit" [FN2] of the contracting officer in which he stated that his Final Decision in both contracts, quoted above, was an "offer of settlement." The "affidavit" also stated that several of Sippial's employees who had been working on the delayed contracts had been re-assigned to other government contracts during the period of delay, and the contracting officer concluded that Sippial had not established entitlement.

**\*\*2** The Board denied all recovery for delay, in both contracts. The Board held that "Appellant must establish with reasonable certainty that it was damaged as a result of disruption or delay. Appellant must show that home office overhead costs were not properly absorbed, and that during the delay labor forces could not be shifted to other work." The Board thus declined to apply the Eichleay formula in accordance with the audit that had been conducted by the Defense Contract Audit Agency. The Board held that Sippial Electric had not proved actual damages for either contract.

We conclude that the Board erred in not giving weight to the DCAA audit, the circumstances of the delays, and the Eichleay methodology of estimating unabsorbed overhead based on the ratio of delayed to ongoing work. When these factors are given ordinary weight they comprise a *prima facie* case of entitlement with respect to the amount approved in the DCAA audit. The burden of coming forward with evidence to defeat recovery of the audited amounts shifted to the government. That burden was not met.

### ANALYSIS

A contractor who can directly prove actual and specific damages resulting from government delay has no need to invoke the Eichleay formula. *See Wickham Contracting Co. v. Fischer,* 12 F.3d 1574, 1578 (Fed.Cir.1994) ("Were it possible to trace a cost to a particular contract, it would be a direct cost of the contract.") The Eichleay formula was developed because of the difficulty of allocating each overhead expense to each of the contractor's activities. The formula permits the contractor to apportion its overhead expenses in the same proportion as a specific contract represents in its total business. [FN3] When a contract is delayed by the government and the contractor is required to stand by, ready to perform when ordered, that portion of its continuing overhead expense which would have been met by payments on the delayed contract is recoverable as damages. The Eichleay formula is a convenient and

accepted method of estimating those damages, for it avoids the need to prove the specific details of the overhead expenses allocable to a specific contract.

In implementation of recovery of delay damages, the burden is upon the contractor to establish a *prima facie* case of entitlement. The burden then shifts to the government to show that the contractor was not harmed by the delay. In *Mech-Con Corp. v. West,* 61 F.3d 883 (Fed.Cir.1995) we reiterated that

> when a contractor can show that the government required a contractor to remain on "standby" and the government-imposed delay was "uncertain," the contractor has established a *prima facie* case of entitlement to Eichleay formula damages. The burden then shifts to the government to present rebuttal evidence or argument showing that the contractor did not suffer or should not have suffered any loss because it was able to either reduce its overhead or take on other work during the delay.

**\*\*3** *Id.* at 886. *See also, e.g., Daly Constr., Inc. v. Garrett,* 5 F.3d 520, 522 (Fed.Cir.1993) ("in order to invoke the Eichleay formula [the contractor] had to show that it was required reasonably to stand by during the period of delay without staff reduction and that it was impractical to take on additional jobs during this period"); *Capital Elect. Co. v. United States,* 729 F.2d 743 (Fed.Cir.1984):

> In this case, compensable delay was stipulated before the board. Moreover, Capital introduced unrebutted evidence that it could not have taken on any large construction jobs during the various delay periods due to the uncertainty of the delays and (except after the original contract period, when a major portion of the project had been completed and accepted) due to the limitation on its bonding capacity. Thus, Capital has not actually used an ipso facto approach. Indeed, as stated in Eichleay, 61-1 BCA para. 2894 at 15,117: "The mere showing of these facts is sufficient to transfer to the Government the burden of going forward with proof that Appellant suffered no loss or should have suffered no loss."

*Id.* at 745-46 (footnotes omitted).

Thus, proof by the contractor of actual loss during the delay is not required. The Board erred in imposing this requirement on Sippial Electric. *See Interstate Gen. Gov't Contractors, Inc. v. West,* 12 F.3d 1053, 1060 (Fed.Cir.1993) (except when contract is completed on time, "unabsorbed overhead is effectively presumed where the contractor can establish standby and the inability to take on additional work"); *Fred R. Comb Co. v. United States,* 103

Ct.Cl. 174, 183 (1945) (the trial commissioner's report "contained a finding that it was not proved that any additional office overhead cost was incurred by reason of the suspension of the contract work and the delay in completion resulting therefrom. We have not included that finding, because we think it is immaterial.")

The government did not dispute that it ordered the delays for both contracts, that the period of delay of the 0080 contract was indefinite, and that the agency instructed the contracting officer that Sippial should be compensated for the delay. Since the 0080 contract required completion within 90 days of the eventual order to proceed, Sippial was effectively required to (and did) perform the contract as soon as the stay was lifted.

For the 0076 contract, the Board accepted the government's representation that Sippial worked on other things during that period. Sippial's response was that it used some of the same workers to do work that was already contracted for, not new work that filled the precise gap of the delayed 0076 contract. The government did not contradict this response or challenge its correctness.

Since Sippial Electric had established a *prima facie* case of entitlement to recovery by application of the Eichleay formula, the Board incorrectly required Sippial to re-prove entitlement by way of proving actual damages. The burden of proof had shifted to the government, and was not met as to the amounts that had been verified in the DCAA audit. The government did not challenge the correctness of the audit.

**4 The government argues that, because Sippial's labor force was not standing by idle, the contractor did not incur unabsorbed overhead expenses. However, Sippial states that the other contracts had been entered into before the government halted work on the contracts in suit. Such other contracts support their share of Sippial's overhead, and enter into the Eichleay calculation. An idle workforce is neither a necessary nor sufficient test for the use of the Eichleay formula:

[A]pplication of the Eichleay formula does not require that the contractor's work force be idle. It simply requires that overhead be unabsorbed because performance of the contract has been suspended or significantly interrupted and that additional contracts are unavailable during the delay when payment for the suspended contract activity

would have supported such overhead.

*Interstate Gen. Gov't Contractors*, 12 F.3d at 1057, (citing *C.B.C. Enterprises*, 978 F.2d at 674.) If Sippial indeed managed to avoid layoffs during these government-ordered delays, that is good management, not evidence that Sippial was not standing by, or that the delays were thus liberated from their effect on overhead during the standby period.

Even giving full credence to the government's position before the Board that the contracting officer's "final decision" was no more than an offer to negotiate, [FN4] The Chief of the Contracts Management Section instructed the contracting officer to compensate Sippial for the delay. There was no dispute that Sippial performed both contracts as soon as the stays were lifted.

We conclude that the government did not meet its burden with respect to the damages that had been verified in the DCAA audit report. On the record before us, Sippial did not act unreasonably in assuming that the contracting officer's final decision resolved the issue with respect to the audited amount. The government did not rebut Sippial's *prima facie* case; it simply tried to withdraw the "final decision." However, the Contract Disputes Act requires a final decision, either actual or deemed. There is no basis for redesignating something entitled "final decision" as a negotiating offer, on an appeal from that final decision. In *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995) (en banc), the court stated:

Requiring contractors to submit the identical claim twice, as the government would have them do, is a waste of the contractor's time and money. The taxpayers' money is likewise wasted when the agency boards or the Court of Federal Claims must hear the same case on two different occasions.

*Id.* at 1581.

As reaffirmed in *Mech-Con v. West*, the burden of overcoming the *prima facie* case of the verified overheads had shifted to the government, and had not been met. The Board erred in declining to award the amount of $16,629 for the 0080 contract and $22,576 for the 0076 contract. The decision with respect to these amounts is reversed. These sums shall be paid with interest in accordance with law.

*The Remaining Sums in Dispute*

**5 The Board did not discuss the evidence with respect to the specific amounts that had been questioned by the DCAA: $6,144 for the 0080

69 F.3d 555 (Table)
**Page 4**
(Cite as: 69 F.3d 555, 1995 WL 646344, **5 (Fed.Cir.))

contract and $10,413.32 for the 0078 contract. On remand the Board shall determine whether Sippial Electric made a *prima facie* case with respect to these amounts, and if so whether the government met its burden of proof with sufficient admissible evidence to overcome that *prima facie* case. Sippial Electric shall have adequate opportunity to supplement the record, should the government's irregular submission of the contracting officer's "affidavit" be admitted into evidence.

*Costs*

Costs to Sippial Electric.

FN1. *Sippial Electric & Construction Co.,* ASBCA Nos. 43993, 43994, 93-2 B.C.A. ¶ 25,572 (Nov. 19, 1992).

FN2. This "affidavit" bore a form for attestation, but neither notarization nor declaration was affixed. Since this document was neither sworn nor notarized, Sippial Electric argues that the Board should not have admitted the document, citing ASBCA Rule 11, which permits supplementation of the record only with "affidavits, depositions, admissions, answers to interrogatories and stipulations." This document was considered by the Board.

FN3. For details of the computation under the Eichleay formula, see *C.B.C. Enterprises, Inc. v. United States,* 978 F.2d 669, 673 (Fed.Cir.1992).

FN4. Sippial complained that the agency did not negotiate, weighing against this post hoc recharacterization of the "final decision" as a negotiating offer.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

# TAB 3

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6002-CIV-(UNGARO-BENAGES/Brown)

DENISE BROOKINS,

      Plaintiff,

vs.

MARTY SHOES, INC.,

      Defendant.

_____/

### ORDER STRIKING PLAINTIFF'S UNSWORN "AFFIDAVIT" (DE 77)

THIS CAUSE came before the Court on the Motion and Memorandum of Law by Defendant Marty Shoes, Inc., to Strike Plaintiff's Unsworn and Untimely Affidavit and Alternative Motion to Stay Ruling (DE ___).

The Court, having reviewed the Motion, reviewed all written submissions by the parties, and being otherwise fully advised in the premises, it is therefore

ORDERED that Defendant's Motion is **GRANTED** and Plaintiff's unsworn Affidavit (DE 77) is stricken from the record in this case.

DONE AND ORDERED this ___ day of _____, 2001, in Miami, Miami-Dade County, Florida.

                            _____

                            STEPHEN T. BROWN
                            United States Magistrate Judge

Copies to:

**Thomas H. Loffredo, Esq.**
**Eric K. Gabrielle, Esq.**
HOLLAND & KNIGHT LLP
Post Office Box 14070
Fort Lauderdale, Florida 33302-4070
(954) 525-1000 – phone
(954) 463-2030 – fax (mail)
(954) 468-7932 – fax (Court Orders)
Counsel for Defendant Marty Shoes, Inc.

**Denise Brookins**, *pro se*
921 N.W. 33rd Way
Fort Lauderdale, Florida 33311
(954) 792-2029 – phone
Plaintiff

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6002-CIV-(UNGARO-BENAGES/Brown)

DENISE BROOKINS,

     Plaintiff,

vs.

MARTY SHOES, INC.,

     Defendant.

_____/

## ORDER STAYING CONSIDERATION OF DEFENDANT'S MOTION TO DISMISS (DE 67) UNTIL JUNE 15, 2000

THIS CAUSE came before the Court on the Motion and Memorandum of Law by Defendant Marty Shoes, Inc., to Strike Plaintiff's Unsworn and Untimely Affidavit and Alternative Motion to Stay Ruling (DE ___).

The Court, having reviewed the Motion, reviewed all written submissions of the parties, and being otherwise fully advised in the premises, it is therefore

ORDERED that Defendant's Motion is **GRANTED.** Consideration of Defendant's Motion to Dismiss (DE 67) is stayed until June 15, 2000. Defendant has until that date to respond to Plaintiff's unsworn "Affidavit" (DE 77).

DONE AND ORDERED this ___ day of _____, 2001, in Miami, Miami-Dade County, Florida.

                           _____

                           STEPHEN T. BROWN
                           United States Magistrate Judge

Copies to:

**Thomas H. Loffredo, Esq.**
**Eric K. Gabrielle, Esq.**
HOLLAND & KNIGHT LLP
Post Office Box 14070
Fort Lauderdale, Florida 33302-4070
(954) 525-1000 – phone
(954) 463-2030 – fax (mail)
(954) 468-7932 – fax (Court Orders)
Counsel for Defendant Marty Shoes, Inc.

**Denise Brookins**, *pro se*
921 N.W. 33rd Way
Fort Lauderdale, Florida 33311
(954) 792-2029 - phone
Plaintiff